Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
333 South Grand Avenue, 25th Floor
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

-and-

Phillip Kim, Esq. (pro hac vice)
THE ROSEN LAW FIRM, P.A.
350 5th Avenue, Suite 5508
New York, New York 10118
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

Lead Counsel for Plaintiffs and Class

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

SEP 1 3 2010

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

RECEIVED
BUT NOT FILED

SEP 1 3 2010

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

DALTON PETRIE, INDIVIDUALLY
AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED,

Plaintiff,

vs.

ELECTRONIC GAME CARD, INC.;
LEE J. COLE; LINDEN BOYNE;
KEVIN DONOVAN, PAUL
FARRELL, EUGENE
CHRISTIANSEN,  ANNA
HOUSSELS, ESTATE OF LORD
LEONARD STEINBERG AND,
BERYL STEINBERG AS
ADMINISTRATOR/ EXECUTOR OF
ESTATE OF LORD STEINBERG,

Defendants.

Case No.: SACV-10-00252-
DOC(RNBx)

<u>CLASS ACTION</u>

CONSOLIDATED AMENDED
COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

**JURY TRIAL DEMANDED**

<u>Hon. David O. Carter</u>

1

Lead Plaintiffs Dr. Thomas Lee, his wife Margaret Yu, and Scott Lovell (collectively the "Plaintiffs" and sometimes the "Lee Group"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege in this Consolidated Amended Complaint (the "Complaint") the following upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, which included, inter alia: (a) review and analysis of relevant filings made by Electronic Game Card, Inc. ("EGC", the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of defendants' public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning the Company; (d) information readily obtainable on the Internet; and (e) interviews of several witnesses with personal knowledge of the relevant facts.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to defendants and are exclusively within their control.

## I.    NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of a class consisting of all persons and entities, other than defendants, who purchased the common stock of EGC between April 5, 2007 and May 18, 2010 inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of federal securities laws (the "Class").

2.    EGC is a small Company with no more than ten employees. Through its purported wholly owned operating subsidiary, EGC designs and manufactures electronic "scratch off" devices for various casinos, lotteries and other gaming establishments primarily in the United Kingdom and Europe. During the Class

Period, nearly all of the Company's reported revenues were derived from its UK and European operating subsidiary, Electronic Game Card, Ltd. ("EGCL").

3.      During the Class Period defendants engaged in a fraud to conceal and misstate the Company's true financial condition and performance.

4.      In the Company's periodic reports filed with the SEC, Defendants falsely represented that EGCL was wholly owned by EGC. In reality, EGC's ownership (and any bank accounts and investments held in the name of EGCL) were subject to a secret 2002 agreement that could (and did) cause the Company's ownership of EGCL to revert or transfer to a third party; and provided for defendant Linden Boyne (and his affiliated entity Greenfield Capital International Limited) to take control over EGCL as its sole directors.

5.      Put another way, the secret 2002 agreement allowed EGC to lose ownership of EGCL, and for Boyne to take control of EGCL away from EGC. EGC never disclosed that highly adverse fact, rendering EGC's statements about its ownership of EGCL, its assets and its revenue stream, materially false and misleading.

6.      On February 19, 2010, the SEC halted trading in the Company's stock "because of questions that have been raised about the accuracy of assertions by [EGC], and by others, in financial disclosures to investors concerning, among other things, the company's assets."

7.      That same day the Company announced that its auditor Mendoza and Berger and Company, LLP ("M&B") had withdrawn its audit opinions of EGC's financial statements for the fiscal years ended December 31, 2006, 2007, and 2008 because, the auditor had "become aware of irregularities in the audit confirmation of a bank account represented to M&B as having been held by [EGCL], a wholly owned subsidiary of [EGC]…".

8.      Based upon M&B's investigation and inability to confirm the balances in the account, M&B concluded that its prior audits could no longer be relied upon

3

and that it was withdrawing its audit opinions related to EGC's financial statements for the years ended December 31, 2006, 2007 and 2008 as of February 12, 2010.

9. Even though the Company had reported over $12.6 million of cash and cash equivalents on its balance sheet in its most recent 10-Q filed with the SEC on November 20, 2009, on March 19, 2010, the Company announced that it had retained a strategic financial advisor whose "first initiatives will be to raise working capital funds to enable the Company to engage legal, accounting and other service providers to review the historical operating and financial performance of EGC and its subsidiaries." In short, the $12.6 million the Company claimed it had on its balance sheet was not there.

10. On May 18, 2010 the Company announced its Board of Directors had concluded that its financial statements for the years ended December 31, 2006, 2007 and 2008 should no longer be relied upon because of "significant concerns as to the integrity of audited financial statements for the fiscal years ended December 31, 2006, 2007 and 2008."

11. The May 18, 2010 announcement stated that "[EGC] is concerned that reported revenue may be materially overstated and that the reported carrying value of its assets and investments in third-party companies may not be fairly stated."

12. Ultimately, on May 18, 2010, the Company disclosed that defendant Boyne asserted that $12.9 million was held in an account in the name of EGCL in Luxembourg, but that EGCL was no longer a subsidiary of the Company, i.e., the Company no longer owned EGCL and its assets, including the $12.9 million. The Company stated it was unable to confirm Boyne's assertion that the $12.9 million was really in the Luxembourg account. The Company did not admit or deny Boyne's assertion that the Company no longer owned EGCL and its assets. It has remained silent on that critical fact.

13. The following day, in a May 19, 2010 announcement EGC confirmed that the Company's financial statements for the fiscal years ended 2006, 2007 and 2008 should no longer be relied upon and had to be restated.

14. UK company filings show EGCL had less than £768 of cash on its balance sheet as of December 31, 2008. Yet, EGC's 10-K filings with the SEC claim it had $8.3 million in cash and $876,000 in marketable securities as of December 31, 2008. EGCL was the Company's only operating subsidiary, as the U.S. subsidiaries operations had not yet generated any cash. The Company's claim to have $12.6 million in cash was a complete fabrication. Indeed, given the auditor's and Company's statement that it believed its revenue and assets have been materially overstated for each fiscal year since 2006, EGC was by all accounts a sham. A copy of the UK company filing is attached hereto was Exhibit 1 and is incorporated herein by reference.

15. EGC knew as of March 1, 2010 EGC did not own the share capital of EGCL and an entity called EPN Advisory Limited owned 100% of the share capital of EGCL, according to a filing EGCL made with UK authorities on April 12, 2010. A copy of the filing is attached hereto as Exhibit 2 and is incorporated herein by reference.

16. Consequently, EGC's stock was delisted from the NASDAQ Bulletin Board; a SEC investigation was initiated and is ongoing; several former high level executives of the Company have resigned asserting, among other things, that certain members of EGC's management have lied to, and concealed information from, investors, the SEC and the Company's auditor M&B.

17. As a result of Defendants' fraud, EGC's share price has gone from a class period high of $2.20/share, to a current price of $0.01/share, damaging Plaintiffs and the Class.

18. While the Company's May 19, 2010 announcement suggests its internal investigation is ongoing and a restatement of its financial statements will

be issued soon, the Company appears to have gone "dark" and has not released any information to investors since then.  Since May 19, 2010, EGC has not issued a single press release or made a single SEC filing, even though it was required to file a quarterly report.

19.     Nor has EGC filed the customary notification of a late filing on Form 12b-25 with the SEC explaining why it has not yet filed its overdue second quarter 10-Q for the period ended June 30, 2010.

20.     EGC has mysteriously shut down its website.

21.     For all intents and purposes, EGC and its purported business have suspiciously disappeared from the face of the earth.

## II.     JURISDICTION AND VENUE

22.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

23.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

24.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District.

25.     In connection with the acts, conduct and other wrongs alleged herein, defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III.     PARTIES

26.     Court appointed lead plaintiffs Dr. Thomas Lee, his wife Margaret Yu, and Scott Lovell purchased EGC common stock during the Class period and

6

have suffered damages as a result.  Lead Plaintiffs' respective certifications were previously filed with the Court, and are incorporated herein by reference.

27.     Defendant EGC is a Nevada corporation with purported principal executive offices located at 5405 Alton Parkway, Suite A-353 Irvine, CA 92604. This Irvine address is actually a mail drop located at a UPS Store in the Alton Square Shopping Center.  During the Class Period, the Company's common stock was traded on the NASDAQ Bulletin Board under ticker "EGMI."  Because of EGC's failure to restate its previously reported financial statements and to stay current on its current financial reporting obligations, EGC's stock was delisted and now trades over-the-counter on the "Pink Sheets."

28.     The current corporate entity EGC was created in 2003 when a privately held Delaware corporation, Electronic Game Card, Inc. conducted a share exchange with EGC's predecessor, a publicly traded Nevada corporation Scientific Energy, Inc.

29.     As part of the share exchange, Scientific Energy, Inc. changed its named to Electronic Game Card, Inc. (the current EGC) and the other entity contemporaneously changed its named to Electronic Game Card Marketing, Inc. ("EGCM") becoming a wholly owned operating subsidiary of EGC.  EGCM was to conduct its business through its wholly owned subsidiary Electronic Game Card Ltd., an English company (the current EGCL).[1]

30.     Defendant Linden Boyne ("Boyne") was a Company Director and served as the Company's Chief Financial Officer, Principal Accounting Officer, and Secretary from at least the beginning of the Class Period until his resignation on August 31, 2009.  He was reappointed CFO and Company's secretary effective

---

[1]   There exists a dormant United Kingdom entity Electronic Gamecard Marketing Limited controlled by defendant Boyne and Greenfield Capital.  Its reports filed with the UK Company Registry show it had less than 200 British pounds in assets as of December 31, 2008.  This entity is different than EGC's U.S. subsidiary Electronic Game Card Marketing, Inc.

