**ORIGINAL**

Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
333 South Grand Avenue, 25th Floor
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

-and-

Phillip Kim, Esq. (pro hac vice)
THE ROSEN LAW FIRM, P.A.
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

Lead Counsel for Plaintiffs and Class

**BY FAX**



# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| DALTON PETRIE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>vs.<br><br>ELECTRONIC GAME CARD, INC.; LEE J. COLE; LINDEN BOYNE; KEVIN DONOVAN, PAUL FARRELL, EUGENE CHRISTIANSEN, ANNA HOUSSELS, AND THE ESTATE OF LORD LEONARD STEINBERG AND, DOMINIC BURKE, LYNNE ROCHELLE ATTIAS, AND JONATHAN STEINBERG AS EXECUTORS/TRUSTEES/REPRESENTATIVES OF THE ESTATE OF LORD STEINBERG,<br><br>Defendants. | Case No.: SACV-10-00252-DOC(RNBx)<br><br>CLASS ACTION<br><br>CONSOLIDATED SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>**JURY TRIAL DEMANDED**<br><br>Hon. David O. Carter |

1

Lead Plaintiffs Dr. Thomas Lee, his wife Margaret Yu, and Scott Lovell (collectively the "Plaintiffs" and sometimes the "Lee Group"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege in this Consolidated Amended Complaint (the "Complaint") the following upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, which included, inter alia: (a) review and analysis of relevant filings made by Electronic Game Card, Inc. ("EGC", the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of defendants' public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning the Company; (d) information readily obtainable on the Internet; and (e) interviews of several witnesses with personal knowledge of the relevant facts.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to defendants and are exclusively within their control.

## I.   NATURE OF THE ACTION

1.   This is a federal securities class action on behalf of a class consisting of all persons and entities, other than defendants, who purchased the common stock of EGC between April 5, 2007 and May 18, 2010 inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of federal securities laws (the "Class").

2.   EGC is a small Company with no more than ten employees. Through its purported wholly owned operating subsidiary, EGC designs and manufactures electronic "scratch off" devices for various casinos, lotteries and other gaming establishments primarily in the United Kingdom and Europe.  During the Class

Period, nearly all of the Company's reported revenues were derived from its UK and European operating subsidiary, Electronic Game Card, Ltd. ("EGCL").

3.     During the Class Period defendants engaged in a fraud to conceal and misstate the Company's true financial condition and performance.

4.     In the Company's periodic reports filed with the SEC, Defendants falsely represented that EGCL was wholly owned by EGC. In reality, EGC's ownership (and any bank accounts and investments held in the name of EGCL) were subject to what EGC described as a secret 2002 agreement (the "2002 'Secret' Agreement") that could (and did) cause the Company's ownership of EGCL to revert or transfer to a third party; and provided for defendant Linden Boyne (and his affiliated entity Greenfield Capital International Limited) to take control over EGCL as its sole directors.

5.     Put another way, the 2002 "Secret" Agreement allowed EGC to lose ownership of EGCL, and for Boyne to take control of EGCL away from EGC. EGC never disclosed that highly adverse fact, rendering EGC's statements about its ownership of EGCL, its assets and its revenue stream, materially false and misleading.

6.     On February 19, 2010, the SEC halted trading in the Company's stock "because of questions that have been raised about the accuracy of assertions by [EGC], and by others, in financial disclosures to investors concerning, among other things, the company's assets."

7.     That same day the Company announced that its auditor Mendoza and Berger and Company, LLP ("M&B") had withdrawn its audit opinions of EGC's financial statements for the fiscal years ended December 31, 2006, 2007, and 2008 because, the auditor had "become aware of irregularities in the audit confirmation of a bank account represented to M&B as having been held by [EGCL], a wholly owned subsidiary of [EGC]…".

3

8.    Based upon M&B's investigation and inability to confirm the balances in the account, M&B concluded that its prior audits could no longer be relied upon and that it was withdrawing its audit opinions related to EGC's financial statements for the years ended December 31, 2006, 2007 and 2008 as of February 12, 2010.

9.    Even though the Company had reported over $12.6 million of cash and cash equivalents on its balance sheet in its most recent 10-Q filed with the SEC on November 20, 2009, on March 19, 2010, the Company announced that it had retained a strategic financial advisor whose "first initiatives will be to raise working capital funds to enable the Company to engage legal, accounting and other service providers to review the historical operating and financial performance of EGC and its subsidiaries." In short, the $12.6 million the Company claimed it had on its balance sheet was not there.

10.    On May 18, 2010 the Company announced its Board of Directors had concluded that its financial statements for the years ended December 31, 2006, 2007 and 2008 should no longer be relied upon because of "significant concerns as to the integrity of audited financial statements for the fiscal years ended December 31, 2006, 2007 and 2008."

