> On December 5, 2003, the Company acquired 100% of the outstanding stock of the Electronic Game Card, Inc. (Nevada) in a reverse acquisition. At this time, a new reporting entity was created and the name of the Company was changed to Electronic Game Card, Inc.

87.     These statements concerning the Company's ownership and control of EGCL is materially false and misleading because EGC failed to disclose its that its ownership and control of EGCL was subject to the 2002 "Secret" Agreement signed by Boyne, that could (and did) cause the Company's ownership of EGCL (and any bank accounts and investments held in EGCL's name) to revert or transfer to a third party and for Boyne to retain control of EGCL, as set forth more fully in ¶ 67, above.

88.     Filed with the first quarter 10-Q were SOX certifications separately executed by defendants Boyne and Cole, which are in sum and substance identical to the SOX certifications Boyne and Cole executed for the Company's FY 2006 10KSB.  Thus, Boyne and Cole's SOX certifications filed with EGC's first quarter 10-Q are materially false and misleading for the same reasons, as more set forth more fully in ¶¶ 67, 71, above.

89.     Nearly identical misstatements were made in the Company's second quarter ended June 30, 2008 10-Q (and attached SOX certifications) filed with the SEC on August 8, 2008, and the Company's third quarter ended September 30, 2008 10-Q (and attached SOX certifications) filed with the SEC on November 17, 2008.  The second and third quarter 10-Qs were signed, and separately certified under SOX, by defendants Boyne and Cole and are materially false and misleading for the same reasons the first quarter 10-Q and SOX certifications are materially false and misleading and as set forth more fully in ¶¶ 67, 71, above.

**E.  <u>Fiscal Year Ended December 31, 2008</u>**

90.     On March 16, 2009, The Company issued a press release announcing its fourth quarter and fiscal year ended December 31, 2008 results.   The press release touted that the "[d]uring the course of the last twelve months the company has delivered four profitable quarters and increased shareholder equity by $12 million, achieved cash balances net of all debt and convertible preferred of $3.5 million,…"   In the balance sheet portion of the press release, the Company reported cash of $8,281,899 and cash equivalents at $867,186 and total current assets of $12,151,747.   The press release also noted sequential and year-over-year growth of "cash and equivalents" of $1.3 and $4.4 million, respectively.   The Company also touted that its revenues for the full year 2008 increased over 76% to $10.6 million from $6 million in 2007.

91.     In commenting on the results, defendant Donovan is quoted as stating:

"2008 marked the Company's second successful profitable growth year. Our balance sheet is strong and our net cash balance is building consistently. Our company's technology platform is robust and has been prepared to quickly evolve into the next stage of the Company's growth. Electronic Game Card is securely positioned to achieve its earnings guidance of $0.14 per share for 2009," commented Kevin Donovan, CEO of Electronic Game Card, Inc

92.     On March 16, 2009 during the EGC Earnings Conference Call for the quarter and fiscal year ending December 31, 2008, Donovan made materially false and misleading statements. Donovan stated: "Full year 2008 net income totaled $6.3 million…. Our balance sheet has strengthened materially during the year. Cash and equivalents on December 31, 2008 were $9.2 million and an increase of approximately $4.4 million from year end December 31, 2007, and an increase of over $1.3 million from the period ended September 30, 2008."

93.     On March 24, 2009 the Company filed with the SEC its financial results for the fiscal year ended December 31, 2008 on Form 10-K, repeating the substantially same cash and equivalents line item and revenue as reported in the press release and repeated by Donovan during the conference call.

27

94.    The 2008 10-K also falsely represented the Company's ownership and/or control of EGCL. The 10-K states in relevant part:

> The Company was incorporated under the laws of the United Kingdom on April 6, 2000, under the name of Electronic Game Card, Ltd. Until 2002, the Company remained dormant and had no operations until August 8, 2002, then issuing stock for services. This date has been treated as the date of inception. On May 5, 2003, the Company entered into an agreement whereby it acquired 100% of the outstanding stock of Electronic Game Card Marketing, a Delaware Company. The Company ceased being a development stage company in 2006.
>
> On December 5, 2003, the Company acquired 100% of the outstanding stock of the Electronic Game Card, Inc. (Nevada) in a reverse acquisition. At this time, a new reporting entity was created and the name of the Company was changed to Electronic Game Card, Inc.
>
> *      *      *
>
> The Company owns 100% of the share capital of Electronic Game Card, Ltd., a company incorporated under the laws of England, through its wholly owned U.S. subsidiary Electronic Game Card Marketing, Inc. (Delaware). Electronic Game Card Marketing Inc., is the marketing and sales operating division of Electronic Game Card Inc. in the USA which also owns and operates Electronic Game Card Marketing Ltd, as the UK and European marketing and sales division.

95.    These statements about EGC's ownership and control of EGCL are materially false and misleading because, EGC failed to disclose its that its ownership and control of EGCL was subject to the 2002 "Secret" Agreement signed by Boyne, that could (and did) cause the Company's ownership of EGCL (and any bank accounts and investments held in EGCL's name) to revert or transfer to a third party and for Boyne to retain control of EGCL, as set forth more fully in ¶ 67, above.

28

96.    Filed with the 10-K were SOX certifications separately executed by defendants Boyne and Cole, which are in sum and substance identical to the SOX certifications Boyne and Cole executed for the Company's FY 2006 10KSB.

