e.    The restatement also implicates the validity of the Company's disclosures concerning the Company's Series A convertible preferred stock and the capitalization of the Company, due to among other things, the failure of the Company to simply file a certificate of designation with Secretary of State of Nevada for the preferred stock. The May 19, 2010 8-K states in relevant part:

> With respect to [EGC's] Series A Convertible Preferred Stock, it appears that a certificate of designation establishing the terms of the Series A Convertible Preferred Stock was not filed with the Secretary of State of Nevada, where [EGC] is incorporated. This fact, among others, calls into question, among other things, the validity of the preferred stock and the accuracy of disclosures relating to capitalization and similar matters in [EGC's] historical financial statements, periodic reports and proxy statements filed with the Securities and Exchange Commission.

142. Throughout the Class Period the Company falsely assured investors that its internal control over financial reporting and disclosure controls were effective. In addition to the misstatements alleged herein, on April 15, 2008, the Company issued an 8-K stating that its FY 2007 10KSB was mistakenly filed "[a]s a result of a miss-communication [sic] between Registrant and its auditors, Mendoza Berger & Company, L.L.P., Registrant mistakenly understood that its auditors had completed their audit of the financial statements contained in that Form 10-KSB and had consented to the use of the financial statements." Ultimately the Company filed the restated 10KSB with the SEC on April 15, 2008 with no materially apparent changes. Thereafter on May 14, 2008 the Company filed its first quarter ended March 30, 2008 results, in the section of the 10-Q discussing the Company's "controls and procedures" EGC stated that the Company "found it necessary to upgrade its procedure for contact with our auditors," yet the Company found that its controls and procedures were effective.

CONSOLIDATED SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
No. SACV-10-00252-DOC(RNBx)

143. Throughout the Class Period the Company's senior management has access to and monitored the Company's cash and revenue because they touted the Company's growing cash, revenue and financial health. For example:

    a. In a March 16, 2009 press release announcing the Company's results for the fiscal year and fourth quarter ended, December 31, 2008, Defendant Donovan is quoted as saying:

"2008 marked the Company's second successful profitable growth year. Our **balance sheet is strong and our net cash balance is building consistently**. Our company's technology platform is robust and has been prepared to quickly evolve into the next stage of the Company's growth. Electronic Game Card is securely positioned to achieve its earnings guidance of $0.14 per share for 2009," commented Kevin Donovan, CEO of Electronic Game Card, Inc.

    b. In an August 6, 2009 press release announcing the Company's second quarter ended June 30, 2009 results, defendant Donovan is quoted as stating:

"During this second quarter Electronic Game Card achieved **record revenue** and net income as well as **continued improvement in the company's net cash balance.** We have made great strides this quarter to materially add to this solid financial base as we progress through the second half of this year and beyond," commented Kevin Donovan, CEO of Electronic Game Card, Inc.

    c. In a November 12, 2008 press release, defendant Steinberg touted the Company's "growing balance sheet."

144. According to CW1, in a March 2008 email from Steinberg's secretary relaying a message to CW1 and others, Steinberg noted that EGC's larger shareholders at the time, Pequot, Trafelet, and Ingalls & Snyder, had suspicions that EGC's financial figures may not be what they seem. Such meetings were taking place between Steinberg and EGC's larger shareholders to ensure Steinberg's appointment as Chairman. In early to mid-2008, CW1 advised Steinberg that he hire a forensic accountant to review the Company's financials

and particularly EGC's sales agreements and other agreements in order to conduct proper due diligence of the Company and its operations prior to joining EGC. In December 2008, CW1 also requested that defendant Farrell, who at the time was an EGC director and Audit Committee member to conduct a forensic examination of the Company's financial statements. At anytime during his tenure at EGC, CW1 was not aware if any such forensic examination took place.

145. Donovan, as CEO, failed to meet the SOX requirement that he sign certifications that the financial statements in each of the 10K and 10Qs filed in 2009 fully comply with federal securities laws.

