1   Lawrence B. Steinberg, Esq.
2   Buchalter Nemer, a Professional Corporation
    1000 Wilshire Boulevard, Suite 1500
3   Los Angeles, CA 90017-2457
4   Telephone: (310) 460-4481
    Facsimile: (310) 282-8213
5
6   -and-
7
    Jeffrey J. Greenbaum, Esq. (pro hac vice)      Kenneth R. Schachter, Esq. (pro hac
8   Hervé Gouraige, Esq. (pro hac vice)            vice)
    Sills Cummis & Gross P.C.                      Sills Cummis & Gross P.C.
9   One Riverfront Plaza                           30 Rockefeller Plaza, 29th floor
10  Newark, New Jersey 07102                       New York, New York 10112
    Telephone: (973) 643-7000                      Telephone: (212) 643-7000
11  Facsimile: (973) 643-6500                      Facsimile: (212) 643-6500
12
13  Counsel for Defendant Lee J. Cole

14            **UNITED STATES DISTRICT COURT**
15            **CENTRAL DISTRICT OF CALIFORNIA**

16  DALTON PETRIE, INDIVIDUALLY        Case No.  SACV-10-00252-
    AND ON BEHALF OF ALL OTHERS        DOC(RNBx)
17  SIMILARLY SITUATED,
18              Plaintiff,             CLASS ACTION
19                 v.                  DECLARATION OF LEE J. COLE IN
                                       SUPPORT OF HIS MOTION FOR
20  ELECTRONIC GAME CARD, INC.;        JUDGMENT ON THE PLEADINGS
    LEE J. COLE; LINDEN BOYNE;         PURSUANT TO FED. R. CIV. P. 12(c)
21  KEVIN DONOVAN, PAUL FARREL,
    EUGENE CHRISTIANSEN, ANNA          Hon. David O. Carter
22  HOUSSELS, AND THE ESTATE OF
    LORD LEONARD STEINBERG AND
23  DOMINIC BURKE, LYNNE               Hearing:    September 26, 2011
    ROCHELLE ATTIÁS, AND               Time:       8:30 a.m.
24  JOHATHAN STEINBERG AS              Judge:      The Hon. David O. Carter
    EXECUTORS/TRUSTEES/
25  REPRESENTATIVES OF THE
    ESTATE OF LORD STEINBERG,
26  DEFENDANTS,
27              Defendant.
28

SILLS CUMMIS &
GROSS P.C.
ATTORNEYS AT LAW
NEWARK

DECLARATION OF LEE J. COLE IN SUPPORT OF HIS MOTION          No. SACV-10-002552-DOC(RNBx)
FOR JUDGMENT ON THE PLEADINGS

LEE J. COLE declares as follows:

1.      I am a named defendant in this action and have personal knowledge of the documents attached hereto.  I make this declaration in support of my motion for judgment on the pleadings under Fed. R. Civ. P. 12(c).

2.      Attached hereto as Exhibit A is a true and correct copy of the Acquisition Agreement dated 2 August, 2002 by and between Electronic Game Card, Inc., a Delaware corporation ("EGCI Delaware"), Electronic Game Card, Limited ("EGCL"), and the shareholders of EGCL ("Sellers"), which is the "2002 Agreement" that is referred to in the plaintiffs' Second Amended Complaint ("SAC").

3.      Attached hereto as Exhibit B is a true and correct copy of an Assumption Agreement dated 1 February 2006 by and between Electronic Game Card, Inc., a Nevada corporation ("EGCI"), EGCI-Delaware, EGCL and EPN Advisory Limited, as agent for the Sellers, by which EGCI directly assumed the rights and obligations of EGCI-Delaware under the 2002 Acquisition Agreement, and which amended and superseded the 2002 Acquisition Agreement.

4.      Attached hereto as Exhibit C is a true and correct copy of the Amendment of Remedies License under the 2006 Assumption Agreement (including the 2002 Acquisition Agreement), dated 19 February 2010, by and between EGCI, EGCI-Delaware, EGCL, and EPN Advisory Limited as agent for the Sellers, pursuant to which the parties agreed to amend the licensing provisions of the 2002 and 2006 Agreements, subject to certain conditions, to provide a minimum annual licensing fee of $9 million from EGCL to EGCI.  This agreement is referred to in the SAC, at paragraphs 67(b) and 147(c).

1        I declare under penalty of perjury under the laws of the United States of

2    America that the foregoing is true and correct.

3

4    Executed on 25ᵗʰ August, 2011

5

6                            LEE J. COLE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

DECLARATION OF LEE J. COLE IN SUPPORT OF HIS MOTION
FOR JUDGMENT ON THE PLEADINGS                                    No. SACV-10-002552-DOC(RNBx)

# EXHIBIT A

# ACQUISITION AGREEMENT

AGREEMENT dated 2nd August, 2002 ("the Agreement") by, between and among Electronic Game Card Inc, a company incorporated under the laws of the State of Delaware (herein referred to as EGCI), of 14 Wall Street, New York, NY, 10005, Electronic Game Card Limited, a company incorporated under the laws of England of 32 Haymarket London SW1Y 4TP, UK (hereinafter referred to as "EGCL "); and the persons listed on Exhibit "A" attached hereto and made a part hereof, (hereinafter referred to as the "SELLERS").

WHEREAS, EGCI desires to acquire the shares of EGCL from the SELLERS in a tax-free exchange of shares on the terms and conditions of this Agreement; and

WHEREAS, in order to induce the SELLERS to enter into this Agreement, EGCI agrees to provide funding to EGCL; and

WHEREAS, as a further necessary inducement to SELLERS to enter into this Agreement, EGCI shall irrevocably undertake to the SELLERS that for a period of five (5) years after the date hereof (which shall extend for a subsequent additional five (5) year period unless all SELLERS, satisfied with EGCI's performance to date, waive such extension in writing) EGCI, directly or indirectly, will not change or permit the change of the Memorandum or Articles or other governing instruments of EGCL, the number of persons constituting the Board of Directors of EGCL, or the persons constituting the Board of Directors of EGCL, without the prior written agreement of a majority of the then-existing Board of Directors of EGCL; and

WHEREAS, as a further necessary inducement to SELLERS to enter into this Agreement, EGCI agrees that for a period of five (5) years after the date hereof (which shall extend for a subsequent additional five (5) year period unless all SELLERS, satisfied with EGCI's performance to date, waive such extension in writing) EGCL will continue to own and have all rights to exploit in Europe all intellectual property to which EGCL has or hereafter acquires rights, and to trade independently under the direction and control of its own Board of Directors and officers designated by such Board of Directors, with its own bank account(s) and agreed operating budget and funds under the control of such Board of Directors and officers, and that EGCI will not solicit or make sales to the customers of EGCL in Europe during such period, on the terms and conditions of this Agreement; and

WHEREAS, as a further necessary inducement to SELLERS to enter into this Agreement a license agreement and a share transfer have been irrevocably completed in favour of Sellers to be effective immediately upon the occurrence of certain events unless waived by all Sellers; and

WHEREAS, the SELLERS own a total of 99 Ordinary Shares of the share capital of EGCL at £1 per share, said shares being 100% of the issued and outstanding shares of EGCL; and

WHEREAS, the SELLERS desire to sell to EGCI and EGCI desires to purchase one hundred (100%) percent of such shares from the SELLERS in a tax-free exchange on the terms and conditions of this Agreement:

NOW, THEREFORE, in consideration of the mutual covenants, agreements, representations and warranties herein contained, and intending to be bound hereby, the parties hereby agree as follows:

1

1. <u>Purchase and Sale</u> – The SELLERS hereby agree to sell, transfer, assign and convey to EGCI and EGCI hereby agrees to purchase and acquire from the SELLERS, a total of 99 shares of Ordinary stock, £1 par value of EGCL, which equates to one hundred percent (100%) percent of all of EGCL 's currently issued and outstanding stock ("the EGCL Ordinary Shares"), in a tax-free stock-for-stock acquisition.

2. <u>Consideration</u> - The consideration price to be paid by EGCI for the EGCL Ordinary Shares shall be 4,000,000 shares (the "Consideration Shares") of EGCI voting common stock, $0.001 par value per share, representing 50% percent of the issued share capital of EGCI as enlarged by such issue.

3. <u>Warranties Representations and Covenants of EGCL and SELLERS.</u> - In order to induce EGCI to enter into this Agreement and to complete the transaction contemplated hereby, EGCL and the SELLERS jointly and severally warrant and represent to EGCI that:

(a) <u>Organization and Standing; Power and Authority; Subsidiaries.</u> EGCL is a corporation duly organized, validly existing and in a good standing under the laws of England and Wales and is qualified to do business as in every other jurisdiction in which it operates to the extent required by the laws of such jurisdictions to be so qualified except to the extent that failure to be so qualified would not have a material adverse effect on EGCL. EGCL has full power and authority to carry on its business as now conducted and to own and operate its assets, properties and business. Attached hereto as Exhibit "B" are true and correct copies of EGCL's Certificate of Incorporation, Memorandum and Articles, and amendments thereto. No changes have been made in any of the Exhibit "B" documents. EGCL has no subsidiaries nor any investments or ownership interests in any corporation, partnership, joint venture or other business enterprise which are material to its business.

(b) <u>Capitalization.</u> EGCL 's entire authorized equity capital consists of 1000 shares of Ordinary stock, £1 par value of which 99 shares of ordinary stock, £1 par value are issued, fully paid and outstanding. There are no other voting or equity securities authorized or issued, nor any authorized or issued securities convertible into voting stock, and no outstanding subscriptions, warrants, calls, options, rights, commitments or agreements by which EGCL or the SELLERS are bound, for the issuance of any additional shares of common stock or any other voting or equity security. The 99 EGCL Ordinary Shares to be transferred by SELLERS constitute one hundred (100%) percent of the currently issued and outstanding shares of EGCL Ordinary Shares, which includes that same percentage of EGCL's voting power, right to receive dividends, when, as and if declared and paid, and the right to receive the proceeds of liquidation attributable to EGCL shares, if any.

(c) <u>Ownership of EGCL Ordinary Shares.</u> Each SELLER warrants and represents, severally, that as of the date hereof, such SELLER is the sole owner of the EGCL Ordinary Shares listed by such SELLER's name on Exhibit "A", free and clear of all liens, encumbrances, and restrictions whatsoever. By SELLERS' transfer of the EGCL Ordinary Shares to EGCI pursuant to this Agreement EGCI will thereby acquire 100% of the outstanding shares of EGCL, free and clear of all liens, encumbrances and restrictions of any nature whatsoever.

(d) <u>Taxes.</u> To the best of the SELLERS' knowledge EGCL has filed all tax returns and reports that are required to be filed with all governmental agencies, wherever situate, and has paid or accrued for payment all taxes as shown on such returns, such that a failure to file, pay or accrue will not have a material adverse effect on EGCL. Any authority empowered to do so has never audited EGCL's tax returns.

2

(e) <u>Pending Actions.</u> To the best of the SELLERS' knowledge there are no known material legal actions, lawsuits, proceedings or investigations, either administrative or judicial, pending or threatened, against or affecting EGCL, or against the SELLERS that arrive out of their operation of EGCL, except as described in Exhibit "C" attached hereto.  EGCL is not knowingly in material violation of any law, material ordinance or regulation of any kind whatever.

(f) <u>Government and Regulation.</u> To the best of the SELLERS' knowledge EGCL holds the licenses and registrations set forth on Exhibit "D" hereto from the jurisdictions set forth therein, which licenses and registrations are all of the licenses and registrations necessary to permit EGCL to conduct its current business except for licenses and registrations whose omission would not have a material adverse effect on EGCL. All of such licenses and registrations are in full force and effect, and there are no proceedings, hearings or other actions pending that may affect the validity or continuation of any of them. No approval of any other trade or professional association or agency of government other than as set forth on Exhibit "D" is required for any of the transactions effected by this Agreement, and the completion of the transactions contemplated by this Agreement will not, in and of themselves, affect or jeopardize the validity or continuation of any of them.