October 30, 2009 when his replacement Thomas Schiff resigned effective October 30, 2009. Boyne also served on the Company's Audit Committee.

31. Defendant Lee J. Cole ("Cole"), was a Company Director and the throughout the Class Period until his resignation effective March 8, 2010. Cole served as the Company's CEO from the beginning of the Class Period until he was replaced by defendant Kevin Donovan. During his time with the Company he served on the Company's Audit and Compensation committees.

32. Defendant Kevin Donovan ("Donovan") served as the Company's Chief Executive Officer and Director from February 1, 2009 through the end of the Class Period. Following the death of Company Chairman Lord Leonard Steinberg, Donovan was appointed as a member of the Company's two-person Interim Office of the Chairman of the Company, a position he held with defendant Eugene Christiansen.

33. Boyne, and Greenfield Capital International Limited (a Gibraltar company he controlled) served as a director of EGCL until his and Greenfield's termination as directors of EGCL on December 28, 2009. On December 28, 2009, Defendants Donovan and Christiansen were installed as directors of EGCL in place of Boyne and Christiansen. On April 2, 2010, Boyne and Greenfield were reappointed as the directors of EGCL and Donovan and Christiansen were terminated. This appears to chronicle the corporate in-fighting between the two groups and EGC's loss of ownership of EGCL to Boyne's group.

34. Defendant the Estate of Lord Leonard Steinberg ("Steinberg") is a United Kingdom entity. Lord Steinberg officially served as the Company's Executive Chairman from September 2, 2008 until his passing on November 2, 2009. On June 6, 2008, the Company initially announced that Steinberg had agreed to join the Company and nominated defendant Anna Houssels and Eugene Christiansen to EGC's Board.

8

35. During his tenure at EGC, Steinberg also served as the Chairman of the Company's Audit, Executive Compensation, and Nominations committees. Steinberg became involved with the Company in November 2007, when he along with others contacted defendant Cole and Boyne with a proposal to join the EGC Board, invest capital, and restructure the Company. Following months of negotiations, in May 2008, the Company accepted Steinberg's proposal to join EGC as Executive Chairman, and to have certain of his business associates as directors and officers of the Company.

36. Per the Company's SEC filings, beginning in May 31, 2008 Steinberg began to acquire EGC common stock. By May 27, 2008 he had accumulated over 5.04% of the Company's common stock. Prior to his death, as reported in a Company proxy statement filed with the SEC on August 27, 2009, Steinberg owned over 10.6 million shares or 16.05% of the Company.

37. Upon information and belief, Steinberg's wife Beryl Steinberg is the Administrator and/or Executor of Steinberg's estate. Therefore, she in that capacity and Steinberg's estate is named herein as a defendant.

38. Defendant Eugene Christiansen ("Christiansen") served as Company Director from September 2008 through the end of the Class Period. On November 3, 2009, following the death of the Company's Chairman, Lord Leonard Steinberg, Christiansen was appointed as a member of to the Interim Office of the Chairman. Christiansen also served on the Company's Nominations Committee. Prior to his appointment, the Company announced on June 6, 2008, that Christiansen had been nominated to EGC's Board in June 2008.

39. Defendant Anna Houssels, ("Houssels") served as a Company Director from September 2008 to February 11, 2010. Houssels officially joined the Company's executive management team as Vice President of Sales on February 1, 2009 and was later promoted to Executive Vice President. Houssels also served on the Company's Executive Compensation and Nominations

committees.  In a January 25, 2010 letter filed with the SEC on April 9, 2010, citing several disagreements and concerns with other members of the Company's management and Board, she notified the Company's Board of her intent to resign.

40.     Defendant Paul Farrell ("Farrell") served as a Company Director from October 2, 2008 until his resignation on October 28, 2009.  During his tenure, he served on the Company's Audit Committee.

41.     Boyne, Cole, Donovan, Steinberg, Houssels, Christiansen, and Farrell, are collectively referred to hereinafter as the "Individual Defendants."

42.     Each of the Individual Defendants:

    a.   directly participated in the management of the Company;

    b.   was directly involved in the day-to-day operations of the Company at the highest levels;

    c.   was privy to confidential proprietary information concerning the Company and its business and operations;

    d.   was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

    e.   was directly or indirectly involved in the oversight or implementation of the Company and Bank's internal controls;

    f.   was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and

    g.   approved or ratified these statements in violation of the federal securities laws.

43.     EGC is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

44.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to EGC under *respondeat superior* and agency principles.

## A. Confidential Witness

45.     Confidential Witness No. 1 ("CW1") is a former paid advisor and consultant to the EGC and its Board. CW1 was engaged by EGC in June 2006 as an advisor to the Company's Board as an expert in the U.S. gaming industry and a technology specialist. CW1's role as a consultant and advisor ceased in July 2009 when payments were stopped on what was a 3 year contract with EGC. According to CW1:

> a.     CW1 was hired by the Company in connection with the Company's efforts to expand and explore business opportunities in the United States, as nearly all of its revenues were derived from the Company's European and U.K. operations and EGC wished to expand its business in the US. During his tenure at EGC, EGC's U.S. operations were generating little to no sales as CW1 was informed that most if not all of EGC's sales were made through EGCL.

> b.     As part of his efforts on behalf of the Company, CW1 met Steinberg at the Four Seasons Hotel in New York City in the summer of 2007. During this meeting, Steinberg indicated his interest in managing and investing in a Company such as EGC. CW1 was privy to and involved in negotiations from late 2007 through 2008 between EGC and Steinberg concerning Steinberg investing in, and taking over control of the Company. During these negotiations, Steinberg agreed that CW1 would either be appointed CEO and/or COO of the Company, after Steinberg joined the Company. Ultimately, CW1 was not appointed CEO and/or COO, after he had disagreed with Steinberg's choice of certain individuals to join the

11

management team in late 2008 and early 2009. After Steinberg officially joined the Company, in January 2009, CW1's engagement with EGC was renewed.

     c.    During CW1's tenure at EGC he met with defendants Steinberg, Houssels, Christiansen and Cole on many occasions. These meetings concerned several facets of EGC's business and operations, including but not limited to, (a) the formation and development of the Company's U.S. operations; (b) the hiring of personnel; (c) business and opportunities for the Company; and (d) potential strategic partnerships for the Company.

     d.    Some of these meetings were held in New York in the June 2007 through November 2007 period and in London in the November 2007 through April 2008 time period. CW1 also attended meetings with the Individual Defendants in Las Vegas in December 2007 and February of 2008. Thereafter, beginning in February of 2009, CW1 continued to have discussions with the Individual Defendants through various modes of communications, including telephone and email.

     e.    Defendant Steinberg wielded "great power" and control over the Company due to Steinberg's wealth, status in social circles as a Member of the British House of Lords and former head of one of the leading betting companies in the U.K. which was the largest bookmaker and casino owner in the UK at one time. He also held a large position in EGC's equity and thereby handpicked his Board of directors and management team.

     f.    During mid 2008, when Steinberg agreed to join the Company as Executive Chairman, he hand-picked his friends and associates as officers and directors of the Company.

12

g.      Steinberg selected defendants Farrell, Christiansen, Donovan and Houssels to serve as directors and officers of EGC and agreed to have Cole continue as a Director of the Company.

h.      Defendant Steinberg interviewed and selected defendant Donovan to serve as EGC's CEO in December 2008. Houssels and Christiansen were prior business and social contacts of Steinberg.

i.      Houssels, a former actress and ballerina, was Steinberg's real estate agent and sold him two condos at the MGM City Center Development in Las Vegas. Houssels had no gaming or technology experience. After her tenure in the movie industry, she became a real estate agent and worked for a series of organizations including MGM where she met Steinberg who was a high roller and a VIP client for the Bellagio Hotel and Casino. Steinberg was a frequent visitor to Las Vegas and met with Houssels on a routine basis during his trips. Initially the headquarters of the Company was slated to be in Las Vegas as it is the capital of the global gaming industry and Nevada is where EGC is registered. Houssels had decided to live in Orange County, CA and through her encouragement, in 2009 EGC's U.S. "offices" were moved to an Irvine, CA mail drop, while Houssels and Donovan operated from their residences.

j.      Houssels, as the Company's Vice President and as Executive Vice President and head of operations/sales was compensated with an annual salary of $375,000 and provided 1.5 million shares of Company stock. Yet, defendant Donovan's compensation was $250,000 per year and he was the CEO of the Company. Christiansen was paid $150,000 per year. Steinberg authorized these payments and arrangements for Houssels, Christiansen and Donovan.

13

## IV.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS OF MATERIAL FACT

### A. <u>Fiscal Year Ended December 31, 2006</u>

46.   The Class Period begins on April 5, 2007 when EGC filed with the SEC the Company's fiscal year ended December 31, 2006 results on Form 10KSB. In the 10KSB, signed by defendants, Cole and Boyne, the Company falsely described its ownership and control of EGCL.

47.   The 10KSB states in relevant part:

> The Company was incorporated under the laws of the United Kingdom on April 6, 2000, under the name of Electronic Game Card, Ltd. Until 2002, the Company remained dormant and had no operations until August 8, 2002, then issuing stock for services. This date has been treated as the date of inception. On May 5, 2003, the Company entered into an agreement whereby it acquired 100% of the outstanding stock of Electronic Game Card Marketing, a Delaware Company. The Company ceased being a development stage company in 2006.