11.    The May 18, 2010 announcement stated that "[EGC] is concerned that reported revenue may be materially overstated and that the reported carrying value of its assets and investments in third-party companies may not be fairly stated."

12.    Ultimately, on May 18, 2010, the Company disclosed that defendant Boyne asserted that $12.9 million was held in an account in the name of EGCL in Luxembourg, but that EGCL was no longer a subsidiary of the Company, i.e., the Company no longer owned EGCL and its assets, including the $12.9 million. The Company stated it was unable to confirm Boyne's assertion that the $12.9 million was really in the Luxembourg account. The Company did not admit or deny

4

Boyne's assertion that the Company no longer owned EGCL and its assets. It has remained silent on that critical fact.

13.    The following day, in a May 19, 2010 announcement EGC confirmed that the Company's financial statements for the fiscal years ended 2006, 2007 and 2008 should no longer be relied upon and had to be restated.

14.    UK company filings show EGCL had less than £768 of cash on its balance sheet as of December 31, 2008. Yet, EGC's 10-K filings with the SEC claim it had $8.3 million in cash and $876,000 in marketable securities as of December 31, 2008. EGCL was the Company's only operating subsidiary, as the U.S. subsidiaries operations had not yet generated any cash. The Company's claim to have $12.6 million in cash was a complete fabrication. Indeed, given the auditor's and Company's statement that it believed its revenue and assets have been materially overstated for each fiscal year since 2006, EGC was by all accounts a sham. A copy of the UK company filing is attached hereto was Exhibit 1 and is incorporated herein by reference.

15.    EGC knew as of March 1, 2010 EGC did not own the share capital of EGCL and an entity called EPN Advisory Limited owned 100% of the share capital of EGCL, according to a filing EGCL made with UK authorities on April 12, 2010. A copy of the filing is attached hereto as Exhibit 2 and is incorporated herein by reference.

16.    Consequently, EGC's stock was delisted from the NASDAQ Bulletin Board; a SEC investigation was initiated and is ongoing; several former high level executives of the Company have resigned asserting, among other things, that certain members of EGC's management have lied to, and concealed information from, investors, the SEC and the Company's auditor M&B.

17.    As a result of Defendants' fraud, EGC's share price has gone from a class period high of $2.20/share, to a current price of $0.01/share, damaging Plaintiffs and the Class.

18.     While the Company's May 19, 2010 announcement suggests its internal investigation is ongoing and a restatement of its financial statements will be issued soon, the Company appears to have gone "dark" and has not released any information to investors since then.  Since May 19, 2010, EGC has not issued a single press release or made a single SEC filing, even though it was required to file a quarterly report.

19.     Nor has EGC filed the customary notification of a late filing on Form 12b-25 with the SEC explaining why it has not yet filed its overdue second quarter 10-Q for the period ended June 30, 2010.

20.     EGC has mysteriously shut down its website.

21.     For all intents and purposes, EGC and its purported business have suspiciously disappeared from the face of the earth.

## II.     JURISDICTION AND VENUE

22.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

23.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

24.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District.

25.     In connection with the acts, conduct and other wrongs alleged herein, defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III.    PARTIES

26.    Court appointed lead plaintiffs Dr. Thomas Lee, his wife Margaret Yu, and Scott Lovell purchased EGC common stock during the Class period and have suffered damages as a result.  Lead Plaintiffs' respective certifications were previously filed with the Court, and are incorporated herein by reference.

27.    Defendant EGC is a Nevada corporation with purported principal executive offices located at 5405 Alton Parkway, Suite A-353 Irvine, CA 92604. This Irvine address is actually a mail drop located at a UPS Store in the Alton Square Shopping Center.  During the Class Period, the Company's common stock was traded on the NASDAQ Bulletin Board under ticker "EGMI."  Because of EGC's failure to restate its previously reported financial statements and to stay current on its current financial reporting obligations, EGC's stock was delisted and now trades over-the-counter on the "Pink Sheets."

28.    The current corporate entity EGC was created in 2003 when a privately held Delaware corporation, Electronic Game Card, Inc. conducted a share exchange with EGC's predecessor, a publicly traded Nevada corporation Scientific Energy, Inc.

29.    According to EGC's 2004 Annual Report filed with the SEC on April 20, 2005, EGC and EGCL entered a merger agreement on November 19, 2003.

30.    According to EGC's 2006 Annual Report filed with the SEC on April 5, 2007, EGCL became EGC's wholly-owned subsidiary on December 5, 2003.