97.    Thus, Donovan's statements made in the March 16, 2009 Earnings Conference Call, the statements made in the March 16, 2009 press release, the FY 2008 10-K, and Boyne and Cole's SOX certifications filed with EGC's FY 2008 10-K are materially false and misleading for the same reasons, as more set forth more fully in ¶¶ 67, 71, above.

98.    Donovan as CEO violated the Sarbanes Oxley Act by not certifying the FY 2008 10-K.

### F.  Quarterly Reports for 2009

99.    On May 14, 2009 during the EGC Earnings Conference Call for the first quarter ending March 31, 2009, Donovan made materially false and misleading statements. Donovan stated: "For the first quarter of 2009 Electronic Game Card generated revenues of $3 million…. Electronic Game Card reported comprehensive net income of $1.7 million…. Your company and Board of Directors have been very highly disciplined in managing expenses and will continue to do so under my direction. Our balance sheet continues to strengthen. Cash and equivalents on March 31, 2009 were $9.7 million, an increase of approximately $4 million for first quarter 2008, and an increase of $1.4 million from December 31, 2008. At quarter end the Company's current assets totaled $12.8 million…"

100.    Donovan's statements made in the May 14, 2009 Earnings Conference Call are materially false and misleading for the same reasons, as more set forth more fully in ¶¶ 67, 71, above.

101.    On May 15, 2009, the Company filed with the SEC its financial results for the first quarter ended March 31, 2009 on Form 10-Q.  In the 10-Q, signed by defendants Cole and Boyne, the Company made material misstatements

about its ownership and control of EGCL similar to those it made in its 10QSB's filed in 2007 and 10-Qs filed in 2008. The 10-Q states in relevant part:

102.    The 10-Q states in relevant part:

The Company was incorporated under the laws of the England on April 6, 2000, under the name of Electronic Game Card, Ltd. Until 2002, the Company remained dormant and had no operations until August 8 2002. On May 5, 2003, the Company entered into an agreement whereby it acquired 100% of the outstanding stock of Electronic Game Card Marketing, a Delaware Company.

 On December 5, 2003, the Company acquired 100% of the outstanding stock of the Electronic Game Card, Inc. (Nevada) in a reverse acquisition. At this time, a new reporting entity was created and the name of the Company was changed to Electronic Game Card, Inc.

103.    These statements concerning the Company's ownership and control of EGCL is materially false and misleading because EGC failed to disclose that its ownership and control of EGCL was subject to the 2002 "Secret" Agreement signed by Boyne, that could (and did) cause the Company's ownership of EGCL (and any bank accounts and investments held in EGCL's name) to revert or transfer to a third party and for Boyne to retain control of EGCL, as set forth more fully in ¶ 67 and for Boyne to retain control of EGCL, above.

104.    Filed with the first quarter 10-Q were SOX certifications separately executed by defendants Boyne and Cole, which are in sum and substance identical to the SOX certifications Boyne and Cole executed for the Company's FY 2006 10KSB. Thus, Boyne and Cole's SOX certifications filed with EGC's first quarter 10-Q are materially false and misleading for the same reasons, as more set forth more fully in ¶¶ 67, 71, above.

105.    Donovan as CEO violated the Sarbanes Oxley Act by not certifying the 10-Q.

106.    Nearly identical misstatements were made in the Company's second quarter ended June 30, 2009 10-Q (and attached SOX certifications) filed with the SEC on August 14, 2009, and the Company's third quarter ended September 30, 2009 10-Q (and attached SOX certifications) filed with the SEC on November 20, 2009 The second and third quarter 10-Qs were signed, and separately certified under SOX, by defendants Boyne and Cole and are materially false and misleading for the same reasons the first quarter 10-Q and SOX certifications are materially false and misleading, as more fully set forth above in ¶¶ 67, 71, above.

107.    Donovan as CEO violated the Sarbanes Oxley Act by not certifying the 10-Q.

108.    On August 6, 2009 during the EGC Earnings Conference Call for the second quarter ending June 30, 2009, Donovan made materially false and misleading statements. Donovan stated: "For the second quarter 2009 Electronic Game Card generated record revenues of $3.1 million…. Electronic Game Card reported record comprehensive net income of $2 million…. Our balance sheet continues to strengthen. Cash equivalents and marketable securities on June 30, 2009 totaled $11 million, an increase of approximately $1 million from first quarter 2009 and an increase of $2 million from December 31, 2008."

109.    Donovan's statements made in the August 6, 2009 Earnings Conference Call are materially false and misleading for the same reasons, as more set forth more fully in ¶¶ 67, 71, above.

110.    In an August 6, 2009 press release announcing the Company's second quarter ended June 30, 2009 results, Defendant Donovan is quoted as stating:

"During this second quarter Electronic Game Card achieved **record revenue** and net income as well as **continued improvement in the company's net cash balance.** We have made great strides this quarter to materially add to this solid financial base as we progress through the second half of this year and beyond," commented Kevin Donovan, CEO of Electronic Game Card, Inc."

31

The Press Release also stated: "The Company reported a comprehensive net income … of $2.0 million… for the second quarter of 2009…. and a net income of $1.7 million…. Cash and equivalents on June 30, 2009 were $10.8 million…."