146. Donovan never instituted legal process to stop the transfer of EGCL from from EGC to EPN.

147. Defendants' explanation that EGC lost all of its cash because it was forced to relinquish ownership of EGCL due to the 2002 "Secret" Agreement and the purported contingency that EGCL would revert to a "master license" (as stated by Cole in his February 25, 2010 letter) is false and misleading for the following reasons:

    a. EGCL's financial statements filed with UK regulators state that EGCL had only £763 in cash as of December 31, 2008, while EGC's 2008 10K lists cash balances of $8.3 million. This huge discrepancy means that likely neither EGC nor EGCL had $8.3 million of cash on December 31, 2008 – and EGC's entire balance sheet was a sham. The inference that EGC was a complete sham is further evidenced by Houssels's and the other EGC directors' inability to get any bank confirmations from EGCL. Had the funds been in EGC bank accounts, the EGC directors would have had no problem getting bank confirmations after the supposedly successful September 2009 bank confirmation. The funds were not in EGCL's accounts, as EGCL showed only £763 on its balance sheet rather than the $8.3

million shown on EGC's balance sheet as of December 31, 2008. It is unbelievable and indicative of fraud that EGCL had been transferring over the years all of the cash it earned to EGC until October 2009, EGC voluntarily transferred all of its cash back to EGCL, just before EGC lost ownership of that cash and EGCL.

    b.    Additionally, the missing $2.8 million and $3.7 million of accounts receivable that EGC showed on its December 31, 2008 (reported in EGC's 2008 10K) and September 30, 2009 (reported in EGC's 2009 3Q) balance sheets, respectively, also indicates EGC was a complete fraud. Donovan swore under penalty of perjury in EGC's Summary of Schedules filed in the United States Bankruptcy Court for the Northern District of Nevada, Las Vegas Division that on October 12, 2010 EGC owned $0 in accounts receivable and $0 cash. In EGCL's UK filings, its December 31, 2008 balance showed accounts receivable of only £17,908–demonstrating that if the accounts receivable reported in SEC filings as of December 31, 2008 really existed, they were owned directly by (and payable directly to) EGC, and not EGCL. Had the accounts receivable truly existed, EGC would have received some of the accounts receivable as cash and continued to report some accounts receivable as still owing in its bankruptcy schedule on October 12, 2010. Instead EGC reported $0 cash and $0 accounts receivable, further proving EGC's entire financial statements were fraudulent.

    c.    Moreover, Cole stated in his February 25, 2010 letter that after EGCL was transferred from EGC, the 2002 "Secret" Agreement would provide EGC with $9 million of licensing fees per year, and if EGC maintained its current rate of expenses, EGC would still be left with $5.5 million EBITDA/year. Yet Donovan swore before the

bankruptcy court that on October 12, 2010 EGC had no cash and no known bank accounts, and that EGC had gross income during the twelve-month period that began in October 2009 of $0. If the 2002 "Secret" Agreement really exists and really substitutes licensing fees of $9 million per year in place of ownership of EGCL, then EGC would have earned $9 million in revenue in 2010, and would have cash on October 12, 2010. Additionally, Donovan stated in the EGC Earnings Conference Call on November 12, 2009 that, in the prior quarter, EGC's American operations, which were independent of EGCL's operations, recognized revenue from two license deals. EGC should have continued to have gross income from those license deals even after it lost EGCL and should have also received the $9 million/year pursuant to the 2002 "Secret" Agreement. Indeed, Donovan stated in the call: "This quarter we recognized revenues from our two license deals with Sovereign Game Card, our native American casinos-focused licensed distribution partner, and Scientific Games. Sovereign has been working diligently on several key initiatives in turnkey promotional orders within tribes in Southwest, Northwest, and Midwest regions of the U.S."

    d.    That the 2002 "Secret" Agreement between EGC and EGCL modified a merger agreement they didn't enter until November 19, 2003 is also suspicious.

148. Each of the Defendants had access to the board minutes and resolutions of EGC existing from 2002 (when EGC was named Scientific Energy) to present. As EGC must do for any major transaction (or merger!), in 2002, when the 2002 "Secret" Agreement was supposedly entered, it would have been discussed, voted on, and recorded in the board minutes and resolutions. The 2002 "Secret" Agreement must have been known to each of the Defendants as Boyne

and Cole could not have hid the 2002 agreement from them by not entering it in EGC board minutes and resolutions because Boyne and Cole did not have any control over EGC until it merged with EGCL, which occurred afterwards -- in December 2003.