(g) <u>Ownership of Assets.</u>  Except as set forth in Exhibit "E" attached hereto, EGCL has good, marketable title, without any liens or encumbrances of any nature whatever, to all of the following, if any; assets, properties and rights of every type and description, including, without limitation, all cash on hand and in banks, certificates of deposit, stocks, bonds, and other securities, good will, customer lists, its corporate name and all variants thereof, trademarks and trade names, copyrights and interests thereunder, licenses and registrations, pending licenses and permits and applications therefor, inventions, processes, know-how, trade secrets, real estate and interests therein and improvements thereto, machinery, equipment, vehicles, notes and accounts receivable, fixtures, rights under agreements and leases, franchises, all rights and claims under insurance policies and other contracts of whatever nature, rights in funds of whatever nature, books and records and all other property and rights of every kind and nature owned or held by EGCL as of this date, and will continue to hold such title on and after the completion of the transactions contemplated by this Agreement; nor, except in the ordinary course of its business, has EGCL disposed of any such asset since the date of the most recent accounts filing.

(h) <u>No Interest in Suppliers, Customers or Competitors.</u> Save for shareholdings in McNally EGC Ltd. neither the SELLERS nor any member of their families have any material interest of any nature whatever in any supplier, customer or competitor of EGCL.

(i) <u>No Debt Owed by EGCL to the SELLERS.</u> Except as set forth in Exhibit "F" attached hereto or for agreements, if any, to provide goods or services at fair value from time to time in the future, EGCL does not owe any money, securities, or property to either the SELLERS or any member of their families or to any company controlled by such a person, directly or indirectly.

(j) <u>Complete Records.</u> All of EGCL's books and records, including, without limitation, its books of account, corporate records, minute book, stock certificate books and other records are up-to-date, complete and reflect accurately and fairly the conduct of its business in all material respects since its date of incorporation.

3

EXHIBIT "A"   6

(k) <u>No Misleading Statements or Omissions.</u>  Neither this Agreement nor any budget, cash flow, financial statement, exhibit, schedule or document attached hereto or presented to EGCI in connection herewith, contains any materially misleading statement or omits any fact or statement necessary to make the other statements or facts therein set forth not materially misleading.

(l) <u>Validity of this Agreement.</u>  All corporate and other proceedings required to be taken by the SELLERS and by EGCI in order to enter into and carry out this Agreement have been duly and properly taken. This Agreement has been duly executed by the SELLERS and by EGCL, and constitutes the valid and binding obligation of each of them, enforceable in accordance with its terms except to the extent applicable bankruptcy, reorganization, insolvency, moratorium or other laws relating to or effecting generally the enforcement of creditors rights. The execution and de

(m) livery of this Agreement and the carrying out of its purposes will not result in the breach of any of the terms and conditions of, or constitute a default under or violate, EGCL's Certificate of Incorporation or Memorandum and Articles, or any material agreement, lease, mortgage, bond, indenture, license or other material document or undertaking, oral or written, to which EGCL or the SELLERS is a party or is bound or may be affected, nor will such execution, delivery and carrying out violate any law, rule or regulation or any order, with injunction or decree, of any court, regulatory agency or other governmental body; and the business now conducted by EGCL can continue to be so conducted after completion of the transaction contemplated hereby, with EGCL as a wholly owned subsidiary of EGCI.

(n) <u>Concepts and Approvals: Compliance with Laws.</u>  Neither EGCL nor the SELLERS are required to make any filing with, or obtain the consent or approval of, any person or entity as a condition to the consummation of the transactions contemplated by this Agreement. The business of EGCL has been operated in material compliance with all laws, rules, and regulations applicable to its business, including, without limitation, those related to securities matters, trade matters, environmental matters, public health and safety, and labor and employment.

(o) <u>Access to Books and Records.</u>  EGCI will have full and free access to EGCL's books during the course of this transaction prior to closing, during regular business hours, on reasonable notice.

(p) <u>Significant Agreements.</u>  Except as disclosed or contemplated by this Agreement, EGCL is not and will not be bound by any of the following:

    (i)    Employment, advisory or consulting contracts.
    (ii)   Plan providing for employee benefits of any nature.
    (iii)  Leases in respect of any property or equipment.
    (iv)  Contracts or commitments for any expenditure.
    (v)   Guarantees or other liability assumed for any obligation for a third party.
    (vi)  Any agreement, contract arrangement or understanding other in the normal course of business.

4. <u>Warranties, representations and Covenants of EGCL.</u>  In order to induce the SELLERS and EGCL to enter into this Agreement and to complete the transaction contemplated hereby, EGCI warrants, represents and covenants to EGCL and SELLERS that:

4

EXHIBIT "A"   7

(a) <u>Organization and Standing; Power and Authority; Subsidiaries.</u>  EGCI is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, will be qualified to do business as a foreign corporation in every other state and jurisdiction in which it operates to the extent required by the laws of such states or jurisdictions to be so qualified (except to the extent that failure to be so qualified would not have a material adverse effect on EGCI), and will have full power and authority to carry on its business as now conducted and to own and operate its assets, properties and business. EGCI has no subsidiaries or any other investments or ownership interests in any corporation, partnership, joint venture or other business enterprise.

(b) <u>Capitalization.</u>  EGCI's entire authorized equity capital consists of 25,000,000 shares of voting common stock, $0.001 par value of which 4,000,000 shares of voting common stock are currently outstanding. EGCI will issue 4,000,000 shares of voting common stock for the acquisition of EGCL, upon closing EGCI will have issued and outstanding 8,000,000 shares of voting common stock, $0.001 par value and no shares of preferred stock issued. Upon issuance, all of the Consideration Shares will be validly issued, fully paid and non-assessable.  The relative rights and preferences of EGCI's equity securities are set forth on the Certificate of Incorporation of EGCI, as amended and EGCI's By-laws.  There are no other voting or equity securities authorized or issued, not any authorized or issued securities convertible into voting stock, and no outstanding subscriptions, warrants, calls, options, rights, commitments or agreements by which EGCI is bound, calling for the issuance of any additional shares of common stock or any other voting or equity security.  The By-laws of EGCI provide that a simple majority of the shares voting at a stockholders' meeting at which a quorum is present may elect all of the directors of EGCI.  The By-Laws and Certificate of Incorporation of EGCI does not provide for cumulative voting.  Accordingly, as of the Closing the 4,000,000 shares being issued to and acquired by the SELLERS will constitute 50% of the outstanding shares of EGCI which will then be issued and outstanding which includes, inter alia, that same percentage of EGCI's voting power (subject to the provisions regarding cumulative rights), right to receive dividends, when, as and if declared and paid, and the right to receive the proceeds of liquidation attributable to common stock, if any.

(c) <u>Ownership of Shares.</u>  By EGCI's issuance of the Consideration Shares to the SELLERS pursuant to this Agreement, the SELLERS will thereby acquire good, absolute marketable title thereto, free and clear of all liens, encumbrances and restrictions of any nature whatsoever, except by reason of the fact that such Consideration Shares will not have been registered under the Securities Act of 1933, as amended (the "33 Act"), or any applicable state securities laws.

(d) <u>Significant Agreements.</u>  Except for the agreements, if any, which EGCI agrees to enter into upon the express written terms of this Agreement, EGCI is not bound by any of the following:

    (i) Employment, advisory or consulting contract

    (ii) Plan providing for employee benefits of any nature.

    (iii) Lease with respect to any property or equipment.

    (iv) Contract of commitments for any current expenditure.

    (v) Contract or commitment, pursuant to which it has assumed, guaranteed, endorsed or otherwise become liable for any obligation of any other person, firm or organization.

5

    (vi) Contract, agreement, understanding, commitment or arrangement either than in the normal course of business, not set forth in the Agreement or an Exhibit hereto.

    (vii) Agreement with any person relating to the dividend, purchase or sale of securities, that has not been settled by the delivery of payment of securities when due, and which remains unsettled upon the date of this Agreement.

(e) **Taxes.** EGCI has filed all federal, state and local income or other tax returns and reports that it is required to file with all governmental agencies, wherever situate, and has paid all taxes as shown on such returns. All of such returns are true and complete. EGCI's income tax returns have never been audited by any authority empowered to do so.

(f) **Absence of Liabilities.** As of the Closing Date EGCI will have no liabilities of any kind or nature, fixed or contingent, except for the costs, including legal and accounting fees and other expenses amounting to not more than US$10,000, in connection with this transaction, for which EGCI agrees to be responsible and to pay in full at or before the Closing.

(g) **No Pending Actions.** To the best of its knowledge, there are no legal actions, lawsuits, proceedings or investigations, either administrative or judicial, pending or threatened against or affecting EGCI. EGCI has been in compliance with, and has not received notice of violation of any law, ordinance of any kind whatever, including, but not limited to, the 33 Act, the Securities Exchange Act of 1934, as amended (the "34 Act"), the rules and regulations of the United States Securities and Exchange Commission (the "SEC"), or the securities laws and regulations of any state or other jurisdiction. EGCI is not an investment company as defined in, or otherwise subject to regulation under, the Investment Company Act of 1940, as amended. EGCI is not required to file reports pursuant to either Section 13 or Section 15 (d) of the 34 Act.

(h) **Corporate Records.** All of EGCI's books and records, including, without limitation, its books of account, corporate records, minute book, stock certificate books and other records are up-to-date complete and reflect accurately and fairly the conduct of its business in all respects since its date of incorporation; all of said books and records will be made available for inspection by EGCL's authorized representatives.

(i) **No Misleading Statements or Omissions.** Neither this Agreement nor any financial statement, exhibit, schedule or document attached hereto or presented to EGCL in connection herewith contains any materially misleading statement, or omits any fact or statement necessary to make the other statements or facts therein set forth not materially misleading.

(j) **Validity of this Agreement.** All corporate and other proceedings required to be taken by EGCI in order to enter into and to carry out this Agreement will have been duly and properly taken. This Agreement has been duly executed by EGCI, constitutes a valid and binding obligation of EGCI enforceable in accordance with its terms. The execution and delivery of this Agreement and the carrying out of its purposes will not result in the breach of any of the terms or conditions of, or constitute a default under or violate, EGCI's Certificate of Incorporation or By-Laws, or any agreement, lease, mortgage, bond, indenture, license or other document or undertaking, oral or written, to which EGCI is a party or is bound or may be affected nor will such execution,

6

delivery and carrying out violate any law, rule or regulation or any order, writ, injunction or decree of any court, regulatory agency or other governmental body.

(k) **Consents and Approvals. Compliance with Laws.** EGCI is not required to make any filing with, or obtain the consent or approval of, any person or entity as a condition to the consummation of the transactions contemplated by this Agreement. The business of EGCI has been operated in compliance with all laws, rules and regulations applicable to its business, including, without limitation, those related to securities matters, trade matters, environmental matters, public health and safety, and labor and employment.

(l) **Access to Books and Records.** EGCI and SELLERS will have full and free access to EGCI's books and records during the course of this transaction on reasonable notice.

(m) **Directors and Shareholders Approval.** EGCI's Board of Directors and shareholders, by meeting or consent shall have properly authorized the matters described in section 4 herein by closing.

(n) **The EGCI Shares.** All of the Consideration Shares issued to SELLERS shall be validly issued, fully-paid non-assessable shares, with full voting rights, dividend rights, and right to receive the proceeds of liquidation, if any, as set forth in EGCI's Certificate of Incorporation.

(o) **EGCI Funding of EGCL.** EGCI will provide funding to EGCL. At the date hereof EGCI will arrange an advance to EGCL of up to a maximum of US$200,000.