> On December 5, 2003, the Company acquired 100% of the outstanding stock of the Electronic Game Card, Inc. (Nevada) in a reverse acquisition. At this time, a new reporting entity was created and the name of the Company was changed to Electronic Game Card, Inc.

> The Company engages in the development, marketing, sale and distribution of recreational electronic software which primarily targets towards lottery and sales promotion markets through its Great Britain subsidiary.
>
> *     *     *
>
> The Company owns 100% of the share capital of Electronic Game Card, Ltd., a company incorporated under the laws of England, through its wholly owned U.S. subsidiary Electronic Game Card Marketing, Inc. (Delaware). Electronic Game Card Marketing Inc., is the marketing and sales operating division of Electronic Game Card Inc. in the USA which also owns and operates Electronic Game Card Marketing Ltd, as the UK and European marketing and sales division.

48.   The statements about EGC's ownership and control of EGCL are materially false and misleading because it failed to disclose:

a.   The existence and terms of a 2002 agreement signed by the "former CFO (and director)" (*i.e.,* Boyne), which could (and did cause) ownership of EGCL (and any bank accounts and investments held in EGCL's name) to revert or transfer to a third party. The May 19, 2010 8-K states in relevant part:

In addition, [EGC] has been unable to confirm the existence or value of a purported investment account in the name of Electronic Game Card (UK) Limited ("EGCL") with R.I.C. Asset Management Limited ("R.I.C."). **While the former CFO of [EGC] has stated that the R.I.C. investment account exists and had a balance of $12.9 million as of February 26, 2010, he asserts that [EGC] does not own the funds in the R.I.C. account because [EGC] no longer owns EGCL. This assertion is based on a document described as a 2002 agreement entered into among [EGC], EGCL and the original (unidentified) sellers of EGCL to [EGC].** The current [EGC] Board of Directors and management were unaware of this document, which was **signed by the former CFO on behalf of EGCL,** until after questions had arisen concerning the company's audited financial statements.

b.   A purported contingency that EGCL (EGC's UK and European operations) could revert to a "master licence." This contingency is described in a February 25, 2010 letter from defendant Cole which was filed on Form 8-K with the SEC by EGC on April 9, 2010.   A copy the Form 8-K and the letters attached thereto is attached hereto as Exhibit 3, and is incorporated herein by reference. The letter states in relevant part:

"Due to certain actions which have been taken, unilaterally by the co-chairman **the Company's European business has reverted to a master licence which under the terms of which the company will net $9 million per annum (this does not include lotteries**)."

15

c.      According to a UK company filing (Exhibit 2), on March 1, 2010, EGC no longer owned the share capital of EGCL and that an entity called EPN Advisory Limited owned 100% of the share capital of EGCL.  Additional UK filings indicate that as of May 2, 2010 the sole directors of EGCL were Boyne and an entity controlled by Boyne called Greenfield Capital International Limited.  A later filing dated July 9, 2010 lists Boyne and Greenfield Capital as the sole directors of EGCL.  Copies of the filings are attached hereto as Exhibit 4, and are incorporated herein by reference.

49.    To date, EGC has not disclosed the terms of the purported contract provision that permitted EGC's European operations, and assets (i.e. EGCL) to revert to a "master licence" and cause EGC to lose ownership of the assets of the business, and for Boyne to retain control of EGCL.

50.    EGC's continued ownership and control of EGCL the Company's U.K. and European operating subsidiary, was extremely material because the nearly all of the Company's revenues and sales were generated from and through the Company's European and UK operations.

51.    Additionally, the 10KSB falsely reported cash and cash equivalents at the fiscal year ended December 31, 2006 as $3,052,733 and revenue of $997,363 for fiscal 2006.

52.    EGC's reported cash at the end of the 2006 fiscal year, its revenue for 2006, and related statements are materially false and misleading for the following reasons:

a.      On February 19, 2010 the Company filed an 8-K with the SEC entitled "Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Audit Report", announcing that

16

on "February 12, 2009 [sic]"[2], the Company's auditor M&B, informed EGC's Board of Directors that M&B "had withdrawn its audit opinions for [EGC]'s financial statements for the years ended December 31, 2006, 2007, and 2008." The 8-K sets forth M&B's reasoning for withdrawing its audit opinions and confirms that Company's financial statements would have to be restated as follows:

> **M&B advised [EGC] that it had become aware of irregularities in the audit confirmation of a bank account represented to M&B as having been held by Electronic Game Card (UK) Limited ("EGC Ltd"),** a wholly owned subsidiary of [EGC] that conducts its European operations. **Based upon M&B's investigation and inability to confirm the balances in the account, M&B concluded that its prior audits could no longer be relied upon and that it was withdrawing its audit opinions related to [EGC] financial statements for the years ended December 31, 2006, 2007 and 2008 as of February 12, 2010.**
>                          *       *       *
> [EGC] intends to determine the adjustments necessary to reissue its prior financial statements, and file amended Annual Reports on Form 10-K for the years ended December 31, 2006, December 31, 2007 and December 31, 2008, and amended Quarterly Report on Form 10-Q for the periods ended March 31, 2009, June 30, 2009 and September 30, 2009 as soon as practicable.

b.      On February 19, 2010, the SEC instituted a temporary trading halt of the Company's stock "because of questions that have been raised about the accuracy of assertions by [EGC], and by others, in financial disclosures to investors concerning, among other things, the company's assets."

c.      On April 8, 2010, the Company issued a press release announcing that PricewaterhouseCoopers LLP, had "begun a forensic review

---

[2] On February 22, 2010, the Company filed an amended 8-K, correcting the date to February 12, 2010.

of the circumstances that gave rise to EGC's independent auditors' withdrawal of its audit opinions...."

      d.     On May 19, 2010, the Company filed an 8-K with the SEC providing additional information about the Company's intended restatement of its financial statements. The 8-K stated that EGC's Board "concluded that its financial statements for the years ended December 31, 2006, 2007 and 2008 should no longer be relied upon because preliminary findings of the previously announced forensic review ... have raised significant concerns as to the integrity of audited financial statements for the fiscal years ended December 31, 2006, 2007 and 2008." The Company explained that it is concerned "that reported revenue may be materially overstated and that the reported carrying value of its assets and investment in third-party companies may not be fairly stated."

      e.     Because the Company's financial statements for the fiscal years ended December 31, 2006, 2007, and 2008 could no longer relied upon and had to be restated, the Company's financial statements and related information in its annual reports filed with the SEC were false when made.

      f.     Restatements are required for material accounting errors that existed at the time financial statements were prepared. *See* Statement of Financial Accounting ("SFAS") 154.

      g.     An accounting "error" is a term of art and results from, among other things, an error in recognition, measurement, or mistakes in the application of Generally Accepted Accounting Principles. SFAS 154.

      h.     Under SFAS 154, errors result from (i) mathematical mistakes, (ii) mistakes in application of GAAP, or (iii) oversight or misuse of facts that existed at the time the financial statements were prepared.

      i.     The May 19, 2010 8-K states that the Company's $12.9 million of cash was purportedly held in the name of EGCL with R.I.C. Asset

18

Management Limited.  However, defendant Boyne claimed that EGC no longer owned the funds in the R.I.C. account because EGC no longer owns ECGL, pursuant to a 2002 agreement entered into among EGC, EGCL, and the original sellers of EGCL.

j.     Prior to May 19, 2010, Defendants never disclosed any such agreement, condition or contingency which would cause the Company to lose ownership of EGCL or its cash or investment accounts and for Boyne to retain control of EGCL.

53.    Since the Company's May 19, 2010 announcement, the Company has gone "dark" and has not issued any news releases or filed any periodic reports with the SEC.

54.    Filed with the 10KSB were separately signed Sarbanes-Oxley Act of 2002 ("SOX") certifications of defendants Cole and Boyne.  The signed certifications falsely attested that the 10SKB complied with the Exchange Act and that the "information contained in the [10KSB] fairly presents, in all material respects, the financial condition and results of operations of the Company."

55.    Cole and Boyne also certified that the they were each "responsible for establishing and maintaining disclosure controls and procedures (as defined in the Exchange Act...)..."; and the certifications falsely stated, in part, that the 10KSB (a) "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Annual Report," (b) "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash follows of the registrant as of, and for, the periods presented in this report," and  (c) each of them disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely

19

affect the registrant's ability to record, process, summarize and report financial information," and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

56.     The SOX certifications are materially false and misleading because the Company failed to disclose its ownership and control of EGCL was subject to loss of ownership pursuant to a purported 2002 agreement (which Boyne had signed), and the Company's annual report for fiscal year 2006 could not be relied upon and had to be restated as set forth more fully in ¶¶48, 52.

## B. Quarterly Reports for 2007

57.     On May 15, 2007, the Company filed with the SEC its financial results for the first quarter ended March 31, 2007 on Form 10QSB. In the 10QSB, signed by defendants Cole and Boyne, the Company made similar material misstatements about its ownership and control of EGCL, as set forth above. The 10QSB states in relevant part:

> The Company was incorporated under the laws of the United Kingdom on April 6, 2000, under the name of Electronic Game Card, Ltd. Until 2002, the Company remained dormant and had no operations until August 8 2002. On May 5, 2003, the Company entered into an agreement whereby it acquired 100% of the outstanding stock of Electronic Game Card Marketing, a Delaware Company.

> On December 5, 2003, the Company acquired 100% of the outstanding stock of the Electronic Game Card, Inc. (Nevada) in a reverse acquisition. At this time, a new reporting entity was created and the name of the Company was changed to Electronic Game Card, Inc.