31.    As part of the share exchange, Scientific Energy, Inc. changed its named to Electronic Game Card, Inc. (the current EGC) and the other entity contemporaneously changed its named to Electronic Game Card Marketing, Inc. ("EGCM") becoming a wholly owned operating subsidiary of EGC.  EGCM was to conduct its business through its wholly owned subsidiary Electronic Game Card Ltd., an English company (the current EGCL).[1]

---

[1]  There exists a dormant United Kingdom entity Electronic Gamecard Marketing Limited controlled by defendant Boyne and Greenfield Capital.  Its reports filed

7

32.    Defendant Linden Boyne ("Boyne") served as the Company's Chief Financial Officer, Principal Accounting Officer, and Secretary from at least the beginning of the Class Period, and was a Company Director since 2003, until his resignation from each of those positions on August 31, 2009.  He was reappointed CFO and Company's secretary effective October 30, 2009 (but not Director) when his replacement Thomas Schiff resigned effective October 30, 2009.  Boyne resigned from these remaining two positions on March 1, 2010. While an EGC Director, Boyne also served on the Company's Audit Committee.

33.    Defendant Lee J. Cole ("Cole"), was a Company Director from 2003 until his resignation effective March 8, 2010. Cole served as the Company's CEO from the beginning of the Class Period until he was replaced by Defendant Kevin Donovan on February 1, 2009.  During his time with the Company Cole served on the Company's Audit and Compensation committees.

34.    Defendant Kevin Donovan ("Donovan") served as the Company's Chief Executive Officer and Director from February 1, 2009 through the end of the Class Period.  Following the death of Company Chairman Lord Leonard Steinberg, Donovan was appointed as a member of the Company's two-person Interim Office of the Chairman of the Company, a position he held with defendant Eugene Christiansen.

35.    Boyne, and Greenfield Capital International Limited (a Gibraltar company he controlled) served as a director of EGCL until his and Greenfield's termination as directors of EGCL on December 28, 2009. On December 28, 2009, Defendants Donovan and Christiansen were installed as directors of EGCL in place of Boyne and Christiansen.   On February 4, 2010, Boyne and Greenfield were reappointed as the directors of EGCL and Donovan and Christiansen were

with the UK Company Registry show it had less than 200 British pounds in assets as of December 31, 2008.  This entity is different than EGC's U.S. subsidiary Electronic Game Card Marketing, Inc.

8

terminated.  This appears to chronicle the *apparent* corporate in-fighting between the two groups and EGC's loss of ownership of EGCL to Boyne's group.

36.     Defendant the Estate of Lord Leonard Steinberg ("Steinberg") is a United Kingdom entity.  Lord Steinberg officially served as the Company's Executive Chairman from September 2, 2008 until his passing on November 2, 2009.  On June 6, 2008, the Company initially announced that Steinberg had agreed to join the Company and nominated defendant Anna Houssels and Eugene Christiansen to EGC's Board.

37.     During his tenure at EGC, Steinberg also served as the Chairman of the Company's Audit, Executive Compensation, and Nominations committees. Steinberg became involved with the Company in November 2007, when he along with others contacted defendant Cole and Boyne with a proposal to join the EGC Board, invest capital, and restructure the Company.  Following months of negotiations, in May 2008, the Company accepted Steinberg's proposal to join EGC as Executive Chairman, and to have certain of his business associates as directors and officers of the Company.

38.     Per the Company's SEC filings, beginning in May 31, 2008 Steinberg began to acquire EGC common stock.  By May 27, 2008 he had accumulated over 5.04% of the Company's common stock.  Prior to his death, as reported in a Company proxy statement filed with the SEC on August 27, 2009, Steinberg owned over 10.6 million shares or 16.05% of the Company.

39.     Upon information and belief, Steinberg's wife Beryl Steinberg is the Administrator and/or Executor of Steinberg's estate.  Therefore, she in that capacity and Steinberg's estate is named herein as a defendant.

40.     Defendant Eugene Christiansen ("Christiansen") served as Company Director from September 2008 through the end of the Class Period.  On November 3, 2009, following the death of the Company's Chairman, Lord Leonard Steinberg, Christiansen was appointed as a member of to the Interim Office of the Chairman.

9

Christiansen also served on the Company's Nominations Committee.  Prior to his appointment, the Company announced on June 6, 2008, that Christiansen had been nominated to EGC's Board in June 2008.

41.    Defendant Anna Houssels, ("Houssels") served as a Company Director beginning on September 2008.  Houssels officially joined the Company's executive management team as Executive Vice President of Sales on February 1, 2009.  Houssels also served on the Company's Executive Compensation and Nominations committees.  Houssels resigned on February 21, 2010.  In a January 25, 2010 letter filed with the SEC on April 9, 2010, citing several disagreements and concerns with other members of the Company's management and Board, she notified the Company's Board of her intent to resign.

42.    Defendant Paul Farrell ("Farrell") served as a Company Director from October 2, 2008 until his resignation on October 28, 2009.  During his tenure, he served on the Company's Audit Committee.