111.   The statements made in the August 6, 2009 press release are materially false and misleading for the same reasons, as more set forth more fully in ¶¶ 67, 71, above.

112.   On November 12, 2009 during the EGC Earnings Conference Call for the third quarter ending September 30, 2009, Donovan made materially false and misleading statements. Donovan stated: "During third quarter 2009, Electronic Game Card generated record revenues of $4.2 million…. We generated $2.9 million or $.04 per diluted share in comprehensive net income applicable to common stockholders, marking our 11th consecutive profitable quarter…. Cash and equivalents on September 30, 2009 totaled $12.7 million."

113.   Donovan's statements made in the November 12, 2009 Earnings Conference Call are materially false and misleading for the same reasons, as more set forth more fully in ¶¶ 67, 71, above.

### G. Additional Materially False Statements Issued in 2009

114.   On October 13, 2009, the Company filed a form 8-K with the SEC, signed by defendant Schiff, falsely stating that the Company "has signed a memorandum of understanding ("MOU") to form a strategic partnership with Poken Holding AG ("POKEN AG"), a privately held company based in Kilssnacht, Switzerland that owns the POKEN product and related intellectual property ("POKEN"). POKEN is a next-generation RF technology-based social networking platform."

115.   This announcement is materially misleading because the entry of the MOU and the related agreements were not entered into with the requisite approval of the Company's Board according to an undated letter by defendant Cole to defendant Houssels, filed with the SEC on April 22, 2010 on Form 8-K/A.  A copy

32

of 8-K/A is attached hereto as Exhibit 5, and is incorporated herein by reference. The letter states in relevant part:

> "EGC has established corporate governance procedures adopted by the Board (i) to ensure effective operation of the Company to maximize shareholder benefits, and (ii) achieve actual and apparent good governance and transparency. **Lately there have been too many actions taken ad hoc without following established procedures and proper consultation with the entire Board. This can lead to business missteps such as the recent case of Poken alleging that commitments were made by EGC pursuant to an agreement not authorized by the Board and were not fulfilled by EGC.** Inattention to the establish procedures undermines financial controls, reporting and accountability such as occurred with the recent unexpected jump in CA expenses and jeopardizes achievement of budget targets. Board members are required by law to exercise their best judgment; action without adequate prior preparation followed by proper consultation with all Board members does not satisfy legal requirements and is not authorized. Failure to follow established procedures exposes the Company and individual officers and directors who act outside established procedures to liability."
>
> \*     \*     \*
>
> <u>Poken</u>---I share all of your concerns regarding Poken. Yet again, this is an example of Kevin Donovan, apparently with Eugene Christensen's complicity based upon Eugene's approval of Kevin's conduct, **acting to commit the Company to significant transaction and expense without proper discussion among Board members much less Board approvals and compliance with procedures. As I have previously written to Kevin Donovan, Eugene Christensen and others, I did not receive the alleged Poken agreements, purporting to be effective as of 12 October 2009, until 22 December so I certainly hadn't been part of any Board meeting approving Kevin Donovan entering into those alleged agreements either.** There can be no question that an investment of the magnitude proposed should have had to have been formally approved by the Board of Directors. It is outrageous that Kevin Donovan and, apparently, Eugene Christensen have ignored this obvious requirement and, once again, attempted to rush commitments through without proper consideration or procedure.

## V.     TRUTH BEGINS TO EMERGE / LOSS CAUSATION

116.   On November 16, 2009, the Company filed with the SEC on Form 12b-25 a notification of late filing for the Company's third quarter ended September 30, 2009 10-Q.  The notification states in relevant part:

> The Registrant's annual report on Form 10-Q could not be filed within the prescribed time period due to the Registrant and its accountants requiring additional time to prepare and review the financial statements of the Registrant for the period ended September 30, 2009. Such delay could not be eliminated by the Company without unreasonable effort and expense. In accordance with Rule 12b-25 of the Securities Exchange Act of 1934, the Company will file its Form 10-Q no later than the fifth calendar day following the prescribed due date.

117.   This announcement caused the Company stock to fall $.15 per share, or 8%, to $1.70 per share through November 17, 2009.

118.   On February 10, 2010 the Company issued a press release announcing it was rescheduling a conference call with investors scheduled for that day to February 25, 2010.   The conference call was originally announced in the Company's February 1, 2010 press release to "Update Investors on Company Progress."

119.   The February 10, 2010 announcement caused the Company's stock to fall $.17 per share, or 15.8%, to $.901 per share on February 10, 2010.

120.   On February 12, 2010 it was announced after market close that Merriman Curhan Ford & Co. downgraded the Company's stock from a "Buy" recommendation to "Neutral."  The announcement caused the Company's stock to fall from $.91 to $.83 per share, or 8.8%.

121.  On February 19, 2010 trading in the Company's stock was temporarily suspended by the SEC "because of questions that have been raised about the accuracy of assertions by [EGC], and by others, in financial disclosures to investors concerning, among other things, the company's assets." The SEC's release states in relevant part:

SECURITIES EXCHANGE ACT OF 1934

34

Release No. 61544 / February 19, 2010
The Securities and Exchange Commission ("Commission") announced the
temporary suspension, pursuant to Section 12(k) of the Securities Exchange
Act of 1934 (the "Exchange Act"), of trading in the securities of [EGC], of
Irvine, California, at 9:30 a.m. on February 19, 2010, and terminating at
11:59 p.m. on March 4, 2010.