149. The directorship, and thus control of EGCL, could not have been assumed by Donovan and Christiansen on December 28, 2009 without EGC's allowing it, as EGC owned all of EGCL at the time (until March 1, 2010). The EGC board consisting of four directors had to approve it. The directorship, and thus control, of EGCL could not have reverted back to Boyne and Greenfield from Donovan and Christiansen on February 4, 2010 without EGC's and its four-member Board's allowing it, as EGC owned all of EGCL at the time. The transfer of EGC's shares of EGCL to EPN on March 1, 2010 required EGCL's board authorization–which would have required EGC's approval because transfer of ownership of privately held and restricted shares can only be effected with the approval of the subject company on whose books the transfer is recorded.

## VII. CLASS ACTION ALLEGATIONS

150. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who purchased the common stock of EGC during the Class Period and who were damaged thereby. Excluded from the Class are Defendants, the present and former officers and directors of the EGC and any subsidiary thereof, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

151. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, EGC's stock was actively traded on the NASDAQ Bulletin Board. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds, if not

thousands, of members in the proposed Class. Members of the Class may be identified from records maintained by EGC or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

152. Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

153. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

154. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

    b. whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of EGC; and

    c. to what extent the members of the Class have sustained damages and the proper measure of damages.

155. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VIII. RELIANCE PRESUMPTIONS

### A. <u>Affiliated Ute</u>

156. Neither Plaintiffs nor the Class need prove reliance – either individually or as a class because under the circumstances of this case, which involves a failure to disclose the 2002 "Secret" Agreement signed by Boyne providing for transfer of ownership of EGCL, positive proof of reliance is not a prerequisite to recovery, pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security

### B. Fraud-on-the-Market Presumption of Reliance

157. At all relevant times, the market for EGC's common stock was an efficient market for the following reasons, among others:

    a.    EGC's stock met the requirements for listing, and was listed and actively traded on the NASDAQ Bulletin Board, a highly efficient and automated market;

    b.    During the class period, on average, 1,847,165 shares of EGC common stock were traded on a weekly basis. During the Class Period approximately 57,109,428 million shares were outstanding (per the Company's fiscal year 2008 10-K). Approximately 3.23% of all outstanding shares were bought and sold on a weekly basis, demonstrating a very strong presumption of an efficient market;

    c.    EGC regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

    d.    EGC was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales

force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace;

  e. At least 50 NASD member firms were active market-makers in Quest Resource stock at all times during the Class Period; and

  f. Unexpected material news about EGC was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

158. As a result of the foregoing, the market for EGC's common stock promptly digested current information regarding EGC from all publicly available sources and reflected such information in EGC's stock price. Under these circumstances, all purchasers of EGC's common stock during the Class Period suffered similar injury through their purchase of EGC's common stock at artificially inflated prices, and a presumption of reliance applies.

## IX. NO SAFE HARBOR

159. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of EGC who knew that those statements were false when made.

## X. FIRST CAUSE OF ACTION

### Violation of Section 10(b) of

### The Exchange Act Against and Rule 10b-5

### Promulgated Thereunder Against All Defendants Except Eugene Christiansen, Paul Farrell, And Anna Houssels

160. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

161. This cause of action is asserted against all Defendants except Eugene Christiansen, Paul Farrell, and Anna Houssels (collectively "Section 10(b) Defendants").

162. During the Class Period, Section 10(b) Defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase and/or sell EGC's securities at artificially inflated and distorted prices. In furtherance of this unlawful scheme, plan and course of conduct, Section 10(b) Defendants, individually and as a group, took the actions set forth herein.

163. Section 10(b) Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of EGC as specified herein.

164. Section 10(b) Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of EGC's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about EGC and its business operations and financial

condition in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers EGC's securities during the Class Period.

165. Each of the Section 10(b) Defendants' primary liability, and controlling person liability, arises from the following: (a) Section 10(b) Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (b) by virtue of their responsibilities and activities as senior officers and/or directors of the Company, were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (c) Section 10(b) Defendants enjoyed significant personal contact and familiarity with the other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and (d) Section 10(b) Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

166. Section 10(b) Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Section 10(b) Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing EGC's financial condition from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Section 10(b) Defendants' false and misleading statements during the Class Period, Section 10(b) Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in

failing to obtain such knowledge by failing to take steps necessary to discover whether those statements were false or misleading.

167. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price for EGC's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of EGC's publicly-traded securities were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the Company's securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Section 10(b) Defendants but not disclosed in public statements by Section 10(b) Defendants during the Class Period, Plaintiffs and the other members of the Class acquired EGC's securities during the Class Period at artificially high prices and were damaged thereby.

168. At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding EGC's financial results and condition, which were not disclosed by Section 10(b) Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired EGC's securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices or distorted prices at which they did.

169. By virtue of the foregoing, the Section 10(b) Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

170. As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

171. This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action.

## XI. SECOND CAUSE OF ACTION

### Violation of Section 20(a) of
### The Exchange Act Against The Individual Defendants

172. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

173. This Second Claim is asserted against each of the Individual Defendants.

174. The Individual Defendants acted as controlling persons of EGC within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of aspects of the Company's revenues and earnings and dissemination of information to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

175. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is

presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

176. As set forth above, EGC and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

177. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act as they culpably participated in the fraud alleged herein. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

178. This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action.

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

    a. Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

    b. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

    c. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

    d. Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

| | |
|---|---|
| Dated: February 11, 2011 | Respectfully submitted,<br><br>THE ROSEN LAW FIRM, P.A.<br><br>*/s/ Laurence Rosen*<br><br>Laurence M. Rosen (SBN # 219683)<br>333 South Grand Avenue, 25th Floor<br>Los Angeles, CA 90071<br>Telephone: (213) 785-2610<br>Facsimile: (213) 226-4684<br>Email: lrosen@rosenlegal.com<br><br>and<br><br>Phillip Kim, Esq. (pro hac vice)<br>THE ROSEN LAW FIRM, P.A.<br>275 Madison Avenue, 34th Floor<br>New York, New York 10016<br>Telephone: (212) 686-1060<br>Facsimile: (212) 202-3827<br>Email: pkim@rosenlegal.com<br><br>Lead Counsel for Plaintiffs and Class |

# PROOF OF SERVICE

I am employed in the County of New York, State of New York. I am over the age of eighteen (18) years and not a party to the within action. My business address is 275 Madison Avenue, 34th Floor, New York, New York 10016.

On February 11, 2011, I served the following document described as:

**CONSOLIDATED SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

on the parties in this action, as stated on the attached service list by causing the foregoing document to be placed in a sealed envelope addressed as set forth on the attached service list and caused such envelope, with first class postage thereon fully prepaid, to be placed in the U.S. Mail at New York, NY and certify that such envelope was placed for collection and mailing following ordinary business practices.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on February 11, 2011, in New York, New York.

Ilya Glinchenko
The Rosen Law Firm, P.A.

**SERVICE LIST**

Steven D. Hibbard, Esq.
SHEARMAN & STERLING, LLP
525 Market Street, Suite 1500
San Francisco, CA 94105

*Counsel for Defendants Electronic Game Card, Inc. , Kevin Donovan, and Eugene Christiansen*

Christopher Kim
Norma Nava
Lisa J. Yang
LIM RUGER & KIM LLP
1055 West Seventh Street Suite 2800
Los Angeles, CA 90017

*Counsel for Defendant Paul Farrell*

Seth A Aronson
Meredith N Landy
Sara May Folchi
O'MELVENY AND MYERS LLP
400 South Hope Street 15th Floor
Los Angeles, CA 90071

*Counsel for Defendant Anna Houssels*

Lee J. Cole
c/o Greenfield Capital International Limited
Suite 404 4th Floor
Albany House
324/326 Regent Street
London W1B 3HH
United Kingdom

Jerome S. Fortinsky
Brian G. Burke
SHEARMAN & STERLING, LLP
599 Lexington Avenue
New York, NY 10022

*Counsel for Defendant Kevin Donovan and Eugene Christiansen*

Andrew M. Meehan
Jonathan D. Cogan
Steven G. Kobre
KOBRE & KIM LLP
800 Third Avenue Floor 6
New York, NY 10022

*Counsel for Defendant Paul Farrell*

Linden Boyne
c/o Greenfield Capital International Limited
Suite 404 4th Floor
Albany House
324/326 Regent Street
London W1B 3HH
United Kingdom