(p) **EGCI Covenant to EGCL and SELLERS Prohibiting Certain Changes in EGCL.** EGCI irrevocably covenants and agrees with EGCL and the SELLERS that for a period of five (5) years after the date hereof (which shall extend for a subsequent additional five (5) year period unless all SELLERS, satisfied with EGCI's performance to date, waive such extension in writing) EGCI, directly or indirectly, will not do, attempt to do, or permit any other person to do or attempt to do any of the following without the prior written agreement of a majority of the then-existing Board of Directors of EGCL: (x) change the Memorandum or Articles or other governing instruments of EGCL; (y) change the number of persons constituting the Board of Directors of EGCL; or (z) change the persons constituting the Board of Directors of EGCL. By way of clarification for the purpose of performing the covenants in this Section 4 (p), at the date hereof and at closing of this Agreement, the directors of EGCI shall be Lee Cole and John Bentley and the directors of EGCL shall be, Linden Boyne and John Bentley.

(q) **EGCI Covenant to EGCL and SELLERS Concerning Operation of EGCL.** EGCI irrevocably covenants and agrees with EGCL and the SELLERS that for a period of five (5) years after the date hereof (which shall extend for a subsequent additional five (5) year period unless all SELLERS, satisfied with EGCI's performance to date, waive such extension in writing), EGCI shall perform and observe the following covenants and agreements and shall cause each person or entity under its control to perform and observe the same: (x) EGCL shall continue to own and have all rights to exploit in Iceland, the Republic of Ireland, the United Kingdom, and all countries in Western and Eastern Europe up to but not including Russia (such territories being hereinafter referred to as "Europe") all intellectual property to which EGCL has or hereafter acquires rights (except as may otherwise be specifically agreed in writing from time to

7

time by EGCL); (y) EGCL shall trade independently under the direction and control of its own Board of Directors and officers designated by such Board of Directors, with its own bank account(s) and agreed operating budget and funds under the control of such Board of Directors and officers, although within the EGCI group, and (z) EGCI shall not, directly or indirectly, solicit, attract away or contact, or sell or distribute products or services to, any of EGCL's customers in Europe. EGCI Group accounts will be prepared for the purposes of filing in US GAAP however the Group will prepare management accounts so that the trading performance and cash generation of the EGCI and EGCL can be individually identified and compared to budget.

(r) EGCI and EGCL Covenants to EGCL and SELLERS Concerning Springing License. EGCL, EGCI. and SELLERS irrevocably covenant and agree on the date hereof that the applicable parties shall have a perpetual exclusive license (the "Remedies License") as hereinafter set forth in this Agreement of all intellectual property of EGCI and EGCL, which either now has or hereafter acquires, including without limitation the non-exclusive right to develop and manufacture products and services using the same, and the exclusive right to market, distribute, license and sell products and services using the same in Europe but not including marketing or sales to national lotteries (but including charitable lotteries and sales promotions). The Remedies License shall not be effective or usable until such time as is hereinafter specified in this Agreement. License rights shall be subject to any licenses or joint venture agreements executed by or authorised by EGCL prior to the effective date of the Remedies License provided that there shall be no amendments, extensions or renewals of such other licenses or joint venture agreements after the effective date of the Remedies License.

(s) EGCI and EGCL Covenants to SELLERS Concerning Transfer of the EGCL Ordinary Shares. EGCI and EGCL irrevocably covenant and agree on the date hereof with SELLERS that for a period of five (5) years after the date hereof (which shall extend for a subsequent additional five (5) year period unless all SELLERS, satisfied with EGCI's performance to date, waive such extension in writing) title to all EGCL Ordinary Shares shall transfer to SELLERS or at their direction upon the occurrence of one or more of the events described in this Agreement unless effectiveness is waived in writing by SELLERS, and that a fully executed Share Transfer in the form of Exhibit "M" to this Agreement is executed and deposited in escrow in accordance with an escrow agreement and escrow agent satisfactory to SELLERS in order to facilitate and insure such transfer, it being the intention of the parties that all share capital of EGCL shall be subject to that Share Transfer.

5. Survival of Representations, Warranties, Covenants and Agreements. All representations and warranties made herein and in the exhibits attached hereto shall survive the execution and delivery of this Agreement and payment pursuant thereto. All covenants and agreements made herein and in the exhibits and annexes attached hereto shall survive the execution and delivery of this Agreement and payment pursuant thereto for such period of time during which the same are required to be performed pursuant to the stated terms and conditions of this Agreement or the term of this Agreement, whichever is longer.

6. Conditions Precedent to Closing

(a) The obligations of BGCI to close this Agreement shall be and are subject to fulfillment of each of the following conditions:

8

(i) That EGCL 's and SELLERS' representations and warranties contained herein shall be true and correct;

(ii) That EGCL and SELLERS have performed or complied with all agreements, terms and conditions required by this Agreement to be performed or complied with by them prior to closing.

(iii) That EGCL directors and shareholders, by proper and sufficient vote taken either by consent or at a meeting duly and properly convened and held, have properly approved all the matters requiring approval by the directors and shareholders respectively.

(iv) That EGCL's Board of Directors, by proper and sufficient vote, has approved this Agreement and the transactions contemplated hereby.

(b) The obligations of EGCL and the SELLERS to close this Agreement shall be and are subject to fulfillment, at the date hereof for each of the following conditions:

(i) That EGCI's representations and warranties contained herein are true and correct.

(ii) That EGCI have performed or complied with all agreements, terms and conditions required by this Agreement prior to closing.

(iii) That EGCI's directors and shareholders, by proper and sufficient vote taken either by consent or at a meeting duly and properly convened and held, have properly approved all of the matters required to be approved by EGCI's directors and shareholders, respectively.

(iv) That EGCI's Board of Directors, by proper and sufficient vote, have approved this Agreement and the transactions contemplated hereby.

7. <u>Termination.</u> This Agreement may be terminated at any time prior to the closing hereunder by:

(a) The mutual written agreement of the parties;

(b) Any party if any legal proceeding shall have been instituted or shall be imminently threatening to delay, restrain or prevent the consummation of this Agreement;

(c) EGCL if EGCI has not arranged funding by a credit facility of $2M on mutually agreeable terms for the development of EGCL within 10 days after EGCI common stock is admitted to trading on the NASDAQ OTCBB; or

(d) Any party if the conditions precedent to the obligation of such party to close are not satisfied.

8. <u>Act of Default.</u> An act of default occurs when either party fails to fulfill its obligations herein required to be performed after the closing of this Agreement. If such an event occurs then the other party may issue a notice of default requiring the defaulting party to rectify that fault within fourteen (14) days. If the offending party fails to rectify the default at the end of 14 days the affected party shall have the right to terminate this Agreement. Specific acts of default: -

(a) If EGCI fails to advance funds to EGCL as provided under this Agreement.

(b) If EGCI fails to achieve independent revenues of at least those achieved by EGCL in any 12 month trading period during the ten years from the date hereof.

(c) Any breach or effort to attempt to breach any of the covenants under this Agreement for the benefit of EGCL or the SELLERS or by which EGCI is bound including without limitation those in Sections 4 (o), (p), (q), (r), and (s); provided, that notwithstanding the foregoing, a breach or attempted breach of the covenants in Sections 4 (o), (p), (q), (r), or (s) immediately shall be deemed a default without notice or cure unless waived in writing by all of the SELLERS prior thereto.

9

EGCI agrees that upon any such default not cured within such fourteen (14) day period (if the
same is capable of cure and the breach is not a default under Section 8(c) with regard to Sections 4
(o), (p), (q), (r) or (s), with respect to which there shall be no cure period) or waived in writing by
EGCL and all of the SELLERS, SELLERS and their respective directors, officers, employees,
consultants, shareholders, representatives and agents, shall be free of any duty of confidentiality or
restriction on competition (whether under contract, implied by law or otherwise, or under any
concept of corporate opportunity or fiduciary duty) with respect to EGCI, EGCL, their respective
affiliates, or the respective group companies of any of them.

EGCI also agrees that upon any such default (other than a default by SELLERS) not cured within
such fourteen (14) day period (if the same is capable of cure and the breach is not a default under
Section 8(c) with regard to Sections 4 (o), (p), (q), (r), or (s), with respect to which there shall be no
cure period) or waived in writing by EGCL and all of the SELLERS, a sum equal to Fifty Per Cent
(50%) of the gross revenues of EGCI, over the preceding twelve month period is irrevocably
directed by the SELLERS, EGCI and EGCL to be paid immediately to the SELLERS agent as
indicated by notice from time to time for distribution by such SELLERS agent in its sole discretion
as agent for the SELLERS and EGCI and EGCL shall have no further interest therein. Such
payment shall be made in U.S. Dollars or GB Pounds as the SELLERS agent may direct and in
U.S. Dollars if it issues not direction. The calculation of gross profit shall be made by the directors
of EGCL in their sole discretion, as the same directors existed immediately prior to the breach or
attempted breach, and need not be based upon audited or reviewed financial statements if such are
not available at the moment of payment for the relevant twelve month period. Thereafter, all
available funds in EGCI shall be applied first to minimize any net intercompany balances in favor
of EGCL, and all available funds in EGCL shall be applied first to minimize any net intercompany
balances in favor of EGCI, as the case may be, and then all remaining funds of EGCL shall be
applied by EGCL to payment of such outstanding obligations of EGCL, fixed or contingent, as the
persons who are directors of EGCI (taking into account EGCI's covenant hereunder to not change
the directors of EGCL) may determine. In addition, upon any such default the Share Transfer
immediately shall become effective and shall immediately be made out of escrow, in each case
unless waived in writing by the SELLERS. In the event that the Share Transfer is made, the
SELLERS' shall thereafter pay to EGCI as promptly as practicable and in any event within thirty
(30) days either (i) the Consideration Shares or (ii) the aggregate sum, in United States Dollars, of
the market price on the date of this Agreement of the Consideration Shares on the principal market
on which such shares are listed for trading on the date of this Agreement or if not so listed the
aggregate par value of those shares. In addition, upon any such default the Remedies License
immediately shall become effective as follows:

        (A) The Remedies License shall be perpetual.
        (B) The Remedies License shall be exclusive except if it becomes non-exclusive as
           hereafter set forth.
        (C) The Remedies License shall consist of a license of all intellectual property of
           EGCI and EGCL now owned or hereafter acquired, including without
           limitation patents and patent applications and extensions thereof, including
           without limitation the non-exclusive right to develop and manufacture products
           and services using the same, and the exclusive right to market, distribute, license
           and sell products and services using the same in Europe but not including
           marketing or sales to national lotteries (but including charitable lotteries and
           sales promotions). The territory for the Remedies License shall be Europe from
           Iceland, Ireland and the United Kingdom through mainland Europe through
           Russia including Turkey.

10

EXHIBIT "A"   13

(D) The Remedies License shall incorporate sections 10-15 of this Agreement.

(E) The licensee under the Remedies License shall be such party as SELLERS agent shall designate in writing on behalf of the SELLERS.

(F) The licensee shall report to the licensor (EGCI and EGCL) on net revenues under the Remedies License within 30 days after the end of each calendar quarter and within 60 days after the end of each calendar year. (Net revenues shall mean sales net of returns, samples, discounts, third party sales commissions, etc. and after cost of manufacture, insurance, freight, actual marketing and advertisement, and reasonably allocated design and company overhead.)

(G) The licensee shall pay a license fee annually which shall be equal to 25% of net revenues under the Remedies License.

(H) The Remedies License shall become a non-exclusive license in the event that the license fee paid by licensee to licensor for any calendar year is less than the average of 25% of the annual net revenues from European operations of the EGCI group companies for the two years immediately preceding the effective date of the Remedies License excluding national lotteries (other than charitable lotteries).

(I) In the event that license fee payments made by licensee to licensor for any calendar year are less than the minimum specified above, licensee may nonetheless maintain exclusivity by paying the shortfall in the annual amount to licensor within 90 days after the end of the calendar year for which such shortfall exists.