> The Company is engaged in the development, marketing, sale and distribution of recreational electronic software which is primarily targeted towards lottery and sales promotion markets through its UK subsidiary.

58.     These statements concerning the Company's ownership and control of EGCL are materially false and misleading because EGC failed to disclose its that

20

its ownership and control of EGCL was subject to the 2002 agreement signed by Boyne, that could (and did) cause the Company's ownership of EGCL (and any bank accounts and investments held in EGCL's name) to revert or transfer to a third party and for Boyne to retain control of EGCL, as set forth more fully in ¶48, above.

59.     Filed with the 10QSB were signed SOX certifications of Cole and Boyne, which are substantially the same as the SOX certifications filed with the Company's April 5, 2007 10KSB.  These SOX certifications are materially false and misleading for the same reasons the SOX certifications filed with the April 5, 2007 10KSB were false and misleading as set forth more fully in ¶¶48, 52, above.

60.     Nearly identical materially false and misleading statements were made in the Company's second quarter ended June 30, 2007 10QSB (and attached SOX certifications) filed with the SEC on August 14, 2007, and the Company's third quarter ended September 30, 2007 10QSB (and attached SOX certifications) filed with the SEC on November 14, 2007.

61.     The second and third quarter 10QSBs were signed, and separately certified under SOX, by defendants Boyne and Cole and are materially false and misleading for the same reasons the first quarter 10QSB was materially false and misleading, as set forth in ¶¶ 48, 52 above.

C. **Fiscal Year Ended December 31, 2007**

62.     On March 26, 2008, the Company filed with the SEC on Form 10KSB the Company's financial results for the fiscal year ended December 31, 2007.  In the 10KSB, signed by defendants, Cole and Boyne, the Company falsely represented its ownership and control of EGCL.

63.     The 10SKB contained nearly identical disclosures about EGC's purported ownership and control of EGCL as reported in the Company's April 5, 2007 10KSB described above.  Therefore, the FY 2007 10KSB was materially false and misleading because EGC failed to disclose its that its ownership and

21

control of EGCL was subject to the 2002 agreement signed by Boyne, that could (and did) cause the Company's ownership of EGCL (and any bank accounts and investments held in EGCL's name) to revert or transfer to a third party and for Boyne to retain control of EGCL, as set forth more fully in ¶48, above.

64.    The March 26, 2008 10KSB the Company's reported cash and cash equivalents at the fiscal year ended December 31, 2007 as $4,753,040 and revenues for the fiscal 2007 of $6,038,058.

65.    The Company's statements about its cash and cash equivalents at the fiscal year ended 2007 and revenues earned in the FY 2007 10KSB are materially false and misleading because the Company must restate its financial statements for the fiscal year ended 2007, the Company's auditor pulled its unqualified audit opinion for the Company's fiscal year financial statements, and the Company admitted that it its revenues may be materially overstated, as set forth more fully in ¶¶48, 52, above.

66.    Filed with the 10KSB are SOX certifications separately executed by defendants Boyne and Cole, which are in sum and substance identical to the SOX certifications Boyne and Cole executed for the Company's FY 2006 10KSB. Thus, Boyne and Cole's SOX certifications filed with EGC's FY 2007 10KSB are materially false and misleading for the same reasons, as more set forth more fully in ¶¶48, 52, above.

**D. Quarterly Reports for 2008**

67.    On May 14, 2008 the Company filed with the SEC its financial results for the first quarter ended March 31, 2008 on Form 10-Q. In the 10-Q, signed by defendants Cole and Boyne, the Company made material misstatements about its ownership and control of EGCL similar to those it had made in its 10QSB's filed in 2007. The 10-Q states in relevant part:

> The Company was incorporated under the laws of the United Kingdom on April 6, 2000, under the name of Electronic Game Card, Ltd. Until 2002, the Company remained dormant and had no operations until August 8 2002. On

May 5, 2003, the Company entered into an agreement whereby it acquired 100% of the outstanding stock of Electronic Game Card Marketing, a Delaware Company.

On December 5, 2003, the Company acquired 100% of the outstanding stock of the Electronic Game Card, Inc. (Nevada) in a reverse acquisition. At this time, a new reporting entity was created and the name of the Company was changed to Electronic Game Card, Inc.

68.     These statements concerning the Company's ownership and control of EGCL is materially false and misleading because EGC failed to disclose its that its ownership and control of EGCL was subject to the 2002 agreement signed by Boyne, that could (and did) cause the Company's ownership of EGCL (and any bank accounts and investments held in EGCL's name) to revert or transfer to a third party and for Boyne to retain control of EGCL, as set forth more fully in ¶48, above.

69.     Filed with the first quarter 10-Q were SOX certifications separately executed by defendants Boyne and Cole, which are in sum and substance identical to the SOX certifications Boyne and Cole executed for the Company's FY 2006 10KSB. Thus, Boyne and Cole's SOX certifications filed with EGC's first quarter 10-Q are materially false and misleading for the same reasons, as more set forth more fully in ¶¶48, 52, above.

70.     Nearly identical misstatements were made in the Company's second quarter ended June 30, 2008 10-Q (and attached SOX certifications) filed with the SEC on August 8, 2008, and the Company's third quarter ended September 30, 2008 10-Q (and attached SOX certifications) filed with the SEC on November 17, 2008. The second and third quarter 10-Qs were signed, and separately certified under SOX, by defendants Boyne and Cole and are materially false and misleading for the same reasons the first quarter 10-Q and SOX certifications are materially false and misleading and as set forth more fully in ¶¶ 48, 52, above.

23

### E. <u>Fiscal Year Ended December 31, 2008</u>

71.     On March 16, 2009. The Company issued a press release announcing its fourth quarter and fiscal year ended December 31, 2008 results.   The press release touted that the "[d]uring the course of the last twelve months the company has delivered four profitable quarters and increased shareholder equity by $12 million, achieved cash balances net of all debt and convertible preferred of $3.5 million,..."   In the balance sheet portion of the press release, the Company reported cash of $8,281,899 and cash equivalents at $867,186 and total current assets of $12,151,747.  The press release also noted sequential and year-over-year growth of "cash and equivalents" of $1.3 and $4.4 million, respectively.  The Company also touted that its revenues for the full year 2008 increased over 76% to $10.6 million from $6 million in 2007.

72.     In commenting on the results, defendant Donovan is quoted as stating:

> "2008 marked the Company's second successful profitable growth year. Our balance sheet is strong and our net cash balance is building consistently. Our company's technology platform is robust and has been prepared to quickly evolve into the next stage of the Company's growth. Electronic Game Card is securely positioned to achieve its earnings guidance of $0.14 per share for 2009," commented Kevin Donovan, CEO of Electronic Game Card, Inc

73.     On March 24, 2009 the Company filed with the SEC its financial results for the fiscal year ended December 31, 2008 on Form 10-K, repeating the substantially same cash and equivalents line item and revenue as reported in the press release.

74.     The statements about Company's cash and cash equivalents at the fiscal year ended 2008 and revenues earned in the FY 2008 are materially false and misleading because the Company had to restate its financial statements for the fiscal year ended 2008, the Company's auditor pulled its unqualified audit opinion for the Company's fiscal year financial statements, and the Company admitted that it its revenues may be materially overstated, as set forth more fully in ¶52, above.

24

75.    The 2008 10-K also falsely represented the Company's ownership and/or control of EGCL. The 10-K states in relevant part:

> The Company was incorporated under the laws of the United Kingdom on April 6, 2000, under the name of Electronic Game Card, Ltd. Until 2002, the Company remained dormant and had no operations until August 8, 2002, then issuing stock for services. This date has been treated as the date of inception. On May 5, 2003, the Company entered into an agreement whereby it acquired 100% of the outstanding stock of Electronic Game Card Marketing, a Delaware Company. The Company ceased being a development stage company in 2006.
>
> On December 5, 2003, the Company acquired 100% of the outstanding stock of the Electronic Game Card, Inc. (Nevada) in a reverse acquisition. At this time, a new reporting entity was created and the name of the Company was changed to Electronic Game Card, Inc.
>
> *    *    *
>
> The Company owns 100% of the share capital of Electronic Game Card, Ltd., a company incorporated under the laws of England, through its wholly owned U.S. subsidiary Electronic Game Card Marketing, Inc. (Delaware). Electronic Game Card Marketing Inc., is the marketing and sales operating division of Electronic Game Card Inc. in the USA which also owns and operates Electronic Game Card Marketing Ltd, as the UK and European marketing and sales division.

76.    The statements about EGC's ownership and control of EGCL are materially false and misleading because, EGC failed to disclose its that its ownership and control of EGCL was subject to the 2002 agreement signed by Boyne, that could (and did) cause the Company's ownership of EGCL (and any bank accounts and investments held in EGCL's name) to revert or transfer to a third party and for Boyne to retain control of EGCL, as set forth more fully in ¶ 42, above.

77.    Filed with the 10-K were SOX certifications separately executed by defendants Boyne and Cole, which are in sum and substance identical to the SOX

25

certifications Boyne and Cole executed for the Company's FY 2006 10KSB. Thus, Boyne and Cole's SOX certifications filed with EGC's FY 2008 10-K are materially false and misleading for the same reasons, as more set forth more fully in ¶¶48, 52, above.