43.    Farrell, Steinberg, Cole, and Boyne comprised EGC's Audit Committee.

44.    According to EGC's Schedule 14C filed with the SEC on August 27, 2009, "The Audit Committee reviews the Company's financial reporting process on behalf of the Board... The Audit Committee ... review[s] and discusse[s] the audited financial statements with management. In addition, the Audit Committee ... discusse[s] with the independent auditors the matters required to be discussed.... The Audit Committee meets with the independent auditors, with and without management present, to discuss the results of their examinations, the evaluation of the Company's internal controls and the overall quality of the Company's reporting."

45.    According to EGC's Schedule 14C filed with the SEC on August 27, 2009, Farrell was one of seven members of the executive committee that oversaw the firm-wide investment strategy and operations of Pequot Capital Management,

CONSOLIDATED SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
No. SACV-10-00252-DOC(RNBx)

Inc. ("Pequot"), a multi-billion dollar investment advisor and one of EGC's largest shareholders. Farrell was also the managing director, co-portfolio manager and chief operating officer of the Scout Fund Group of Pequot.

46.     According to EGC's Schedule 13G/A filed with the SEC on February 13, 2009, as of December 31, 2008, three months after Farrell joined EGC, Pequot was EGC's controlling stock holder with a 16.1% ownership interest, owning 9.5 million shares.

47.     According to EGC's 2008 Annual Report filed with the SEC on March 24, 2009, as of March 5, 2009, in the middle of Farrell's tenure at EGC, Pequot sold off 4.8 million shares of EGC stock. It was thereby left with an 8.24% ownership interest.

48.     According to EGC's Schedule 13G/A filed with the SEC on July 1, 2009, as of June 30, 2009, due to investigations of Pequot's engagement for insider trading, Pequot sold off its 8.24% interest in EGC stock, and ceased all operations.

49.     Indeed, on May 27, 2010, several months after Farrell resigned from EGC–which followed the aforementioned Pequot's sale of millions of shares of EGC stock–the SEC announced that Pequot and its CEO, Arthur Samberg, agreed to pay nearly $28 million to settle SEC charges of insider trading in Microsoft securities.

50.     According to EGC's Schedule 14C filed with the SEC on August 27, 2009, as of August 2009, Manatuck Hill Partners ("Manatuck") was the second largest EGC shareholder, owning 12.48% of EGC's stock, in the amount of 8.3 million shares.

51.     Manatuck owned its EGC stock through the same Scout Fund that had been previously owned by Pequot – before Pequot ceased business. Manatuck's Scout Fund consisted of the same team that ran Pequot's Scout Fund, except that Farrell was no longer officially the Scout Fund's manager.

11

52.     According to EGC's Schedule 13G/A filed with the SEC on February 11, 2010, as of June 30, 2009, by December 31, 2009, Manatuck's Scout Fund, of which Farrell was without a doubt the manager only a few months prior (until June 30, 2009), sold off almost half of its EGC stock, left with only 5.3 million shares—7.16% ownership of EGC.

53.     Manatuck's sale of EGC stock occurred just after Farrell exited EGC, at the end of October 2009.

54.     Thus, Pequot and Manatuck both sold many millions of shares of EGC stock at a high price, only shortly before EGC's fraud was disclosed to the public, which caused EGC stock to become virtually worthless.

55.     Boyne, Cole, Donovan, Steinberg, Houssels, Christiansen, and Farrell, are collectively referred to hereinafter as the "Individual Defendants."

56.     Each of the Individual Defendants:

    a.  directly participated in the management of the Company;

    b.  was directly involved in the day-to-day operations of the Company at the highest levels;

    c.  was privy to confidential proprietary information concerning the Company and its business and operations;

    d.  was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

    e.  was directly or indirectly involved in the oversight or implementation of the Company and Bank's internal controls;

    f.  was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and

    g.  approved or ratified these statements in violation of the federal securities laws.

12

57.    EGC is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

58.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to EGC under *respondeat superior* and agency principles.