The Commission temporarily suspended trading in the securities of [EGC]
because of questions that have been raised about the accuracy of assertions
by [EGC], and by others, in financial disclosures to investors concerning,
among other things, the company's assets.

122.    The last trade price of the Company's stock immediately prior to the
trading halt was $.88 per share.

123.    On February 19, 2010 the Company filed an 8-K with the SEC
announcing that that its auditor, M&B, on February 12, 2010[3] withdrew its clean
audit opinions for the Company's financial statements for the years ended
December 31, 2006, 2007 and 2008.  The stated reason for this action was M&B
becoming aware of irregularities in the audit confirmation of a bank account
represented to M&B as having been held by EGCL and M&B's investigation and
inability to confirm the balances in the account.   The announcement states in
relevant part:

Item 4.02    Non-Reliance on Previously Issued Financial Statements or a
Related Audit Report or Completed Interim Audit Report.

(b)  On February 12, [2010], Mendoza Berger and Company, LLP ("M&B"),
the independent auditors for [EGC], informed the [EGC] Board of Directors
that it had withdrawn its audit opinions for [EGC's] financial statements for
the years ended December 31, 2006, 2007 and 2008.

M&B advised [EGC] that it had become aware of irregularities in the audit
confirmation of a bank account represented to M&B as having been held by
Electronic  Game  Card  (UK)  Limited  ("EGC  Ltd"),  a  wholly  owned

---

[3]  See footnote no. 2.

subsidiary of [EGC] that conducts its European operations.  Based upon M&B's investigation and inability to confirm the balances in the account, M&B concluded that its prior audits could no longer be relied upon and that it was withdrawing its audit opinions related to [EGC's] financial statements for the years ended December 31, 2006, 2007 and 2008 as of February 12, 2010.

**Kevin Donovan, the Chief Executive Officer of [EGC], has discussed all matters described above with M&B, and has provided a copy of this Form 8-K to M&B.**

(Emphasis added.)

124.  In the February 19, 2010 8-K, the Company also explained that the Company would determine the necessary adjustment and reissue corrected financial statements for the fiscal years ended 2006, 2007, 2008, and the first three quarters of 2009.  The 8-K states in relevant part:

[EGC] intends to determine the adjustments necessary to reissue its prior financial statements, and file amended Annual Reports on Form 10-K for the years ended December 31, 2006, December 31, 2007 and December 31, 2008, and amended Quarterly Report on Form 10-Q for the periods ended March 31, 2009, June 30, 2009 and September 30, 2009 as soon as practicable.

125.  On February 24, 2010, the Company issued a press release announcing it had postponed the shareholder conference call with investors scheduled for February 25, 2010 (per the Company's February 10, 2010 press release above) "due to the suspension of trading of its common shares.  The Company noted that it "is working diligently with its independent auditor to address the situation and will update investors as soon as possible."

126.  On March 5, 2010 the Company's shares began trading again with an opening price of $.25 per share.  The last trade immediately prior to the halt was $.88 per share.

127.  During the afternoon of March 5, 2010, the Company issued a press release announcing that it "believes that there will be no material change to the

36

Company's net asset value upon the completion of the review of its financial statement by its independent accountant."

128.   Notwithstanding the false reassurances from the Company, the Company's stock closed at $.44 per share on March 5, 2010 down, $.44 per share, or 50%, from its previous closing price.  The Company's stock fell an additional $.10 per share, or 22.7%, the following trading day.

129.   The March 5, 2010 assurance was materially false and misleading because on March 1, 2010 EGC no longer owned the share capital of EGCL, and an entity named EPN Advisors Limited owned all the share capital of EGCL (*See* Exhibit 2).  Defendants never disclosed this to investors.

130.   Boyne and Cole had resigned from management of EGC, so they did not author or sign the March 5, 2010 press release.

131.   On March 19, 2010, the Company issued a press release which revealed the dire financial situation of the Company.  The announcement stated that the Company had engaged G.C. Andersen Partners, LLC, to serve as the Company's strategic and financial advisor.  According the announcement, "[d]ue to EGC's state of affairs, one of Andersen Partners' first initiatives will be to raise working capital funds to enable the Company to engage legal, accounting and other service providers to review the historical operating and financial performance of EGC and its subsidiaries."

132.   Commenting on the engagement of G.C. Andersen Partners in the press release defendant Donovan stated:

> Kevin Donovan, CEO and Interim Joint Chairman of Electronic Game Card, Inc., said, "Having the support of an experienced advisor such as G.C. Andersen Partners will allow us to review our operations and identify the most advantageous options for the Company and its shareholders going forward."

133.   This announcement caused the Company's stock to fall $.17 per share, or 13.6%, to $.18 per share on March 19, 2010.