The parties hereto agree that the then applicable directors of EGCL and other persons who execute the remedies set forth in this Section 8 do so and shall do so without liability to any party to this Agreement or their respective affiliates or the group companies of any of them, or the respective officers, directors, shareholders, employees, or representatives of any of them, and said applicable directors are specifically released from the same, and said directors also shall be indemnified by EGCI and EGCL to the fullest extent of applicable law.

EGCL and the SELLERS agree that upon any default by EGCL under Sections 8 (a) or (b) of this Agreement not cured within such fourteen (14) day period (if the same is capable of cure) or waived in writing by EGCL, all available funds in EGCL shall be applied first to minimize any intercompany balances in favor of EGCL, and all available funds in EGCL shall be applied first to minimize any intercompany balances in favor of EGCI, as the case may be.

The parties to this Agreement agree that any breach of the covenants set forth in this Agreement could cause irreparable harm to the non-breaching party(ies) for which monetary damages may be difficult to ascertain or an inadequate remedy. The parties therefore agree that in the event of any breach or anticipated breach of a covenant by one of the parties to this Agreement, the non-breaching party(ies) shall have the right, without posting bond, in addition to its other rights and remedies, to seek and obtain injunctive relief for any violation of this Agreement. In addition, the non-breaching party(ies) shall have its/their available remedies under applicable law.

Except as provided above, each party shall bear its own costs and expenses under this Agreement.

9. Exhibits. All Exhibits attached hereto are incorporated herein by this reference as if they were set forth in their entirety.

11

EXHIBIT "A"   14

10. Miscellaneous Provisions. This Agreement is the entire agreement between the parties in respect of the subject matter hereof, and there are no other agreements, written or oral, nor may this Agreement be modified except in writing and executed by all of the parties hereto. The failure to insist upon strict compliance with any of the terms, covenants or conditions of this Agreement shall not be deemed a waiver or relinquishment of such rights or power at any other time or times. Time shall be of the essence in this Agreement in respect of payments and performance. Each party to this Agreement acknowledges it has had an opportunity to take independent legal advice with regard to this Agreement and that the provisions of this Agreement including, without limitation, restrictions, covenants and agreements, are fair and reasonable. If any such restriction is held to be unreasonably wide but would be valid if part of the wording were deleted, such restriction will apply with so much of the wording deleted as may be necessary to make it valid.

11. Further Instruments. From time to time, as and when requested by either of the parties or by its successors or assignee, the other party will execute and deliver or cause to be delivered, all such deeds and other instruments; and will take or cause to be taken such further or other action as the parties reasonably may deem necessary or desirable in order to vest in and confirm to the purchaser title to and possession of all its property, rights, privileges, possessions, and franchises and otherwise to carry out the intent and purposes of this Agreement.

12. Partial Invalidity. Failure by either party to enforce any provision in this Agreement or if any provision becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction neither the legality, validity or enforceability of the remaining provisions hereof nor the legality, validity or enforceability of such provision under the law of any other jurisdiction shall in any way be affected or impaired thereby.

13. Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of England and Wales. The parties agree that any disputes arising out of or relating to the Agreement shall be submitted to the jurisdiction of the courts of England and Wales, and submit to the jurisdiction of such courts for such purpose and waive all objections to such disputes being heard in such courts.

14. Counterparts. This Agreement may be executed in duplicate facsimile counterparts, each of which shall be deemed an original and together shall constitute one and the same binding Agreement, with one counterpart being delivered to each party hereto.

15. Notices. Notices served to any party hereto pursuant to this Agreement shall be in writing in English and given by First Class mail or Air mail, postage prepaid, to the address of the party herein and shall be deemed to have been served 5 days after posting to the applicable address.

16. Marketability of Consideration Shares. Consideration Shares issued hereunder to SELLERS shall not be subject to any restrictions on sale following admission of any of the issued share capital of EGCI to the NASDAQ OTCBB.

EXHIBIT "A"   15

16-FEB-2010 15:16  FROM:                                    TO:00442074513799      P.13/33

IN WITNESS WHEREOF, the parties hereto have set their hands and seals as of the date and year first above written.

ELECTRONIC GAME CARD INC.

By:

ELECTRONIC GAME CARD LTD

By:

SELLERS

By:

For and on behalf of
Rory Capital Ltd

13

EXHIBIT "A"   16

## LIST OF EXHIBITS

| | |
|---|---|
| Exhibit "A" | List of SELLERS |
| Exhibit "B" | True and correct copies of EGCL's Certificate of Incorporation, amendments thereto and all current By-laws. |
| Exhibit "C" | Any material legal actions, lawsuits, proceedings of investigations, either administrative or judicial, pending or threatened, against or affecting EGCL, or against the SELLERS that arise out of their operation of EGCL. |
| Exhibit "D" | Evidence of EGCL 's licenses and registrations necessary to permit EGCL to conduct its current business. |
| Exhibit "E" | Any impediments to EGCL 's good, marketable title including liens or encumbrances of any nature whatever. |
| Exhibit "F" | Any money, securities, or property owed by EGCL to either the SELLERS of EGCL or any member of their families or to any company controlled by such a person, directly or indirectly. |
| Exhibit "G" | EGCL's agreed short term cash requirement projection ; |
| Exhibit "H" | EGCL's agreed budget and cash requirement projection for 24 months. |
| Exhibit "I" | EGCL license in perpetuity for exclusive operation and development of the Software, patents and intellectual property associated with the product Electronic Gaming Card or Electronic Scratch card |
| Exhibit "J" | True and correct copy of EGCI's Certificate of Incorporation, amendments thereto plus all current By-laws. |
| Exhibit "K" | Form of Share Transfer Executed in Favour of SELLER |

14

EXHIBIT "A"    17

16-FEB-2010 15:19  FROM:                                    TO:00442074513799      P.21/33

**Exhibit A**
List of SELLERS.

Shareholding in EGCL
£1.00 Ordinary Shares

Polly Capital Ltd of Suite F8 International Commercial
Centre Casemates Gibraltar, as the initial SELLERS agent,
on behalf of the SELLERS                                       99

TOTAL.                                                         99

15

**Exhibit B**

True and correct copies of EGCL's Certificate of Incorporation, Memorandum and Articles and amendments thereto.

See attached.

16



# CERTIFICATE OF INCORPORATION
## ON CHANGE OF NAME

Company No. 3966151

The Registrar of Companies for England and Wales hereby certifies that

**ELECTRONIC GAME CARD LIMITED**

having changed its name, is now incorporated under the name of

**ELECTRONIC GAME CARD (UK) LIMITED**

Given at Companies House on **6th November 2008**.





THE OFFICIAL SEAL OF THE
REGISTRAR OF COMPANIES

LL29.2



# CERTIFICATE OF INCORPORATION

## ON CHANGE OF NAME

### Company No.  3966151

The Registrar of Companies for England and Wales hereby certifies that

C14NET SOLUTIONS LIMITED

having by special resolution changed its name, is now incorporated

under the name of

ELECTRONIC GAME CARD LIMITED

Given at Companies House, Cardiff, the 8th May 2002



THE OFFICIAL SEAL OF THE
REGISTRAR OF COMPANIES



*Companies House*
—— *for the record* ——

HC006A

EXHIBIT "A"   21

**FILE COPY**



# CERTIFICATE OF INCORPORATION

## ON CHANGE OF NAME

### Company No.  3966151

The Registrar of Companies for England and Wales hereby certifies that

ALLIED SOFTWARE LTD

having by special resolution changed its name, is now incorporated

under the name of

C14NET SOLUTIONS LIMITED

Given at Companies House, Cardiff, the 25th May 2000



*C039661510*





*C O M P A N I E S   H O U S E*                    C006

EXHIBIT "A"   22

**FILE COPY**



# CERTIFICATE OF INCORPORATION

# OF A PRIVATE LIMITED COMPANY

## Company No. 3966151

The Registrar of Companies for England and Wales hereby certifies that

ALLIED SOFTWARE LTD

is this day Incorporated under the Companies Act 1985 as a private

company and that the company is limited.

Given at Companies House, Cardiff, the 6th April 2000



*N03966151I*



THE OFFICIAL SEAL OF THE
REGISTRAR OF COMPANIES



*C O M P A N I E S   H O U S E*

HC007B

16-FEB-2010 15:17  FROM:                                            TO:00442074513799      P.15/33

610412000

The Companies Acts 1985 to 1989

PRIVATE COMPANY LIMITED BY SHARES

ARTICLES OF ASSOCIATION

OF

ALLIED SOFTWARE LTD

### PRELIMINARY

1. The Regulations contained in Table A in the Schedule to the Companies (Table A to F) Regulations 1985 as amended by the Companies (Table A to F) (Amendment) Regulations 1985 (such table being hereinafter called 'Table A') shall apply to the Company save in so far as they are excluded or varied hereby and such Regulations (save as so excluded or varied) and the Articles hereinafter contained shall be the regulations of the Company.

2. The Company is a private company and shall not offer to the public (whether for cash or otherwise) any shares in or debentures of the Company, or allot or agree to allot (whether for cash or otherwise) any shares in or debentures of the Company with a view to all or any of those shares or debentures being offered for sale to the public.

3. In these articles the expression "the Act" means the Companies Act 1985, but also any reference in these articles to any provisions of the Act shall be deemed to include reference to any statutory modification or re-enactment of the Act for the time being in force.

### ALLOTMENT OF SHARES

4. The shares of the Company shall be under the control of the Directors who may allot, grant options over, or otherwise deal with or dispose of any relevant securities (subject to Section 80 of the Act) to such persons, on such terms and in such manner as they think fit.

5. All relevant securities of the Company from time to time unissued shall come under the general authority and powers conferred by Article hereof and the directors may further exercise any power of the Company to convert securities into shares of the Company up to the amount of the authorised share capital with which the Company is incorporated at any time or times for a period of not more than five years from the date of incorporation of the Company. The authority hereby given may at any time (subject to the said section 80) be renewed, revoked or varied by the Ordinary Resolution of the Company in General Meeting (but not for more than five years at a time) and the Directors under tho general authority shall be entitled to make at any time before the expiry of such authority any offer or agreement which will or may require securities to be allotted after the expiry of such authority.

5

EXHIBIT "A"   24

6. Any shares which are not in the original authorised share capital with which the Company is incorporated and where the Directors propose to issue shall first be offered to the Members in proportion as nearly as may be to the number of the existing shares held by them respectively unless the Company in General Meeting shall by Special Resolution otherwise direct. The offer shall be made by notice specifying the number of shares offered, and limiting a period (not being less than fourteen days) within which the offer, if not accepted, will be deemed to be declined. After the expiration of that period, those shares so deemed to be declined shall be offered in the proportion aforesaid to the persons who have, within the said period, accepted all the shares offered to them; such further offer shall be made in like terms in the same manner and limited by a like period as the original offer. Any share not accepted pursuant to such offer or further offer as aforesaid or not capable of being offered as aforesaid except by way of fractions and any shares released from the provisions of the Article by any such Special Resolution as aforesaid shall be under the control of the Directors, who may allot, grant options over or otherwise dispose of the same to such persons, on such terms, and in such a manner as they think fit, provided that, in the case of shares not accepted as aforesaid, such shares shall not be disposed of on terms which are more favourable to the subscribers therefore than the terms on which they were offered to the Members. The foregoing provisions of this paragraph shall have effect subject to Section 80 of the Act.

7. In accordance with Section 91(1) of the Act Sections 89 (1) and 90 (1) to (6) inclusive shall be excluded from applying in relation to any allotment of Shares in the Company.

8. The Company shall have the power to issue shares which are to be redeemed or are liable to be redeemed at the option of the Company or the Shareholder subject to the provisions within part V of the Act and on such terms as may be provided by the Resolution of the Company creating such redeemable shares.