### F. Quarterly Reports for 2009

78.　On May 15, 2009, the Company filed with the SEC its financial results for the first quarter ended March 31, 2009 on Form 10-Q. In the 10-Q, signed by defendants Cole and Boyne, the Company made material misstatements about its ownership and control of EGCL similar to those it made in its 10QSB's filed in 2007 and 10-Qs filed in 2008. The 10-Q states in relevant part:

79.　The 10-Q states in relevant part:

The Company was incorporated under the laws of the England on April 6, 2000, under the name of Electronic Game Card, Ltd. Until 2002, the Company remained dormant and had no operations until August 8 2002. On May 5, 2003, the Company entered into an agreement whereby it acquired 100% of the outstanding stock of Electronic Game Card Marketing, a Delaware Company.

On December 5, 2003, the Company acquired 100% of the outstanding stock of the Electronic Game Card, Inc. (Nevada) in a reverse acquisition. At this time, a new reporting entity was created and the name of the Company was changed to Electronic Game Card, Inc.

80.　These statements concerning the Company's ownership and control of EGCL is materially false and misleading because EGC failed to disclose that its ownership and control of EGCL was subject to the 2002 agreement signed by Boyne, that could (and did) cause the Company's ownership of EGCL (and any bank accounts and investments held in EGCL's name) to revert or transfer to a third party and for Boyne to retain control of EGCL, as set forth more fully in ¶48 and for Boyne to retain control of EGCL, above.

81.     Filed with the first quarter 10-Q were SOX certifications separately executed by defendants Boyne and Cole, which are in sum and substance identical to the SOX certifications Boyne and Cole executed for the Company's FY 2006 10KSB. Thus, Boyne and Cole's SOX certifications filed with EGC's first quarter 10-Q are materially false and misleading for the same reasons, as more set forth more fully in ¶¶48, 52, above.

82.     Nearly identical misstatements were made in the Company's second quarter ended June 30, 2009 10-Q (and attached SOX certifications) filed with the SEC on August 14, 2009, and the Company's third quarter ended September 30, 2009 10-Q (and attached SOX certifications) filed with the SEC on November 20, 2009 The second and third quarter 10-Qs were signed, and separately certified under SOX, by defendants Boyne and Cole and are materially false and misleading for the same reasons the first quarter 10-Q and SOX certifications are materially false and misleading, as more fully set forth above in ¶¶ 48, 52, above.

### G. Additional Materially False Statements Issued in 2009

83.     On October 13, 2009, the Company filed a form 8-K with the SEC, signed by defendant Schiff, falsely stating that the Company "has signed a memorandum of understanding ("MOU") to form a strategic partnership with Poken Holding AG ("POKEN AG"), a privately held company based in Kilssnacht, Switzerland that owns the POKEN product and related intellectual property ("POKEN"). POKEN is a next-generation RF technology-based social networking platform."

84.     This announcement is materially misleading because the entry of the MOU and the related agreements were not entered into with the requisite approval of the Company's Board according to an undated letter by defendant Cole to defendant Houssels, filed with the SEC on April 22, 2010 on Form 8-K/A. A copy of 8-K/A is attached hereto as Exhibit 5, and is incorporated herein by reference. The letter states in relevant part:

"EGC has established corporate governance procedures adopted by the Board (i) to ensure effective operation of the Company to maximize shareholder benefits, and (ii) achieve actual and apparent good governance and transparency. **Lately there have been too many actions taken ad hoc without following established procedures and proper consultation with the entire Board. This can lead to business missteps such as the recent case of Poken alleging that commitments were made by EGC pursuant to an agreement not authorized by the Board and were not fulfilled by EGC.** Inattention to the establish procedures undermines financial controls, reporting and accountability such as occurred with the recent unexpected jump in CA expenses and jeopardizes achievement of budget targets. Board members are required by law to exercise their best judgment; action without adequate prior preparation followed by proper consultation with all Board members does not satisfy legal requirements and is not authorized. Failure to follow established procedures exposes the Company and individual officers and directors who act outside established procedures to liability."

*   *   *

Poken---I share all of your concerns regarding Poken. Yet again, this is an example of Kevin Donovan, apparently with Eugene Christensen's complicity based upon Eugene's approval of Kevin's conduct, **acting to commit the Company to significant transaction and expense without proper discussion among Board members much less Board approvals and compliance with procedures. As I have previously written to Kevin Donovan, Eugene Christensen and others, I did not receive the alleged Poken agreements, purporting to be effective as of 12 October 2009, until 22 December so I certainly hadn't been part of any Board meeting approving Kevin Donovan entering into those alleged agreements either.** There can be no question that an investment of the magnitude proposed should have had to have been formally approved by the Board of Directors. It is outrageous that Kevin Donovan and, apparently, Eugene Christensen have ignored this obvious requirement and, once again, attempted to rush commitments through without proper consideration or procedure.

## V.   TRUTH BEGINS TO EMERGE / LOSS CAUSATION

85.     On November 16, 2009, the Company filed with the SEC on Form 12b-25 a notification of late filing for the Company's third quarter ended September 30, 2009 10-Q. The notification states in relevant part:

28

> The Registrant's annual report on Form 10-Q could not be filed within the prescribed time period due to the Registrant and its accountants requiring additional time to prepare and review the financial statements of the Registrant for the period ended September 30, 2009. Such delay could not be eliminated by the Company without unreasonable effort and expense. In accordance with Rule 12b-25 of the Securities Exchange Act of 1934, the Company will file its Form 10-Q no later than the fifth calendar day following the prescribed due date.

86.     This announcement caused the Company stock to fall $.15 per share, or 8%, to $1.70 per share through November 17, 2009.

87.     On February 10, 2010 the Company issued a press release announcing it was rescheduling a conference call with investors scheduled for that day to February 25, 2010.   The conference call was originally announced in the Company's February 1, 2010 press release to "Update Investors on Company Progress."

88.     The February 10, 2010 announcement caused the Company's stock to fall $.17 per share, or 15.8%, to $.901 per share on February 10, 2010.

89.     On February 12, 2010 it was announced after market close that Merriman Curhan Ford & Co. downgraded the Company's stock from a "Buy" recommendation to "Neutral."  The announcement caused the Company's stock to fall from $.91 to $.83 per share, or 8.8%.

90.     On February 19, 2010 trading in the Company's stock was temporarily suspended by the SEC "because of questions that have been raised about the accuracy of assertions by [EGC], and by others, in financial disclosures to investors concerning, among other things, the company's assets."  The SEC's release states in relevant part:

> SECURITIES EXCHANGE ACT OF 1934
> Release No. 61544 / February 19, 2010
> The Securities and Exchange Commission ("Commission") announced the temporary suspension, pursuant to Section 12(k) of the Securities Exchange Act of 1934 (the "Exchange Act"), of trading in the securities of [EGC], of

29

Irvine, California, at 9:30 a.m. on February 19, 2010, and terminating at 11:59 p.m. on March 4, 2010.

The Commission temporarily suspended trading in the securities of [EGC] because of questions that have been raised about the accuracy of assertions by [EGC], and by others, in financial disclosures to investors concerning, among other things, the company's assets.

91.    The last trade price of the Company's stock immediately prior to the trading halt was $.88 per share.

92.    On February 19, 2010 the Company filed an 8-K with the SEC announcing that that its auditor, M&B, on February 12, 2010[3] withdrew its clean audit opinions for the Company's financial statements for the years ended December 31, 2006, 2007 and 2008.  The stated reason for this action was M&B becoming aware of irregularities in the audit confirmation of a bank account represented to M&B as having been held by EGCL and M&B's investigation and inability to confirm the balances in the account.    The announcement states in relevant part:

Item 4.02    Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Audit Report.

(b) On February 12, [2010], Mendoza Berger and Company, LLP ("M&B"), the independent auditors for [EGC], informed the [EGC] Board of Directors that it had withdrawn its audit opinions for [EGC's] financial statements for the years ended December 31, 2006, 2007 and 2008.

M&B advised [EGC] that it had become aware of irregularities in the audit confirmation of a bank account represented to M&B as having been held by Electronic Game Card (UK) Limited ("EGC Ltd"), a wholly owned subsidiary of [EGC] that conducts its European operations.  Based upon M&B's investigation and inability to confirm the balances in the account, M&B concluded that its prior audits could no longer be relied upon and that it was withdrawing its audit opinions related to [EGC's] financial statements

---

[3] See footnote no. 2.

for the years ended December 31, 2006, 2007 and 2008 as of February 12, 2010.

Kevin Donovan, the Chief Executive Officer of [EGC], has discussed all matters described above with M&B, and has provided a copy of this Form 8-K to M&B.

93.    In the February 19, 2010 8-K, the Company also explained that the Company would determine the necessary adjustment and reissue corrected financial statements for the fiscal years ended 2006, 2007, 2008, and the first three quarters of 2009. The 8-K states in relevant part:

[EGC] intends to determine the adjustments necessary to reissue its prior financial statements, and file amended Annual Reports on Form 10-K for the years ended December 31, 2006, December 31, 2007 and December 31, 2008, and amended Quarterly Report on Form 10-Q for the periods ended March 31, 2009, June 30, 2009 and September 30, 2009 as soon as practicable.

94.    On February 24, 2010, the Company issued a press release announcing it had postponed the shareholder conference call with investors scheduled for February 25, 2010 (per the Company's February 10, 2010 press release above) "due to the suspension of trading of its common shares. The Company noted that it "is working diligently with its independent auditor to address the situation and will update investors as soon as possible."

95.    On March 5, 2010 the Company's shares began trading again with an opening price of $.25 per share. The last trade immediately prior to the halt was $.88 per share.

96.    During the afternoon of March 5, 2010, the Company issued a press release announcing that it "believes that there will be no material change to the Company's net asset value upon the completion of the review of its financial statement by its independent accountant."