## Confidential Witness

59.    Confidential Witness No. 1 ("CW1") is a former paid advisor and consultant to the EGC and its Board. CW1 was engaged by EGC in June 2006 as an advisor to the Company's Board as an expert in the U.S. gaming industry and a technology specialist. CW1's role as a consultant and advisor ceased in July 2009 when payments were stopped on what was a 3 year contract with EGC. According to CW1:

      a.    CW1 was hired by the Company in connection with the Company's efforts to expand and explore business opportunities in the United States, as nearly all of its revenues were derived from the Company's European and U.K. operations and EGC wished to expand its business in the US. During his tenure at EGC, EGC's U.S. operations were generating little to no sales as CW1 was informed that most if not all of EGC's sales were made through EGCL.

      b.    As part of his efforts on behalf of the Company, CW1 met Steinberg at the Four Seasons Hotel in New York City in the summer of 2007. During this meeting, Steinberg indicated his interest in managing and investing in a Company such as EGC. CW1 was privy to and involved in negotiations from late 2007 through 2008 between EGC and Steinberg concerning Steinberg investing in, and taking over control of the Company. During these negotiations,

Steinberg agreed that CW1 would either be appointed CEO and/or COO of the Company, after Steinberg joined the Company. Ultimately, CW1 was not appointed CEO and/or COO, after he had disagreed with Steinberg's choice of certain individuals to join the management team in late 2008 and early 2009. After Steinberg officially joined the Company, in January 2009, CW1's engagement with EGC was renewed.

c.      During CW1's tenure at EGC he met with defendants Steinberg, Houssels, Christiansen and Cole on many occasions. These meetings concerned several facets of EGC's business and operations, including but not limited to, (a) the formation and development of the Company's U.S. operations; (b) the hiring of personnel; (c) business and opportunities for the Company; and (d) potential strategic partnerships for the Company.

d.      Some of these meetings were held in New York in the June 2007 through November 2007 period and in London in the November 2007 through April 2008 time period. CW1 also attended meetings with the Individual Defendants in Las Vegas in December 2007 and February of 2008. Thereafter, beginning in February of 2009, CW1 continued to have discussions with the Individual Defendants through various modes of communications, including telephone and email.

e.      Defendant Steinberg wielded "great power" and control over the Company due to Steinberg's wealth, status in social circles as a Member of the British House of Lords and former head of one of the leading betting companies in the U.K. which was the largest bookmaker and casino owner in the UK at one time. He also held a

large position in EGC's equity and thereby handpicked his Board of directors and management team.

f.     During mid 2008, when Steinberg agreed to join the Company as Executive Chairman, he hand-picked his friends and associates as officers and directors of the Company.

g.     Steinberg selected defendants Farrell, Christiansen, Donovan and Houssels to serve as directors and officers of EGC and agreed to have Cole continue as a Director of the Company.

h.     Defendant Steinberg interviewed and selected defendant Donovan to serve as EGC's CEO in December 2008. Houssels and Christiansen were prior business and social contacts of Steinberg.

i.     Houssels, a former actress and ballerina, was Steinberg's real estate agent and sold him two condos at the MGM City Center Development in Las Vegas.  Houssels had no gaming or technology experience.  After her tenure in the movie industry, she became a real estate agent and worked for a series of organizations including MGM where she met Steinberg who was a high roller and a VIP client for the Bellagio Hotel and Casino.  Steinberg was a frequent visitor to Las Vegas and met with Houssels on a routine basis during his trips. Initially the headquarters of the Company was slated to be in Las Vegas as it is the capital of the global gaming industry and Nevada is where EGC is registered.  Houssels had decided to live in Orange County, CA and through her encouragement, in 2009 EGC's U.S. "offices" were moved to an Irvine, CA mail drop, while Houssels and Donovan operated from their residences.

j.     Houssels, as the Company's Executive Vice President and head of operations/sales was compensated with an annual salary of $375,000 and provided 1.5 million shares of Company stock.  Yet,

15

defendant Donovan's compensation was $250,000 per year and he was the CEO of the Company. Christiansen was paid $150,000 per year. Steinberg authorized these payments and arrangements for Houssels, Christiansen and Donovan.

**Board of Directors**

60.   From August 2008 through August 2009, there were eight EGC directors: Boyne, Cole, Steinberg, Farrell, Houssels, Christiansen, Donovan, and Schiff.

61.   From September 2009 through October 28, 2009, there were only seven directors because Boyne resigned at the end of August 2009. The remaining seven directors were Cole, Steinberg, Farrell, Houssels, Christiansen, Donovan, and Schiff.

62.   Between October 28 and November 2, 2009, Farrell and Schiff resigned and Steinberg died. From November 3, 2009 through February 21, 2010, there were only four remaining EGC directors: Houssels, Donovan, Christiansen, and Cole.

63.   A letter from Greenfield, signed by Defendant Boyne, to Lead Counsel for Plaintiffs, dated January 6, 2011, states: "board control passed to Donovan and Christiansen in November 2009."

64.   Houssels resigned from the Board on February 21, 2010.

**IV.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS OF MATERIAL FACT**

**A. Fiscal Year Ended December 31, 2006**

65.   The Class Period begins on April 5, 2007 when EGC filed with the SEC the Company's fiscal year ended December 31, 2006 results on Form 10KSB. In the 10KSB, signed by defendants, Cole and Boyne, the Company falsely described its ownership and control of EGCL.