134. On May 18, 2010, after market close, the Company issued a press release entitled "Electronic Game Card, Inc. Provides Stockholder Update" which provided additional and new information about the Company's financial statements. The press release states in relevant part:

> IRVINE, CA, – May 18, 2010 - Electronic Game Card, Inc. provided the following update to its stockholders.
>
> The investigation into [EGC's] financial position is continuing. However, preliminary findings have raised significant concerns as to the integrity of audited financial statements for the fiscal years ended December 31, 2006, 2007 and 2008. [EGC] is concerned that reported revenue may be materially overstated and that the reported carrying value of its assets and investments in third-party companies may not be fairly stated.
>
> In addition, [EGC] has been unable to confirm the existence or value of a purported investment account in the name of Electronic Game Card (UK) Limited ("EGCL") with R.I.C. Asset Management Limited ("R.I.C."). While a former CFO (and director) of [EGC] has stated that the R.I.C. investment account exists and had a balance of $12.9 million as of February 26, 2010, he asserts that [EGC] does not own the funds in the R.I.C. account because [EGC] no longer owns EGCL. This assertion is based on a document described as a 2002 agreement entered into among [EGC], EGCL and the original (unidentified) sellers of EGCL to [EGC]. The current [EGC] Board of Directors and management were unaware of this document, which was signed by the former CFO on behalf of EGCL, until after questions had arisen concerning the company's audited financial statements.
>
> With respect to [EGC's] Series A Convertible Preferred Stock, it appears that a certificate of designation establishing the terms of the Series A Convertible Preferred Stock was not filed with the Secretary of State of Nevada, where [EGC] is incorporated. This fact, among others, calls into question, among other things, the validity of the preferred stock and the accuracy of disclosures relating to capitalization and similar matters in [EGC] historical financial statements, periodic reports and proxy statements filed with the Securities and Exchange Commission (the "SEC").
>
> [EGC] continues to investigate these matters. The SEC, which suspended trading in [EGC] stock for two weeks starting on February 19, 2010, also

38

continues to investigate. [EGC] continues to explore its strategic options, which may include filing for bankruptcy protection.

135.   On May 19, 2010 the Company filed with the SEC an 8-K which attached the May 18, 2010 press release and stated that on May 18, 2010 that "the Board of Directors of Electronic Game Card, Inc. [EGC] concluded that its financial statements for the years ended December 31, 006, 2007 and 2008 should no longer be relied upon because preliminarily findings of its previously announced forensic review of the circumstances that gave rise to [EGC's] independent auditors withdrawal of its audit opinions... ."

136.   The adverse information in these disclosures caused the Company's stock to fall $.09 per share, or 75%, to $.03 per share on May 19, 2010.

137.   Since May 19, 2010, the Company has gone "dark." The Company has not issued a single press release or made any SEC filings.   The price of the Company's stock has drifted downward.  As of September 7, 2010, the Company's stock closed at 1 cent per share and had a market capitalization of approximately $550,000, compared to a class period high of $2.20 per share and market capitalization of over $100 million.

VI.   **ADDITIONAL ALLEGATIONS DEMONSTRATING FALSITY AND SCIENTER**

138.   The following additional facts, when considered holistically with the other allegations in the Complaint, demonstrate a cogent and compelling strong inference of scienter and further demonstrate the falsity of Defendants' statements.

139.   The Company is subject to an ongoing SEC investigation concerning the validity of its financial statements and assets.

140.   Present and former members of EGC management have accused each other of wrongdoing.

      a.   In an April 20, 2010 letter from defendant Cole to EGC's Board, filed with the SEC on Form 8-K/A on April 22, 2010 (Exhibit

39

5), Lee Cole asserted that the Company's Co-Chairman (defendant Donovan and Christiansen) deliberately spread misrepresentations, delayed the announcement of his resignation, omitted facts concerning Cole's resignation, interfered with the Company's audit and provided misrepresentations to EGC's auditors, the letter states in relevant part:

Gentlemen:

In keeping with the inappropriate conduct which the Co-Chairmen of the Electronic Game Card Inc. (Nevada) (the "Company" or "EGC") *have routinely followed for months*, **I was not consulted prior to the grossly late *filing* of the Current Report on Form 8K announcing my resignation but, instead, was furnished with the filing as a fait accompli after the fact.** In describing my resignation, the Co-Chairmen, Kevin Donovan and Eugene Christensen, had the following written on behalf of EGC:

> [EGC] believes that the disagreement that led to Mr. Cole's resignation related to his dissatisfaction with the way the [EGC's] U.S. operations were being run.

**The Co-Chairmen and EGC are well aware that my resignation resulted, instead, from broader concerns over conduct by the Co-Chairmen over an extended period of time. Clearly the Co-Chairmen have chosen not to disclose those broad concerns which I had expressed repeatedly over several months to no avail.** The non-performance by management is only a part of the concern I had expressed. **Consequently, in accordance with paragraph (a) (3) of Item 5.02 of the Form for Current Reports on Form 8K, I am herewith furnishing this letter to EGC stating that I disagree with the statements made by the Co-Chairmen on behalf of EGC in describing my resignation and providing an explanation of the basis for my disagreement in the expectation that the Co-Chairmen will comply on behalf of EGC with the requirements of Item 5.02 of the Form and file this letter, and its attachments, as an exhibit by an amendment to the previously filed Form 8K.**

I, and my colleague, Linden Boyne, and the company ("Sterling FCS") that employs us to furnish various management support services to EGC, have

40

previously informed the Board of our concerns orally and in numerous letters and reports various correspondence to the Board . (I, Linden Boyne and Sterling FCS are sometimes referred to below as "the parties").