9. The Company may purchase its own shares (including any redeemable shares) subject to the provisions of Part V of the Act.

10. The Company may make a payment in respect of the redemption or purchase of any of its shares otherwise than out of its distributable profits or the proceeds of a fresh issue of Shares subject to Sections 159 or 162 (as the case may be) of the Act.

### TRANSFER OF SHARES

11. The Directors may in their absolute discretion and without assigning any reason therefore decline to register the transfer of a Share whether or not it is a fully paid Share.

### LIEN

12. The Company shall have a first and paramount lien on every Share (whether it is fully paid or not) for all monies (whether presently payable or not) called or payable at a fixed time or called in respect of that Share and of all shares registered in the name of any person indebted or under liability to the Company whether he shall be the sole registered holder thereof or shall be one of two or more joint holders or his estate and clause 8 of Table A shall be modified accordingly.

6

TO:00442074513799      P.17/33

13. The liability of any Member in default in respect of a call shall be increased and the words "and all expenses that may have been incurred by the Company by reason of such non-payment." added at the end of the first sentence of Clause 18 in Table A.

## GENERAL MEETINGS AND RESOLUTIONS

4. Every notice convening a General Meeting shall comply with the provisions of Section 372 (3) of the Act, as to giving information to members in regard to their right to appoint proxies, and notices of and other communications relating to any General Meeting which any Member is entitled to receive; shall be sent to the Directors and to the Auditors for the time being of the Company.

15. No business shall be transacted at any General Meeting unless a quorum is present, subject to 16 below two persons entitled to vote upon the business to be transacted, each being a Member or a proxy for a Member or a duly authorised representative of a corporation, shall be a quorum.

16. If and for so long as the Company has only one Member, that Member present in person or by proxy or if that Member is a corporation by a duly authorised representative shall be a quorum and clause 40 in Table A shall be varied accordingly.

17. If a quorum is not present within half an hour from the time appointed for a General Meeting, the General Meeting will stand adjourned to the same day in the next week at the same time and place or such time and place as the Directors may determine and if at the adjourned General Meeting a quorum is not present within half an hour from the time appointed therefore such adjourned General Meeting shall be dissolved and Clause 41 in Table A shall not apply to the Company.

18. If and for so long as the Company has only one Member and that Member takes any decision which is required to be taken in General Meeting or by means of a written resolution, that decision shall be as valid and effectual as if agreed by the Company in General Meeting save that this paragraph shall not apply to resolutions passed pursuant to Sections 303 and 391 of the Act.

19. Any decision taken by a sole Member pursuant to the above paragraph 14 shall be recorded in writing and delivered by that Member to the Company for entry in the Company's Minute Book.

## APPOINTMENT OF DIRECTORS

20. Clause 64 in table A shall not apply to the Company.

21. The Directors shall not be required to retire by rotation and Clauses 73 to 80 (inclusive) in Table A shall not apply to the Company.

22. There shall be at least one Director and unless otherwise determined by an Ordinary Resolution of the Company in General Meeting there shall not be any other limitation as to the number of Directors and if at any time there shall be only one Director of the Company, he or she, may act as sole Director exercising all the powers, authorities and discretions vested in the Directors generally and Clause 89 of Table A shall be modified accordingly.

7

EXHIBIT "A"   26

23. No person shall be appointed a Director at any General Meeting unless

(a) he is recommended by the Directors, or

(b) Not less than fourteen or more than thirty-five clear days before the date appointed for the meeting, notice signed by a member qualified to vote at the meeting has been given to the Company of the intention to propose that person for appointment together with a notice signed by that person of his willingness to be appointed.

24. Subject to the above the Company may by Ordinary Resolution appoint any person who is willing to act, to be a Director, either to fill a vacancy or as an additional Director.

25. The Directors may appoint a person who is willing to act to be a Director, either to fill a vacancy or as an additional Director, provided that the appointment does not cause the number of Directors to exceed any number determined in accordance with 23 above as the maximum number of Directors and for the time being in force.

26. In any case where as the result of the death of a sole Member of the Company, the Company has no Members and no Directors the personal representatives of such deceased Member shall have the right by notice in writing to appoint a person to be a Director of the Company and such appointment shall be as effective as if made by the Company in General Meeting pursuant to paragraph 24 above.

## BORROWING POWERS

27. The Directors may exercise all the powers of the Company to borrow money without limit as to the amount and upon such terms and in such a manner as they think fit, and subject (in the case of any security convertible into shares) to Section 80 of the Act to grant any mortgage, charge or standard security over its undertaking, property and uncalled capital, or any part thereof, and to issue debentures debenture stock and other securities whether outright or as security for any debt, liability or obligation of the Company or of any third party.

## ALTERNATE DIRECTORS

28. A Director, or any such person as is mentioned in Clause 65 in Table A, may act as an alternate Director to represent more than one Director, and an alternate Director shall be entitled at any meeting of the Directors or of any committee of the Directors to one vote for every Director whom he represents in addition to his own vote (if any) as a Director, but he shall count as only one for the purpose of determining whether a quorum is present.

29. An alternate Director shall not be entitled as such to receive any remuneration from the Company, save that he may be paid by the Company such part (if any) of the remuneration otherwise payable to his appointer as such appointer may by notice in writing to the Company from time to time direct, and the first sentence of Clause 66 in Table A shall be modified.

### DIRECTORS INTERESTS

30. Any Director may act by himself or with his firm in a professional capacity for the company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director to act as Auditor to the Company.

31. A Director may vote, as a Director in regard to any contract or arrangement in which he is interested or upon any matter arising thereout, and if he shall so vote, his vote shall be counted and he shall be reckoned in estimating a quorum when any such contract or arrangement is under consideration and Clause 94 to 97 inclusive of table A shall not apply to the Company.

### THE SEAL

32. If the Company has a seal it shall only be used with the authority of the Directors or a committee of Directors. The Directors may determine who shall sign any instrument to which the seal is affixed and unless otherwise so determined it shall be signed by a Director and by the Secretary or second Director. The obligation under Clause 6 of Table A relating to the sealing of share certificates shall apply only if the Company has a seal. Clause 101 of table A shall not apply to the Company.

33. The Company may exercise the powers conferred by section 39 of the Act with regard to having an official seal for use abroad, and such powers shall be vested in the Directors.

### INDEMNITY

34. Every Director or other official officer or Auditor of the Company shall be indemnified out of the assets of the Company against all losses or liabilities which he may sustain or incur in of about the execution of the duties of his office or otherwise in relation thereto, including any liability incurred by him in defending any proceedings, whether civil or criminal, or in connection with any application under Section 144 or Section 727 of the Act in which relief is granted to him by the Court, and no Director or other officer shall be liable for any loss, damage or misfortune which may happen to or be incurred by the Company in the execution of the duties of his office or in relation thereto. But this Article shall only have effect in so far as its provisions are not avoided by Section 310 of the Act.

35. The Directors shall have the power to purchase and maintain for any Director, officer or Auditor of the Company Insurance against any such liability as is referred to in Section 310(1) of the Act.

36. Clause 118 in Table A shall not apply to the Company.

9



NAMES AND ADDRESSES OF SUBSCRIBERS

for and on behalf of
QA NOMINEES LIMITED
THE STUDIO
ST NICHOLAS CLOSE
ELSTREE
HERTS
WD6 3EW

for and on behalf of
QA REGISTRARS LIMITED
THE STUDIO
ST NICHOLAS CLOSE
ELSTREE
HERTS
WD6 3EW

DATED     30 MAR 2000

WITNESS to the above signatures:-

for and on behalf of
QUICK ACCESS FORMATIONS PLC
THE STUDIO
ST NICHOLAS CLOSE
ELSTREE
HERTS
WD6 3EW

10

## Exhibit C

Any material legal actions, lawsuits, proceedings of investigations, either administrative or judicial,
pending or threatened, against or affecting EGCL, or against the SELLERS that arise out of their
operation of EGCL.

None.

17

## Exhibit D

Evidence of EGCL's licenses and registrations necessary to permit EGCL to conduct its current business.

No licenses or registrations are required to permit EGCL to conduct its current business.

18

16-FEB-2010 15:20  FROM:                                                    TO:004420745l3799      P.25/33

## Exhibit E

Any impediments to EGCL's good and marketable title including liens or encumbrances of any nature whatever.

None.

19

16-FEB-2010 15:20  FROM:                                          TO:00442074513799      P.26/33

**Exhibit F**

Any money, securities, or property owed by EGCL to either the Principals of EGCL or any member of their families or to any company controlled by such a person. directly or indirectly.

None.

20

## Exhibit G

EGCL's agreed budget and cash requirement projection for 24 months attached.

EGCI has obtained funding to support EGCL agreed budget and cash flow requirements up to US$2 million subject to the following terms and conditions.

Funding will attract interest at 3% above the Barclays Bank plc base rate with monthly lifts. The amount drawn down from the facility will be repaid with accrued interest after 24 months or within 14 days of closing of a stock placement or refinancing of not less than $2.5m. Commercially achievable debt or equity fund raising for operational purposes in the commercial interests of EGCI shall be undertaken during the Budget period referred to herein with the agreement of the Board of EGCI. The loan plus accrued interest may be repaid in full at any time without penalty. Funding will be secured on the assets of EGCI and its subsidiaries in a form agreeable to the lender.   During the period of the loan EGCL will not enter into any alternative or additional borrowing arrangements without the consent of EGCI with the exception of funds raised in the normal course of business by factoring orders/invoices on standard commercial terms

EGCI reserves the right to vary payments if variances to Budget occur.

Timelines & Milestones to be implemented by EGCL and approved by EGCI

Consultants transfer to salaried staff full time by later of 1st November 2002
Review Budget and marketing plan for second half 2002/3 by 30th November 2002
Review sales plan for second half 2002/2003 by 30th November 2002 and separate budget for US Sales office.
Review product development for 2003 by 30th November 2002
Locate US office for January 2003
Start staff recruitment for US office during December 2002
Review budget and prepare Sales / Marketing plans for 2003/4 by 31st May 2003

21

EXHIBIT "A"   34

## Exhibit H

EGCL's agreed short term budget requirements.

EGCI has agreed to provide an advance on the funding to EGCL up to US$200,000 subject to the following terms and conditions.

The attached detailed budget which forms the first three months of the 24 month Cash Flow and Budget agreed between the parties must be strictly adhered to in respect of Cash requirements. EGCI must be informed of any material potential variances in trading which may affect performance of the business compared to the budget within five working days of the variance becoming known. EGCI reserves the right to vary payments if variances to budget or the cash requirement occur.

Timelines & Milestones to be implemented by EGCL and approved by EGCI

        Commencement date 1st August 2002
        Security testing completed by 30th November 2002
        Sales campaign plan approved by 31st August 2002
        Marketing plan approved by 31st August 2002
        Game card development plan approved by 30th September 2002

22

EXHIBIT "A"    35

**Exhibit H(cont)**

GTL Short Term Budget

| Expense £ | Timing | Month 1 | Month 2 | Month 3 | Total £ |
|---|---|---|---|---|---|
| Office Rent | | 2850 | 2850 | 2850 | 8550 |
| Office Ancillary | | 750 | 1000 | 1250 | 3000 |
| Legal & Prof | | 1000 | 2000 | 1500 | 4500 |
| Office Software | | | 1000 | 1500 | 2500 |
| Recruitment | | | 1000 | 1500 | 2500 |
| Marketing Brochure / Trade Press etc | | | 1000 | 2000 | 3000 |
| Travel Manufacturer HK | | 2000 | 2000 | | 4000 |
| Travel Sales US | | | 2000 | 2000 | 4000 |
| Travel/ Irish Launch/ Europe Sales | | | 1000 | 1000 | 2000 |
| Marketing Events | | 1000 | 5000 | 5500 | 11500 |
| Gamesoft | | 1500 | 6000 | 7000 | 14500 |
| Prototype Samples | | 6500 | | | 6500 |
| Entertainment | | 500 | 1500 | 1500 | 3500 |
| Consultant Salaries - CEO - J Bentley | | 4000 | 4000 | 4000 | 12000 |
| Development - Gordon McNally | | 2000 | 2000 | 2000 | 6000 |
| Lottery Sales - Dan Kane | | 3000 | 3000 | 3000 | 9000 |
| Marketing Patrick Woodward | | 2000 | 2000 | 2000 | 6000 |
| Casino/ Gaming Sales - Allan Howard | | 2000 | 2000 | 2000 | 6000 |
| Secretarial | | | 500 | 500 | 1000 |
| Accounting/ Co Sec/ LIB | | 1500 | 2000 | 2000 | 5500 |
| Contingency | | 500 | 5500 | 6500 | 12500 |
| Totals | | 31100 | 47350 | 49600 | 128050 |

23

## Exhibit I

EGCL license in perpetuity for exclusive operation and development of the Software, patents and intellectual property associated with the product Electronic Game Card™ /Gaming Card™ or Electronic Scratch Card™ Agreement.