97.   Notwithstanding the false reassurances from the Company, the Company's stock closed at $.44 per share on March 5, 2010 down, $.44 per share, or 50%, from its previous closing price.  The Company's stock fell an additional $.10 per share, or 22.7%, the following trading day.

98.   The March 5, 2010 assurance was materially false and misleading because on March 1, 2010 EGC no longer owned the share capital of EGCL, and an entity named EPN Advisors Limited owned all the share capital of EGCL (*See* Exhibit 2).  Defendants never disclosed this to investors.

99.   On March 19, 2010, the Company issued a press release which revealed the dire financial situation of the Company.  The announcement stated that the Company had engaged G.C. Andersen Partners, LLC, to serve as the Company's strategic and financial advisor.  According the announcement, "[d]ue to EGC's state of affairs, one of Andersen Partners' first initiatives will be to raise working capital funds to enable the Company to engage legal, accounting and other service providers to review the historical operating and financial performance of EGC and its subsidiaries."

100.  Commenting on the engagement of G.C. Andersen Partners in the press release defendant Donovan stated:

> Kevin Donovan, CEO and Interim Joint Chairman of Electronic Game Card, Inc., said, "Having the support of an experienced advisor such as G.C. Andersen Partners will allow us to review our operations and identify the most advantageous options for the Company and its shareholders going forward."

101.  This announcement caused the Company's stock to fall $.17 per share, or 13.6%, to $.18 per share on March 19, 2010.

102.  On May 18, 2010, after market close, the Company issued a press release entitled "Electronic Game Card, Inc. Provides Stockholder Update" which provided additional and new information about the Company's financial statements.  The press release states in relevant part:

32

IRVINE, CA, – May 18, 2010 - Electronic Game Card, Inc. provided the following update to its stockholders.

The investigation into [EGC's] financial position is continuing. However, preliminary findings have raised significant concerns as to the integrity of audited financial statements for the fiscal years ended December 31, 2006, 2007 and 2008. [EGC] is concerned that reported revenue may be materially overstated and that the reported carrying value of its assets and investments in third-party companies may not be fairly stated.

In addition, [EGC] has been unable to confirm the existence or value of a purported investment account in the name of Electronic Game Card (UK) Limited ("EGCL") with R.I.C. Asset Management Limited ("R.I.C."). While a former CFO (and director) of [EGC] has stated that the R.I.C. investment account exists and had a balance of $12.9 million as of February 26, 2010, he asserts that [EGC] does not own the funds in the R.I.C. account because [EGC] no longer owns EGCL. This assertion is based on a document described as a 2002 agreement entered into among [EGC], EGCL and the original (unidentified) sellers of EGCL to [EGC]. The current [EGC] Board of Directors and management were unaware of this document, which was signed by the former CFO on behalf of EGCL, until after questions had arisen concerning the company's audited financial statements.

With respect to [EGC's] Series A Convertible Preferred Stock, it appears that a certificate of designation establishing the terms of the Series A Convertible Preferred Stock was not filed with the Secretary of State of Nevada, where [EGC] is incorporated. This fact, among others, calls into question, among other things, the validity of the preferred stock and the accuracy of disclosures relating to capitalization and similar matters in [EGC] historical financial statements, periodic reports and proxy statements filed with the Securities and Exchange Commission (the "SEC").

[EGC] continues to investigate these matters. The SEC, which suspended trading in [EGC] stock for two weeks starting on February 19, 2010, also continues to investigate. [EGC] continues to explore its strategic options, which may include filing for bankruptcy protection.

103.  On May 19, 2010 the Company filed with the SEC an 8-K which attached the May 18, 2010 press release and stated that on May 18, 2010 that "the

33

Board of Directors of Electronic Game Card, Inc. [EGC] concluded that its financial statements for the years ended December 31, 006, 2007 and 2008 should no longer be relied upon because preliminarily findings of its previously announced forensic review of the circumstances that gave rise to [EGC's] independent auditors withdrawal of its audit opinions... ."

104.  The adverse information in these disclosures caused the Company's stock to fall $.09 per share, or 75%, to $.03 per share on May 19, 2010.

105.  Since May 19, 2010, the Company has gone "dark." The Company has not issued a single press release or made any SEC filings.  The price of the Company's stock has drifted downward.  As of September 7, 2010, the Company's stock closed at 1 cent per share and had a market capitalization of approximately $550,000, compared to a class period high of $2.20 per share and market capitalization of over $100 million.

## VI.  ADDITIONAL ALLEGATIONS DEMONSTRATING FALSITY AND SCIENTER

106.  The following additional facts, when considered holistically with the other allegations in the Complaint, demonstrate a cogent and compelling strong inference of scienter and further demonstrate the falsity of Defendants' statements.

107.  The Company is subject to an ongoing SEC investigation concerning the validity of its financial statements and assets.

108.  Present and former members of EGC management have accused each other of wrongdoing.

>  a.  In an April 20, 2010 letter from defendant Cole to EGC's Board, filed with the SEC on Form 8-K/A on April 22, 2010 (Exhibit 5), Lee Cole asserted that the Company's Co-Chairman (defendant Donovan and Christiansen) deliberately spread misrepresentations, delayed the announcement of his resignation, omitted facts concerning

34

Cole's resignation, interfered with the Company's audit and provided misrepresentations to EGC's auditors, the letter states in relevant part:

Gentlemen:

In keeping with the inappropriate conduct which the Co-Chairmen of the Electronic Game Card Inc. (Nevada) (the "Company" or "EGC") have routinely followed for months**, I was not consulted prior to the grossly late filing of the Current Report on Form 8K announcing my resignation but, instead, was furnished with the filing as a fait accompli after the fact.** In describing my resignation, the Co-Chairmen, Kevin Donovan and Eugene Christensen, had the following written on behalf of EGC:

> [EGC] believes that the disagreement that led to Mr. Cole's resignation related to his dissatisfaction with the way the [EGC's] U.S. operations were being run.

**The Co-Chairmen and EGC are well aware that my resignation resulted, instead, from broader concerns over conduct by the Co-Chairmen over an extended period of time. Clearly the Co-Chairmen have chosen not to disclose those broad concerns which I had expressed repeatedly over several months to no avail.** The non-performance by management is only a part of the concern I had expressed. **Consequently, in accordance with paragraph (a) (3) of Item 5.02 of the Form for Current Reports on Form 8K, I am herewith furnishing this letter to EGC stating that I disagree with the statements made by the Co-Chairmen on behalf of EGC in describing my resignation and providing an explanation of the basis for my disagreement in the expectation that the Co-Chairmen will comply on behalf of EGC with the requirements of Item 5.02 of the Form and file this letter, and its attachments, as an exhibit by an amendment to the previously filed Form 8K.**

I, and my colleague, Linden Boyne, and the company ("Sterling FCS") that employs us to furnish various management support services to EGC, have previously informed the Board of our concerns orally and in numerous letters and reports various correspondence to the Board . (I, Linden Boyne and Sterling FCS are sometimes referred to below as "the parties").

"The parties" have at all times acted within the remit of the Sterling FCS contract to provide various management support services which adheres to EGC's bylaws, committee charters and resolutions and other authorities as established 2 March 2006 when Sterling FCS's contract was amended and it became responsible for providing individuals to perform EGC's CEO function as well as the CFO function.

*     *     *

**From information received I believe that selective and misleading disclosure has been made by the Co-Chairmen with reference to me, Linden Boyne and Sterling FCS.**

**From information received it appears that these misrepresentations have been deliberately spread to cause damage to both "the parties", EGC, and EGC's public shareholders.**

From November 3rd when Kevin Donovan and Eugene Christensen were appointed as Co-chairman there has been a catalogue of what now appear to have been deliberately obstructive tactics by US management and their agents which have been described at length in our letters and reports to the Board.

We became concerned by signs suggesting that management were incurring considerable unauthorised and unbudgeted expenses despite efforts by management to delay disclosure. Management failed to furnish information on these points despite repeated requests.

In December 2009 there was a sudden flurry of activity concerning a potential merger in what management described as an emergency. I found that months earlier management had entered into commitments to and agreements with the proposed partner of which I was unaware and without authorisation by the Company's full Board. I requested customary due diligence materials, including any business plans and projections for the combined entity but management was unable to furnish these items which apparently had not been prepared. I remarked that I would be unable to approve a transaction without customary due diligence materials and review and management turned its attention to other matters.

Subsequent to November 3rd Sterling had been extremely concerned by the lack of any business generation in the US and the escalating expenses and

36

had also been extremely concerned that Company procedures and processes were being ignored by the Co-Chairmen---not just in the instance mentioned above but in other cases as well---and a meeting was scheduled to be held on January 7th to discuss Company business. Sterling made a determined effort to have these concerns included prominently on the agenda for the meeting. Despite EGC's own Board procedures and common sense, the Board meeting agenda was not circulated to the entire Board by the Co-Chairmen until the actual day of the January 7th meeting (although we did later determine that the Co-Chairmen had circulated the agenda selectively to some Board members and not others) and it contained none of the agenda items Sterling had requested. Taken altogether, the circumstances dictated that the meeting was not properly noticed for Board members to make prudent informed decisions and myself and Linden Boyne did not attend.