66.   The 10KSB states in relevant part:

16

The Company was incorporated under the laws of the United Kingdom on April 6, 2000, under the name of Electronic Game Card, Ltd. Until 2002, the Company remained dormant and had no operations until August 8, 2002, then issuing stock for services. This date has been treated as the date of inception. On May 5, 2003, the Company entered into an agreement whereby it acquired 100% of the outstanding stock of Electronic Game Card Marketing, a Delaware Company. The Company ceased being a development stage company in 2006.

On December 5, 2003, the Company acquired 100% of the outstanding stock of the Electronic Game Card, Inc. (Nevada) in a reverse acquisition. At this time, a new reporting entity was created and the name of the Company was changed to Electronic Game Card, Inc.

The Company engages in the development, marketing, sale and distribution of recreational electronic software which primarily targets towards lottery and sales promotion markets through its Great Britain subsidiary.

*　　　*　　　*

The Company owns 100% of the share capital of Electronic Game Card, Ltd., a company incorporated under the laws of England, through its wholly owned U.S. subsidiary Electronic Game Card Marketing, Inc. (Delaware). Electronic Game Card Marketing Inc., is the marketing and sales operating division of Electronic Game Card Inc. in the USA which also owns and operates Electronic Game Card Marketing Ltd, as the UK and European marketing and sales division.

67.     The statements about EGC's ownership and control of EGCL are materially false and misleading because it failed to disclose:

a.      The existence and terms of the 2002 "Secret" Agreement signed by the "former CFO (and director)" (*i.e.,* Boyne), which could (and did cause) ownership of EGCL (and any bank accounts and investments held in EGCL's name) to revert or transfer to a third party. The May 19, 2010 8-K states in relevant part:

17

In addition, [EGC] has been unable to confirm the existence or value of a purported investment account in the name of Electronic Game Card (UK) Limited ("EGCL") with R.I.C. Asset Management Limited ("R.I.C."). **While the former CFO of [EGC] has stated that the R.I.C. investment account exists and had a balance of $12.9 million as of February 26, 2010, he asserts that [EGC] does not own the funds in the R.I.C. account because [EGC] no longer owns EGCL. This assertion is based on a document described as a 2002 agreement entered into among [EGC], EGCL and the original (unidentified) sellers of EGCL to [EGC].** The current [EGC] Board of Directors and management were unaware of this document, which was **signed by the former CFO on behalf of EGCL,** until after questions had arisen concerning the company's audited financial statements.

        b.     A purported contingency that EGCL (EGC's UK and European operations) could revert to a "master licence." This contingency is described in a February 25, 2010 letter from defendant Cole which was filed on Form 8-K with the SEC by EGC on April 9, 2010. A copy the Form 8-K and the letters attached thereto is attached hereto as Exhibit 3, and is incorporated herein by reference. The letter states in relevant part:

Due to certain actions which have been taken, unilaterally by the co-chairman **the Company's European business has reverted to a master licence which under the terms of which the company will net $9 million per annum (this does not include lotteries)**.

        c.     According to a UK company filing (Exhibit 2), on March 1, 2010, EGC no longer owned the share capital of EGCL and that an entity called EPN Advisory Limited owned 100% of the share capital of EGCL. Additional UK filings indicate that as of May 2, 2010 the sole directors of EGCL were Boyne and an entity controlled by Boyne called Greenfield Capital International Limited. A later filing dated July 9, 2010 lists Boyne and Greenfield Capital as the sole directors of

18

EGCL. Copies of the filings are attached hereto as Exhibit 4, and are incorporated herein by reference.

68.    To date, EGC has not disclosed the terms of the purported contract provision that permitted EGC's European operations, and assets (i.e. EGCL) to revert to a "master licence" and cause EGC to lose ownership of the assets of the business, and for Boyne to retain control of EGCL.

69.    EGC's continued ownership and control of EGCL the Company's U.K. and European operating subsidiary, was extremely material because the nearly all of the Company's revenues and sales were generated from and through the Company's European and UK operations.

70.    Additionally, the 10KSB falsely reported cash and cash equivalents at the fiscal year ended December 31, 2006 as $3,052,733 and revenue of $997,363 for fiscal 2006.

71.    EGC's reported cash at the end of the 2006 fiscal year, its revenue for 2006, and related statements are materially false and misleading for the following reasons:

        a.    On February 19, 2010 the Company filed an 8-K with the SEC entitled "Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Audit Report", announcing that on "February 12, 2009 [sic],"[2] the Company's auditor M&B, informed EGC's Board of Directors that M&B "had withdrawn its audit opinions for [EGC]'s financial statements for the years ended December 31, 2006, 2007, and 2008." The 8-K sets forth M&B's reasoning for withdrawing its audit opinions and confirms that Company's financial statements would have to be restated as follows:

_____

[2] On February 22, 2010, the Company filed an amended 8-K, correcting the date to February 12, 2010.