"The parties" have at all times acted within the remit of the Sterling FCS contract to provide various management support services which adheres to EGC's bylaws, committee charters and resolutions and other authorities as established 2 March 2006 when Sterling FCS's contract was amended and it became responsible for providing individuals to perform EGC's CEO function as well as the CFO function.
                              *       *       *

**From information received I believe that selective and misleading disclosure has been made by the Co-Chairmen with reference to me, Linden Boyne and Sterling FCS.**

**From information received it appears that these misrepresentations have been deliberately spread to cause damage to both "the parties", EGC, and EGC's public shareholders.**

From November 3rd when Kevin Donovan and Eugene Christensen were appointed as Co-chairman there has been a catalogue of what now appear to have been deliberately obstructive tactics by US management and their agents which have been described at length in our letters and reports to the Board.

We became concerned by signs suggesting that management were incurring considerable unauthorised and unbudgeted expenses despite efforts by management to delay disclosure. Management failed to furnish information on these points despite repeated requests.

In December 2009 there was a sudden flurry of activity concerning a potential merger in what management described as an emergency. I found that months earlier management had entered into commitments to and agreements with the proposed partner of which I was unaware and without authorisation by the Company's full Board. I requested customary due diligence materials, including any business plans and projections for the combined entity but management was unable to furnish these items which apparently had not been prepared. I remarked that I would be unable to

41

approve a transaction without customary due diligence materials and review and management turned its attention to other matters.

Subsequent to November 3rd Sterling had been extremely concerned by the lack of any business generation in the US and the escalating expenses and had also been extremely concerned that Company procedures and processes were being ignored by the Co-Chairmen---not just in the instance mentioned above but in other cases as well---and a meeting was scheduled to be held on January 7th to discuss Company business. Sterling made a determined effort to have these concerns included prominently on the agenda for the meeting. Despite EGC's own Board procedures and common sense, the Board meeting agenda was not circulated to the entire Board by the Co-Chairmen until the actual day of the January 7th meeting (although we did later determine that the Co-Chairmen had circulated the agenda selectively to some Board members and not others) and it contained none of the agenda items Sterling had requested. Taken altogether, the circumstances dictated that the meeting was not properly noticed for Board members to make prudent informed decisions and myself and Linden Boyne did not attend.

We were promised prompt delivery of a record of the January 7 meeting in order that we might review and react to discussion items but despite follow-up requests we did not receive a transcript until a fortnight later. We eventually received, in addition, a copy of the letter announcing intention to resign which Anna Houssels sent in on 25th January. When we received the transcript of the call and Anna's resignation letter it became apparent that US management was engaging in more obstructive and damaging conduct. We sent a comprehensive reply to Anna's letter to correct her misunderstandings and furnish information which the Co-Chairmen had apparently withheld from her. We aren't surprised that in the Form 8K reporting the resignations of Anna Houssels and me the Co-Chairmen arranged to attach Anna Houssels' full letter but omitted my response (which is attached as "exhibit 1" ) , which was part of the explanation of disagreements with the Co-Chairmen which ultimately led to my resignation.

Subsequent to this the Co-Chairmen continued to engage in **obstructive and damaging behaviour even more extreme than previously. They contacted banks and EGC's auditors and interfered with EGC's audit**

42

**process by not going through the proper channels and not informing the CFO or the only remaining member of the Board's Audit Committee.**

**Throughout this period the Co-Chairmen were confusing Mendoza Berger, EGC's auditors, by repeating misinformation resulting from the Co-Chairmen's interference in the audit process. The Co-Chairmen continued to interfere and hinder the process by not informing Sterling of the incorrect information they were circulating despite repeated requests from Sterling. If common sense and proper channels had been followed misinformation would not have been passed to Mendoza Berger, confusion would have been avoided or easily corrected and EGC would not have been damaged.**

Subsequent to this the Co-Chairmen continued to act outside the remit of EGC's charters. Belatedly recognizing their lack of authority, they have attempted to change the committee charters and increase their authority (please see letter to the Board 24th March, "Exhibit 2") ---without going through proper channels and committees or otherwise following proper and prudent procedures, of course.

Prior to the Board meeting scheduled to be held on February 22nd Linden Boyne and myself registered our dissatisfaction with the fact that we had both not been allowed to carry out our properly constituted positions with EGC and that the actions of the Co-Chairmen had caused EGC substantial damage as they had not heeded repeated warnings regarding their misconduct. On 25th February I and Linden Boyne submitted our resignation letters and a draft 8K announcing the same which became effective on March 1, 2010. EGC has not properly reported those resignations despite our requests that the Co-Chairmen do so .

Although I have resigned as an officer and director and Linden Boyne as CFO we have continued in good faith to assist EGC under the Sterling contract despite continuing obstruction and misinformation by US management.

The information listed above along with the information included within Exhibits 1-2 illustrates our concerns, not just with US operations but with corporate governance by the Co-Chairman, which formed the basis for disagreement and, ultimately, resignation.

43

(Emphasis added.)

   b. The April 22, 2010 8-K/A (Exhibit 5) also contained an undated letter from defendant Boyne to the Company's Donovan and Christiansen stating that there is "tissue of misstatements and improper behavior in which you continue to engage is breathtaking" in connection with "falsehoods" in the Company's Board of Directors meeting minutes.  Additionally, the letter corroborates the assertions made by defendant Cole set forth above.  The letter states in relevant part:

Gentlemen:

I am in receipt of the minutes of the so-called February 22, 2010 board meeting and the so-called March 15, 2010 board meeting. I will limit my response at this time but, the issue of misstatements and improper behaviour in which you continue to engage is breathtaking.