See attachments.

24

**Exhibit I**

True and correct copy of EGCI's Certificate of Incorporation, Memorandum and Articles, plus all
amendments thereto to date plus all current By-laws and certificate of good standing

See attachments.

25

EXHIBIT "A"    38

**Exhibit K**

Form of share transfer executed in favour of SELLER

26

16-FEB-2010 15:21  FROM:                                    TO:00442074513799        P.33/33

**TRANSFER FORM**

**J 30**

(Above this line for Registrars only)

|  | Certificate lodged with the Registrar |
|---|---|

Consideration Money £ ... 99 - 00

(For completion by the Registrar/Stock Exchange)

| Full name of Undertaking | ELECTRONIC GAME CARD LIMITED |
|---|---|
| Full description of Security. | ORDINARY SHARES |

| Number or amount of Shares, Stock or other security and, in figures column only, numbered denomination of units, if any. | Words | Figures |
|---|---|---|
| | NINETY NINE | ( 99 units of £1.00 ) |

| Name(s) of registered holder(s) should be given in full; the address should be given where there is only one holder. If the transfer is not made by the registered holder(s) insert also the name(s) and capacity (e.g. Executor(s)) of the person(s) making the transfer. | In the name(s) of | Account Designation (if any) |
|---|---|---|
| | ELECTRONIC GAME CARD INC 14 WALL STREET NEW YORK, NY 10005 USA. | |

I/We hereby transfer the above security out of the name(s) aforesaid to the person(s) named below or to the several persons named in Parts 2 of Brokers Transfer Forms relating to the above security:
Delete words in italics except for stock exchange transactions.

Signature(s) of transferor(s)

1.
2.
3.
4.

Bodies corporate should execute under their common seal.

Stamp of Selling Broker(s) or, for transactions which are not stock exchange transactions, of Agent(s), if any, acting for the Transferor(s).

Date

| Full name(s) and full postal address(es) (including county or, if applicable, Postal District number) of the person(s) to whom the security is transferred. | E.P.N. ADVISORY LTD SUITE F-8 INTERNATIONAL COMMERCIAL CENTRE CASEMATES GIBRALTAR. | Account Designation (if any) |
|---|---|---|

Please state title, if any, or whether Mr., Mrs. or Miss.

Please complete in typewriting or in Block Capitals.

I/We request that such entries be made in the register as are necessary to give effect to this transfer.

| Stamp of Buying Broker(s) (if any) | Stamp or name and address of person lodging this form (if other than the Buying Broker(s)) |
|---|---|

EXHIBIT "A"   40

# EXHIBIT B

## ASSUMPTION OF
## ACQUISITION AGREEMENT

Assumption dated 1 February 2006 (the "Agreement") by and among Electronic Game Card Inc., a company incorporated under the laws of the State of Nevada ("EGCI NEVADA"), Electronic Game Card Inc., a company incorporated under the laws of the State of Delaware ("EGCI DELAWARE"), Electronic Game Card Limited, a company incorporated under the laws of England ("EGCL"), and EPN Advisory Ltd for the Sellers ("SELLERS").

Reference is made to the Acquisition Agreement dated 2nd August, 2002 (the "Acquisition Agreement") by, between and among EGCI DELAWARE, EGCL, and SELLERS.

EGCI DELAWARE has previously acquired EGCL, which holds certain intellectual property rights, pursuant to the Acquisition Agreement.

EGCI NEVADA desires to acquire and exercise more direct control over the aforesaid intellectual property, both that owned directly by EGCL and by related parties.

NOW, THEREFORE, in consideration of the mutual covenants, agreements, representations and warranties herein contained, and intending to be bound hereby, the parties hereby agree as follows:

1.  _Assumption and Amendment._ EGCI NEVADA agrees to assume and perform the rights and obligations of EGCI DELAWARE under the Acquisition Agreement as amended to the date hereof. All references to EGCI DELAWARE there under shall be deemed to be references to both EGCI NEVADA and EGCI DELAWARE henceforth, mutatis mutandis, unless in a particular instance the same would clearly be inappropriate and would defeat the protections intended for EGCL and/or the SELLERS under the Acquisition Agreement.

    (a) Notwithstanding anything to the contrary in the Acquisition Agreement or this Agreement, the obligations assumed and to be performed by EGCI NEVADA include, without limitation, the outstanding obligations to issue stock of EGC Delaware in connection with the performance of those agreements (which now, upon this assumption, now become obligations to issue instead stock of EGCI NEVADA), and certain cash payment obligations.

    (b) In addition, notwithstanding anything to the contrary in the Acquisition Agreement or this Agreement, references in the Acquisition Agreement to intellectual property of EGCI DELAWARE now, upon this assumption, include the intellectual property of EGCI NEVADA and its subsidiaries now owned or hereafter acquired.

    (c) Notwithstanding anything to the contrary in the Acquisition Agreement or this Agreement, EPN Advisory Ltd. shall give notice directly to the other parties to the Acquisition Agreement and this Agreement if it should resign or be replaced as representative of the SELLERS, and the same requirement shall apply to any successive successor as representative, each of whom shall be treated as representative of the SELLERS until it gives notice otherwise to the other parties to the Acquisition Agreement and this Agreement.

2.  _Entire Agreement._ This Agreement is the entire agreement between the parties in respect of the subject matter hereof other than the Acquisition Agreement. This Agreement incorporates the Acquisition Agreement in its entirety, and such terms and provisions are deemed restated in

1

this Agreement in their entirety, as amended by this Agreement. This Agreement, as a consequence of such incorporation of the Acquisition Agreement, ratifies and then replaces and supersedes the Acquisition Agreement in its entirety.

3. Amendment. This Agreement be not be modified except in writing executed by all of the parties hereto.

4. Rights Cumulative. The rights and remedies provided by this Agreement are cumulative, and the exercise of any right or remedy by any party hereto (or by its successor), whether pursuant to this Agreement, to any other agreement, or to law, shall not preclude or waive its right to exercise any or all other rights and remedies concurrently or subsequently.

5. No Waiver. No failure or neglect of any party hereto in any instance to exercise any right, power or privilege hereunder or under law or waiver of the same in any instance shall constitute a waiver of any other right, power or privilege or of the same right, power or privilege in any other instance. All waivers by any party hereto must be contained in a written instrument signed by the party to be charged.

6. Expenses. The parties hereto shall be responsible for their own respective costs and expenses, including fees and expenses of their counsel, in connection with the negotiation, preparation, execution and delivery of this Agreement.

7. Provisions Fair and Reasonable. Each party to this Agreement acknowledges it has had an opportunity to take independent legal advice with regard to this Agreement and that the provisions of this Agreement including, without limitation, restrictions, covenants and agreements, are fair and reasonable. If any such restriction is held to be unreasonably wide but would be valid if part of the wording were deleted, such restriction will apply with so much of the wording deleted as may be necessary to make it valid.

8. Further Instruments. From time to time, as and when requested by any of the parties or by its successors or assignee, the other parties will execute and deliver, or cause to be delivered, all such deeds and other instruments; and will take or cause to be taken such further or other action as the parties reasonably may deem necessary or desirable in order to vest in and confirm to the respective parties title to and possession of all its respective property, rights, privileges, possessions, and franchises and otherwise to carry out the intent and purposes of this Agreement.

9. Partial Invalidity. If any provision of this Agreement becomes illegal, invalid or unenforceable in any respect, neither the legality, validity nor enforceability of the remaining provisions hereof nor the legality, validity or enforceability of such provision under the law of any other jurisdiction shall in any way be affected or impaired thereby. Furthermore, in such event the parties to this Agreement shall agree to such amendment to this Agreement as shall substitute for the provision held illegal, invalid or unenforceable such substitute provision therefore as shall as nearly as practicable reflect the applicable rights and obligations intended by the parties to this Agreement.

10. Governing Law; Jurisdiction. This Agreement shall be governed by and construed in accordance with the internal laws of England and Wales. The parties agree that any disputes arising out of or relating to the Agreement shall be submitted to the jurisdiction of the courts of England and Wales, and submit to the jurisdiction of such courts for such purpose and waive all objections to such disputes being heard in such courts.

2

EXHIBIT "B"  42

11. <u>No Third Party Beneficiaries</u>. No provision of this Agreement is intended to confer upon any person other than the parties any rights or remedies hereunder.

12. <u>Successors and Assigns</u>. This Agreement shall continue to bind the parties hereto notwithstanding any amalgamation or merger that may be entered into between a party and another company, entity or person, or any reorganization involving the transfer of a whole or any part of the undertaking and assets of a party to another company, entity or person, whether or not that other company, entity or person, in each case, differs in its objects, character or constitution; it being the intent that this Agreement shall remain valid and effectual in all respects in favor of or against, as the case may be, and that the benefits of this Agreement and all rights of the parties hereunder may be assigned to and enforced by any such company, entity or person, and proceeded on in the same manner as if such company, entity or person had been named herein. The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. No party may assign its obligations under this Agreement to any other party without the prior written consent of any other party, which consent shall not be unreasonably withheld.

13. <u>Facsimiles; Counterparts.</u> This Agreement may be executed in duplicate facsimile counterparts, each of which shall be deemed an original and together shall constitute one and the same binding Agreement, with one counterpart being delivered to each party hereto.

14. <u>Public Announcements</u>. The parties agree to consult with each other, except as may be required by applicable law, before issuing any press release or making any public statement with respect to this Agreement or the transactions, agreements or documents contemplated hereby and, except as may be required by applicable law or any listing agreement with any national securities exchange, will not issue any such press release or make any such public statement prior to such consultation.

15. <u>Parties Not Co-Venturers or Partners</u>. It is expressly understood and agreed that the relationship between the parties in connection with this Agreement, and the transactions and documents contemplated hereby, is as contract parties, and no party or its respective officers, directors, employees, representatives or agents, is an employee, agent, representative or partner of the other party except that EGCI NEVADA has assumed certain obligations of EGCI DELAWARE and, indirectly, EGCI, pursuant to this Agreement. No party shall be responsible for the payment of any employee-related taxes, employee benefits, workers' compensation or unemployment compensation to or for the benefit of any other party or its respective employees, officers, directors, manager, agents or representatives.

16. <u>Notices.</u> Any notice, request, consent or communication (collectively a "<u>Notice</u>") under this Agreement shall be effective only if it is in writing and furnished as provided in this paragraph.

    (a)  Each Notice shall be in English.

    (b)  Each Notice shall be sent by one of the following means:  (i) personal delivery; (ii) certified or registered mail, return receipt requested, postage prepaid; (iii) a nationally recognized overnight delivery service, with delivery confirmed; (iv) telex or telecopy, with receipt confirmed; or (v) email.