We were promised prompt delivery of a record of the January 7 meeting in order that we might review and react to discussion items but despite follow-up requests we did not receive a transcript until a fortnight later. We eventually received, in addition, a copy of the letter announcing intention to resign which Anna Houssels sent in on 25th January. When we received the transcript of the call and Anna's resignation letter it became apparent that US management was engaging in more obstructive and damaging conduct. We sent a comprehensive reply to Anna's letter to correct her misunderstandings and furnish information which the Co-Chairmen had apparently withheld from her. We aren't surprised that in the Form 8K reporting the resignations of Anna Houssels and me the Co-Chairmen arranged to attach Anna Houssels' full letter but omitted my response (which is attached as "exhibit 1" ) , which was part of the explanation of disagreements with the Co-Chairmen which ultimately led to my resignation.

Subsequent to this the Co-Chairmen continued to engage in **obstructive and damaging behaviour even more extreme than previously. They contacted banks and EGC's auditors and interfered with EGC's audit process by not going through the proper channels and not informing the CFO or the only remaining member of the Board's Audit Committee**.

**Throughout this period the Co-Chairmen were confusing Mendoza Berger, EGC's auditors, by repeating misinformation resulting from the Co-Chairmen's interference in the audit process. The Co-Chairmen**

37

**continued to interfere and hinder the process by not informing Sterling of the incorrect information they were circulating despite repeated requests from Sterling. If common sense and proper channels had been followed misinformation would not have been passed to Mendoza Berger, confusion would have been avoided or easily corrected and EGC would not have been damaged**.

Subsequent to this the Co-Chairmen continued to act outside the remit of EGC's charters. Belatedly recognizing their lack of authority, they have attempted to change the committee charters and increase their authority (please see letter to the Board 24th March, "Exhibit 2") ---without going through proper channels and committees or otherwise following proper and prudent procedures, of course.

Prior to the Board meeting scheduled to be held on February 22nd Linden Boyne and myself registered our dissatisfaction with the fact that we had both not been allowed to carry out our properly constituted positions with EGC and that the actions of the Co-Chairmen had caused EGC substantial damage as they had not heeded repeated warnings regarding their misconduct. On 25th February I and Linden Boyne submitted our resignation letters and a draft 8K announcing the same which became effective on March 1, 2010. EGC has not properly reported those resignations despite our requests that the Co-Chairmen do so .

Although I have resigned as an officer and director and Linden Boyne as CFO we have continued in good faith to assist EGC under the Sterling contract despite continuing obstruction and misinformation by US management.

The information listed above along with the information included within Exhibits 1-2 illustrates our concerns, not just with US operations but with corporate governance by the Co-Chairman, which formed the basis for disagreement and, ultimately, resignation.

       b.     The April 22, 2010 8-K/A (Exhibit 5) also contained an undated letter from defendant Boyne to the Company's Donovan and Christiansen stating that there is "tissue of misstatements and improper behavior in which you continue to engage is breathtaking"

in connection with "falsehoods" in the Company's Board of Directors meeting minutes.  Additionally, the letter corroborates the assertions made by defendant Cole set forth above.  The letter states in relevant part:

Gentlemen:

I am in receipt of the minutes of the so-called February 22, 2010 board meeting and the so-called March 15, 2010 board meeting. I will limit my response at this time but, the issue of misstatements and improper behaviour in which you continue to engage is breathtaking.

*    *    *

The minutes of the February 22nd meeting state that you attempted to retain legal counsel and amend the Company bylaws. Once again, you have attempted actions without following appropriate procedures. Was a bylaws change considered and reviewed by the appropriate Board committee? Was engagement of counsel similarly considered by the appropriate Board committee? Has care been taken to analyze costs or conflicts of interest? Of course not; you persist in ignoring common sense and procedures as you continue unilaterally to take control of a public company without any reference or consideration for the company's procedure and byelaws or the shareholders...

Also, one notes that you apparently have filed a Form 8K on behalf of the Company; quite an interesting development, given the damage that misstatements in that Form 8K caused the Company as it was filed without circulation to the Board for comment and due authorisation. Perhaps, in your continued selective disclosure and secret and improper decision-making you forgot these points?

Your self-serving and self-aggrandizing misstatements and actions continue in the same pattern. S,. [sic] **How could you possibly state in February 22nd minutes that "Mr. Cole had raised issues as to the validity of the January 7, 2010 meeting, but did not state any specific defect with respect to the notice or conduct of the meeting"? You have received lengthy written explanations of objections to that meeting, quite apart from our oral discussions, so it is appalling that you would state so**

39

**blatant a falsehood as if making your untrue statement would somehow make it true.**

**The comments you make in the minutes about myself and audit matters at root are utterly false** How can you suggest that I have not furnished financial information without acknowledging the numerous requests made to you for financial documentation in order to complete work on financials? Your failures to respond are documented. Your omission of these facts, and your refusal to furnish the relevant information, is all the more revealing in the context that we have repeatedly expressed our concern that you have inappropriately incurred substantial undisclosed liabilities in the name of the Company and otherwise.

However, if anything, **those omissions by you pale in comparison to your brazen misstatement and mischaracterisation of dealings with the Company's accountants. As we have repeatedly informed you (and as the record clearly shows), there was no problem with completion of the Company's financial statements until you surreptitiously and (we believe) maliciously interfered with the audit process.** You contacted banks directly, ignoring the CFO and the Audit Committee, acting upon misinformation and then, what is worse, conveyed that misinformation to the Company's auditors again without reference to the proper channels. **Your conduct in this regard is all the more shameful given that it your statement to the auditors that a bank account did not exist was subsequently proven to be incorrect and based upon a misunderstanding which arose when you acted outside the companies proper channels and contacted the bank directly rather than through or even with the myself as CFO.** You need only have asked the question and irreparable harm to the Company and its shareholders could have been avoided. Instead, you clearly persist in an effort to seek, establish and, if possible, exaggerate problems to distract attention from your own non performance rather than to take actions in the best interest of the Company and its shareholders.

Your efforts in the February 22nd minutes to retroactively justify improper change of directors of Electronic Game Card Limited (which you initially undertook surreptitiously in December 2009 without any Board approval or discussion whatsoever) and to move accounts of that company failed to disguise actions which were so damaging to EGC. You were well aware of

the underlying contracts which you have blatantly breached and yet you persisted in this conduct. You were warned repeatedly that you should not act in violation of contractual obligations and you chose to ignore the warnings and, thereby, incur liability for the damage to the Company and its shareholders. As if this were not enough, you ought to have known not to act to disrupt the company's European business relationships without prior discussion with those who are the generating the business, particularly as they are the only ones generating any income for the Company. Your failure to act sensibly merely emphasises [sic] our concern that you appear to be motivated by an agenda that is not to the benefit of the Company or its shareholders.

With regard to the SEC, the statements in the February 22nd minutes are deliberately misleading and false insofar as you neglected to mention the improper contacts by Mr. Donovan and Mr. Morgan with the SEC, in which the misinformation referred to above was apparently passed to the SEC, which have cause harm not only to the Company and its shareholders but to Sterling and Messrs. Cole and Boyne individually.

*    *    *

Finally, the statement in the February 22nd minutes you have made various unfilled requests for case studies, samples, etc. from the London office are patently false. In fact, the London office has provided numerous case studies, samples and pricings. The European business has been dealt with by Limited as provided under contract and confirmed, prior to his untimely demise, with Lord Steinberg, the past Chairman. Your statements are merely a smokescreen---and a poor one, at that---for the complete lack of performance by the U.S. operations and management.

Your misconduct continues to be reflected in the March 15th minutes. Have new Board members actually been appointed? After review and approvals by what committee of the Board? .

Oddly, the March 15th minutes appear to suggest that you did not remove myself as CFO at the so-called February 22nd meeting after all and fail to mention my resignation or the reason for my resignation.

*    *    *

Yet again, the March 15th minutes make false statements concerning myself. **I have repeatedly requested information from the U.S. office since**

41

**December, which has not been forthcoming and has repeatedly stated that the information was required in order to complete financial statements. After your failure to cooperate in timely fashion or at all, and your repeated and malicious interference in the audit process and incitement of the SEC, your assertions that I am somehow at fault are totally unacceptable**.

The March 15th minutes again make ridiculous statements by suggesting that the complete failure of the U.S. operations and management to generate a single order for any product in the last year can be laid at the doorstep of the London office which had generated all of the Company's income. You statements that you have not had access to information are false and your attempt to excuse your total failure by blaming the only part of the organisation which has produced income is not credible.