19

**M&B advised [EGC] that it had become aware of irregularities in the audit confirmation of a bank account represented to M&B as having been held by Electronic Game Card (UK) Limited ("EGC Ltd")**, a wholly owned subsidiary of [EGC] that conducts its European operations. **Based upon M&B's investigation and inability to confirm the balances in the account, M&B concluded that its prior audits could no longer be relied upon and that it was withdrawing its audit opinions related to [EGC] financial statements for the years ended December 31, 2006, 2007 and 2008 as of February 12, 2010.**

*     *     *

[EGC] intends to determine the adjustments necessary to reissue its prior financial statements, and file amended Annual Reports on Form 10-K for the years ended December 31, 2006, December 31, 2007 and December 31, 2008, and amended Quarterly Report on Form 10-Q for the periods ended March 31, 2009, June 30, 2009 and September 30, 2009 as soon as practicable.

b.   On February 19, 2010, the SEC instituted a temporary trading halt of the Company's stock "because of questions that have been raised about the accuracy of assertions by [EGC], and by others, in financial disclosures to investors concerning, among other things, the company's assets."

c.   On April 8, 2010, the Company issued a press release announcing that PricewaterhouseCoopers LLP, had "begun a forensic review of the circumstances that gave rise to EGC's independent auditors' withdrawal of its audit opinions...."

d.   On May 19, 2010, the Company filed an 8-K with the SEC providing additional information about the Company's intended restatement of its financial statements. The 8-K stated that EGC's Board "concluded that its financial statements for the years ended December 31, 2006, 2007 and 2008 should no longer be relied upon because preliminary findings of the previously announced forensic review ... have raised significant concerns as to the integrity of audited financial statements for the fiscal

20

---

years ended December 31, 2006, 2007 and 2008." The Company explained that it is concerned "that reported revenue may be materially overstated and that the reported carrying value of its assets and investment in third-party companies may not be fairly stated."

e. Because the Company's financial statements for the fiscal years ended December 31, 2006, 2007, and 2008 could no longer relied upon and had to be restated, the Company's financial statements and related information in its annual reports filed with the SEC were false when made.

f. Restatements are required for material accounting errors that existed at the time financial statements were prepared. *See* Statement of Financial Accounting ("SFAS") 154.

g. An accounting "error" is a term of art and results from, among other things, an error in recognition, measurement, or mistakes in the application of Generally Accepted Accounting Principles. SFAS 154.

h. Under SFAS 154, errors result from (i) mathematical mistakes, (ii) mistakes in application of GAAP, or (iii) oversight or misuse of facts that existed at the time the financial statements were prepared.

i. The May 19, 2010 8-K states that the Company's $12.9 million of cash was purportedly held in the name of EGCL with R.I.C. Asset Management Limited. However, defendant Boyne claimed that EGC no longer owned the funds in the R.I.C. account because EGC no longer owns ECGL, pursuant to the 2002 "Secret" Agreement entered into among EGC, EGCL, and the original sellers of EGCL.

j. Prior to May 19, 2010, Defendants never disclosed any such agreement, condition or contingency which would cause the Company to lose ownership of EGCL or its cash or investment accounts and for Boyne to retain control of EGCL.

21

72.     Since the Company's May 19, 2010 announcement, the Company has gone "dark" and has not issued <u>any</u> news releases or filed any periodic reports with the SEC.

73.     Filed with the 10KSB were separately signed Sarbanes-Oxley Act of 2002 ("SOX") certifications of defendants Cole and Boyne.   The signed certifications falsely attested that the 10SKB complied with the Exchange Act and that the "information contained in the [10KSB] fairly presents, in all material respects, the financial condition and results of operations of the Company."

74.     Cole and Boyne also certified that the they were each "responsible for establishing and maintaining disclosure controls and procedures (as defined in the Exchange Act...)..."; and the certifications falsely stated, in part, that the 10KSB (a) "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Annual Report," (b) "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash follows of the registrant as of, and for, the periods presented in this report," and  (c) each of them disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information," and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

75.     The SOX certifications are materially false and misleading because the Company failed to disclose its ownership and control of EGCL was subject to loss of ownership pursuant to the 2002 "Secret" Agreement (which Boyne had

22

signed), and the Company's annual report for fiscal year 2006 could not be relied upon and had to be restated as set forth more fully in ¶¶67, 71.

### B. Quarterly Reports for 2007

76.     On May 15, 2007, the Company filed with the SEC its financial results for the first quarter ended March 31, 2007 on Form 10QSB.  In the 10QSB, signed by defendants Cole and Boyne, the Company made similar material misstatements about its ownership and control of EGCL, as set forth above.  The 10QSB states in relevant part:

> The Company was incorporated under the laws of the United Kingdom on April 6, 2000, under the name of Electronic Game Card, Ltd. Until 2002, the Company remained dormant and had no operations until August 8 2002. On May 5, 2003, the Company entered into an agreement whereby it acquired 100% of the outstanding stock of Electronic Game Card Marketing, a Delaware Company.

> On December 5, 2003, the Company acquired 100% of the outstanding stock of the Electronic Game Card, Inc. (Nevada) in a reverse acquisition. At this time, a new reporting entity was created and the name of the Company was changed to Electronic Game Card, Inc.

> The Company is engaged in the development, marketing, sale and distribution of recreational electronic software which is primarily targeted towards lottery and sales promotion markets through its UK subsidiary.

77.     These statements concerning the Company's ownership and control of EGCL are materially false and misleading because EGC failed to disclose its that its ownership and control of EGCL was subject to the 2002 "Secret" Agreement signed by Boyne, that could (and did) cause the Company's ownership of EGCL (and any bank accounts and investments held in EGCL's name) to revert or transfer to a third party and for Boyne to retain control of EGCL, as set forth more fully in ¶ 67, above.

78.     Filed with the 10QSB were signed SOX certifications of Cole and Boyne, which are substantially the same as the SOX certifications filed with the

23

Company's April 5, 2007 10KSB. These SOX certifications are materially false and misleading for the same reasons the SOX certifications filed with the April 5, 2007 10KSB were false and misleading as set forth more fully in ¶¶67, 71, above.

79.     Nearly identical materially false and misleading statements were made in the Company's second quarter ended June 30, 2007 10QSB (and attached SOX certifications) filed with the SEC on August 14, 2007, and the Company's third quarter ended September 30, 2007 10QSB (and attached SOX certifications) filed with the SEC on November 14, 2007.

80.     The second and third quarter 10QSBs were signed, and separately certified under SOX, by defendants Boyne and Cole and are materially false and misleading for the same reasons the first quarter 10QSB was materially false and misleading, as set forth in ¶¶ 67, 71 above.

## C. **Fiscal Year Ended December 31, 2007**

81.     On March 26, 2008, the Company filed with the SEC on Form 10KSB the Company's financial results for the fiscal year ended December 31, 2007. In the 10KSB, signed by defendants, Cole and Boyne, the Company falsely represented its ownership and control of EGCL.

82.     The 10SKB contained nearly identical disclosures about EGC's purported ownership and control of EGCL as reported in the Company's April 5, 2007 10KSB described above. Therefore, the FY 2007 10KSB was materially false and misleading because EGC failed to disclose its that its ownership and control of EGCL was subject to the 2002 "Secret" Agreementsigned by Boyne, that could (and did) cause the Company's ownership of EGCL (and any bank accounts and investments held in EGCL's name) to revert or transfer to a third party and for Boyne to retain control of EGCL, as set forth more fully in ¶ 67, above.

24

83.    The March 26, 2008 10KSB the Company's reported cash and cash equivalents at the fiscal year ended December 31, 2007 as $4,753,040 and revenues for the fiscal 2007 of $6,038,058.

84.    The Company's statements about its cash and cash equivalents at the fiscal year ended 2007 and revenues earned in the FY 2007 10KSB are materially false and misleading because the Company must restate its financial statements for the fiscal year ended 2007, the Company's auditor pulled its unqualified audit opinion for the Company's fiscal year financial statements, and the Company admitted that it its revenues may be materially overstated, as set forth more fully in ¶¶ 67, 71, above.

85.    Filed with the 10KSB are SOX certifications separately executed by defendants Boyne and Cole, which are in sum and substance identical to the SOX certifications Boyne and Cole executed for the Company's FY 2006 10KSB. Thus, Boyne and Cole's SOX certifications filed with EGC's FY 2007 10KSB are materially false and misleading for the same reasons, as more set forth more fully in ¶¶ 67, 71, above.

**D. Quarterly Reports for 2008**

86.    On May 14, 2008 the Company filed with the SEC its financial results for the first quarter ended March 31, 2008 on Form 10-Q. In the 10-Q, signed by defendants Cole and Boyne, the Company made material misstatements about its ownership and control of EGCL similar to those it had made in its 10QSB's filed in 2007. The 10-Q states in relevant part:

> The Company was incorporated under the laws of the United Kingdom on April 6, 2000, under the name of Electronic Game Card, Ltd. Until 2002, the Company remained dormant and had no operations until August 8 2002. On May 5, 2003, the Company entered into an agreement whereby it acquired 100% of the outstanding stock of Electronic Game Card Marketing, a Delaware Company.

25