    *  *  *

The minutes of the February 22nd meeting state that you attempted to retain legal counsel and amend the Company bylaws. Once again, you have attempted actions without following appropriate procedures. Was a bylaws change considered and reviewed by the appropriate Board committee? Was engagement of counsel similarly considered by the appropriate Board committee? Has care been taken to analyze costs or conflicts of interest? Of course not; you persist in ignoring common sense and procedures as you continue unilaterally to take control of a public company without any reference or consideration for the company's procedure and byelaws or the shareholders...

Also, one notes that you apparently have filed a Form 8K on behalf of the Company; quite an interesting development, given the damage that misstatements in that Form 8K caused the Company as it was filed without circulation to the Board for comment and due authorisation. Perhaps, in your continued selective disclosure and secret and improper decision-making you forgot these points?

Your self-serving and self-aggrandizing misstatements and actions continue in the same pattern. S,. [sic] **How could you possibly state in February 22nd minutes that "Mr. Cole had raised issues as to the validity of the January 7, 2010 meeting, but did not state any specific defect with respect to the notice or conduct of the meeting"? You have received lengthy written explanations of objections to that meeting, quite apart from our oral discussions, so it is appalling that you would state so blatant a falsehood as if making your untrue statement would somehow make it true.**

**The comments you make in the minutes about myself and audit matters at root are utterly false** How can you suggest that I have not furnished financial information without acknowledging the numerous requests made to you for financial documentation in order to complete work on financials? Your failures to respond are documented. Your omission of these facts, and your refusal to furnish the relevant information, is all the more revealing in the context that we have repeatedly expressed our concern that you have inappropriately incurred substantial undisclosed liabilities in the name of the Company and otherwise.

However, if anything, **those omissions by you pale in comparison to your brazen misstatement and mischaracterisation of dealings with the Company's accountants. As we have repeatedly informed you (and as the record clearly shows), there was no problem with completion of the Company's financial statements until you surreptitiously and (we believe) maliciously interfered with the audit process.** You contacted banks directly, ignoring the CFO and the Audit Committee, acting upon misinformation and then, what is worse, conveyed that misinformation to the Company's auditors again without reference to the proper channels. **Your conduct in this regard is all the more shameful given that it your statement to the auditors that a bank account did not exist was subsequently proven to be incorrect and based upon a misunderstanding which arose when you acted outside the companies proper channels and contacted the bank directly rather than through or even with the myself as CFO.** You need only have asked the question and irreparable harm to the Company and its shareholders could have been avoided. Instead, you clearly persist in an effort to seek, establish and, if possible, exaggerate problems to distract attention from your own non

45

performance rather than to take actions in the best interest of the Company and its shareholders.

Your efforts in the February 22nd minutes to retroactively justify improper change of directors of Electronic Game Card Limited (which you initially undertook surreptitiously in December 2009 without any Board approval or discussion whatsoever) and to move accounts of that company failed to disguise actions which were so damaging to EGC. You were well aware of the underlying contracts which you have blatantly breached and yet you persisted in this conduct. You were warned repeatedly that you should not act in violation of contractual obligations and you chose to ignore the warnings and, thereby, incur liability for the damage to the Company and its shareholders. As if this were not enough, you ought to have known not to act to disrupt the company's European business relationships without prior discussion with those who are the generating the business, particularly as they are the only ones generating any income for the Company. Your failure to act sensibly merely emphasises [sic] our concern that you appear to be motivated by an agenda that is not to the benefit of the Company or its shareholders.

With regard to the SEC, the statements in the February 22nd minutes are deliberately misleading and false insofar as you neglected to mention the improper contacts by Mr. Donovan and Mr. Morgan with the SEC, in which the misinformation referred to above was apparently passed to the SEC, which have cause harm not only to the Company and its shareholders but to Sterling and Messrs. Cole and Boyne individually.

                    *        *        *

Finally, the statement in the February 22nd minutes you have made various unfulfilled requests for case studies, samples, etc. from the London office are patently false. In fact, the London office has provided numerous case studies, samples and pricings. The European business has been dealt with by Limited as provided under contract and confirmed, prior to his untimely demise, with Lord Steinberg, the past Chairman. Your statements are merely a smokescreen---and a poor one, at that---for the complete lack of performance by the U.S. operations and management.

Your misconduct continues to be reflected in the March 15th minutes. Have new Board members actually been appointed? After review and approvals by what committee of the Board? .

46

Oddly, the March 15th minutes appear to suggest that you did not remove myself as CFO at the so-called February 22nd meeting after all and fail to mention my resignation or the reason for my resignation.

*     *     *

Yet again, the March 15th minutes make false statements concerning myself. **I have repeatedly requested information from the U.S. office since December, which has not been forthcoming and has repeatedly stated that the information was required in order to complete financial statements. After your failure to cooperate in timely fashion or at all, and your repeated and malicious interference in the audit process and incitement of the SEC, your assertions that I am somehow at fault are totally unacceptable.**

The March 15th minutes again make ridiculous statements by suggesting that the complete failure of the U.S. operations and management to generate a single order for any product in the last year can be laid at the doorstep of the London office which had generated all of the Company's income. You statements that you have not had access to information are false and your attempt to excuse your total failure by blaming the only part of the organisation which has produced income is not credible.

I should add that Cole and I submitted our resignations as officers and Mr. Cole's resignation as a director of the Company on March 1 2010 but have nonetheless attempted to continue to assist the Company in good faith, despite your misconduct and lack of cooperation, under the Sterling contracts. Why have you not disclosed those resignations, or filed the appropriate Form 8Ks by now? *Why has an 8K concerning the resignation by Ms. Houssels not been filed?* You continue to compound your misconduct to the ultimate damage of the Company and its shareholders, but also the individuals in question. Clearly, *you have engaged in selective (and frequently improper) disclosure for so long* that you don't even feel the need to comply with any disclosure requirements.

(Emphasis added.)

47

     c.    In a January 25, 2010 resignation letter from defendant Houssels to EGC's Board (Exhibit 3), Houssels asserted that the last "Bank confirmation" was September 2009 and that that Board has been unable to secure the requested "Confirmation of Funds." Houssels also raised issues concerning the difference between the Company's Series A convertible preferred stock activity summary as compared to what was represented in the Company's third quarter 2008 10-Q, she also raised issues concerning previously undisclosed "EGMI –Delaware" entity that "was never listed in an exhibit to SEC filings as a Subsidiary as require" [sic]. Surprisingly, and contrary to the Company's prior SEC filings, she noted the lack an Audit Committee within the Company. The letter states in relevant part:

There are a myriad of issues that I have raised recently as part of my obligations as a Board member. To reiterate:

1- Bank Confirmations
The last Bank Confirmation was September 2009. **As BOD's _we have all_ continuously requested Confirmation of Funds and have been unable to secure them.** I have no idea what the reasons for this are but I know that without this I am not doing my job as a director in protecting the shareholders. I have requested bank Confirmations repeatedly. I of course I have kept the 25-30 or so requests along this line – If you want I can forward them to you should you need evidence of this;

3- Series A Stock (Status)

Numerous requests have been made for documentation on the Series A stock, nothing has been resolved and this has raised some concerns. As per Tom Schiff's advice, specifically, Linden needs to explain/reconcile the difference between the activity summary and what was published in the last 10Q. Also, he should be able to provide a list of Series A holders and amounts owned by each. (Actual Documentation, not verbal confirmation);

48

4- Common Stock – Outstanding

> As per Tom Schiff's advice, "Kevin Donovan, as CEO of the company, should request from Michael Mullings of Continental Transfer a current copy (thru the date of request) of the Master Control for EGC Common Stock. This will show stock issuance activity that will shed light on the 70MM share number shown on the face of the latest 10Q filing generated by Lee and Linden". I am unsure where we stand on this;

5- [EGC], EGMI Delaware (Manufacturing) – Clarification
(Please see notes below from Thomas Morgan):

> EGMI-Delaware was never "up stream" merged with [EGC], and is a separate entity.  While wholly owned by [EGC], EGMI-Delaware's assets were never transferred to [EGC].  I don't know if EGMI-Delaware is in good standing, but will find ask a paralegal to find out.  I have not seen any evidence that business has been conducted in the name of EGMI-Delaware.  I don't know what assets it had when acquired, or how they have been managed since the acquisition.

> Two "EGMI" entities that show up as Delaware entities-
> Electronic Game Card, Inc.
> Electronic Game Card Manufacturing, Inc.
> Do any of you know about the second corp?

> EGMI-Delaware was never listed in an exhibit to SEC filings as a Subsidiary as require [sic];.          .

6-Audit Committee

> We need an Audit Committee but do not have enough Board Members as of yet.

(Emphasis added.)

141.   The magnitude of the restatement and misconduct at issue further supports a strong inference of scienter.

>           a.     EGC was at all relevant times a small company with no more than 10 employees per the Company's most recent 10-K.

49

b.      According the May 18 and 19, 2010 announcements $12.9 million of cash and cash equivalents, either no longer, or never, belonged to the Company and should not have been reported as an asset of the Company on its balance sheet, due to the undisclosed 2002 "Secret" Agreement.   $12.9 million constituted nearly *all* of EGC's cash and cash equivalents.  According to the Company's most recent 10-Q filed on November 20, 2009, the reported at September 30, 2009, $12,696,691 in cash and cash equivalents, $18,385,648 in total current assets, and $27,073,478 in total assets.  The $12.9 million in cash and cash equivalents EGC either no longer, or never owned, constituted 70% and 47% of the Company's total current assets ad total assets, respectively, at September 30, 2009.

c.      Throughout the Class Period, the Company's cash and cash equivalents constituted a material percentage of the Company's assets as reported in its periodic reports filed with the SEC.   For example, as reported the Company's April 5, 2007 10KSB for FY 2006, cash and cash equivalents constituted 76% of the Company's total current assets on the balance sheet.  In the Company's March 26, 2008 10KSB for the FY 2007, cash and cash equivalents constituted 63.7% of the Company's total current assets on the balance sheet.

d.      The restatement implicates three years worth of financial statements and involves straight forward and fundamental measures of a Company, i.e. cash, assets and revenue.   EGC's auditors have withdrawn its clean audit opinions for three years of the Company's financial statements for fiscal years 2006, 2007 and 2008, and the Company has confirmed it would need to restate those financial statements.

50