3

(c) Each Notice shall be given to the applicable party at its address set forth beneath its signature on the signature page to this Agreement, or to such other or additional persons or addresses as shall be furnished in writing by any party to the other parties.

(d) A Notice properly addressed shall be deemed to have been given on the applicable date determined as follows: (i) as of the date when personally delivered; (ii) five (5) days after being deposited with the applicable national mail service, postage prepaid for first class, international or air delivery, as applicable; (iii) the next day when delivered during business hours on a business day to a nationally recognized overnight delivery service; (iv) when receipt of the telex or telecopy is confirmed, as the case may be; or (v) when sent by email. Notwithstanding the foregoing, no such Notice shall be deemed given if the sending party has actual knowledge that a Notice was not received by the intended recipient.   Furthermore, notwithstanding the foregoing, no such Notice shall be deemed given on a date determined as set forth above in this paragraph if such date is not a business day in the locality of the recipient. For this purpose, a business day shall be a date other than a Saturday, a Sunday, a holiday, or any date upon which commercial banks in that locality are closed, in which event the Notice shall be deemed given on the next business day in such locality.

17. <u>Construction and Certain Rules of Interpretation</u>.

(a) This Agreement shall not be construed more strongly against any party regardless of which party (or its representative or advisor) is responsible for its preparation, it being agreed that this Agreement was fully negotiated by each of the parties.

(b) The table of contents and headings of paragraphs, subparagraphs, sections, subsections, clauses, sub-clauses, schedules, and appendixes, if any, are for convenience only and do not affect the interpretation of this Agreement.

(c) References to recitals, schedules, paragraphs, subparagraphs, sections, subsections, clauses, sub-clauses and appendixes are to (respectively) recitals to, schedules to, paragraphs, subparagraphs, sections, subsections, clauses and sub-clauses of, and appendixes to this Agreement (unless otherwise specified).

(d) References within a schedule or an appendix to paragraphs, subparagraphs, sections, subsections, clauses, sub-clauses are to paragraphs, subparagraphs, sections, subsections, clauses, sub-clauses of that schedule or appendix (unless otherwise specified).

(e) Unless the context requires otherwise, words in the singular include the plural and vice versa.

(f) Unless the context requires otherwise, a reference to one gender includes a reference to the other gender or to a neutral gender, as applicable.

(g) References to any person for the purposes of this Agreement shall include any natural person, bodies corporate, unincorporated associations, partnerships, joint ventures, trusts, foundations, estates, governments, governmental agencies and departments, statutory bodies or other entities, in each case whether or not having a separate legal personality. Such references also shall include the person's successors.

4

(h) A reference to a particular treaty, directive of a governmental agency, statute, statutory provision or subordinate legislation is a reference to it as it is in force from time to time taking account of any amendment or re-enactment. Each such reference includes any treaty, directive of a governmental agency, statute, statutory provision or subordinate legislation which it amends or re-enacts and subordinate legislation for the time being in force made under it. Such references also include any order, regulation, instrument or other subordinate legislation made under any of the same, except to the extent that it comes into force after the date of this Agreement and would impose any new or extended obligation, liability or restriction on or otherwise adversely affect the rights of any party. Notwithstanding the foregoing three sentences, as between the parties, no such amendment or re-enactment shall apply for the purposes of this Agreement to the extent that it would impose any new or extended obligation, liability or restriction on, or otherwise adversely affect the rights of, any party.

(i) A reference to any document being in the agreed form means that it is in the form agreed between the parties to this Agreement and signed or initialed for the purposes of identification by or on behalf of the applicable party(ies).

(j) Any reference to "writing" or "written" includes faxes, emails and any other legible reproduction of words delivered (electronically or otherwise) in permanent and tangible form.

(k) References to times of the day are to London time (unless expressly provided otherwise) and references to a day are to a period of 24 hours running from midnight on the previous day.

(l) References to any English legal term for any action, remedy, method of judicial proceeding, legal document, legal status, court, organization, body, official or any legal concept, state of affairs or thing shall in respect of any jurisdiction other than England be deemed to include that which most nearly approximates in that jurisdiction to the English legal term.

(m) Where the words "include"(s), "including" or "in particular" are used in this Agreement, they are deemed to have the words "without limitation" following them.

(n) Where the context permits, "other" and "otherwise" are illustrative and shall not limit the sense of the words preceding them.

(o) Where any statement is qualified as being limited by any person's "knowledge" (for example, by using expressions such as "so far as he is aware"), the statement shall be deemed to be given to the best of such person's knowledge, information and belief after making due and careful enquiries of (i) such persons responsible executive officers, if such person is a body or of a body which has such officers, or (ii) of such persons as a reasonable person would prudently enquire in the management of such reasonable person's own affairs.

(p) The table of contents and headings and sub-headings, if any, are for convenience only and are not intended to and shall not affect the construction or interpretation of this Agreement. The language in all parts of this Agreement shall be in all cases construed according to its fair meaning and not strictly for or against any party to this Agreement.

EXHIBIT "B"  45

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement by officers or other persons duly authorized and intending to be bound hereby as of the date and year first above written.

ELECTRONIC GAME CARD INC. (NEVADA)

By: _____
Title: Director

By: _____
Title: Secretary

Address: 712 FIFTH AVE
15th FLOOR   NEW YORK
NY 10019

ELECTRONIC GAME CARD INC. (DELAWARE)

By: _____
Title: Director

By: _____
Title: Secretary

Address: 712 FIFTH AVE
15th FLOOR   NEW YORK
NY 10019

6

EXHIBIT "B"   46

ELECTRONIC GAME CARD LTD

By: _____
Title: Director

By: _____
Title: Secretary

Address: 5th Fl. Swannah House
11 Chelsea ☒ Pt London
SW1 4 uNz.

SELLERS:

EPN ADVISORY, LTD.

By: _____
Title: Director

By: _____
Title: Secretary

Address: Suite F6 Lec.
Cocu mbs
Gibraltar

7

EXHIBIT "B"  47

# EXHIBIT C

# AMENDMENT OF
## REMEDIES LICENSE
### UNDER
### ASSUMPTION AGREEMENT
#### (Including the Acquisition Agreement)

This Amendment is dated 19 February 2010 (the "Amendment") by and among Electronic Game Card Inc., a company incorporated under the laws of the State of Nevada ("EGCI NEVADA"), Electronic Game Card Inc., a company incorporated under the laws of the State of Delaware ("EGCI DELAWARE"), Electronic Game Card Limited, a company incorporated under the laws of England ("EGCL"), and EPN Advisory Limited ("SELLERS").

Reference is made to the Acquisition Agreement dated 2nd August, 2002 (the "Acquisition Agreement") by, between and among EGCI DELAWARE, EGCL, and SELLERS.

Reference is made to the Assumption Agreement dated 1 February 2006 (the "Assumption Agreement") by and among EGCI NEVADA, EGCI DELAWARE, EGCL, and SELLERS.

EGCI DELAWARE has previously acquired EGCL, which held certain intellectual property rights, pursuant to the Acquisition Agreement.

EGCI NEVADA and EGCI DELAWARE are and have been in default under the Assumption Agreement (including, by way of clarification, the terms and conditions of the Acquisition Agreement which were restated and incorporated in the Assumption Agreement) and the remedies upon default have automatically taken effect, including without limitation the implementation of the Remedies License (as defined in the Assumption Agreement by virtue of the incorporation of the Acquisition Agreement), the application of funds as provided in the Assumption Agreement (by virtue of the incorporation of the Acquisition Agreement) upon default, and the transfer at the direction of the SELLERS of the shares of EGCL. The SELLERS have not waived the defaults or any of the remedies available to the SELLERS.

Notwithstanding the foregoing, the SELLERS have been persuaded that there may be some mutual commercial benefit from strengthening the position and reputation of EGCI NEVADA in the market. Consequently, the SELLERS have decided to propose to amend the terms of the Remedies License, and the other parties have decided to agree to such amendment of the Remedies License (and, consequently, the Assumption Agreement which contains those provisions) upon the following terms and conditions:

NOW, THEREFORE, in consideration of the mutual covenants, agreements, representations and warranties herein contained, and intending to be bound hereby, the parties hereby agree as follows:

    1.  Increase in License Fee for Exclusivity. The license fee payable for exclusivity under the Remedies License shall be increased to $9 million per year rather than the amount calculated as specified in the Remedies License.

    2.  Timing for License Fee for Exclusivity. Said license fee shall be payable each year in 4 equal installments quarterly in arrears 30 days after the end of each calendar quarter to such account or accounts as Licensor may direct in writing by notice to Licensee from time to time received not less than three (3) Business Days prior to the date upon which payment is due.

1

EXHIBIT "C"   48

3.   Intellectual Property Covered by License. By way of clarification, the Remedies License shall continue to cover all intellectual property of EGCI NEVADA and its direct and indirect subsidiaries owned now or hereafter acquired, including without limitation patents and patent applications and extensions thereof. EGCI NEVADA shall not, directly or indirectly, sell, transfer, encumber or otherwise dispose of that intellectual property or any interest therein or seek to do so without our prior written consent, which shall not be unreasonably withheld or delayed provided that the disposition does not interfere with the full enjoyment of the Remedies License by the licensee under the Remedies License.

4.   Field and Territory of Remedies License. The Remedies License shall continue to grant to the SELLERS or such party(ies) as are designated by the SELLERS representative, currently EPN Advisory Limited, the non-exclusive right to develop and manufacture products and services using the intellectual property, and the exclusive right to market, distribute, license and sell products and services using the same in the Territory. The Remedies License shall not include the right to market or sell to state and national lotteries in the Territory but shall include without limitation the right to market and sell to charitable lotteries and market and sell for sales promotions. The Territory for the Remedies License shall continue to be Europe from Iceland, Ireland and the United Kingdom through mainland Europe through Russia including Turkey.

5.   Payment of License Fee. The license fee shall be payable in cash unless EGCI NEVADA and SELLERS or such party(ies) as are designated by the SELLERS representative, currently EPN Advisory Limited, mutually agree otherwise.

6.   Remedies License, Acquisition Agreement and Assumption Agreement in Full Force and Effect. All provisions of the Remedies License and the Assumption Agreement (including by way of clarification the terms and provisions of the Acquisition Agreement which have been incorporated and restated in the Assumption Agreement, as amended by the Assumption Agreement) shall remain in full force and effect but as amended by the preceding provisions.

7.   Effective Date of Amendment. The provisions of this Amendment shall not take effect, and the Assumption Agreement (nor the terms and provisions of the Acquisition Agreement which have been restated and incorporated in the Assumption Agreement) shall not be amended as a consequence of this Amendment, unless and until the SELLERS confirm in writing that the Management Conditions (as hereinafter defined) are satisfied. EGCI NEVADA and its officers, directors, employees, agents, consultants and representatives shall have ceased, directly and indirectly, to do all of the following: interfere with, or attempt to control the ownership or management or accounts of EGCL; dispute the applicability and enforcement of the remedies under the Assumption Agreement; and harass or impugn, directly or indirectly, the managers of European operations. The management of EGCL shall have reverted to directors and officers acceptable to SELLERS. The shares of EGCL shall have been transferred irrevocably at SELLERS' direction as a consequence of the default by EGCI NEVADA precipitated (among other things) by its attempt to change the directors of EGCL without SELLERS' prior written consent in breach of the Assumption Agreement (or the terms and provisions of the Acquisition Agreement which have been restated and incorporated in the Assumption Agreement). The Remedies License and the Assumption Agreement (including the terms and provisions of the Acquisition Agreement which have been restated and incorporated in the Assumption Agreement) shall be in full force and effect as amended hereby. The Board of Directors of EGCI NEVADA shall have agreed to the foregoing in writing satisfactory to SELLERS, which shall have been executed and delivered to SELLERS. The foregoing provisions of this paragraph are sometimes called the "Management Conditions".

2

8.   Amendment Null and Void Upon Certain Defaults. The Amendment shall be null and void ab initio, and the Remedies License shall revert to its original terms as set forth in the Acquisition Agreement as amended by and incorporated in the Assumption Agreement, in the event that there should be any unremedied default as defined in Section 8 of that Acquisition Agreement or any default under the Assumption Agreement or this Amendment, including any future breach or attempted breach of the Management Conditions.  SELLERS may withdraw their agreement to this Amendment at any time on seven (7) days written notice if the SELLERS have not received the approval by the Board of Directors of EGCI NEVADA and other performance required under Paragraph 7 of this Amendment, in which event this Amendment shall be null and void ab initio.

9.   Entire Agreement. This Amendment is the entire agreement between the parties in respect of the subject matter hereof other than the Assumption Agreement (including without limitation the terms and provisions of the Acquisition Agreement which have been restated and incorporated in the Assumption Agreement) and there are no other agreements, written or oral, with respect to the subject matter hereof.

10.   Amendment. This Amendment be not be modified except in writing executed by all of the parties hereto.

11.  Rights Cumulative. The rights and remedies provided by this Amendment are cumulative, and the exercise of any right or remedy by any party hereto (or by its successor), whether pursuant to this Amendment, to any other agreement, or to law, shall not preclude or waive its right to exercise any or all other rights and remedies concurrently or subsequently.

12.  No Waiver. No failure or neglect of any party hereto in any instance to exercise any right, power or privilege hereunder or under law or waiver of the same in any instance shall constitute a waiver of any other right, power or privilege or of the same right, power or privilege in any other instance. All waivers by any party hereto must be contained in a written instrument signed by the party to be charged.

13.  Expenses.  The parties hereto shall be responsible for their own respective costs and expenses, including fees and expenses of their counsel, in connection with the negotiation, preparation, execution and delivery of this Amendment.

14.  Provisions Fair and Reasonable. Each party to this Amendment acknowledges it has had an opportunity to take independent legal advice with regard to this Amendment and that the provisions of this Amendment including, without limitation, restrictions, covenants and agreements, are fair and reasonable. If any such restriction is held to be unreasonably wide but would be valid if part of the wording were deleted, such restriction will apply with so much of the wording deleted as may be necessary to make it valid.

15.  Further Instruments. From time to time, as and when requested by any of the parties or by its successors or assignee, the other parties will execute and deliver, or cause to be delivered, all such deeds and other instruments; and will take or cause to be taken such further or other action as the parties reasonably may deem necessary or desirable in order to vest in and confirm to the respective parties title to and possession of all its respective property, rights, privileges, possessions, and franchises and otherwise to carry out the intent and purposes of this Amendment.

16. Partial Invalidity. If any provision of this Amendment becomes illegal, invalid or unenforceable in any respect, neither the legality, validity nor enforceability of the remaining

3

provisions hereof nor the legality, validity or enforceability of such provision under the law of any other jurisdiction shall in any way be affected or impaired thereby. Furthermore, in such event the parties to this Amendment shall agree promptly to such amendment to this Amendment as shall substitute for the provision held illegal, invalid or unenforceable such substitute provision there for as shall as nearly as practicable reflect the applicable rights and obligations intended by the parties to this Amendment.

17. Governing Law; Jurisdiction. This Amendment shall be governed by and construed in accordance with the internal laws of England and Wales. The parties agree that any disputes arising out of or relating to the Amendment shall be submitted to the jurisdiction of the courts of England and Wales, and submit to the jurisdiction of such courts for such purpose and waive all objections to such disputes being heard in such courts.

18. No Third Party Beneficiaries. No provision of this Amendment is intended to confer upon any person other than the parties any rights or remedies hereunder.

19. Successors and Assigns. This Amendment shall continue to bind the parties hereto notwithstanding any amalgamation or merger that may be entered into between a party and another company, entity or person, or any reorganization involving the transfer of a whole or any part of the undertaking and assets of a party to another company, entity or person, whether or not that other company, entity or person, in each case, differs in its objects, character or constitution, it being the intent that this Amendment shall remain valid and effectual in all respects in favor of or against, as the case may be, and that the benefits of this Amendment and all rights of the parties hereunder may be assigned to and enforced by any such company, entity or person, and proceeded on in the same manner as if such company, entity or person had been named herein. The provisions of this Amendment shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. No party may assign its obligations under this Amendment to any other party without the prior written consent of each other party, which consent shall not be unreasonably withheld.

20. Facsimiles; Counterparts. This Amendment may be executed in duplicate facsimile counterparts, each of which shall be deemed an original and together shall constitute one and the same binding Amendment, with one counterpart being delivered to each party hereto.

21. Public Announcements. The parties agree to consult with each other, except as may be required by applicable law, before issuing any press release or making any public statement with respect to this Amendment or the transactions, agreements or documents contemplated hereby and, except as may be required by applicable law or any listing agreement with any national securities exchange, will not issue any such press release or make any such public statement prior to such consultation.

22. Parties Not Co-Venturers or Partners. It is expressly understood and agreed that the relationship between the parties in connection with this Amendment, and the transactions and documents contemplated hereby, is as contract parties, and no party or its respective officers, directors, employees, representatives or agents, is an employee, agent, representative or partner of the other party except that EGCI NEVADA has assumed certain obligations of EGCI DELAWARE and, indirectly, EGCL pursuant to the Assumption Agreement. No party shall be responsible for the payment of any employee-related taxes, employee benefits, workers' compensation or unemployment compensation to or for the benefit of any other party or its respective employees, officers, directors, manager, agents or representatives.

4

EXHIBIT "C"  51

23. <u>Notices.</u> Any notice, request, consent or communication (collectively a "Notice") under this Amendment shall be effective only if it is in writing and furnished as provided in this paragraph.

(a) Each Notice shall be in English.

(b) Each Notice shall be sent by one of the following means: (i) personal delivery; (ii) certified or registered mail, return receipt requested, postage prepaid; (iii) a nationally recognized overnight delivery service, with delivery confirmed; (iv) telex or telecopy, with receipt confirmed; or (v) email.

(c) Each Notice shall be given to the applicable party at its address set forth beneath its signature on the signature page to this Amendment, or to such other or additional persons or addresses as shall be furnished in writing by any party to the other parties.

(d) A Notice properly addressed shall be deemed to have been given on the applicable date determined as follows: (i) as of the date when personally delivered; (ii) five (5) days after being deposited with the applicable national mail service, postage prepaid for first class, international or air delivery, as applicable; (iii) the next day when delivered during business hours on a business day to a nationally recognized overnight delivery service; (iv) when receipt of the telex or telecopy is confirmed, as the case may be; or (v) when sent by email. Notwithstanding the foregoing, no such Notice shall be deemed given if the sending party has actual knowledge that a Notice was not received by the intended recipient. Furthermore, notwithstanding the foregoing, no such Notice shall be deemed given on a date determined as set forth above in this paragraph if such date is not a business day in the locality of the recipient. For this purpose, a business day shall be a date other than a Saturday, a Sunday, a holiday, or any date upon which commercial banks in that locality are closed, in which event the Notice shall be deemed given on the next business day in such locality.

24. <u>Construction and Certain Rules of Interpretation.</u>

(a) This Amendment shall not be construed more strongly against any party regardless of which party (or its representative or advisor) is responsible for its preparation, it being agreed that this Amendment was fully negotiated by each of the parties.

(b) The table of contents and headings of paragraphs, subparagraphs, sections, subsections, clauses, sub-clauses, schedules, and appendixes, if any, are for convenience only and do not affect the interpretation of this Amendment.

(c) References to recitals, schedules, paragraphs, subparagraphs, sections, subsections, clauses, sub-clauses and appendixes are to (respectively) recitals to, schedules to, paragraphs, subparagraphs, sections, subsections, clauses and sub-clauses of, and appendixes to this Amendment (unless otherwise specified).

(d) References within a schedule or an appendix to paragraphs, subparagraphs, sections, subsections, clauses, sub-clauses are to paragraphs, subparagraphs, sections, subsections, clauses, sub-clauses of that schedule or appendix (unless otherwise specified).

5

(e) Unless the context requires otherwise, words in the singular include the plural and vice versa.

(f) Unless the context requires otherwise, a reference to one gender includes a reference to the other gender or to a neutral gender, as applicable.

(g) References to any person for the purposes of this Amendment shall include any natural person, bodies corporate, unincorporated associations, partnerships, joint ventures, trusts, foundations, estates, governments, governmental agencies and departments, statutory bodies or other entities, in each case whether or not having a separate legal personality. Such references also shall include the person's successors.

(h) A reference to a particular treaty, directive of a governmental agency, statute, statutory provision or subordinate legislation is a reference to it as it is in force from time to time taking account of any amendment or re-enactment. Each such reference includes any treaty, directive of a governmental agency, statute, statutory provision or subordinate legislation which it amends or re-enacts and subordinate legislation for the time being in force made under it. Such references also include any order, regulation, instrument or other subordinate legislation made under any of the same, except to the extent that it comes into force after the date of this Amendment and would impose any new or extended obligation, liability or restriction on or otherwise adversely affect the rights of any party. Notwithstanding the foregoing three sentences, as between the parties, no such amendment or re-enactment shall apply for the purposes of this Amendment to the extent that it would impose any new or extended obligation, liability or restriction on, or otherwise adversely affect the rights of, any party.

(i) A reference to any document being in the agreed form means that it is in the form agreed between the parties to this Amendment and signed or initialed for the purposes of identification by or on behalf of the applicable party(ies).

(j) Any reference to "writing" or "written" includes faxes, emails and any other legible reproduction of words delivered (electronically or otherwise) in permanent and tangible form.

(k) References to times of the day are to London time (unless expressly provided otherwise) and references to a day are to a period of 24 hours running from midnight on the previous day.

(l) References to any English legal term for any action, remedy, method of judicial proceeding, legal document, legal status, court, organization, body, official or any legal concept, state of affairs or thing shall in respect of any jurisdiction other than England be deemed to include that which most nearly approximates in that jurisdiction to the English legal term.

(m) Where the words "include"(s), "including" or "in particular" are used in this Amendment, they are deemed to have the words "without limitation" following them.

(n) Where the context permits, "other" and "otherwise" are illustrative and shall not limit the sense of the words preceding them.

6

(o) Where any statement is qualified as being limited by any person's "knowledge" (for example, by using expressions such as "so far as he is aware"), the statement shall be deemed to be given to the best of such person's knowledge, information and belief after making due and careful enquiries of (i) such persons responsible executive officers, if such person is a body or of a body which has such officers, or (ii) of such persons as a reasonable person would prudently enquire in the management of such reasonable person's own affairs.

(p) The table of contents and headings and sub-headings, if any, are for convenience only and are not intended to and shall not affect the construction or interpretation of this Amendment. The language in all parts of this Amendment shall be in all cases construed according to its fair meaning and not strictly for or against any party to this Amendment.

EXHIBIT "C"  54

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Amendment by officers or other persons duly authorized and intending to be bound hereby as of the date and year first above written.

ELECTRONIC GAME CARD INC. (NEVADA)

By: _____
Title: Director

By: _____
Title: Secretary

Address: 318 N Carson St
CARSON CITY
NV 89701

ELECTRONIC GAME CARD INC. (DELAWARE)

By: _____
Title: Director

By: _____
Title: Secretary

Address: 318 N Carson St
CARSON CITY
NV 89701

8

EXHIBIT "C"  55

ELECTRONIC GAME CARD LTD

By: _____
Title: Director

By: _____
Title: Secretary

Address: NORFOLK HOUSE
31 ST JAMESS SQUARE
LONDON SW1Y 4TR

SELLERS:

EPN ADVISORY LTD.

By: _____
Title: Director

By: _____
Title: Secretary

Address: Suite 2/12
VICTORIA HOUSE MAIN ST
GIBRALTAR

9

EXHIBIT "C"  56