I should add that Cole and I submitted our resignations as officers and Mr. Cole's resignation as a director of the Company on March 1 2010 but have nonetheless attempted to continue to assist the Company in good faith, despite your misconduct and lack of cooperation, under the Sterling contracts. Why have you not disclosed those resignations, or filed the appropriate Form 8Ks by now? Why has an 8K concerning the resignation by Ms. Houssels not been filed? You continue to compound your misconduct to the ultimate damage of the Company and its shareholders, but also the individuals in question. Clearly, you have engaged in selective (and frequently improper) disclosure for so long that you don't even feel the need to comply with any disclosure requirements.

       c.    In a January 25, 2010 resignation letter from defendant Houssels to EGC's Board (Exhibit 3), Houssels asserted that the last "Bank confirmation" was September 2009 and that that Board has been unable to secure the requested "Confirmation of Funds." Houssels also raised issues concerning the difference between the Company's Series A convertible preferred stock activity summary as compared to what was represented in the Company's third quarter 2008 10-Q, she also raised issues concerning previously undisclosed "EGMI –Delaware" entity that "was never listed in an exhibit to SEC

42

filings as a Subsidiary as require" [sic].  Surprisingly, and contrary to the Company's prior SEC filings, she noted the lack an Audit Committee within the Company.  The letter states in relevant part:

There are a myriad of issues that I have raised recently as part of my obligations as a Board member.  To reiterate:

1- Bank Confirmations
The last Bank Confirmation was September 2009. As BOD's we have all continuously requested Confirmation of Funds and have been unable to secure them. I have no idea what the reasons for this are but I know that without this I am not doing my job as a director in protecting the shareholders. I have requested bank Confirmations repeatedly.  I of course I have kept the 25-30 or so requests along this line − If you want I can forward them to you should you need evidence of this;

3- Series A Stock (Status)

Numerous requests have been made for documentation on the Series A stock, nothing has been resolved and this has raised some concerns. As per Tom Schiff's advice, specifically, Linden needs to explain/ reconcile the difference between the activity summary and what was published in the last 10Q. Also, he should be able to provide a list of Series A holders and amounts owned by each. (Actual Documentation, not verbal confirmation);

4- Common Stock − Outstanding

As per Tom Schiff's advice, "Kevin Donovan, as CEO of the company, should request from Michael Mullings of Continental Transfer a current copy (thru the date of request) of the Master Control for EGC Common Stock. This will show stock issuance activity that will shed light on the 70MM share number shown on the face of the latest 10Q filing generated by Lee and Linden". I am unsure where we stand on this;

5- [EGC], EGMI Delaware (Manufacturing) − Clarification
(Please see notes below from Thomas Morgan):

> EGMI-Delaware was never "up stream" merged with [EGC], and is a separate entity.  While wholly owned by [EGC], EGMI-Delaware's assets were never transferred to [EGC].  I don't know if EGMI-Delaware is in good standing, but will find ask a paralegal to find out. I have not seen any evidence that business has been conducted in the name of EGMI-Delaware.  I don't know what assets it had when acquired, or how they have been managed since the acquisition.
>
> Two "EGMI" entities that show up as Delaware entities-
> Electronic Game Card, Inc.
> Electronic Game Card Manufacturing, Inc.
> Do any of you know about the second corp?
>
> EGMI-Delaware was never listed in an exhibit to SEC filings as a Subsidiary as require [sic];.
> 6-Audit Committee
>
> We need an Audit Committee but do not have enough Board Members as of yet;

109.   The magnitude of the restatement and misconduct at issue further supports a strong inference of scienter.

       a.   EGC was at all relevant times a small company with no more than 10 employees per the Company's most recent 10-K.

       b.   According the May 18 and 19, 2010 announcements $12.9 million of cash and cash equivalents, either no longer, or never, belonged to the Company and should not have been reported as an asset of the Company on its balance sheet, due to the undisclosed 2002 agreement.  $12.9 million constituted nearly *all* of EGC's cash and cash equivalents.  According to the Company's most recent 10-Q filed on November 20, 2009, the reported at September 30, 2009, $12,696,691 in cash and cash equivalents, $18,385,648 in total current assets, and $27,073,478 in total assets.  The $12.9 million in cash and

44

cash equivalents EGC either no longer, or never owned, constituted 70% and 47% of the Company's total current assets ad total assets, respectively, at September 30, 2009.

      c.     Throughout the Class Period, the Company's cash and cash equivalents constituted a material percentage of the Company's assets as reported in its periodic reports filed with the SEC. For example, as reported the Company's April 5, 2007 10KSB for FY 2006, cash and cash equivalents constituted 76% of the Company's total current assets on the balance sheet. In the Company's March 26, 2008 10KSB for the FY 2007, cash and cash equivalents constituted 63.7% of the Company's total current assets on the balance sheet.

      d.     The restatement implicates three years worth of financial statements and involves straight forward and fundamental measures of a Company, i.e. cash, assets and revenue. EGC's auditors have withdrawn its clean audit opinions for three years of the Company's financial statements for fiscal years 2006, 2007 and 2008, and the Company has confirmed it would need to restate those financial statements.

      e.     The restatement also implicates the validity of the Company's disclosures concerning the Company's Series A convertible preferred stock and the capitalization of the Company, due to among other things, the failure of the Company to simply file a certificate of designation with Secretary of State of Nevada for the preferred stock. The May 19, 2010 8-K states in relevant part:

With respect to [EGC's] Series A Convertible Preferred Stock, it appears that a certificate of designation establishing the terms of the Series A Convertible Preferred Stock was not filed with the Secretary of State of Nevada, where [EGC] is incorporated. This fact, among others, calls into question, among other things, the validity of the preferred stock and the

accuracy of disclosures relating to capitalization and similar matters in [EGC's] historical financial statements, periodic reports and proxy statements filed with the Securities and Exchange Commission.

110.    Throughout the Class Period the Company falsely assured investors that its internal control over financial reporting and disclosure controls were effective.  In addition to the misstatements alleged herein, on April 15, 2008, the Company issued an 8-K stating that its FY 2007 10KSB was mistakenly filed "[a]s a result of a miss-communication [sic] between Registrant and its auditors, Mendoza Berger & Company, L.L.P., Registrant mistakenly understood that its auditors had completed their audit of the financial statements contained in that Form 10-KSB and had consented to the use of the financial statements." Ultimately the Company filed the restated 10KSB with the SEC on April 15, 2008 with no materially apparent changes.  Thereafter on May 14, 2008 the Company filed its first quarter ended March 30, 2008 results, in the section of the 10-Q discussing the Company's "controls and procedures" EGC stated that the Company "found it necessary to upgrade its procedure for contact with our auditors," yet the Company found that its controls and procedures were effective.

111.    Throughout the Class Period the Company's senior management has access to and monitored the Company's cash and revenue because they touted the Company's growing cash, revenue and financial health.  For example:

> a.    In a March 16, 2009 press release announcing the Company's results for the fiscal year and fourth quarter ended, December 31, 2008, Defendant Donovan is quoted as saying:

"2008 marked the Company's second successful profitable growth year. Our **balance sheet is strong and our net cash balance is building consistently.** Our company's technology platform is robust and has been prepared to quickly evolve into the next stage of the Company's growth. Electronic Game Card is securely positioned to achieve its earnings guidance of $0.14 per share for 2009," commented Kevin Donovan, CEO of Electronic Game Card, Inc.

   b. In an August 6, 2009 press release announcing the Company's second quarter ended June 30, 2009 results, defendant Donovan is quoted as stating:

> "During this second quarter Electronic Game Card achieved **record revenue** and net income as well as **continued improvement in the company's net cash balance.** We have made great strides this quarter to materially add to this solid financial base as we progress through the second half of this year and beyond," commented Kevin Donovan, CEO of Electronic Game Card, Inc.

   c. In a November 12, 2008 press release, defendant Steinberg touted the Company's "growing balance sheet."

 112. According to CW1, in a March 2008 email from Steinberg's secretary relaying a message to CW1 and others, Steinberg noted that EGC's larger shareholders at the time, Pequot, Trafelet, and Ingalls & Snyder, had suspicions that EGC's financial figures may not be what they seem.  Such meetings were taking place between Steinberg and EGC's larger shareholders to ensure Steinberg's appointment as Chairman.  In early to mid-2008, CW1 advised Steinberg that he hire a forensic accountant to review the Company's financials and particularly EGC's sales agreements and other agreements in order to conduct proper due diligence of the Company and its operations prior to joining EGC.  In December 2008, CW1 also requested that defendant Farrell, who at the time was an EGC director and Audit Committee member to conduct a forensic examination of the Company's financial statements.  At anytime during his tenure at EGC, CW1 was not aware if any such forensic examination took place.

## VII. CLASS ACTION ALLEGATIONS

 113. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who purchased the common stock of EGC during the Class Period and who were damaged thereby.  Excluded from the Class are Defendants, the present and former

officers and directors of the EGC and any subsidiary thereof, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

114.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, EGC's stock was actively traded on the NASDAQ Bulletin Board.   While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds, if not thousands, of members in the proposed Class.   Members of the Class may be identified from records maintained by EGC or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

115.   Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

116.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

117.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

a.     whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of EGC; and

c.     to what extent the members of the Class have sustained damages and the proper measure of damages.

118.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VIII.   RELIANCE PRESUMPTIONS

### A.   <u>Affiliated Ute</u>

119.   Neither Plaintiffs nor the Class need prove reliance – either individually or as a class because under the circumstances of this case, which involves a failure to disclose the 2002 agreement signed by Boyne providing for transfer of ownership of EGCL, positive proof of reliance is not a prerequisite to recovery, pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security

### B.   <u>Fraud-on-the-Market Presumption of Reliance</u>

120.   At all relevant times, the market for EGC's common stock was an efficient market for the following reasons, among others:

    a.   EGC's stock met the requirements for listing, and was listed and actively traded on the NASDAQ Bulletin Board, a highly efficient and automated market;

    b.   During the class period, on average, 1,847,165 shares of EGC common stock were traded on a weekly basis.  During the Class Period approximately 57,109,428 million shares were outstanding (per the Company's fiscal year 2008 10-K).   Approximately 3.23%   of all

49

outstanding shares were bought and sold on a weekly basis, demonstrating a very strong presumption of an efficient market;

       c.     EGC regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

       d.     EGC was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period.  Each of these reports was publicly available and entered the public marketplace;

       e.     At least 50 NASD member firms were active market-makers in Quest Resource stock at all times during the Class Period; and

       f.     Unexpected material news about EGC was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

121.  As a result of the foregoing, the market for EGC's common stock promptly digested current information regarding EGC from all publicly available sources and reflected such information in EGC's stock price.  Under these circumstances, all purchasers of EGC's common stock during the Class Period suffered similar injury through their purchase of EGC's common stock at artificially inflated prices, and a presumption of reliance applies.

## IX.   NO SAFE HARBOR

122.  The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary