# EXHIBIT D

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGj1WyK3Xm2v3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 MyCgLHQsXGx7iBPwrhJ9I82OOu0FcaUR/rEHPl2xAVnHt9jBGu+7rQml8KEzmocz
 twDAwkLaTcm73khDl1lXKQ==

<SEC-DOCUMENT>0001144204-03-008291.txt : 20031210
<SEC-HEADER>0001144204-03-008291.hdr.sgml : 20031210
<ACCEPTANCE-DATETIME>20031210142922
ACCESSION NUMBER:         0001144204-03-008291
CONFORMED SUBMISSION TYPE:     8-K
PUBLIC DOCUMENT COUNT:      3
CONFORMED PERIOD OF REPORT:   20031205
ITEM INFORMATION:         Changes in control of registrant
ITEM INFORMATION:         Acquisition or disposition of assets
ITEM INFORMATION:         Changes in registrant's certifying accountant
ITEM INFORMATION:         Other events
ITEM INFORMATION:         Resignations of registrant's directors
ITEM INFORMATION:         Financial statements and exhibits
FILED AS OF DATE:         20031210

FILER:

     COMPANY DATA:
         COMPANY CONFORMED NAME:          SCIENTIFIC ENERGY INC
         CENTRAL INDEX KEY:               0001083036
         STANDARD INDUSTRIAL CLASSIFICATION:  SEMICONDUCTORS & RELATED DEVICES [3674]
         IRS NUMBER:                      870570975
         STATE OF INCORPORATION:          NV
         FISCAL YEAR END:        1231

     FILING VALUES:
         FORM TYPE:            8-K
         SEC ACT:          1934 Act
         SEC FILE NUMBER:000-25643
         FILM NUMBER:           031046990

     BUSINESS ADDRESS:
         STREET 1:              630 NORTH 400 WEST
         CITY:                  SALT LAKE CITY
         STATE:                 UT
         ZIP:                   83103
         BUSINESS PHONE:        801-359-2410

     MAIL ADDRESS:
         STREET 1:              630 NORTH 400 WEST
         CITY:                  SALT LAKE CITY
         STATE:                 UT
         ZIP:                   84103

     FORMER COMPANY:
         FORMER CONFORMED NAME: QUAZON CORP /NV/
         DATE OF NAME CHANGE:   19990330
</SEC-HEADER>
<DOCUMENT>
<TYPE>8-K
<SEQUENCE>1
<FILENAME>form8k.txt
<TEXT>
                          FORM 8-K
                       CURRENT REPORT

      Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934


        Date of Report (Date of earliest event reported) December 5, 2003


                    ELECTRONIC GAME CARD, INC.
 - --------------------------------------------------------------------
            (Exact Name of registrant as specified in its charter)


        Nevada                   0-25853           87-0570975
 (State or other jurisdiction  (Commission File Number)  (I.R.S. Employ
    of incorporation)                              Identification No.)

                        16th Floor
                    666 Third Avenue
```

EXHIBIT "D"   234

New York, New York 10017
(Address of principal executive offices)

Registrant's telephone number, including area code (44) 207-451-2480
-------------------

SCIENTIFIC ENERGY, INC.
-----------------------

(Former name or former address, if changed since last report.)

<PAGE>

Certain statements in this 8-K may contain forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995 (the "Act"), including, without limitation, statements regarding the Company's expectations, beliefs, estimates, intentions, and strategies about the future. Words such as, "anticipates," "expects," "intends," "plans," "believes," "seeks," "estimates," or variations of such words and similar expressions are intended to identify such forward-looking statements, but their absence does not mean that the statement is not forward-looking. The Company desires to avail itself of certain "safe harbor" provisions of the Act and is therefore including this special note to enable the Company to do so and to disclose any such projections without warranting they can be realized.

ITEM 1.  CHANGE OF CONTROL

Scientific Energy, Inc., a Nevada public corporation, ("SCFE" or "Company") entered into a Share Exchange dated November 19, 2003 with Electronic Game Card, Inc. ("EGC"), a Delaware Corporation having a principal place of business in New York City, New York. The Company deemed that such exchange closed December 5, 2003 with the name and symbol change on the Electronic Bulletin Board and the concurrent filing and dissemination of an Information Statement. The essential terms of the exchange were that Scientific Energy, Inc. changed its name to Electronic Game Card, Inc. and issued a majority of its reverse split shares to shareholders of Electronic Game Card, Inc. which in exchange became a wholly owned operating subsidiary to be named Electronic Game Card Marketing, Inc. Electronic Game Card Marketing, in turn, will for the immediate future conduct most of its business activities through its British subsidiary Electronic Game Card, Ltd.

The following parties were elected by majority shareholder consent and pursuant to the share exchange as the new directors for the Company. Mr. John Bentley, Mr. Lee Cole and Mr. Linden Boyne. These individuals, as the new directors, appointed the following as the principal officers of the Company:

        Mr. John Bentley, President, Chief Executive Officer
        Mr. Lee Cole as Vice-President
        Mr. Linden Boyne as Secretary/Treasurer & Chief Financial Officer

As a result of a 100:1 reverse split in the concurrent share exchange, the presently issued and outstanding shares of Electronic Game Card, Inc. are as follows:

2

<PAGE>

| Prior Scientific Energy shareholders | 552,000 shares |
| Debenture holders converting to equity | 552,000 shares |
| Electronic Game Card shareholders | 12,696,000 shares |
| TOTAL | 13,800,000 shares |

A more detailed description of the exchange and reorganization, biographical information, sharehold interest and compensation information was supplied to the shareholders of the Company pursuant to an attached and incorporated Information Statement. Any shareholder, or other interested party, not having received a copy of the Information Statement may obtain a copy upon request to the Company at the address or telephone number appearing on the face of this Report. Additionally, a copy may be viewed and downloaded online at www.sec.gov/edgar.

ITEM 2.  ACQUISITION OR DISPOSITION OF ASSETS

See attached and incorporated Shareholder Disclosure Statement.

ITEM 4.  CHANGES IN REGISTRANT'S CERTIFYING ACCOUNTANT

The Company does not intend to change auditors for either the public parent company, Electronic Game Card, Inc., or its present operating subsidiary, Electronic Game Card Marketing, Inc. The auditor for the parent company is Robison, Hill & Company of Salt Lake City, Utah and will serve on an interim basis at least through the completion of the consolidated financials. The firm of F.E. Hanson, CPA, Arlington, VA will continue to serve as the independent auditors for Electronic Game Card Marketing, Inc. and Electronic Game Card, Ltd. on an interim basis and through the completion of the consolidated financial statements. It is anticipated that as soon as the consolidated financial statements have been completed for the Company, the Company will determine and select a permanent independent auditing firm to represent the Company on an ongoing basis. Any change in auditors from Robison, Hill would require the filing of a subsequent 8-K notice with the Securities and Exchange Commission.

ITEM 5.  OTHER EVENTS AND REGULATION FD DISCLOSURE

The Company has attempted to set out with sufficient particularity the terms and provisions of the share exchange between the company, while operating as Scientific Energy, Inc. and Electronic Game Card, Inc., which resulted in a name change of the company to Electronic Game Card, Inc., ownership by a new majority interest, appointment of new directors and officers and continued operation of the company through its operating subsidiary Electronic Game Card, Ltd. The Company is engaged in development and marketing of various software products principally related to recreational applications. The details of this exchange and resulting business are more fully set out and incorporated by this reference in the attached and referenced Shareholder Disclosure Statement.

3

<PAGE>

As a result of the share exchange, the Company intends to go forward through its present subsidiary, Electronic Game Card Marketing, Inc., which is the prior Electronic Game Card, Inc, which, in turn, primarily operates through its British operating subsidiary Electronic Game Card, Ltd. These companies have been engaged in the development of a proprietary interactive credit card sized gaming product format that is believed to have multiple applications for the U.S. and international lotteries and the sales promotion markets. It should be noted that both the parent company, Electronic Game Card, Inc. and its subsidiary, Electronic Game Card Marketing, Inc. and its subsidiary, Electronic Game Card, Ltd., are development stage companies without revenues or any substantial operating history. No assurance or warranty can be given that the companies will be successful in the development or marketing of the technology products. The public company and its operating subsidiaries do not have substantial capital assets at the present time, nor do they generate any revenue.

The current trading symbol for the Company on the Electronic Bulletin Board is "EGMI".

Unaudited financial statements for the Electronic Game Card, Inc. and its subsidiaries through June 30, 2003 are attached and incorporated as part of the Shareholder Information Statement and made a part of this 8-K. Further, the financial statements for the parent company, Scientific Energy, Inc., prior to the name change, have been included as an exhibit to the incorporated Information Statement.

ITEM 6.  RESIGNATION OF REGISTRANT'S DIRECTORS

As previously and generally described in the foregoing materials and the attached and incorporated Information Statement, the prior officers and directors of Scientific Energy, Inc., Mr. Todd Crossland, President and Director; Ms. Jana Meyer, Director and Secretary/Treasurer; and Mr. Mark Clawson, Director, resigned pursuant to the Share Exchange Agreement dated November 19, 2003 and effective after filing Articles of Amendment in Nevada on November 26, 2003. The replacement directors, in accordance with the Articles of Share Exchange, are Mr. John Bentley, President and Chairman of the Board, Mr. Lee Cole, Director and Vice-President and Mr. Linden Boyne, Director, CFO, Treasurer and Secretary. More detailed biographical information concerning these individuals is set-out in the attached in the attached and incorporated Information Statement.

EXHIBIT "D"   236

<PAGE>

4

ITEM 7.  FINANCIAL STATEMENT AND EXHIBITS

(A)      Financials:

As noted above, Electronic Game Card, Inc. will file a consolidated financial
statement reflecting the share exchange with Scientific Energy, Inc. within
sixty days from the filing of this 8-K Report as a supplemental 8-K filing. In
the interim, the prior Scientific Energy, Inc. has filed its regular 10-QSB
Quarterly Unaudited Financial Report for the period ending September 30, 2003
and a copy is attached to the incorporated Information Statement. The unaudited
financials for Electronic Game Card for June 30, 2003 are also attached and
incorporated as part of the Information Statement.

(B)      Other Exhibits:

         (1) Information Statement (including):
             (i)  Articles of Share Exchange
             (ii) Articles of Name Change
         (2) Share Exchange Agreement
         (3) Press Release


                              SIGNATURE


Pursuant to the requirements of the Securities Exchange Act of 1934, the
registrant has duly caused this report to be signed on its behalf by the
undersigned hereunto duly authorized.


                              ELECTRONIC GAME CARD, INC.
                              F/K/A SCIENTIFIC ENERGY, INC.


Date:                         By:
     ------------------------     ----------------------------
                                  Mr. John Bentley
                                  President/CEO



                              5

<PAGE>

                     INFORMATION STATEMENT

                     SCIENTIFIC ENERGY, INC.

                        NOW KNOWN AS

                  ELECTRONIC GAME CARD, INC.


                     December ____, 2003

General Information & Incorporation by Reference:

         THIS INFORMATION STATEMENT IS BEING MAILED TO ALL SHAREHOLDERS OF
RECORD OF SCIENTIFIC ENERGY, INC. IN CONNECTION WITH THE RECENT MAJORITY SHARE
EXCHANGE RESULTING IN A CHANGE OF MAJORITY SHARE OWNERSHIP AND NAME OF THE
COMPANY TO ELECTRONIC GAME CARD, INC., ("the Company" or "EGC"), RESULTING FROM
ACQUISITION OF A NEW OPERATING SUBSIDIARY TO BE KNOWN AS ELECTRONIC GAME CARD
MARKETING.

         NO VOTE IS BEING SOLICITED AS THE COMPANY DEEMS THAT THE SHARE EXCHANGE
HAS BEEN COMPLETED BY MAJORITY SHAREHOLDER CONSENT AND THIS STATEMENT IS BEING
PROVIDED TO SHAREHOLDERS OF RECORD FOR INFORMATION PURPOSES ONLY. WE ARE NOT
ASKING YOU FOR A PROXY AND YOU ARE REQUESTED NOT TO SEND US A PROXY.

         Various items of important information and accounting for the company
related to this Information Statement are set-out in the annual report for
Scientific Energy, Inc. on Form 10-KSB. Such detailed information may be
relevant in reviewing this Information Statement, but is not repeated in this
document.


              DESCRIPTION OF SHARE EXCHANGE AND RELATED CHANGES


         Your company, Scientific Energy, Inc., has conducted limited activities
pending various attempts to raise developmental funding for its core technology

EXHIBIT "D"  237

related to new battery type devices. The company has been pursuing, on a limited basis because of its extremely limited funding, development of this technology through its sole operating subsidiary, Scientific Energy, Inc., a Utah corporation. Due to the company being unable to obtain what it deems to be adequate developmental funds for this technology at the present time, and in an attempt to acquire another operating business entity, it has engaged in an unrelated industry with the intention of creating an operating subsidiary within the company; and, subsequently, spinning off the shares of its battery related technology subsidiary to shareholders of record, the "spinoff".

6

<PAGE>

To accomplish the foregoing objectives, the company entered into a majority shareholder exchange agreement whereby it reverse split its existing and issued outstanding shares on a 100:1 reverse split basis to all shareholders of record. It then issued new reverse split shares, constituting approximately 92% of the issued and outstanding shares of the company, to the shareholders of a private Delaware corporation known as Electronic Game Card, Inc. The Electronic Game Card, Inc. ("EGC") shareholders, in turn, exchanged all of their issued and outstanding shares of EGC to Scientific Energy, Inc. in order to become its fully owned operating subsidiary and with the understanding that the EGC shareholders would nominate and have appointed, by majority shareholder consent, new directors who in turn would appoint new officers for the ongoing public entity. The former directors have resigned as of the closing of the share exchange, but remain as officers and directors of the subsidiary to be "spun off" Scientific Energy, Inc. of Utah. It was also agreed, as part of the share exchange, that the new entity would be named Electronic Game Card, Inc. and that the acquired operating subsidiary would continue to function as Electronic Game Card Marketing Company, or some reasonable derivation of that name.

The foregoing transactions occurred through a Share Exchange Agreement between both entities, and shareholders where required, in accordance with Nevada law as to Scientific Energy, Inc. and Delaware law as to Electronic Game Card, Inc. The approval of these transactions by majority shareholder consent of each of the majority shareholders of the respective corporations, eliminated the necessity to solicit all shareholders for approval of these transactions by shareholder vote, since a sufficient majority existed and consented to the transaction without a proxy solicitation or special shareholder meetings.

It was further determined by management of both entities, in consultation with their various legal advisors, that minority shareholder rights provisions under both Delaware and Nevada laws were inapplicable to this transaction; and, therefore, no solicitation of dissenting shareholder rights is being provided as part of this Information Statement. Should any shareholder have any question regarding so called "dissenting" or "minority" shareholder rights, they should direct such questions directly to management of the company described in this Information Statement either directly or through any retained legal counsel.

Finally, each of you will shortly be receiving a registration statement incident to the spinoff of the Scientific Energy, Inc. of Utah shares previously held by Scientific Energy, Inc. of Nevada. These shares will be distributed to you pursuant to a registration statement as required by law, but will not require any change in your status as a shareholder or any further consideration being paid to receive these shares.

In summary, then, the key elements and resulting ownership implications for each public shareholder of Scientific Energy, Inc. can be summarized as follows:

7

<PAGE>

o       You will continue to hold your existing shares in Scientific Energy, Inc., to be known as Electronic Game Card, Inc., the parent Nevada corporation; however, these shares have been subject to a 100:1 reverse split by majority shareholder consent. Accordingly, for each prior 100 shares which you held in Scientific Energy, Inc. of Nevada, you now hold one share of stock in Electronic Game Card, Inc. Provided, however, the minimum lot holding was determined to be 100 shares, so that the minimum number of shares to which any shareholder will be reduced will be not less than 100 shares. You will not receive any fractional shares or any cash compensation for fractional shares with each divided share being rounded to the next whole number. Shares will not be recalled for transfer, but the reverse split certificates will be issued as shares are

subsequently submitted for transfer in the regular course of business.

o   As part of the Share Exchange the company has acquired all issued and outstanding shares of Electronic Game Card, Inc., a privately held Delaware corporation engaged in the development, marketing, sale and distribution of unique, proprietary, recreational electronic software products primarily targeted towards the lottery and sales promotion markets. This acquired subsidiary will continue to operate as a wholly owned subsidiary of the parent company and be known as Electronic Game Card Marketing, or some reasonable derivation of that name. Electronic Game Card Marketing initially will develop and market primarily through its existing Great Britain subsidiary, Electronic Game Card, Ltd. Electronic Game Card Marketing is a start-up entity without revenues or significant business history. Its unaudited financials are attached to this Information Statement.

o   The prior shareholders of Electronic Game Card, Inc. received 12,696,595 newly issued reverse split shares of Scientific Energy, Inc. in exchange for all of their issued and outstanding 8,000,000 shares and 800,000 options rights of Electronic Game Card, Inc. The Scientific Energy shares issued on a reverse split basis constitute approximately 92% of all issued and outstanding shares of the prior Scientific Energy, Inc. Upon completion of the reverse split and share acquisition the allocation of issued shares was approximately as follows:

| | |
|---|---|
| Prior Scientific Energy shareholders | 552,000 shares |
| Debenture holders converting to equity | 552,000 shares |
| Electronic Game Card shareholders | 12,696,000 shares |
| TOTAL | 13,800,000 shares |

o   The name of the public Nevada corporation was changed by the majority shareholder consent resolutions to Electronic Game Card, Inc. to reflect the new operating subsidiary and its present business direction.

8

<PAGE>

o   The principal officers and directors listed below were nominated and appointed by Electronic Game Card, Inc. as part of the share exchange in order to reflect the new majority ownership and change of business direction.

o   You will subsequently be receiving a "spinoff" registration statement, by which you will be receiving, without further adjustment to your sharehold interest or consideration, a sharehold interest in the previously held technology subsidiary of Electronic Game Card, Inc. known as Scientific Energy, Inc. a Utah corporation. It is not known, at the present time, whether subsequent funding can or will be obtained for this spinoff entity or whether a viable market will develop for shares in such company and no warranty or representation as to these issues is made or implied by the fact that the shares will be distributed pursuant to a subsequent registration process. You should note the new management for Electronic Game Card, Inc., described below, will not be involved in any manner in the operation of the spinoff entity or the registration statement applicable to this spinoff other than the summary description contained in this information statement.

o   You will continue to receive public information as well as any appropriate subsequent proxy or other shareholder information as public shareholders in Electronic Game Card, Inc. At the present time, no active trading market exists for the reorganized company, although management will use its best efforts to endeavor to establish a trading market and will work for continued growth and viability in the new public entity. No assurance or warranty is made or implied that such objectives can be met. Any subsequent official change of name as a listed company, change of symbol and other related public information will be filed of record on the Edgar filing

EXHIBIT "D"   239

website maintained by the Securities and Exchange Commission for public companies at www.sec.gov/edgar and direct information will be sent to you as shareholders as required and appropriate. In all events, the company will continue to maintain and file periodic reports under the Securities and Exchange Act of 1934 (34' Act ).

o    No warranty or representation, express or implied, is made that the reorganized company will be successful or have sufficient operating capital or revenues to continue as a viable company.

o    A copy of the actual Share Exchange and other related documents may be obtained by shareholders or other interested parties at the transitional U.S. office address for the company listed at the end of this Information Statement.

o    As of December 5, 2003, the company will be listed on the Electronic Bulletin Board as Electronic Game Card, Inc., Trading Symbol: EGMI.

Principal Shareholders

                                   9

<PAGE>

        The Company knows of no person or group, except the following, which, as of the date of this Information Statement, beneficially owns and has the right to vote more than 5% of the Company's Common Stock, or are principal officers or directors:

<TABLE>
<CAPTION>

| Names and Address of Beneficial Owner | Shares Beneficially Owned | Percent of Class |
| --- | --- | --- |
| <S> | <C> | <C> |
| JOHN BENTLEY President and Director Gipps Farmhouse Spithurst Lane Barcombe, Lewes, East Sussex United Kingdom | 2,050,001 | 16.67% |
| LEE COLE Director and Vice-President 32 Haymarket Piccadilly London United Kingdom | 0 | 0 |
| LINDEN BOYNE Director, CFO, Treasurer and Secretary Aberfoyle, Green Lane Blackwater, Camberley, Surrey United Kingdom | 200,000* | 1.5% If Exercised |
| J. SEWARD c/o Abbey National Offshore P. O. Box 545 41 The Parade, St. Helier, Jersey United Kingdom | 1,000,000 | 7.24% |

</TABLE>

*Options for 200,000 shares granted under the 2002 Equity Compensation Plan.

                                   10

<PAGE>

                    SUMMARY INFORMATION AS TO DIRECTORS

<TABLE>
<CAPTION>

| NAME | Director Since | Compensation | Number of Shares (Beneficial & Legal) | Percentage of Issued and Outstanding |
| --- | --- | --- | --- | --- |

| <S> | <C> | <C> | | <C> | | <C> | |
|-----|-----|-----|-----|-----|-----|-----|-----|
| John Bentley | Nov. 19, 2003 | $200,000 | | 2,050,001 | | 16.67% | |
| Lee Cole | Nov. 19, 2003 | 0 | | 0 | | 0 | |
| Linden Boyne | Nov. 19, 2003 | 0 | | 200,000* | | 1.5% If Exercised | |

</TABLE>

*Options for 200,000 shares granted under the 2002 Equity Compensation Plan.

## EXECUTIVE COMPENSATION

The company has not finally resolved the compensation to be paid to its new officers and directors. It is presently intended the president will be engaged on a full-time basis and will be paid an annual salary of $200,000 U.S. dollars.

The directors will not be compensated in their role as directors as such, but will receive a per diem of $1,000 per meeting attended, plus any incurred travel and lodging expenses.

It is presently anticipated the company may maintain a U.S. operations manager to oversee all technical and business operations within the United States under the direct supervision of the president, but such position has not been named nor any compensation fixed at the present time.

## CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

Some of EGC intellectual property was acquired through a license agreement with McNally EGC Ltd. McNally EGC Ltd. is owned by Mr. Bentley and Mr. McNally who are also officers of the company, and in the case of Mr. Bentley, a director of the company. On May 5, 2003, EGC purchased all of the outstanding stock of McNally for an aggregate purchase price of $150,000. Of this, $135,000 of the purchase price is deferred until such time as EGC receives financing in excess of $5,000,000.

## MANAGEMENT'S STOCK RIGHTS AND OPTIONS

EGC instituted a stock option plan for officers, key employees, consultants and advisors. The 2002 Equity Compensation Plan provided for options equivalent up to 10% of the issued share capital of the company to be offered to such individuals by the Board. 440,000 of a total possible of 800,000 options have been distributed. No further stock option plans have been instituted.

## AUDIT COMMITTEE

11

<PAGE>

Historically and presently the company has not designated or utilized an audit committee. At the present time, it is not deemed that the company will be required to have an independent audit committee to continue its anticipated trading as an Electronic Bulletin Board company. However, under the evolving provisions of the Sarbanes-Oxley Act and various regulations and listing requirements promulgated pursuant thereto, it may in the future become necessary for the company to name and employ an independent audit committee to continue public trading. In such event, an audit committee will be established and specific information concerning the composition, actions and charter of such independent audit committee will be made available as part of the public filings by the company.

## CORPORATE PERFORMANCE GRAPH

Normally contained in this section would be a graph comparing the company's stock performance to the performance of the general market on which it trades, as well as comparisons to an industry segment of that market. However, because EGC has no regular trading market, it is deemed such presentation would not be possible as to EGC or accurate as to SCFE. EGC continues to have very limited marketing activity and is considered a start-up company.

## BIOGRAPHICAL INFORMATION AS TO NEW DIRECTORS AND OFFICERS

EXHIBIT "D"   241

The following constitute the newly appointed directors and officers of the company pursuant to the previously described Share Exchange. These directors were appointed as part of the majority shareholder consent resolutions and will serve office until the directors are elected at the next regular shareholder meeting. At present, there is no regularly scheduled shareholder meeting for the company, but it is anticipated that the first regular shareholder meeting will be held at a designated date and time in the calendar year 2004 for the formal election of directors who would then subsequently appoint officers. It is not anticipated that the proposed slate of directors at the first annual meeting will be different from the present directors of the company, described below, or that new officers would be appointed by this Board of Directors if elected. Any change of directors or principal officers will be reported by the company as part of its ongoing public information reporting requirements. The following information is provided for each current director and principal officer of the company:

JOHN BENTLEY, AGE 63, PRESIDENT AND DIRECTOR.

John Bentley is co-founder of EGC. He is an experienced, entrepreneurial CEO of numerous successful start-ups and high-growth companies, which have included a number of publicly listed companies in the media and entertainment fields in the UK. These have ranged in size from 20 employees to 10,000 and included, for example, the UK's largest video rental distributor.

12

<PAGE>

LEE COLE, AGE 42, VICE-PRESIDENT AND DIRECTOR.

Lee Cole has extensive commercial experience, particularly in the venture capital business. From 1995 to 1999, Mr. Cole served s the Managing Director of TEC Capital Group, a venture capital firm.

LINDEN BOYNE, AGE 60, SECRETARY/TREASURER, CFO AND DIRECTOR.

Linden Boyne has had a successful, senior executive career in distribution and FMCG retailing, in particular as a director of NSS Newsagents Plc in the UK managing some 500 stores.

AUDITORS

Robison Hill and Company of Salt Lake City, Utah have been retained as the independent auditors for the previous Scientific Energy, Inc. as a public entity. It is anticipated, for transition purposes and for the period at least through year-end 2003, the company will retain the services of Robison, Hill and Company as the independent auditors for the reorganized company. F. E. Hanson have been the independent auditors for Electronic Game Card, Inc. and it is anticipated that this auditing firm will continue to provide auditing services to Electronic Game Card at least through the end of calendar year 2003 with Robison, Hill and Company being charged with the responsibility of preparing the first consolidated financial statements for the reorganized company as of the earliest date practical in consultation between such auditors. The ratification for the continuing services of the auditors would be a matter presented at any subsequent annual meeting of the corporation to shareholders.

Audit Fees

The current audit fees for Scientific Energy, Inc. for 2003 to date have been $5,919.20 and $2,115 for EGC. No reasonable projection has been made as to the auditing costs for the initial combined financial statements of the two entities or the subsequent audit cost projections for calendar year 2004. Unless otherwise announced, the company plans to continue its auditing on a calendar year basis.

OTHER MATTERS

There are no other matters.

SHAREHOLDER MEETING AND SHAREHOLDER PROPOSALS

13

<PAGE>

As noted above, the company has not fixed a date in 2004 for its anticipated next shareholder meeting. As soon as such meeting date and place is determined, a proxy statement will be solicited from all shareholders of record

EXHIBIT "D"   242

pertaining to this meeting and you will be afforded an opportunity to vote on matters properly brought before the meeting. Further, the meeting will be noticed in such a matter that independent shareholder proposals may properly be presented in accordance with the company bylaws and prevailing SEC proxy rules and standards for presentment at the meeting.

### SECTION 16(A) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

Under Section 16(a) of the Securities Exchange Act of 1934, as amended, EGC's directors, its executive officers, and any persons holding more than 10% of the common stock are required to report their ownership of the common stock and any changes in that ownership to the Securities and Exchange Commission. Specific due dates for these reports have been established, and we are required to report in this Information Statement any failure to file by such dates during 2003. To our knowledge, all of these filing requirements were satisfied by our directors, officers and 10% percent holders. In making these statements, EGC has relied upon the written representations of its directors, officers and its 10% percent holders and copies of the reports that they have filed with the Commission.

### OTHER INFORMATION

### FINANCIAL REPORTS & OTHER IMPORTANT DOCUMENTS

Attached and incorporated by this reference are the most current financial statements for Scientific Energy, Inc. being the Third Quarter 10-QSB unaudited financials through September 30, 2003 and the unaudited financial statements for Electronic Game Card maintained through June 30, 2003. As noted above, consolidated financial statements will be prepared as soon as practical for the company and filed.

### COMPANY ADDRESS

The transitional U.S. address of the company is located at:

> Electronic Game Card, Inc.
> Sixteenth Floor
> 666 Third Avenue
> New York, NY   10017
> Telephone: 44 207 451 2480

14

<PAGE>

Any requested copies of documents, including the actual Share Exchange Agreement, can be made to such address.

Dated: December ___, 2003.

BY ORDER OF THE BOARD OF DIRECTORS:

-------------------------------------
John Bentley
Chairman of the Board

Attached Exhibits:

| | |
|---|---|
| 1.1 | Articles of Name Change |
| 1.2 | Articles of Share Exchange |
| 1.3 | Financial Statements EGC  (Unaudited-June 30, 2003) |
| 1.4 | Financial Statements SCFE (Unaudited-September 30, 2003) |

15

<PAGE>

ARTICLES OF SHARE EXCHANGE
AND NAME CHANGE
FOR

EXHIBIT "D"   243

SCIENTIFIC ENERGY, INC.

TO BE KNOWN AS

ELECTRONIC GAME CARD, INC.

November 21, 2003

These Articles of Share Exchange and Name Change are filed in accordance with Nevada Code Annot.ss.92A.200 and relate to an approved Plan of Share Exchange between Scientific Energy, Inc., a public Nevada Corporation (the "Company" or "SCFE") and Electronic Game Card, Inc., a private Delaware Corporation ("EGC"), as described below.

The Company represents, through its undersigned principal officer, that the Board of Directors approved a Share Exchange by the Company of the majority interest of its shares resulting in a change of control of the corporation and with attendant name change and business purpose. This proposed Share Exchange was approved by a Majority Shareholder Consent on November 19, 2003 with the results of the shareholders consent as to each of the matters addressed in these Articles are set- out below:

PLAN OF SHARE EXCHANGE

The Plan of Share Exchange was earlier approved by the Board of Directors of the Company and ratified by its shareholders through a Majority Shareholder Consent as it required a name change. The Board of EGC approved the exchange and it was deemed adopted by unanimous written consent of the EGC shareholders, in accordance with Delaware law, as all shareholders of EGC participated in the exchange. The essential terms of the Plan of Exchange provided as follows:

(1) The Company (SCFE) issued, in the aggregate, approximately 12,696,000 of its recently reverse split shares ratably to all EGC shareholders or affiliated persons;

(2) SCFE acquired 8,000,000 shares of EGC shares and option rights for 800,000 additional shares, constituting all EGC shares and share rights;

16

<PAGE>

(3) Scientific Energy, Inc. herewith changes its name of record to Electronic Game Card, Inc. (EGC);

(4) SCFE acquired all operations and assets of EGC as its wholly owned and sole operating subsidiary; thereby changing the business purpose to development, testing and potential marketing of recreational computer products.

VOTES ON SHARE EXCHANGE

(1) At the time of the Majority Shareholder Consent, there were approximately 55,200,000 SCFE shares issued. Of these shares 33,734,000 (337,340 post-split), or approximately 61%, approved in writing the share exchange and resultant reorganization, constituting a majority.

(2) Concurrently the SCFE shareholders approved a one hundred-to-one (100:1) reverse split resulting in there currently being approximately 13,800,000 SCFE shares issued and outstanding.

(3) The Share Exchange was approved by unanimous consent of the existing Electronic Game Card, Inc. shareholders, being 8,000,000 shares which were then transferred to SCFE making EGC a wholly owned subsidiary.

(4) The name change of the Company was also approved as of November 19, 2003 from Scientific Energy, Inc. To Electronic Game Card, Inc. and the Company shall be known of record by such name from the date of filing of these Articles.

AVAILABILITY OF SHARE EXCHANGE AGREEMENT

The undersigned President of the Company believes the foregoing constitutes a reasonable and comprehensive summary description of the Share Exchange as required for filing purposes, but notes pursuant to Nevada Code Annot. ss.92A.200(6), that the entire Plan of Share Exchange is available for

review upon request by any shareholder of the constituent corporations or other interested persons by contacting the company at:

                Mr. John Bentley, President
                32 Haymarket
                London, UK SW1Y4TP

17

<PAGE>

                Or its United States Counsel:

                Mr. Julian D. Jensen, Esq.
                311 South State Street, Suite 380
                Salt Lake City, UT 84111

CERTIFICATION

    The undersigned Chief Executive Officer and President verifies and affirms that the foregoing proposals were appropriately and previously adopted and recommended by the Board of Directors and subsequently approved by Majority Shareholder Consent and hereby certifies these amendments in accordance with the foregoing statutory provisions and with the appropriate votes set-out and accounted above. These Articles of Share Exchange and Name Change are now authorized and directed to be filed pursuant to resolution of the Board of Directors of Electronic Game Card, Inc., formerly known as Scientific Energy, Inc.

    Dated this _____ day of November, 2003.

        -------------------------------------------------
        Mr. John Bentley
        President and Chairman of the Board
        Electronic Game Card, Inc.
        F/K/A Scientific Energy, Inc.

<PAGE>

                              FILED # C24224-97
                              DATE: November 26, 2003

DEAN HELLER
Secretary of State
204 North Carson Street, Suite 1
Carson City, Nevada 89701-4299
(755) 684-5708
Website: secretaryofstate.biz

                    Articles of Exchange
                (PURSUANT TO NRS 92A.200)
                    PAGE 1

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-1.3
<SEQUENCE>3
<FILENAME>ex1_3.txt
<TEXT>
<PAGE>

Exhibit 1.3

EXHIBIT "D"   245

Unaudited results for Electronic Game Card Limited, for year ending June 30 2003

Electronic Game Card Limited
Balance Sheet
June 30, 2003
(unaudited)

(British pounds converted into U.S. Dollars at the exchange rate on June 30, 2003)

|  | June 30, 2003 $ |  |
|---|---|---|
| Fixed Assets |  |  |
| Plant and Machinery | 6,188.63 |  |
| Office Equipment | 7,211.71 |  |
|  |  | 13,400.34 |
| Current Assets |  |  |
| Deposits and Cash | 14,069.12 |  |
| Bank Account | 6,337.96 |  |
| VAT Liability | 650.45 |  |
|  |  | 21,057.53 |
| Current Liabilities |  |  |
| Creditors Short Term | 168,193.99 |  |
| Taxation | 61,178.04 |  |
| Staff costs | 30,468.81 |  |
|  |  | 259,840.84 |
| Current Assets less Current Liabilities |  | (238,783.31) |
| Total Assets less Current Liabilities |  | (225,382.97) |
| Long Term Liabilities |  |  |
| Creditors: Long Term | 403,020.39 |  |
|  |  | 403,020.39 |
| Total Assets less Total Liabilities |  | (628,403.36) |
| Capital and Reserves |  |  |
| Reserves | (219,611.44) |  |
| P&L Account | (401,520.53) |  |
| Previous Year Adjustment | (7,271.39) |  |
|  |  | (628,403.36) |

<PAGE>

Electronic Game Card Limited
Profit and Loss
For Year ending June 30, 2003
(unaudited)

(British pounds converted into U.S. Dollars at the average exchange rate during the year ended June 30, 2003)

|  | Period Ending June 30, 2003 $ |  |
|---|---|---|
| Sales |  | 0 |
| Purchases |  |  |
| Purchases | 9,526.58 |  |
| Purchase Charges | 389.83 |  |
|  |  | 9,916.41 |
| Direct Expenses |  |  |
| Sales Promotion | 36,012.69 |  |
| Miscellaneous Expenses | 55.40 |  |
|  |  | 36,068.09 |
| Gross |  | (45,984.50) |
| Overheads |  |  |
| Staff costs | 151,059.85 |  |
| Rent and Rates | 16,654.47 |  |
| Traveling and Entertainments | 14,821.05 |  |
| Printing and Stationery | 6,066.75 |  |
| Professional Fees | 145,454.11 |  |
| Maintenance | 26.90 |  |
| Bank Charges and Interest | 5,677.11 |  |
| General Expenses | 165.56 |  |
|  |  | 339,925.80 |
| Net |  | (385,910.30) |

EXHIBIT "D"   246

<PAGE>

November 19, 2003

STOCK EXCHANGE AGREEMENT

THIS STOCK EXCHANGE AGREEMENT (the "Agreement") is entered into on November ___, 2003 by and among Scientific Energy, Inc., a Nevada corporation ("SCFE"), Electronic Game Card, Inc., a Delaware corporation ("EGC") and the EGC Owners acting by and through EGC as their attorney-in-fact and agent for this transaction, ("Owners" as defined below). When all of the foregoing parties are collectively referenced in this Agreement they shall sometimes be designated as the "Parties".

R E C I T A L S :

A. The EGC Owners own all of the issued and outstanding shares of capital stock of EGC, with the EGC Owners owning the number of shares of common stock of EGC set forth opposite their respective names on Exhibit A as attached hereto.

B. SCFE, EGC and the Owners have determined that it is in their respective best interests to effect a transaction in which all issued and outstanding shares of EGC will be acquired by SCFE in exchange for certain shares of common stock of SCFE to be issued as hereinafter described; together with certain other consideration in the forms of debt payment and options as specifically described below;

D. The parties hereto intend that the share exchange shall qualify as a tax free reorganization within the meaning of the IRS Code.

E. Shares to be issued and exchanged under the terms of this Agreement are "restricted stock" and shall be subject to certain stipulated restrictions on sale, transfer or other disposition or limitations as set-out in Article of this Agreement.

F. The parties contemplate and agree that contemporaneously with the closing of this transaction the name of the acquiring corporation will be changed to Electronic Game Card, Inc. and the acquired subsidiary to Electronic Game Card Operating Company, or some reasonable derivation of such names. The parties further contemplate the post-closing spin-off of the current SCFE of Utah shares to the SCFE shareholders of record prior to closing; and completion of a one hundred-to-one (100:1) reverse split of SCFE shares prior to closing.

<PAGE>

NOW THEREFORE, in consideration of the promises and the mutual agreements contained herein, the parties hereto agree as follows:

ARTICLE I

Section 1.01. Definitions. As used in this Agreement, unless otherwise defined herein or unless the context otherwise requires, the following terms shall have the following meanings:

"Agreement" means this Agreement and all exhibits hereto and all amendments, modifications, and supplements hereto.

"Balance Sheet Date" is December 31, 2002 for the SCFE audited statements and September 30, 2003 for the SCFE unaudited statements. The balance sheet date for EGC shall be as soon after closing as possible.

"Board of Directors" shall mean the governing body of SCFE under Nevada law, sometimes herein simply designated as the "Board" or the "Directors". Until the closing of this Agreement, the existing Board of SCFE shall continue in office, upon execution those persons designated in Section 2.04(d) shall become the new Board.

"Balance Sheet" is the audited and unaudited balance sheets of SCFE as of the foregoing Balance Sheet Date; and the unaudited Balance Sheet of EGC to be presented as soon after closing as possible, but not later than

"Closing" shall mean the date and place where the parties formally exchange the shares, payments and documents described in this Agreement and other undertakings or commitments as specifically set-out herein. The closing shall occur at the offices of Julian D. Jensen, P.C. of 311 South State Street, Suite 380, Salt Lake City, UT 84111 at 10:00 a.m. on November ___, 2003, unless the parties mutually agree to another date or place of closing in writing

EXHIBIT "D"   247

attached to this Agreement.

"Company" shall mean SCFE or its successor.

"GAAP" has the meaning specified in Section 3.12(b) hereof.

"IRS" means the United States Internal Revenue Service.

"SCFE/Electronic Game Card " when used generally herein shall mean the SCFE entity and its wholly owned Utah subsidiary after the share exchange, but before the formal filing of Articles of Amendment changing its name to Electronic Game Card, Inc. (EGC ) and the intended "spin-off of its subsidiary..

<PAGE>

SCFE/Utah shall mean the wholly owned subsidiary of SCFE which is a Utah corporation.

"Owners" shall mean all owners of Electronic Game Card common stock, $ 0.001 par value (of Electronic Game Card) who are signatories to this Agreement, directly or by agent, and whose names and addresses are set-out in Exhibit A attached hereto.

"Parent Corporation" shall mean the SCFE Nevada corporation both before and after its intended name change to Electronic Game Card, Inc.

"Reverse Split" means the process, under applicable corporate law, whereby a corporation reduces the number of issued and outstanding shares ratably-except as to minimum amounts-as to all shareholders.

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933 and may sometimes be referred to herein as the 33' Act.

"Securities and Exchange Act"means the Securities and Exchange Act of 1934 and may sometimes be referred to herein as the 34' Act.

"Subsidiary", for the purposes of this agreement, shall be a corporation whose stock is wholly owned by another corporation. As of the date of this agreement, SCFE has a wholly owned Utah subsidiary corporation of the same name.

"Spin-off" as used in this Agreement shall mean the post-closing distribution without charge to or accommodation from its shareholders of all shares of the SCFE/Utah shares to the SCFE shareholders of record prior to the closing and before the share exchange contemplated by this Agreement.

"Taxable Period" means any taxable year or any other period that is treated as a taxable year with respect to which any Tax may be imposed under any applicable statute, rule, or regulation.

"Tax Return" means any report, return, or other information required to be supplied to a taxing authority in connection with Taxes.

<PAGE>

"Taxes" means all taxes, charges, fees, levies, or other assessments, including, without limitation, income, gross receipts, excise, real and personal property, sales, use, stamp, transfer, license, payroll, franchise, Social Security, unemployment and withholding taxes imposed or required to be withheld by the United States or any state, local, or foreign government or subdivision or agency thereof, and such term shall include any interest, penalties or additions to tax.

Section 1.02. Accounting Terms. All accounting terms, not specifically defined herein, shall be construed in accordance with GAAP.

ARTICLE II
THE SHARE EXCHANGE AT CLOSING

Section 2.01. Closing Procedures. Subject to the terms and conditions of this Agreement and concurrent with the closing:

(a) EGC and the EGC Owners shall deliver to SCFE the documents, cash payments, shares, options and instruments to be delivered under Article _____ hereof; which shares are more fully described in the attached Exhibit A.

(b) SCFE shall have completed all steps and resolutions

EXHIBIT "D"   248

necessary, except completion of the registration, to spin off their subsidiary Scientific Energy, Inc, a Utah corporation, thereby rendering SCFE free of any loans, mortgages, encumbrances or liabilities.

(c) SCFE shall have completed, subject to any shareholder notice, a 100 for 1 reverse split of its currently issued and outstanding shares thereby reducing such issued from 55,200,000 to 552,000.

(d) SCFE shall deliver to the EGC Owners, described in Exhibit "A", 12,696,000 previously unissued SCFE Shares constituting not less than ninety-two per cent (92%) of the SCFE issued and outstanding shares after the reverse split.

(e) SCFE shall deliver 552,000 shares of authorized but previously unissued SCFE common stock to the holder and upon the conversion of that certain Debenture Note issued by SCFE in October, 2001 and which, upon the conversion of said debenture to SCFE stock, will cancel and settle the debt in full.

(f) SCFE shall deliver to EGC certificates and all other documents and instruments to be delivered under Article _____ hereof.

(g) The existing officers of SCFE shall resign in their respective capacities.

<PAGE>

(h) SCFE will deliver to EGC all contracts, commitments, books, records and other information and filings including Tax Returns filed and those in preparation and any tax related records of SCFE in original form, if any.

(i) SCFE will obtain by written consent of the appropriate shareholder approval to ratify and approve this Agreement and the transactions contemplated herein.

(j) EGC shall, on satisfactory completion of the above closing requirements, make an immediate payment by wire transfer of $100,000 to the SCFE subsidiary which shall pay and discharge all obligations of SCFE owing to any person or entity.

Section 2.02. Results of Share Exchange. When the share exchange has been fully consummated and implemented, the following results or status to the parties shall be extant:

(a) EGC will be a wholly owned operating subsidiary of SCFE

(b) The Certificate of Incorporation of SCFE shall be amended to provide that Article I of the Certificate of Incorporation shall read in its entirety as follows: "The name of the corporation is Electronic Game Card, Inc." The Certificate of Incorporation of the current EGC will be amended pursuant to shareholder ratification to reflect a name change to "Electronic Game Card Development, Inc.", or some reasonable derivation to distinguish the parent and subsidiary. SCFE/EGC will file appropriate Articles of Share Exchange under Nevada law.

(c) The Bylaws of SCFE, in effect immediately prior to the closing, shall be the Bylaws of the Surviving Corporation; but subject to amendment.

(d) The persons nominated below shall be appointed at closing and proposed for election to the shareholders of SCFE as a new Board of Directors. The Directors named below shall immediately upon appointment and following the closing hold an organizational meeting of the Board to, inter alia, appoint new officers for SCFE:

1. John Bentley 3. Linden Boyne

2. Lee Cole

(e) The current officers of SCFE at closing shall resign and new officers will be appointed by the newly elected board of directors set forth in 2.04(d) above.

(f) SCFE/EGC will relocate all operations to the business facilities currently operated by EGC and SCFE/EGC will assume those business operations as its current business and purpose.

<PAGE>

(g) The outstanding SCFE reverse split shares after closing of this share exchange shall be as follows:

|        |                                          |                  |
|--------|------------------------------------------|------------------|
| (i)    | SCFE                                     | 552,000 shares   |
| (ii)   | Debenture Holder upon conversion of debt | 552,000 shares   |
| (iii)  | EGC Founders and Affiliates              | 12,696,000 shares |

Total issued and outstanding shares   13,600,000 shares

(h) Of the 8,000,000 issued and outstanding shares of EGC, and 800,000 option rights for 800,000 shares, all such shares and options will be held by SCFE.

(i) As soon as practical after closing, the SCFE/Utah subsidiary will be spun-off to SCFE shareholders of record existing immediately prior to the closing of this Agreement as a registered distribution.

There are no other shares, options or rights outstanding, or convertible into, exchangeable for, or exercisable to acquire, any shares of capital stock of SCFE or EGC, or any agreements or undertakings to issue the same, whether at the time of closing or otherwise.

Section 2.03. Taking Necessary Action; Further Action. EGC and SCFE, respectively, each shall use their reasonable efforts to take all such action as may be necessary or appropriate to effectuate the share exchange under the applicable law at the time specified in Section 2.02 hereof. If, at any time after the execution hereof, any further action is necessary or desirable to carry out the purposes of this Agreement and to vest SCFE/EGC with full right, title and possession to all sharehold interest in EGC, the officers of SCFE/EGC are fully authorized in the name of EGC and SCFE, or otherwise, to take, and shall take, all such lawful and necessary actions under Nevada law..

Section 2.04. Expenses. Upon the signing of the prior letter of intent between the parties on or about _____, EGC made a payment of $5,000 with respect to legal fees being incurred by SCFE in relation to this transaction. If any additional fees are incurred, SCFE, EGC and the Owners shall each pay their respective expenses incurred in connection with the negotiation, execution, closing and performance of this Agreement and all other agreements contemplated hereby, in each case regardless of whether the closing occurs. Without limitation of the foregoing, any stock transfer taxes payable in connection with the stock exchange shall be the responsibility of, and shall be paid by, the new beneficial owner of such shares.

Section 2.05. Restricted Securities. All parties to this Agreement acknowledge that the shares exchanged or issued will be restricted securities, are not subject to registration rights, and will bear a standard restrictive stock legend.

<PAGE>

ARTICLE III
REPRESENTATIONS AND WARRANTIES OF SCFE

SCFE hereby represents and warrants to EGC and the EGC Owners as follows:

Section 3.01. Corporate Organization. SCFE is a public corporation duly organized, validly existing, and in good standing under the laws of Nevada and has the corporate power and authority to acquire all material governmental licenses, authorizations, permits, consents and approvals required to own, license or lease and operate properties or to conduct business as SCFE/EGC.

Section 3.02. Due Qualification. SCFE is duly qualified to do business and is in good standing under the laws of each jurisdiction in which the nature of its business or of the properties owned or leased by it makes such qualification necessary, except where the failure to be so qualified would not have, either alone or together with all such failures, a material adverse effect on the assets, business, results of operations or financial condition of SCFE.

Section 3.03. Corporate Documentation. (a) Copies of the articles of incorporation and by-laws (or applicable organizational documents) and all amendments thereto, of SCFE heretofore delivered to EGC, as existing, are complete and correct; (b) the existing minute books of SCFE are complete and reflect all proceedings (including actions taken by written consent) of the stockholders, partners and directors and all committees thereof of SCFE in all material respects, subject to the limitations set-out above; (c) the transfer records with respect to capital stock and other equity or ownership interests are complete and accurately reflect all transactions in the shares of capital stock and other equity or ownership interests of SCFE as of the execution date of this agreement; (d) SCFE shall provide to EGC counsel as soon as prepared in final form, and prior to and as a condition of closing in executed form, all Board Resolutions and Majority Shareholder Consents as necessary to adopt, implement and close this transaction for and on behalf of SCFE; (e) Pending closing, SCFE shall provide a copy of any notice to shareholders and any SEC filings in final form prior to mailing or filing; and (f) SCFE shall provide a copy of all material contracts and debt instruments as entered by it, or its

EXHIBIT "D"   250

subsidiary, prior to closing. The undertakings of this paragraph shall require supplementation of any document produced which is amended, altered or supplemented in any material term.

Section 3.04.  Capitalization of SCFE

(a) The entire authorized capital stock of SCFE consists of One Hundred Million shares of common stock, $.001 par value, of which 55,200,000 shares are presently validly issued and outstanding; but subject to the 100:1 reverse split contemplated by this Agreement. In addition, (i) other than as provided in this Agreement, there are no warrants, rights, options, conversion privileges, stock purchase plans, subscriptions or other agreements or undertakings which obligates SCFE now or upon the occurrence of some future event to issue additional shares of capital stock; (ii) there are no restrictions on the transfer of shares of capital stock of SCFE other than those imposed by relevant state and federal securities laws for restricted stock; (iii) no holder of any security of SCFE is entitled to any preemptive or similar statutory or contractual rights, either arising pursuant to an agreement or instrument to which SCFE is a party or which are otherwise binding on Purchaser; and (iv) the current capitalization is properly reflected in the most current balance sheet for SCFE.

<PAGE>

(b) The SCFE Shares are duly authorized and validly issued, fully paid and non-assessable, and have not been issued in violation of any preemptive rights, and will be free and clear of all liens, claims and encumbrances, charges, security interests, stockholder's agreements and voting trusts.

Section 3.05. Authority; Binding Effect.  Subject to majority shareholder approval and/or ratification, if required, SCFE has the right, power, authority, and capacity to execute and deliver this Agreement and all other agreements contemplated hereby, to perform the obligations hereunder and thereunder on its part to be performed and to consummate the transactions contemplated hereby and thereby. The execution and delivery by SCFE of this Agreement and all other agreements and documents contemplated hereby and the performance by SCFE of all obligations on its part to be performed hereunder and thereunder have been duly approved by all necessary corporate and/or other action by SCFE. This Agreement constitutes, and when duly executed and delivered, all other agreements contemplated hereby will constitute, the legal, valid, and binding obligation of SCFE, enforceable against SCFE in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or affecting creditors' rights generally and to general equity principles whether such enforceability is considered in a proceeding at law or in equity.

Section 3.06. No Creation of Violation, Default, Breach or Encumbrance. The execution, delivery and performance of this Agreement by SCFE and the consummation by SCFE of the transactions contemplated hereby will not: (a) violate (1) any statute, rule or regulation to which SCFE is subject, or (2) any order, writ, injunction, decree, judgment or ruling of any court, administrative agency or governmental body to which it is subject, (b) conflict with or violate any provision of the articles of incorporation or by-laws of SCFE or (c) require the consent of any party or constitute a default under, violate, conflict with, breach or give rise to any right of termination, cancellation or acceleration of, or to a loss of benefit to which SCFE is entitled, under (1) any mortgage, indenture, note or other instrument or obligation for the payment of money or any contract, agreement, lease or license to which SCFE is a party, or (2) any governmental licenses, authorizations, permits, consents or approvals required for SCFE to own, license or lease and operate its properties or to conduct its business as presently conducted by it.

Section 3.07. No Present Default. All contracts, agreements, leases and licenses to which SCFE is a party are valid and in full force and effect and constitute legal, valid and binding obligations of SCFE. SFE has disclosed, and EGC accepts, that SCFE has no license or contract rights or obligations, or any asset or interest of value, except for the minimum cash balances carried on the books of SCFE and the value of the SCFE subsidiary.

Section 3.08. Compliance With Law. To the best knowledge and belief of SCFE, its officers, directors, and agents, SCFE is not in violation of, or since inception has violated, any applicable domestic or foreign law, rule or regulation (excluding violations of traffic laws), or any order, writ, injunction or decree of any domestic or foreign court, administrative agency, governmental body or arbitration tribunal, to which it or any of its properties or assets is subject.

<PAGE>

Section 3.09. Governmental Approvals and Filings. No consent, approval or authorization of, or notice to, declaration, filing or registration with, any domestic or foreign governmental or regulatory authority on the part

of SCFE is required in connection with the execution, delivery and performance of this Agreement, except as to certain SEC filings which SCFE represents will be filed by it up to closing as required.

Section 3.10.  Real Property.  SCFE owns no real property.

Section 3.11.  Personal Property.  SCFE owns 100% of Scientific Energy, Inc., a Utah Corporation, which SCFE will "spin-out" of SCFE in connection with this transaction.  SCFE is in possession of and has good and valid title to all personal property and assets reflected on the Balance Sheet or acquired after the Balance Sheet Date, subject to no adverse claims or restrictions on transfer.  There are no outstanding options or rights granted by SCFE to any third person to acquire any such personal property or any interest in them and, there are no outstanding options or rights granted by any third party to acquire any such personal property or any interest in them.  SCFE has represented, and EGC accepts, that SCFE has no material personal property or other tangible or intangible assets or interests other than its ownership of Scientific Energy, Inc. of Utah.

Section 3.12.  Financial Statements.

(a) SCFE will deliver to EGC , prior to closing and as a condition to closing, the audited balance sheets of SCFE as of December 31, 2002 and unaudited balance sheet as of September 30, 2003; and the related audited statements of operations, stockholders' equity and cash flows for the periods then ended, and the notes thereto, together with the report and appended accounting notes of Robison, Hill & Co., independent certified public accountants thereon.

(b) The financial statements referred to in Section 3.12(a) above fairly and accurately present in all material respects the consolidated financial position, results of operations, stockholders' equity and cash flows of SCFE as of the relevant date thereof and for the periods covered thereby have been prepared in accordance with generally accepted accounting principles ("GAAP") consistently applied.

(c) Except as set forth in the Balance Sheet, or in the exhibits hereto, SCFE has no liabilities or obligations, direct or contingent, accrued or otherwise, of a nature customarily reflected in financial statements in accordance with GAAP.  SCFE further agrees to account for and discharge all remaining obligations accrued before or after September 30, 3 up until closing.

<PAGE>

(d) SCFE will represent at closing, and as a condition of closing, that there have been no material changes in its financial condition from the September 30, 2003 Financial Statements.

Section 3.13.  Patents, Trademarks. Service Marks.  Trade Names. Copyrights.

SCFE does not own any registered patents, trademarks, service marks, trade names or copyrights, except those held by its wholly owned subsidiary Scientific Energy, Inc., a Utah Corporation, and which are set forth in Schedule 3.13 attached hereto and by this reference made a part hereof.

Section 3.14. Contracts, Agreements and Obligations.  SCFE is not a party to or is in any way obligated under or subject to:

(a) Any contract or agreement, whether written or oral, with any officer or employee of SCFE;

(b) Any license, franchise or similar agreement, whether written or oral;

(c) Any collective bargaining or other labor or union contract or agreement, whether written or oral;

(d) Any note, bond, indenture or agreement, whether written or oral, to borrow money or any agreement of guarantee or indemnification, whether written or oral;

(e) Any agreement or outstanding purchase order, whether written or oral, relating to capital expenditures involving total payments of more than $1,000.00;

(f) Any other agreement, lease, arrangement or understanding, whether written or oral, which SCFE is a party or by which any of its assets are legally bound, except final accounting and legal service fees to be paid and discharged by SCFE from its capital reserves prior to execution hereof.

Section 3.15. Insurance.  SCFE does not maintain any insurance policies.

EXHIBIT "D"   252

Section 3.16.  Absence of Certain Changes.  Since the Balance Sheet Date, there has not been: (a) any reduction, loss, change, physical damage, or destruction in excess of $1,000 to any asset or property of SCFE; (b) any declaration, setting aside or payment of any dividend, or any distribution, in respect of shares of capital stock or other equity or ownership interests of SCFE, or any redemption, purchase or other acquisition of any of such shares of capital stock or other securities of, or other equity or ownership interests in SCFE; (c) any increase in the compensation payable or to become payable by SCFE to any of its respective directors, officers or employees; (d) any change in the authorized and unissued capital stock or other equity or ownership interest of SCFE or any grant of options, warrants or other rights or convertible or

<PAGE>

exchangeable securities calling for the issuance thereof; (e) any payment by SCFE direct or indirect, of any material liability before the same becomes due in accordance with its terms or otherwise than in the ordinary course of its business; (f) any sale or transfer of, or agreement to sell or transfer, any assets of SCFE; (g) any change in any accounting principle or practice of SCFE or any change in the SCFE's business practices; (h) any event, occurrence, development, state of facts or change in the business which has had, either alone or together with all such events, occurrences, developments, states of facts or changes, a material adverse effect on the assets, business, results of operations, affairs, prospects or financial condition of SCFE; or (i) any liability or obligation incurred or created on the part of SCFE or any creation or assumption by SCFE any lien, claim or encumbrance on any asset of SCFE.

Section 3.17.  Certain Tax Matters.  As of the date hereof, or prior to closing and as a condition to closing, the most current Tax Return required to be filed with respect to SCFE for the Taxable Period ending on or before the date hereof has been or will be timely filed, and the independent auditors for SCFE will have determined that only the most current returns need be filed as they become due. All currently filed Tax Returns or Return: (a) were prepared in the manner required by applicable law; (b) are true, correct, and complete in all respects; and (c) reflect the liability for Taxes of SCFE. All Taxes shown to be payable on such Tax Returns, and all assessments of Taxes made against SCFE with respect to such Tax Returns, have been paid when due. No adjustment in such Tax Returns has been proposed formally or informally by any taxing authority and no basis exists for any such adjustment. Except for liens for real and personal property Taxes that are not yet due and payable, there are no liens for any Tax upon any asset of SCFE.

Section 3.18.  No Litigation, Proceeding or Inquiry.  To the best knowledge and belief of SCFE, its officers, directors or agents, there is no suit, action, claim or other legal, administrative or arbitration proceeding (including a "stop order") pending or, threatened before any court or governmental commission, bureau or other regulatory authority (including the SEC), and there is no investigation or inquiry by any administrative agency or governmental body pending or threatened, nor are there any existing judgments, orders or decrees: (a) against SCFE; or (b) which challenges the validity or propriety of, or seeks to prevent, alter or delay, the transactions contemplated by this Agreement.

Section 3.19.  Employee Benefit Plans; Labor Matters.  SCFE has no employees and no employee benefit plans.

Section 3.20.  Brokers and Finders.  Except as set forth in a separate agreement, no broker or finder has acted for SCFE in connection with this Agreement and the transactions contemplated hereby; and no broker or finder is entitled to receive any shares of the Surviving Corporation in such capacity, is entitled to any brokerage or finder's fee or other commission in respect thereof based in any way on any agreement, arrangement or understanding made by SCFE.

<PAGE>

Section 3.21.  Information Supplied by SCFE.  Neither this Agreement nor any document referenced herein, nor any certificate, statement or memorandum furnished pursuant to this Agreement or in connection herewith by or on behalf of SCFE contains any untrue statement of material fact or omits to state a material fact necessary in order to make the statements contained herein or therein not misleading.

Section 3.22.  SEC Filings; Financial Statements.  SCFE has delivered in the form filed with the SEC, its Annual Report on Form 10-K for the fiscal year ended December 31, 2002 and the 10-Q reports and unaudited financials for the quarters ending March 31, 2003, June 30, 2003 and September 30, 2003 (the "SCFE SEC Reports"). The SCFE SEC Reports do not, at the time they were filed, (or if amended or superseded by a filing prior to the date hereof, then on the date of such filing), contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

EXHIBIT "D"   253

ARTICLE IV
REPRESENTATIONS AND WARRANTIES OF EGC

Section 4.01. Corporate Organization; Corporate Documentation.
EGC is a private corporation duly organized, validly existing and in good
standing under the laws of the State of Delaware, an has the corporate power and
authority and all material governmental licenses, authorizations, permits,
consents and approvals required to own, license or lease an operate its
properties and to conduct its business as presently conducted by it.

Section 4.02. Corporate Authority: Binding Effect. EGC has the
corporate power and authority to execute and deliver this Agreement and all
other agreements contemplated hereby, to perform its obligations hereunder and
thereunder and to consummate the transactions contemplated hereby and thereby.
The execution and delivery by EGC of this Agreement and all other agreements and
documents contemplated hereby and the performance by EGC of all obligations on
its part to be performed hereunder and thereunder have been duly approved by all
necessary corporate action by EGC. This Agreement constitutes, and when duly
executed and delivered by EGC all other agreements contemplated hereby will
constitute, the legal, valid and binding obligation of EGC, enforceable against
EGC, in accordance with its terms, except as enforcement may be limited by
bankruptcy, insolvency, reorganization, moratorium or other similar laws
relating to or affecting creditors' rights generally and to general equity
principles (whether such enforceability is considered in a proceeding at law or
in equity).

Section 4.03. No Creation of Violation, Default, Breach or
Encumbrance. The execution and delivers by EGC of this Agreement do not, and the
consummation by EGC of the transactions contemplated hereby will not: (a)
conflict with or violate any provision of the certificate of incorporation or
by-laws of EGC; (b) result in the breach of or constitute a default under any
material contract, agreement, lease, license, mortgage indenture, note or other
instrument or obligation to which EGC is a party, which could adversely affect
the ability of EGC to consummate the transactions contemplated by this
Agreement; or (c) violate (1) any statute, rule or regulation to which EGC is
subject, or (2) any order, writ, injunction, decree, judgment or ruling of any
court, administrative agency or governmental body to which EGC is subject.

<PAGE>

Section 4.04. No Litigation, Proceeding or Inquiry. There is
no suit, action, claim or other legal, administrative or arbitration proceeding
pending or to EGC's knowledge, threatened before any court or governmental
commission, bureau or other regulatory authority, and, to EGC's knowledge, there
is no investigation or inquiry by any administration agency or governmental body
pending or threatened, nor are there any existing judgments, orders or decrees
which challenges the validity or propriety of, or seeks to prevent, alter or
delay, the transactions contemplated by this Agreement.

Section 4.05. Governmental Approvals and Filings. No consent,
approval or authorization of, or notice to, declaration, filing or registration
with, any governmental or regulatory authority on the part of EGC is required in
connection with the execution, delivery and performance of this Agreement.

Section 4.06. Capitalization of EGC.

(a) The entire authorized capital stock of EGC consists of
25,000,000 shares of common stock, $0.001 par value, of which 6,000,000 shares
are presently validly issued and outstanding, plus 800,000 options which are
exerciseable at the price of SCFE/EGC's next financing for 800,000 additional
shares. In addition (i) there are no warrants, rights, options, conversion
privileges, stock purchase plans or other agreements or undertakings which
obligates EGC now or upon the occurrence of some future event to issue
additional shares of capital stock except as disclosed (ii) there are no
restrictions on the transfer of shares of capital stock of EGC other than those
imposed by relevant state and federal securities laws, and (iii) no holder of
any security of EGC is entitled to any preemptive or similar statutory or
contractual rights, either arising pursuant to an agreement or instrument to
which EGC is a party or which are otherwise binding on Purchaser.

(b) The EGC shares are duly authorized and validly issued,
fully paid and non-assessable, and have not been issued in violation of any
preemptive rights, and will be free and clear of all liens, claims and
encumbrances, charges, security interests, stockholder's agreements and voting
trusts.

Section 4.07. Patents, Trademarks, Service Marks, Trade Names
and Copyrights. Schedule 4.07 contains a complete list of all patents,
trademarks and service marks and all trademark, service mark and copyright
registrations, applications and licenses owned or held by EGC. EGC has no
knowledge of any facts and nothing has come to its attention that would lead to
believe that EGC has infringed, misappropriated, or is infringing upon any

EXHIBIT "D"   254

trademark, copyright, patent or other similar right of any person. No claim relating thereto is pending or, to the knowledge of EGC, is threatened.

<PAGE>

Section 4.08. Audit Undertaking of EGC. EGC undertakes to SCFE, as a necessary term and condition of this Agreement, that they will complete within the next seventy five days audits of their existing operational history in accordance with standard GAAP auditing standards and procedures and also in conformity with auditing standards required for becoming a reporting company under the Securities an Exchange Act of 1934 and that they will timely complete and file all subsequent required consolidated financial statements as a Reporting Company under such act

ARTICLE V
REPRESENTATIONS AND WARRANTIES OF EGC SHAREHOLDERS

Each shareholder of EGC represents and warrants through the undersigned Chairman of the Board of EGC, acting as an agent and attorney-in-fact of each EGC shareholder for this Agreement as follows:

Section 5.01. Each EGC shareholder represents and warrants that he, she or it has the full and exclusive title and ownership in the EGC shares set opposite the shareholder's name on Exhibit "A" attached hereto, and will cause to be delivered such certificates in negotiable form at the time of, and as a condition of, closing.

Section 5.02. Each EGC shareholder warrants such shares are free and clear of any adverse claims, security agreements or hypothecation.

Section 5.03. Each EGC shareholder warrants there are no third party rights or claims to the Exhibit "A" shares, nor does the within transfer of such shares require any third party consent or authorization.

Section 5.04. Each EGC shareholder represents and warrants the Exhibit "A" shares to be free of any option or purchase rights and represents that he, she or it knows of no other securities or security rights or interest in the EGC shares to be transferred.

ARTICLE VI
COVENANTS OF THE PARTIES

<PAGE>

Section 6.01. Further Assurances. Consistent with the terms and conditions hereof, each party hereto will execute and deliver such other instruments and take such other action as any other party hereto may reasonably require in order to carry out this Agreement and the transactions contemplated hereby.

Section 6.02. Acknowledgments by SCFE and SCFE Owners. SCFE and the SCFE Owners hereby acknowledge, confirm, and agree that (I) EGC is an early stage entity and significant risks exists with respect to the proposed business of EGC, and (ii) none of the following have ever been represented, guaranteed, or warranted to any of SCFE or the SCFE Owners by EGC, the EGC Owners, or any of their affiliates, agents, or employees or by any other person, expressly or by implication: (a) the approximate or exact length of time that he/she will be required to remain an owner of the SCFE shares, (b) value of the SCFE shares to be realized at any time, or (c) the amount of profit to be realized at any time from the SCFE shares.

ARTICLE VII
CONDITIONS TO THE OBLIGATIONS OF EGC

Section 7.01. SCFE's Certifications. The representations and warranties of SCFE contained in this Agreement shall have been true and correct as of the date hereof and each of the agreements or obligations of SCFE to be performed on or before the date hereof pursuant to the terms hereof have been performed and complied with in all material respects.

Section 7.02. Authorization of Transactions. All corporate actions and filings necessary to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby by SCFE shall have been duly and validly taken in a manner reasonably satisfactory to EGC and its counsel.

Section 7.03. No Injunctions, etc. SCFE shall not be subject to any rule, regulation, order, decree or injunction of a court or agency of

EXHIBIT "D"   255

competent jurisdiction which enjoins or prohibits the consummation of the stock exchange, or the issuance of SCFE Stock.

Section 7.04. No Litigation. No litigation or proceeding shall have been instituted or, to the parties' knowledge, threatened after the date of this Agreement by any governmental agency or other person or entity seeking to restrain or prohibit the performance of, or to obtain damages or other relief in conjunction with, this Agreement or any of the transactions contemplated hereby that: (a) has a reasonable possibility of success on the merits; and (b) if decided in favor of the agency, person or equity who instituted the same, would have a material averse effect on SCFE.

Section 7.05. No Material Changes. SCFE will warrant and represent as of the date hereof that there have been no material changes in SCFE since the Letter of Intent; to include, though not limited to, entering into any agreement for sale or disposition of assets, merger, funding other than that described in this Agreement, indebtedness, change or commitment to change management, material adverse accounting events or change of reporting litigation, or like acts of reorganization or adverse events.

<PAGE>

ARTICLE VIII
CONDITIONS TO THE OBLIGATIONS OF SCFE

The obligations of SCFE under this Agreement to consummate the stock exchange and take the other actions contemplated herein shall be subject to the satisfaction, on or prior to the date hereof, of each of the following conditions, each of which may be waived by SCFE as provided herein except as otherwise provided by law:

Section 8.01. Buyer's Certifications. The representations and warranties of EGC contained in this Agreement shall have been true and correct as of the date hereof and each of the agreements or obligations of EGC to be performed on or before the date hereof pursuant to the terms hereof have been performed and complied with in all material respects.

Section 8.02. Authorization of Transactions. All corporate action necessary to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby by EGC shall have been duly and validly taken in a manner reasonably satisfactory to SCFE and its counsel.

Section 8.03. No Injunctions, etc. EGC shall not be subject to any rule, regulation, order, decree or injunction of a court or agency of competent jurisdiction which enjoins or prohibits the consummation of the Reverse Acquisition.

Section 8.04. No Litigation. No litigation or proceeding shall have been instituted or, to the parties' knowledge, threatened after the date of this Agreement by any governmental agency or other person or entity seeking to restrain or prohibit the performance of, or to obtain damages or other relief in conjunction with, this Agreement or any of the transactions contemplated hereby that: (a) has a reasonable possibility of success on the merits; and (b) if decided in favor of the agency, person or entity who instituted the same, would have a material adverse effect on SCFE or EGC.

Section 8.05. No Material Changes. EGC will warrant and represent as of the date hereof that there have been no material changes in EGC since the Letter of Intent; to include, though not limited to, entering into any agreement for sale or disposition of assets, merger, funding other than that described in this Agreement, indebtedness, change or commitment to change management, material adverse accounting events or change of reporting litigation, or like acts of reorganization or adverse events.

<PAGE>

ARTICLE IX
MISCELLANEOUS

Section 9.01. Headings. The descriptive headings of the Articles and Sections of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

Section 9.02. Notices. Any notices or other communications required or permitted hereunder shall be given in writing and shall be delivered personally, sent by certified or registered mail, return receipt requested and postage prepaid, or sent by nationally recognized overnight delivery service to the address set forth below:

If to EGC :            Mr. John Bentley
                       32 Haymarket
                       London

UK, SW1Y4TP

Copy to:        Mr. Julian D. Jensen
                311 South State Street, Suite 380
                Salt Lake City, UT 84111

If to SCFE:     Mr. Todd Crossland
                630 North 400 West
                Salt Lake City, UT 84103

Copy to:        Mr. Leonard E. Neilson
                Attorney at Law
                8160 South Highland Drive, Suite 209
                Sandy, UT  84093

Or such other address as shall be furnished in writing by such party, and any such notice or communications shall be effective and be deemed to have been given only upon its delivery in accordance with this Section. Notice shall be deemed given, received, and effective on: (i) if given by courier service, the date of actual receipt by the receiving party, or if delivery is refused on the date delivery was first attempted; or (ii) if given by certified mail, the earlier of: the date received, or the third day after being posted with the United States Postal Service. Any person entitled to notice or a copy of notice may change any address to which notice or a copy of notice is to be given to it by giving notice of such change of address as provided in this Section. The inability to deliver notice because of changed address for which no notice was given shall be deemed to be receipt of the notice as of the date such attempt was first made.

<PAGE>

        Section 9.03. Assignment. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors, heirs, legal representatives and permitted assigns, but neither this Agreement nor any of the rights, interests, or obligations hereunder shall be assigned by any of the parties hereto without the prior written consent of the other parties, except as otherwise provided herein.

        Section 9.04. Complete Agreement. This Agreement and specifically referenced documents contain the entire understanding of the parties with respect to the stock exchange and the related transactions and supersede all prior arrangements or understandings with respect thereto, and there are no restrictions, agreements, promises, representations, warranties, covenants or undertakings other than those expressly set forth in this Agreement.

        Section 9.05. Modifications' Amendments and Waivers. No supplement, modification or waiver or termination of this Agreement shall be binding unless executed in writing by the party to be bound thereby.

        Section 9.06. Counterparts and Facsimile Signatures. This Agreement may be executed in two or more counterparts all of which shall be considered one and the same agreement and each of which shall be deemed an original. Facsimile signatures shall be deemed rebuttably valid as to the execution of this Agreement.

        Section 9.07. No Third Party Beneficiary. The terms and provisions of this Agreement are intended solely for the benefit of the parties hereto and their respective successors or permitted assigns, and it is not the intention of the parties to confer third-party beneficiary rights upon any other person, except the specific third party beneficiary rights and entitlements of Olympic.

        Section 9.08. Invalid Provisions. If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future law, and if the rights or obligations of any party hereto under this Agreement will not be materially and adversely affected thereby: (a) such provision will be fully severable; (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof; and (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance therefrom.

        Section 9.09. Governing Law. This Agreement shall be governed by the laws of the State of Nevada (regardless of the laws that might be applicable under principles of conflicts of law) as to all matters, including but not limited to matters of validity, construction, effect and performance.

<PAGE>

        Section 9.10. Attorney Fees and Costs. Subject however to the

indemnification provisions herein, should any action at law or equity be required to enforce any term or provision of this Agreement, the prevailing party shall be entitled to all court costs and reasonable attorney fees.

Section 9.11. Corporate Authority. Each of the officers signing below represent that they represent that they have been fully and duly authorized by their respective Board of Directors to execute this Agreement for the corporation.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first written above.

Scientific Energy, Inc.                    Electronic Game Card, Inc.

By: _____              By: _____
    Mr. Todd B. Crossland                   Mr. John Bentley
    Its: President, CFO, Director            Its: President

By: _____              By: _____
    Ms. Jana Meyer                           Mr. Lee Cole
    Its: Secretary/Treasurer, Director       Its: Secretary, Director

By: --------------------------        By: --------------------------
    Mr. Mark Clawson                         Mr. Linden Boyne, Director
    It: Director                             Its: Director

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-99.1
<SEQUENCE>4
<FILENAME>ex99_1.txt
<TEXT>

Electronic Game Card Inc Debuts on OTCBB

NEW YORK and LONDON, Dec. 5 /PRNewswire-FirstCall/ -- Electronic Game Card Inc, (OTC Bulletin Board: EGMI - News) developer of digital pocket gamecards, today announced that it has commenced trading on the OTCBB under the symbol EGMI. Electronic Game Card, Inc. has completed a reverse take-over of Scientific Energy, Inc.

Electronic Game Card Inc, and its operating company Electronic Game Card Ltd, have developed a proprietary interactive credit-card-sized gaming product and format that has multiple applications for the US and international lottery, charitable, and sales promotions items markets, including direct mail. Globally these markets amount in size to over $200 billion a year.

EGC distributes its products through distribution agreements with leading suppliers in each of its targeted markets. Since May 2003, EGC has had a distribution agreement with Scientific Games International, Inc. under which Scientific Games has five year exclusive rights to distribute EGC game cards to lotteries worldwide. Scientific Games International is a subsidiary of Scientific Games Corporation (NASDAQ: SGMS - News), one of the leading global suppliers to the $30 billion instant lottery industry. Likewise, in the sales promotion arena, EGC has an exclusive two year distribution deal with Clegg International of California one of the largest direct mail firms in the US.

John Bentley, Chairman of EGC Inc, commented:

"EGC's unique technology breakthrough offers an exciting new marketing medium for major players. We see several distinct global, multi billion dollar markets where we can optimize the contemporary entertainment appeal of our gamecard applications . Our public listing is an important step forward in our ability to deliver our products to the leading commercial prospects in our markets in the US and overseas."

The design of EGC's credit card sized games allows them to be programmed with multiple plays and wins for play over days or weeks. This offers greater flexibility of pricing and ROI to EGC's business customers, as well as greater play value for the consumer. In July the Las Vegas Hilton became the first to use an EGC "slots" styled pocket gamecard in a casino sales promotion. The launch date, utilizing EGC gamecards by a US state lottery operator, is to be announced shortly.

A more detailed description of the transaction, reorganized company, management biographicals, and financial statements for both companies is set-out in a contemporaneously filed Information Statement with the Securities and Exchange

EXHIBIT "D"   258

Commission at www.sec.gov. The Company anticipates filing, contemporaneously with this Press Release, an 8-K containing the foregoing information and which 8-K would be supplemented as soon as consolidated financials for the parent and subsidiary corporations are available.


About EGC


Electronic Game Card Inc, and its UK operating company Electronic Game Card Ltd, own the rights to a unique proprietary electronic credit card sized interactive pocket gaming product. Serving international customers on a business to business basis, EGC designs, customizes and fulfils application of its product to meet the requirements of its customers on a cost efficient and secure basis. Patents for the EGC product are pending. For further details please see the EGC web site at www.egcltd.com


<PAGE>

Safe Harbor Statement


All forward-looking statements contained herein are deemed by the Company to be covered by and to qualify for the safe harbor protection provided by the private securities litigation reform act of 1995 (the "1995 act"). Shareholders and prospective shareholders should understand that several factors govern whether any forward-looking statement contained herein will be or can be achieved, any one of those factors could cause actual results to differ materially from those projected herein. These forward-looking statements include plans and objectives of management for future operation, including plans and objectives relating to the products and the future economic performance of the Company. Assumptions relating to the foregoing involve judgments with respect to, among other things, future economy, competitive and market conditions, future business decisions, and the time and money required to successfully complete development projects, all of which are difficult or impossible to predict accurately and many of which are beyond the control of the Company. Although the Company believes that the assumptions underlying the forward-looking statements contained herein are reasonable, any of those assumptions could prove inaccurate and, therefore, there can be no assurance that the results contemplated in any of the forward-looking statements contained herein will be realized. Based on actual experience and business developments, the impact of which may cause the company to alter its marketing, capital expenditure plans or other budgets, which may in turn affect the company's results of operations in light of the significant uncertainties inherent in the forward-looking statement included herein, the inclusion by the Company or any other person that the objective or plans of the Company will be achieved.


</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----

# EXHIBIT E

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGj1NyK3Xmzv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7zIT+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 VoSmcJ7GcJC4zHD64YzqQ6NVo2rLr3dwxx5CBe/szP7BN9wG5/6fHztbRIEunvI8
 /XENqX1eQNN173eu961pfw==

<SEC-DOCUMENT>0001144204-06-003973.txt : 20060203
<SEC-HEADER>0001144204-06-003973.hdr.sgml : 20060203
<ACCEPTANCE-DATETIME>20060203133028
ACCESSION NUMBER:        0001144204-06-003973
CONFORMED SUBMISSION TYPE:    8-K
PUBLIC DOCUMENT COUNT:        2
CONFORMED PERIOD OF REPORT:   20060131
ITEM INFORMATION:        Departure of Directors or Principal Officers; Election of Directors; Appointment of Principal Officers
ITEM INFORMATION:        Financial Statements and Exhibits
FILED AS OF DATE:        20060203
DATE AS OF CHANGE:       20060203

FILER:

    COMPANY DATA:
        COMPANY CONFORMED NAME:         ELECTRONIC GAME CARD INC
        CENTRAL INDEX KEY:              0001063036
        STANDARD INDUSTRIAL CLASSIFICATION:  MISCELLANEOUS MANUFACTURING INDUSTRIES [3990]
        IRS NUMBER:                     870570975
        STATE OF INCORPORATION:         NV
        FISCAL YEAR END:         1231

    FILING VALUES:
        FORM TYPE:              8-K
        SEC ACT:                1934 Act
        SEC FILE NUMBER:000-25843
        FILM NUMBER:            06576804

    BUSINESS ADDRESS:
        STREET 1:               712 FIFTH AVENUE
        STREET 2:               19TH FLOOR
        CITY:                   NEW YORK
        STATE:                  NY
        ZIP:                    10019
        BUSINESS PHONE:         646-723-8936

    MAIL ADDRESS:
        STREET 1:               712 FIFTH AVENUE
        STREET 2:               19TH FLOOR
        CITY:                   NEW YORK
        STATE:                  NY
        ZIP:                    10019

    FORMER COMPANY:
        FORMER CONFORMED NAME:  SCIENTIFIC ENERGY INC
        DATE OF NAME CHANGE:    20010829

    FORMER COMPANY:
        FORMER CONFORMED NAME:  QUAZON CORP /NV/
        DATE OF NAME CHANGE:    19990330
</SEC-HEADER>
<DOCUMENT>
<TYPE>8-K
<SEQUENCE>1
<FILENAME>v034596_8-k.txt
<TEXT>
```

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 8-K

CURRENT REPORT

PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934

Date of Report (Date of earliest event reported): January, 31 2006

ELECTRONIC GAME CARD, INC.
(Exact name of registrant as specified in its charter)

000-25853
(Commission File Number)

Nevada                                          87-0570975
(State or other jurisdiction            (IRS Employer Identification No.)
    of incorporation)

712 5th Avenue 19th Floor New York                  NY 10019

Address of principal executive offices)         (Zip Code)

(646) 723 8946
Registrant's telephone number, including area code

Check the appropriate box below if the Form 8-K filing is intended to
simultaneously satisfy the filing obligation of the registrant under any of the

following provisions:

|_|  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

|_|  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

|_|  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b)

|_|  Pre-commencement communications pursuant to Rule 13e-4 (c) under the Exchange Act (17 CFR 240.13e-4(c)

<PAGE>
Item 5.02. Departure of Directors or Principal Officers; Election of Directors Appointment of Principal Officers

(b) Effective January 31st, 2006, John Bentley retired due to ill health from all of his positions with the Company, which positions included Chief Executive Officer, President, and member of the Company's Board of Directors. His retirement is not related to any disagreement with the Company.

Item 9.01 Exhibits

The following exhibits are filed with this report.

Copy of Press Release, dated 31st January, 2006

                        SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

                        ELECTRONIC GAME CARD, INC.
                              (Registrant)


                        /s/ Linden J. Boyne
                        ------------------------------------
Date: February 3, 2006   Linden J. Boyne
                         (Officer duly authorized to sign this report)


</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-99.1
<SEQUENCE>2
<FILENAME>v034596_ex99-1.txt
<TEXT>

Exhibit Press release

11.21am EST NEW YORK, LONDON (31st January, 2006) Electronic Game Card, (OTCBB: EGMI), the US rewards based games company, today announces that health concerns have forced John Bentley to stand down as President and CEO with immediate effect.

As the joint creator of the Electronic GameCard concept, John Bentley has played an instrumental role in shaping the company's product range and opening up commercial opportunities in the international lottery, charitable gaming, Indian Gaming and sales promotions markets.

The Board of Electronic Game Card takes this opportunity to thank John Bentley for his significant contribution to the business over the last four years and wishes him a swift return to full health.

The company's existing Board and management team will continue the day-to-day running of the business prior to the appointment of a new CEO.

About Electronic Game Card

Electronic Game Card, Inc., is a listed corporation (OTCBB: EGMI) distributing reward based digital games. Electronic Game Card owns a unique proprietary pocket sized digital platform with a range of extended play games with multiple applications across several markets. Apart from the casino and gaming industry these include the "instant" lottery and charitable markets where the GameCard can be sold directly to the consumer through approved outlets, and the reward and competition markets for branded sales promotions for which EGC has developed its XOGOTM brand. For further information please visit www.electronicgamecard.com.

  - - Ends --


</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----

EXHIBIT "E"   261

# EXHIBIT F



**Companies House**
— for the record —

Please complete in typescript,
or in bold black capitals.
CHWP000

# 288b

**Terminating appointment as director or secretary**
*(NOT for appointment (use Form 288a) or change of particulars (use Form 288c))*

| | |
|---|---|
| **Company Number** | 3966151 |
| **Company Name in full** | ELECTRONIC GAME CARD LIMITED |

| | Day | Month | Year | | |
|---|---|---|---|---|---|
| Date of termination of appointment | 3 0 | 0 1 | 2 0 0 6 | | |

as director ✓        as secretary ☐

*Please mark the appropriate box. If terminating appointment as a director and secretary mark both boxes.*

**NAME**

Please insert details as previously notified to Companies House.

| | |
|---|---|
| *Style / Title | MR |
| *Honours etc | |
| Forename(s) | JOHN RANSOME |
| Surname | BENTLEY |

| | Day | Month | Year |
|---|---|---|---|
| †Date of Birth | 1 9 | 0 2 | 1 9 4 0 |

**A serving director, secretary etc must sign the form below.**

**Signed** _____    **Date** 30 _ 01 _ 06

(** serving director / secretary / administrator / administrative receiver / receiver manager / receiver)

* Voluntary details.
† Directors only.
** Delete as appropriate
You do not have to give any contact information in the box opposite but if you do, it will help Companies House to contact you if there is a query on the form. The contact information that you give will be visible to searchers of the public record.

Tel   020 7451 2468

DX number          DX exchange

When you have completed and signed the form please send it to the Registrar of Companies at:
Companies House, Crown Way, Cardiff, CF14 3UZ     DX 33050 Cardiff
for companies registered in England and Wales        *or*
Companies House, 37 Castle Terrace, Edinburgh, EH1 2EB
for companies registered in Scotland          DX 235 Edinburgh
or LP - 4 Edinburgh

A99          116
**COMPANIES HOUSE**     31/01/2006

Form revised 10/03

EXHIBIT "F"   262

# EXHIBIT G



## Companies House
—— *for the record* ——

# 363a(ef)

| Annual Return |
|---|

*Company Name:*   **ELECTRONIC GAME CARD LIMITED**

*Company Number:*   **03966151**

*Received for filing in Electronic Format on the:* **18/04/2006**

XDJV9EOZ

## Company Details

*Period Ending:* **06/04/2006**

*Company Type:* **PRIVATE COMPANY LIMITED BY SHARES**

*Principal Business Activities:*

   *SIC Codes*
    **3002**

| *Registered Office:* *Address:* | *Register of* *Members Address:* | *Register of Debenture* *Holders Address:* |
|---|---|---|
| **SAVANNAH HOUSE FIFTH FLOOR 11 CHARLES II STREET LONDON SW1Y 4QU** | **At Registered Office** | **Not Applicable** |

## Details of Officers of the Company

*Company Secretary:*

*Name:*   **LINDEN JAMES HASTINGS BOYNE**   *Address:*   **SAVANNAH HOUSE 5TH FLOOR 11 CHARLES 11 STREET LONDON   SW1Y 4QU**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

*Director 1:*

*Name:*   **LINDEN JAMES HASTINGS BOYNE**   *Address:*   **ABERFOYLE GREEN LANE BLACKWATER CAMBERLEY SURREY   GU17 9DG**

*Date of Birth:* **08/06/1943**
*Nationality:* **BRITISH**
*Occupation:* **DIRECTOR**

---

*Electronically Filed Document for Company number:* **03966151**

EXHIBIT "G"   263   *Page:* 1

*Director 2:*

| | | | |
|---|---|---|---|
| *Name:* | **GORDON MCNALLY** | *Address:* | **FOUNTAIN HOUSE** |
| *Date of Birth:* | **20/01/1942** | | **PARK STREET** |
| *Nationality:* | **BRITISH** | | **LONDON   W1K 7HG** |
| *Occupation:* | **INVENTOR** | | |

## Share Capital

*Issued Share Capital Details:*

| Class of share | Number of shares issued | Aggregate nominal value of issued shares |
|---|---|---|
| **ORDINARY** | **99** | **GBP99** |
| *TOTALS* | **99** | **GBP99** |

## Full Details of Shareholders

The details below relate to individuals / corporate bodies that were shareholders as at 06/04/2006, or that had ceased to be shareholders since the made up date of the previous Annual Return.

*Shareholding 1:*

**99 ORDINARY Shares held as at 06/04/2006**

*Name:*     **E G C INC**

*Address:*     **712 FIFTH AVENUE**
**19TH FLOOR**
**NEW YORK**
**NY 10019-4108**
**UNITED STATES OF AMERICA**

## Authorisation

*Authoriser Designation:* **DIRECTOR** *Date Authorised:* **18/04/2006** *Authenticated:* **Yes (E/W)**

# EXHIBIT H

8-K 1 v164640_8k.htm

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, DC 20549

# FORM 8-K

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(d) OF THE**
**SECURITIES EXCHANGE ACT OF 1934**

Date of Report (Date of earliest event reported): February 1, 2009

# Electronic Game Card, Inc.
### (Exact name of registrant as specified in charter)

| **Nevada** | **000-25843** | **87-0570975** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**5405 Alton Parkway, Suite A-353, Irvine, CA 92604**
(Address of principal executive offices)

Registrant's telephone number, including area code: **866-924-2924**

**Not Applicable**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

## SECTION 5 – CORPORATE GOVERNANCE AND MANAGEMENT

**Item 5.02.**   **Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

### Appointment of new CEO and Vice President of Sales; Retirement of Interim CEO

On December 16, 2008 Electronic Game Card, Inc ("EGC") issued a press release announcing the appointment of Kevin Donovan as Chief Executive Officer of EGC and Ms. Anna Houssels as Vice President of Sales, in each case effective as of February 1, 2009, and that Lee Cole would step down as Interim Chief Executive Officer of EGC as of that date. A copy of that press release is attached hereto as Exhibit 99.1 and is incorporated by reference into this Item.

On February 1, 2009, EGC executed three-year employment agreements with Mr. Donovan and with Ms. Houssels. The agreements provide for a base salary of $260,000 per year and $375,000 for the first twelve-month periods for Mr. Donovan and Ms. Houssels, respectively, with annual increases at the discretion of EGC's Compensation Committee. Each executive may receive bonuses based upon revenue and earnings achievements. EGC will fund the costs of medical benefit plans for each executive and the executive's respective dependents.

EGC is obligated to make payments to each of the executives upon termination of employment, depending on the circumstances surrounding the termination. If the agreement is terminated by the executive without good reason or by EGC for cause, or by the executive in breach of the agreement, the executive will have the right to exercise all vested stock options, receive the executive's base salary and accrued vacation through the date of termination.

If the agreement is terminated by the executive for good reason, as defined in the agreement, or if EGC terminates the agreement other than for cause, or due to the executive's incapacity, or retirement, the executive will be entitled to receive the executive's base salary through the date on which the termination occurred, plus credit for any unused vacation and severance payments at the executive's then-current salary for twelve months from the date of termination. The will also be entitled to payment of bonuses for the fiscal year in which the termination occurs (should any bonus plan be in place), continued vesting of stock options and restricted stock, and EGC will be required to maintain at EGC's expense for the executive's continued benefit all medical benefits plans to which the executive was entitled immediately prior to the date of termination (or, at the executive's election, immediately prior to the date of a change-in-control), for twelve months.

If the agreement is terminated due to the executive's death, the executive's estate or legal representative will be entitled to receive benefits that are earned and vested through the date of termination, a prorated incentive bonus for the fiscal year in which the termination occurs, and base salary payments for three months following the date of termination (less any payments the executive receives as a result of any disability insurance EGC maintain for the executive's benefit).

In addition, each of the agreements contains indemnification provisions under which EGC agreed to indemnify the executive if the executive is a party to or threatened to be made a party to, or is otherwise involved in any proceeding (other than a proceeding brought by EGC against the executive) by reason of the fact that the executive is or was an officer and/or director of EGC or is or was serving at the request of EGC as a director, officer, employee or agent of another enterprise, to the fullest extent permitted by California law.

Pursuant to the terms of each of the employment agreements, each of the executives was granted a ten-year option to purchase up to 1,500,000 shares of common stock at an exercise price of $0.36 per share. Each option vests and become exercisable as to one-third of the shares of common stock upon successive anniversary dates of the effective date of the employment agreement, being February 1, 2009, until vested in full.

Each of the agreements contains non-compete, confidentiality and non-disclosure clauses designed to protect EGC's intellectual property. Each of the agreements also contains a provision designed to preclude the executive from claiming rights to any products or technologies the executive develops while in EGC's employ or for a one-year period following termination of the executive's employment.

The options previously granted to Ms. Houssels pursuant to the agreement to appoint Ms. Houssels a director of EGC were cancelled, and that appointment agreement was terminated, with Ms. Houssels continuing to serve as a director of EGC but pursuant to her new employment agreement.

## SECTION 9 - FINANCIAL STATEMENTS AND EXHIBITS.

**Item 9.01**     **Financial Statements and Exhibits.**

(d) Exhibits.

The following exhibits are filed with this report.

99.1          Press release dated December 16, 2008

**SIGNATURES**

    In accordance with the requirements of the Exchange Act, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Electronic Game Card, Inc.

By: /s/ Linden Boyne
_____

Title:  Interim Chief Financial Officer

November 3, 2009

**Exhibit Index**

Exhibit
Number                  Exhibit Title or Description

Exhibit 99.1    Press Release of Electronic Game Card, Inc. dated December 16, 2008

EX-99.1 2 v164640_ex99-1.htm

Exhibit 99.1

**Electronic Game Card Appoints Prominent Brand and Marketing Executive as Chief Executive Officer**

Company appoints Board Director, Anna Houssels, as Vice President of Sales

**NEW YORK, NY/LONDON – December 16, 2008** - Electronic Game Card, Inc. (OTCBB: EGMI) ("EGC"), announced today that Kevin Donovan will join the Company as its Chief Executive Officer, effective February 1, 2009. Mr. Donovan has over 25 years experience in corporate branding and licensing with prominent entities such as the 2002 Winter Olympics, professional sports properties and entertainment media companies. In addition, Anna Houssels, a current non-executive member of the Company's Board of Directors, will join the Company's executive management team as Vice President of Sales.

"Kevin Donovan is joining our Company at a very interesting time. Lee Cole, who has acted as interim CEO over the past three years, has done a good job in turning this company around and successfully delivering to us a profitable business with a good cash balance and a huge market potential. We thank Lee for his effective guidance and look forward to his continued contribution as a member of the Board of Directors," commented Lord Steinberg, Executive Chairman of Electronic Game Card, Inc. "As we enter this new exciting phase of our business model, we are focused on growing our revenues. Kevin Donovan is a well-respected creative visionary and has a keen sense for securing new business opportunities through his vast professional network of industry leaders. He is a major brand architect with the proven record of accomplishment."

Kevin Donovan brings a wealth of creative brand building, business development acumen and an entrepreneurial spirit to Electronic Game Card, Inc. Mr. Donovan most recently co-founded Planetwide Games, Inc. in 2004, a digital media company based on the patent-pending MashON social network applications platform that empowers consumers to interact with their favorite brands online. At Planetwide Games, Mr. Donovan was instrumental in bringing high profile brands into significant partnership deals, including those with Marvel Entertainment, Electronic Arts, National Geographic, NBC Universal Pictures, and Paramount Studios to name a few. Mr. Donovan also founded U4oria Discovery, Inc., a brand image development company, where he developed brand identity programs and product promotions for clients such as Subway Restaurants, Pearle Vision Centers, Kinko's, Iceland Spring Water, NASCAR superstars and former Massachusetts Governor, Mitt Romney. Previously, Mr. Donovan was managing director and vice president of marketing for Fotoball USA, Inc., a premier sports and entertainment marketer and manufacturer that was acquired by K2 Inc., the sporting goods and recreational products company with brands such as Rawlings, Shakespeare, K2, Pflueger and Atlas. Mr. Donovan also served as president and CEO of Smoothie King Franchises, a privately held company of Smoothie Bars and Nutritional Lifestyle Centers based in the New Orleans.

While working on the 2002 XIX Winter Olympics, Mr. Donovan served as Director of Brand Image for the Salt Lake Organizing Committee, during which he was responsible for development of the entire look and feel of the Olympic Games including, the sales development and presentations, sales activation, education, and development process of the Brand Image program. He worked closely and coordinated with all 45 Organizing Committee functions in creating a global award-winning brand image. In addition, Mr. Donovan created the All-American SportPark, a 65 acre theme park on the strip in Las Vegas with Major League Baseball, NASCAR, and Callaway Golf. Donovan has also served as Senior Vice President of New Business Development for Saint Andrews Golf Corporation, the publicly traded parent company of All-American Sportpark. Currently, Mr. Donovan acts in multiple strategic advisory roles to the co-founder and President of Subway Restaurants, the number one franchise company with over 30,000 restaurants in 87 countries.

"Electronic Game Card is a highly unique and well protected technology. Our technology affords us vast opportunities for new growth market potential in our six currently identified business segments of lotteries, gaming, promotions, toys & games, education, sports and beyond. The current corporate hope is to accomplish a substantial penetration of the addressable market to exceed $100 million in annual revenues. We believe this goal is highly achievable and I am very eager to begin working to accomplish our goal," stated Kevin Donovan.

To further support Electronic Game Card's sales initiative, the Company has also appointed Anna Houssels as Vice President of Sales, effective February 1, 2009. Upon her transition to the new role, she will change her title as a non-executive director to that of executive director of the Company's Board. Ms. Houssels most recently was the general manager of international sales for Nakheel Corporation, a key entity of Dubai World and one of the largest real estate developers in the world. While her responsibilities included international sales, she was instrumental in furthering the following joint ventures: The One&Only Cape Town Resort, a joint venture between Kerzner International and Nakheel; Mazagan Resort Morocco, a co-

EXHIBIT "H"   270

development project with Kerzner International and Nakheel; and W Koh Samui Retreat and Residences in Thailand, a joint development project with Amburaya Resorts Co. Ltd. and Nakheel. In addition, Ms. Houssels oversaw VIP sales for CityCenter in Las Vegas, a $9.2 Billion mixed use real estate project developed as a joint venture between MGM Mirage and Dubai World. In this capacity, she focused on expanding the sales network through VIP customers and referrals and liaising with MGM MIRAGE presidents and key executives, plus international and domestic casino marketing teams. Her responsibilities included leading event sales nationally and internationally, and developing new sales leads through business-to-business channels, as well as professional and social personal network associations.

Anna Houssels is a member of the Board of Directors of Susan Dunn Inc., a world-renowned Luxury Spa Wear and Accessories company based in San Diego, California with significant presence in the five star hotel and resort industry. Ms. Houssels also serves as a Director of LuxeGlobal, Inc., an international real estate company headquartered in Ranch Santa Fe, California specializing in world-class homes, yachts and planes. In addition, Ms. Houssels and Joanne Lucia A.S.I.D. have formed H&L Enterprises, an experienced International Design company with offices in California and Nevada specializing in designing, decorating and renovating homes nationally and internationally for over twenty years. Ms. Houssels' real estate company, Houssels Properties, Inc., also operates in California and Nevada and is a successful real estate firm focused on selling luxury residences to a local and a large international network. Lord Steinberg commented, "Anna has consistently demonstrated a keen ability and enthusiasm to effectively market all types of products and has developed an extensive list of professional and Company associations and a high level of credibility with those that have transacted business with her."

"I am looking forward to head up the sales effort of Electronic Game Card. I believe my extensive contacts, in conjunction with Kevin's vision and the Board's guidance, will drive this company to a highly successful future," stated Anna Houssels.

Contact:
**Yvonne L. Zappulla**
Managing Director
Grannus Financial Advisors, Inc.
Call 212-681-4108 or e-mail yvonne@grannusfinancial.com

or

**Roger Holdom**
Electronic Game Card, Inc.
Call 44 207 451 2480 or e-mail investor.relations@electronicgamecard.com

**About Electronic Game Card. Inc.**
Electronic Game Card Inc., (OTCBB: EGMI), develops, produces and markets innovative games to the promotional industry worldwide, toys and games, casinos and lottery. The Company's lead product is the EGC Electronic GameCard™, a unique credit card-sized pocket game combining patent-pending proprietary technology of interactive capability with "instant win" excitement. The "EGC Electronic GameCard™" can be programmed to suit a variety of gaming and promotion applications.

EGMI's client base is across the $100 billion global market of, sales promotion, gaming and casinos, Indian gaming and state and national lotteries markets. EGMI develops sales and marketing relationships with agents and distributors globally and currently has agents and distributors in North America, United Kingdom, Ireland, Mexico, Italy, Sweden, Norway, Denmark, Finland, South Africa Australia, New Zealand and Japan.

For further information please visit www.electronicgamecard.com

February 2008, Electronic GameCard™ received Gaming Laboratory International approval for security and product robustness. In July 2005, the Public Gaming Research Institute (PGRI) named the Electronic GameCard™ as a 2005 Lottery Product of the Year.

Certain statements in this news release may constitute "forward-looking" statements within the meaning of section 21E of the Securities and Exchange Act of 1934. The Company believes that its expectations, as expressed in these statements are based on reasonable assumptions regarding the risks and uncertainties inherent in achieving those expectations. These statements are not, however, guarantees of future performance and actual results may differ materially. Risk factors are listed in the most recent Annual Report on Form 10-KSB and Quarterly Report on Form 10-QSB filed with the Securities and Exchange Commission.

EXHIBIT "H"   272

# EXHIBIT I

8-K 1 v165134_8k.htm

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, DC 20549

## FORM 8-K/A

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(d) OF THE**
**SECURITIES EXCHANGE ACT OF 1934**

Date of Report (Date of earliest event reported): October 30, 2009

## Electronic Game Card, Inc.
(Exact name of registrant as specified in charter)

| Nevada | 000-25843 | 87-0570975 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**5405 Alton Parkway, Suite A-353, Irvine, CA 92604**
(Address of principal executive offices)

Registrant's telephone number, including area code: **866-924-2924**

**Not Applicable**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**SECTION 5 – CORPORATE GOVERNANCE AND MANAGEMENT**

Item 5.02.        Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.

**Death of Executive Chairman Lord Leonard Steinberg; Appointment of Kevin Donovan and Eugene Christiansen to Serve as Interim Office of the Chairman**

On November 3, 2009 Electronic Game Card, Inc ("EGC") issued a press release announcing the passing of Executive Chairman Lord Leonard Steinberg. That press release also announced the appointment of Kevin Donovan and Eugene Christiansen to serve as members of an Interim Office of the Chairman in Lord Steinberg's stead. A copy of that press release is attached hereto as Exhibit 99.1 and is incorporated by reference into this Item.

**Resignation of Executive Officer; Appointment of Interim Replacement Officer**

Effective on October 21, 2009, Thomas E. Schiff resigned from his positions as Chief Financial Officer and company Secretary of Electronic Game Card, Inc ("EGC") because EGC did not have all effective insurance cover required by the terms of his employment agreement. EGC agrees that cover was not in effect, but has since secured that cover and additional business insurance. Mr. Schiff did not cite any disagreement relating the EGC's operations, policies or practices in his resignation. Mr. Schiff, however, continues to provide his services to EGC pursuant to a consulting agreement entered into as of October 22, 2009. Linden J. Boyne, who recently retired as Chief Financial Officer and company Secretary of EGC, was appointed interim Chief Financial Officer and company Secretary effective October 30, 2009. Mr. Boyne is employed by Sterling FCS Limited, who have been contracted to supply various financial function and company secretarial function services to EGC since 2006 pursuant to a contract scheduled to expire on March 2, 2010.

**SECTION 9 - FINANCIAL STATEMENTS AND EXHIBITS.**

Item 9.01        Financial Statements and Exhibits.

    (d)  Exhibits.

    The following exhibits are filed with this report.

    99.1            Press release dated November 3, 2009

## SIGNATURES

In accordance with the requirements of the Exchange Act, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Electronic Game Card, Inc.

By:/s/ Linden J. Boyne
Title:  Interim Chief Financial Officer

November 5, 2009

**Exhibit Index**

Exhibit
Number    Exhibit Title or Description

Exhibit 99.1 Press Release of Electronic Game Card, Inc.
            dated November 3, 2009

---

EXHIBIT "I"   276

EX-99.1 2 v165134_ex99-1.htm

**Exhibit 99.1**

### Electronic Game Card, Inc. Mourns the Passing of its Executive Chairman, The Lord Leonard Steinberg

*CEO Kevin Donovan and Board Member Eugene Christiansen to serve as Interim Office of the Chairman and commit Board to forwarding The Lord Steinberg's vision for the future*

**NEW YORK, NY/LONDON, ENGLAND - November 3, 2009-** Electronic Game Card, Inc. (OTCBB: EGMI) ("EGC"), announced today with great sadness that the Company's Executive Chairman, Leonard Steinberg, Baron Steinberg of Belfast, died suddenly of a heart attack  November 2, 2009 on his 73rd birthday  in London, England.

Lord Steinberg was one of Britain's most successful businessmen and one of the most well known personalities in the gaming industry. He founded Stanley Leisure in Belfast in 1958 with one licensed betting shop. Stanley Leisure plc became the largest casino operator and fourth largest retail bookmaker with 600 shops in the United Kingdom.

In 2005 Stanley Leisure's retail bookmaking operations were sold for £504 million (approximately $1 billion) and returned £327 million (approximately $650 million) to shareholders. In 2006, Stanley Leisure then sold the 45 casinos to Genting International for approximately $1.3 billion.

In addition to his highly successful business career, Lord Steinberg was made a Conservative Life Peer in 2004 and was an active member of the House of Lords in the United Kingdom. He was a well known philanthropist as Founder and Chairman of the Steinberg Family Charitable Trust and had recently attended the launch of the Northern Ireland Friends of Israel as President in March 2009.

"This news has come as a shock to all of us.  We are deeply saddened.  The Steinberg family is in the midst of its mourning period.  The company is convening its Board of Directors to take appropriate actions in light of this unfortunate and untimely development."

"Leonard's passing gives me much pain and sadness and a tremendous sense of loss for his family, many friends and colleagues. All who knew Leonard greatly admired his wisdom, support and personal approach to relationships. Words cannot describe how much we all respected Leonard and appreciated the opportunity to work closely with him," commented Kevin Donovan, interim Co-Chairman and CEO of Electronic Game Card, Inc.  "While we are all deeply saddened with his passing, management, the Board and company consultants will continue to work hard to take this company to the next level, and are accelerating our commitment to growth  to honor this great man and the faith he had in us and the future of the company."

For More Information Contact:

Yvonne L. Zappulla
Managing Director
Grannus Financial Advisors, Inc.
Call 212-681-4108
e-mail: yvonne@grannusfinancial.com

or

Kevin Donovan
Chief Executive Officer
Electronic Game Card, Inc.
Call 866-924-2924
e-mail: investor.relations@electronicgamecard.com

**About Electronic Game Card, Inc.**

Electronic Game Card, Inc., (OTC Bulletin Board: EGMI - News), develops, produces and markets innovative games to the casinos and lottery, toys and games, education, and promotional industry worldwide. The Company's lead product is the EGC Electronic GameCard(TM), a unique credit card-sized pocket game combining patent and patent-pending proprietary technology of interactive capability with "instant win" excitement. The "EGC Electronic GameCard(TM)" can be programmed to suit a variety of gaming and promotion applications.

EGMI's client base is across the $100 billion global market of, sales promotion, gaming and casinos, Indian

gaming and state and national lotteries markets. EGMI develops sales and marketing relationships with agents and distributors globally and currently has agents and distributors in North America, United Kingdom, Ireland, South Korea, Mexico, Italy, Sweden, Norway, Denmark, Finland, South Africa Australia, New Zealand and Japan.

For further information please visit www.electronicgamecard.com.

*Certain statements in this news release may constitute "forward-looking" statements within the meaning of section 21E of the Securities and Exchange Act of 1934. The Company believes that its expectations, as expressed in these statements are based on reasonable assumptions regarding the risks and uncertainties inherent in achieving those expectations. These statements are not, however, guarantees of future performance and actual results may differ materially. Risk factors are listed in the most recent Annual Report on Form 10-KSB and Quarterly Report on Form 10-QSB filed with the Securities and Exchange Commission.*

# EXHIBIT J

In accordance with
Section 167 of the
Companies Act 2006.

# AP01
## Appointment of director



You can use the WebFiling service to file this form online.
Please go to www.companieshouse.gov.uk

| ✓ What this form is for | What this form is NOT for |
|---|---|
| You may use this form to appoint an individual as a director. | You cannot use the form to appoint a corporate director. To do this, please use form AP02 'Appointment of corporate director'. |



TUESDAY

*ACEP5GZ9*

A81       26/01/2010       181
COMPANIES HOUSE

**1** Company details

| Company number | 0 3 9 6 6 1 5 1 |
|---|---|
| Company name in full | Electronic Game Card (UK) Limited |

→ Filling in this form
Please complete in typescript or in bold black capitals.

All fields are mandatory unless specified or indicated by *

**2** Date of director's appointment

| Date of appointment | 2 8  7 2  2 0 0 9 |
|---|---|

**3** New director's details

| Title* | Mr. |
|---|---|
| Full forename(s) | Kevin |
| Surname | Donovan |
| Former name(s) ❶ | |
| Country/State of residence ❷ | NIGUEL  Laguna Nigel, California |
| Nationality | United States |
| Date of birth | 1 8  0 8  1 9 6 2 |
| Business occupation (if any) ❸ | CEO – Electronic Game Card, Inc. |

❶ Former name(s)
Please provide any previous names which have been used for business purposes in the past 20 years.

Married women do not need to give former names unless previously used for business purposes.

Continue in section 6 if required.

❷ Country/State of residence
This is in respect of your usual residential address as stated in Section 4a.

❸ Business occupation
If you have a business occupation, please enter here. If you do not, please leave blank.

**4** New director's service address ❹

| | Please complete your service address below. You must also complete your usual residential address in Section 4a. |
|---|---|
| Building name/number | |
| Street | 5405 Alton Parkway |
| | Suite A-353 |
| Post town | Irvine |
| County/Region | California |
| Postcode | 9 2 6 0 4 |
| Country | United States |

❹ Service address
This is the address that will appear on the public record. This does not have to be your usual residential address.

Please state 'The Company's Registered Office' if your service address is recorded in the company's register of directors as the company's registered office.

If you provide your residential address here it will appear on the public record.

**BIS** | Department for Business Innovation & Skills

CHFP000
10/09 Version 2.0

EXHIBIT "J"   279

## AP01
### Appointment of director

| 5 | Signatures | |
|---|---|---|

| | I consent to act as director of the above named company. | ❶ Societas Europaea |
|---|---|---|

**New director's signature**

Signature

X ~~Kevin Donovan~~     X

**Authorising signature**

Signature

X Eugene M. Christiansen     X     01/22/10

This form may be signed and authorised by:
Director ❶, Secretary, Person authorised ❷, Administrator, Administrative Receiver, Receiver, Receiver manager, Charity commission receiver and manager, CIC manager, Judicial factor.

**❶ Societas Europaea**
If the form is being filed on behalf of a Societas Europaea (SE) please delete 'director' and insert details of which organ of the SE the person signing has membership.

**❷ Person authorised**
Under either section 270 or 274 of the Companies Act 2006.

| 6 | Additional former names (continued from Section 3) | |
|---|---|---|

**Former names ❶**

**❶ Additional former names**
Use this space to enter any additional names.

# AP01
## Appointment of director

### 👤 Presenter information

You do not have to give any contact information, but if you do it will help Companies House if there is a query on the form. The contact information you give will be visible to searchers of the public record.

Contact name  John O'Connell

Company name  Jeffrey Green Russell

Address  Waverley House

7-12 Noel Street

Post town  London

County/Region

Postcode  | W | 1 | F | | 8 | G | Q |

Country

DX  44627 Mayfair

Telephone  020 7339 7014

### ✓ Checklist

We may return forms completed incorrectly or with information missing.

Please make sure you have remembered the following:
- ☐ The company name and number match the information held on the public Register.
- ☐ You have provided a business occupation if you have one.
- ☐ You have provided a correct date of birth.
- ☐ You have completed the date of appointment.
- ☐ You have completed the nationality box in Section 3.
- ☐ You have provided both the service address and the usual residential address.
- ☐ Addresses must be a physical location. They cannot be a PO Box number (unless part of a full service address), DX or LP (Legal Post in Scotland) number.
- ☐ You have included all former names used for business purposes over the last 20 years.
- ☐ You have enclosed a relevant section 243 application if applying for this at the same time as completing this form.
- ☐ The new director has signed the form.
- ☐ You have provided an authorising signature.

### ❗ Important information

Please note that all information on this form will appear on the public record, apart from information relating to usual residential addresses.

### ✉ Where to send

You may return this form to any Companies House address, however for expediency we advise you to return it to the appropriate address below:

**For companies registered in England and Wales:**
The Registrar of Companies, Companies House, Crown Way, Cardiff, Wales, CF14 3UZ.
DX 33050 Cardiff.

**For companies registered in Scotland:**
The Registrar of Companies, Companies House, Fourth floor, Edinburgh Quay 2, 139 Fountainbridge, Edinburgh, Scotland, EH3 9FF.
DX ED235 Edinburgh 1
or LP - 4 Edinburgh 2 (Legal Post).

**For companies registered in Northern Ireland:**
The Registrar of Companies, Companies House, First Floor, Waterfront Plaza, 8 Laganbank Road, Belfast, Northern Ireland, BT1 3BS.
DX 481 N.R. Belfast 1.

**Section 243 exemption**
If you are applying for, or have been granted a section 243 exemption, please post this whole form to the different postal address below:
The Registrar of Companies, PO Box 4082, Cardiff, CF14 3WE.

### ℹ Further information

For further information please see the guidance notes on the website at www.companieshouse.gov.uk or email enquiries@companieshouse.gov.uk

## This form is available in an alternative format. Please visit the forms page on the website at www.companieshouse.gov.uk

This form has been provided free of charge by Companies House.

CHFP000
10/09 Version 2.0

EXHIBIT "J"   281

# EXHIBIT K

In accordance with
Section 167 of the
Companies Act 2006.

# AP01

## Appointment of director



You can use the WebFiling service to file this form online.
Please go to www.companieshouse.gov.uk



| ✓ What this form is for | ✗ What this form is NOT for |
|---|---|
| You may use this form to appoint an individual as a director. | You cannot use the form to appoint a corporate director. To do this, please use form AP02 'Appointment of corporate director'. |

**TUESDAY**

*ACEP4GZ8*

A81     26/01/2010     182
COMPANIES HOUSE

### 1  Company details

| Company number | 0 3 9 6 6 1 5 1 |
|---|---|
| Company name in full | Electronic Game Card (UK) Limited |

→ **Filling in this form**
Please complete in typescript or in bold black capitals.

All fields are mandatory unless specified or indicated by *

### 2  Date of director's appointment

| Date of appointment | 2 8 / 7 / 2 0 0 9 |
|---|---|

### 3  New director's details

| Title* | Mr. |
|---|---|
| Full forename(s) | Eugene M. |
| Surname | Christiansen |
| Former name(s) ❶ | |
| Country/State of residence ❷ | New York, New York |
| Nationality | United States |
| Date of birth | 2 1 / 0 4 / 1 9 4 4 |
| Business occupation (if any) ❸ | CEO - Christiansen Capital Advisors |

❶ **Former name(s)**
Please provide any previous names which have been used for business purposes in the past 20 years.

Married women do not need to give former names unless previously used for business purposes.

Continue in section 6 if required.

❷ **Country/State of residence**
This is in respect of your usual residential address as stated in Section 4a.

❸ **Business occupation**
If you have a business occupation, please enter here. If you do not, please leave blank.

### 4  New director's service address ❹

Please complete your service address below. You must also complete your usual residential address in Section 4a.

| Building name/number | |
|---|---|
| Street | 250 West 57th Street |
| | Suite 432 |
| Post town | New York |
| County/Region | New York |
| Postcode | 1 0 1 0 7 |
| Country | United States |

❹ **Service address**
This is the address that will appear on the public record. This does not have to be your usual residential address.

Please state 'The Company's Registered Office' if your service address is recorded in the company's register of directors as the company's registered office.

If you provide your residential address here it will appear on the public record.

BIS | Department for Business Innovation & Skills

CHFP000
10/09 Version 2.0

EXHIBIT "K"   282

## AP01
Appointment of director

| 5 | Signatures | |
|---|---|---|

I consent to act as director of the above named company.

New director's signature

X _Eugene M. Christiansen_ X

Authorising signature

X _Kevin Donovan_ X

This form may be signed and authorised by:
Director ❶, Secretary, Person authorised ❷, Administrator, Administrative Receiver, Receiver, Receiver manager, Charity commission receiver and manager, CIC manager, Judicial factor.

❶ **Societas Europaea**
If the form is being filed on behalf of a Societas Europaea (SE) please delete 'director' and insert details of which organ of the SE the person signing has membership.

❷ **Person authorised**
Under either section 270 or 274 of the Companies Act 2006.

| 6 | Additional former names (continued from Section 3) | |
|---|---|---|

Former names ❶

❶ **Additional former names**
Use this space to enter any additional names.

CHFP000
10/09 Version 2.0

EXHIBIT "K"   283

# AP01
## Appointment of director

### 👤 Presenter information

You do not have to give any contact information, but if you do it will help Companies House if there is a query on the form. The contact information you give will be visible to searchers of the public record.

**Contact name** John O'Connell

**Company name** Jeffrey Green Russell

**Address** Waverley House

7-12 Noel Street

**Post town** London

**County/Region**

**Postcode** W 1 F  8 G Q

**Country**

**DX** 44627 Mayfair

**Telephone** 020 7339 7014

### ✓ Checklist

We may return forms completed incorrectly or with information missing.

Please make sure you have remembered the following:

- ☐ The company name and number match the information held on the public Register.
- ☐ You have provided a business occupation if you have one.
- ☐ You have provided a correct date of birth.
- ☐ You have completed the date of appointment.
- ☐ You have completed the nationality box in Section 3.
- ☐ You have provided both the service address and the usual residential address.
- ☐ Addresses must be a physical location. They cannot be a PO Box number (unless part of a full service address), DX or LP (Legal Post in Scotland) number.
- ☐ You have included all former names used for business purposes over the last 20 years.
- ☐ You have enclosed a relevant section 243 application if applying for this at the same time as completing this form.
- ☐ The new director has signed the form.
- ☐ You have provided an authorising signature.

### ❗ Important information

Please note that all information on this form will appear on the public record, apart from information relating to usual residential addresses.

### ✉ Where to send

You may return this form to any Companies House address, however for expediency we advise you to return it to the appropriate address below:

**For companies registered in England and Wales:**
The Registrar of Companies, Companies House, Crown Way, Cardiff, Wales, CF14 3UZ.
DX 33050 Cardiff.

**For companies registered in Scotland:**
The Registrar of Companies, Companies House, Fourth floor, Edinburgh Quay 2, 139 Fountainbridge, Edinburgh, Scotland, EH3 9FF.
DX ED235 Edinburgh 1
or LP - 4 Edinburgh 2 (Legal Post).

**For companies registered in Northern Ireland:**
The Registrar of Companies, Companies House, First Floor, Waterfront Plaza, 8 Laganbank Road, Belfast, Northern Ireland, BT1 3BS.
DX 481 N.R. Belfast 1.

**Section 243 exemption**
If you are applying for, or have been granted a section 243 exemption, please post this whole form to the different postal address below:
The Registrar of Companies, PO Box 4082, Cardiff, CF14 3WE.

### ℹ Further information

For further information please see the guidance notes on the website at www.companieshouse.gov.uk or email enquiries@companieshouse.gov.uk

## This form is available in an alternative format. Please visit the forms page on the website at www.companieshouse.gov.uk

This form has been provided free of charge by Companies House.

CHFP000
10/09 Version 2.0

EXHIBIT "K"   284

# EXHIBIT L

In accordance with
Section 276 of the
Companies Act 2006.

# AP03

## Appointment of secretary



You can use the WebFiling service to file this form online.
Please go to www.companieshouse.gov.uk

| ✓ What this form is for | ✗ What this form is NOT for |
|---|---|
| You may use this form to appoint an individual as a secretary. | You cannot use this form if you are appointing a corporate secretary. To do this, please use form AP04 'Appointment of corporate secretary'. |

TUESDAY



*ACEP3GZ7*

A81          26/01/2010          183
COMPANIES HOUSE

## 1  Company details

| Company number | 0 3 9 6 6 1 5 1 |
|---|---|
| Company name in full | Electronic Game Card (UK) Limited |

→ Filling in this form
Please complete in typescript or in bold black capitals.

All fields are mandatory unless specified or indicated by *

## 2  Date of secretary's appointment

| Date of appointment | 2 8  1 2  2 0 0 9 |
|---|---|

## 3  New secretary's details

| Title* | Mr. |
|---|---|
| Full forename(s) | Eugene M. |
| Surname | Christiansen |
| Former name(s) ● | |

❶ Former name(s)
Please provide any previous names which have been used for business purposes in the past 20 years.

Married women do not need to give former names unless previously used for business purposes.

Continue in section 6 if required.

## 4  New secretary's service address ●

Please complete your service address below.

| Building name/number | |
|---|---|
| Street | 250 West 57th Street |
| | Suite 432 |
| Post town | New York |
| County/Region | New York |
| Postcode | 1 0 1 0 7 |
| Country | United States |

❷ Secretary's service address
This is the address that will appear on the public record. This does not have to be your usual residential address.

Please state 'The Company's Registered Office' if your service address is recorded in the company's register of secretaries as the company's registered office.

If you provide your residential address here it will appear on the public record.

**BIS** | Department for Business
Innovation & Skills

CHFP000
10/09 Version 2.0

EXHIBIT "L"   285

## AP03
### Appointment of secretary

| 5 | Signatures |
|---|---|

I consent to act as secretary of the above named company.

**New secretary's signature**

Signature
X _Eugene M. Christiansen_ X

**Authorising signature**

Signature
X _Kevin Donovan_ X

Kevin Donovan

This form may be signed and authorised by:
Director ❶, Secretary, Person authorised ❷, Administrator, Administrative Receiver, Receiver, Receiver manager, Charity commission receiver and manager, CIC manager, Judicial factor.

❶ **Societas Europaea**
If the form is being filed on behalf of a Societas Europaea (SE) please delete 'director' and insert details of which organ of the SE the person signing has membership.

❷ **Person authorised**
Under either section 270 or 274 of the Companies Act 2006.

| 6 | Additional former names (continued from Section 3) |
|---|---|

**Former names** ❶

❶ **Additional former names**
Use this space to enter any additional names.

CHFP000
10/09 Version 2.0

EXHIBIT "L"   286

## AP03
### Appointment of secretary

### 👤 Presenter information

You do not have to give any contact information, but if you do it will help Companies House if there is a query on the form. The contact information you give will be visible to searchers of the public record.

| | |
|---|---|
| Contact name | John O'Connell |
| Company name | Jeffrey Green Russell |
| Address | Waverley House |
| | 7-12 Noel Street |
| Post town | London |
| County/Region | |
| Postcode | W 1 F   8 G Q |
| Country | |
| DX | 44627 Mayfair |
| Telephone | 020 7339 7014 |

### ✓ Checklist

We may return forms completed incorrectly or with information missing.

Please make sure you have remembered the following:
- ☐ The company name and number match the information held on the public Register.
- ☐ You have completed the date of appointment.
- ☐ You have provided the service address.
- ☐ The address must be a physical location. It cannot be a PO Box number (unless part of a full address), DX or LP (Legal Post in Scotland) number.
- ☐ You have included all former names used for business purposes over the last 20 years.
- ☐ The new secretary has signed the form.
- ☐ You have provided an authorising signature.

### ❗ Important information

Please note that all information on this form will appear on the public record.

### ✉ Where to send

You may return this form to any Companies House address, however for expediency we advise you to return it to the appropriate address below:

For companies registered in England and Wales:
The Registrar of Companies, Companies House,
Crown Way, Cardiff, Wales, CF14 3UZ.
DX 33050 Cardiff.

For companies registered in Scotland:
The Registrar of Companies, Companies House,
Fourth floor, Edinburgh Quay 2,
139 Fountainbridge, Edinburgh, Scotland, EH3 9FF.
DX ED235 Edinburgh 1
or LP - 4 Edinburgh 2 (Legal Post).

For companies registered in Northern Ireland:
The Registrar of Companies, Companies House,
First Floor, Waterfront Plaza, 8 Laganbank Road,
Belfast, Northern Ireland, BT1 3BS.
DX 481 N.R. Belfast 1.

### ℹ Further information

For further information, please see the guidance notes on the website at www.companieshouse.gov.uk or email enquiries@companieshouse.gov.uk

This form is available in an alternative format. Please visit the forms page on the website at www.companieshouse.gov.uk

This form has been provided free of charge by Companies House.

CHFP000
10/09 Version 2.0

EXHIBIT "L"   287

# EXHIBIT M

In accordance with
Section 167 of the
Companies Act 2006.

# TM01

## Termination of appointment of director



You can use the WebFiling service to file this form online.
Please go to www.companieshouse.gov.uk

| ✓ What this form is for | ✗ What this form is NOT for |
|---|---|
| You may use this form to terminate the appointment of a director (individual or corporate). | You cannot use this form to terminate the appointment of a secretary. To do this, please use form TM02 'Termination of appointment of secretary'. |

TUESDAY



A81            26/01/2010              184
**"ACEP2GZ6"**
COMPANIES HOUSE

| **1** | **Company details** | |
|---|---|---|
| Company number | 0 3 9 6 6 1 5 1 | ➜ **Filling in this form** Please complete in typescript or in bold black capitals. |
| Company name in full | Electronic Game Card (UK) Limited | All fields are mandatory unless specified or indicated by * |

| **2** | **Director's current details on the Register** | |
|---|---|---|
| | Please give us the current appointment details of this director held on the public Register. | ❶ **Date of birth** Providing a date of birth will help us identify the correct person on the public record. This is voluntary information and if completed it will be placed on the public record. |
| Date of birth* ❶ | 1 0  0 6  2 0 0 2 | |
| Title* | Mr | |
| Full forename(s) | Linden James Hastings | |
| Surname/Corporate name | Boyne | |

| **3** | **Termination date** ❷ | |
|---|---|---|
| Date of termination of appointment | 2 8  1 2  2 0 0 9 | ❷ Only one director appointment can be terminated per form. |

| **4** | **Signature** | |
|---|---|---|
| | I am signing this form on behalf of the company. | ❸ **Societas Europaea** If the form is being filed on behalf of a Societas Europaea (SE) please delete 'director' and insert details of which organ of the SE the person signing has membership. |
| Signature | Signature X [signature] X  Kevin Donovan | |
| | This form may be signed by: Director ❸, Secretary, Person authorised ❹, Liquidator, Administrator, Administrative receiver, Receiver, Receiver manager, Charity Commission receiver and manager, CIC manager, Judicial factor. | ❹ **Person authorised** Under either section 270 or 274 of the Companies Act 2006. |

BIS | Department for Business Innovation & Skills

CHFP000
10/09 Version 2.0

EXHIBIT "M"   288

# TM01
Termination of appointment of director

## 👤 Presenter information

You do not have to give any contact information, but if you do it will help Companies House if there is a query on the form. The contact information you give will be visible to searchers of the public record.

**Contact name**  John O'Connell

**Company name**  Jeffrey Green Russell

**Address**  Waverley House

7-12 Noel Street

**Post town**  London

**County/Region**

**Postcode**  | W | 1 | F | | 8 | G | Q |

**Country**

**DX**  44627 Mayfair

**Telephone**  020 7339 7014

## ✓ Checklist

We may return forms completed incorrectly or with information missing.

Please make sure you have remembered the following:
- ☐ The company name and number match the information held on the public Register.
- ☐ You have correctly entered the name of the director being terminated.
- ☐ You have included the date of termination.
- ☐ You have signed the form.

## ❗ Important information

Please note that all information on this form will appear on the public record.

## ✉ Where to send

You may return this form to any Companies House address, however for expediency we advise you to return it to the appropriate address below:

For companies registered in England and Wales:
The Registrar of Companies, Companies House,
Crown Way, Cardiff, Wales, CF14 3UZ.
DX 33050 Cardiff.

For companies registered in Scotland:
The Registrar of Companies, Companies House,
Fourth floor, Edinburgh Quay 2,
139 Fountainbridge, Edinburgh, Scotland, EH3 9FF.
DX ED235 Edinburgh 1
or LP - 4 Edinburgh 2 (Legal Post).

For companies registered in Northern Ireland:
The Registrar of Companies, Companies House,
First Floor, Waterfront Plaza, 8 Laganbank Road,
Belfast, Northern Ireland, BT1 3BS.
DX 481 N.R. Belfast 1.

## ℹ Further information

For further information, please see the guidance notes on the website at www.companieshouse.gov.uk or email enquiries@companieshouse.gov.uk

This form is available in an alternative format. Please visit the forms page on the website at www.companieshouse.gov.uk

This form has been provided free of charge by Companies House.

CHFP000
10/09 Version 2.0

EXHIBIT "M"   289

# EXHIBIT N

In accordance with Section 276 of the Companies Act 2006.

# TM02
## Termination of appointment of secretary



You can use the WebFiling service to file this form online.
Please go to www.companieshouse.gov.uk

✓ **What this form is for**
You may use this form to terminate the appointment of a secretary (individual or corporate).

✗ **What this form is NOT for**
You cannot use this form if you are terminating the appointment of a director. To do this, please use form TM01 'Termination of appointment of director'.



TUESDAY

A81    26/01/2010    185
COMPANIES HOUSE

*ACEP1GZ5*

| **1** | **Company details** | |
|---|---|---|
| Company number | 0 3 9 6 6 1 5 1 | → Filling in this form<br>Please complete in typescript or in bold black capitals.<br><br>All fields are mandatory unless specified or indicated by * |
| Company name in full | Electronic Game Card (UK) Limited | |

| **2** | **Secretary's current details on the Register** |
|---|---|
| | Please give us the current appointment details of this secretary held on the public Register. |
| Title* | |
| Full forename(s) | |
| Surname/Corporate name | Greenfield Capital International Limited |

| **3** | **Termination date ❶** | |
|---|---|---|
| Date of termination of appointment | 2 8   1 2   2 0 0 9 | ❶ Only one secretary appointment can be terminated per form. |

| **4** | **Signature** | |
|---|---|---|
| | I am signing this form on behalf of the company. | ❷ **Societas Europaea**<br>If the form is being filed on behalf of a Societas Europaea (SE) please delete 'director' and insert details of which organ of the SE the person signing has membership.<br><br>❸ **Person authorised**<br>Under either section 270 or 274 of the Companies Act 2006. |
| Signature | Signature<br>X _____ Kevin Donovan | ✗ |
| | This form may be signed by:<br>Director ❷, Secretary, Person authorised ❸, Liquidator, Administrator, Administrative receiver, Receiver, Receiver manager, Charity Commission receiver and manager, CIC manager, Judicial factor. | |

BIS | Department for Business Innovation & Skills

CHFP000
10/09 Version 2.0

EXHIBIT "N"   290

# TM02

Termination of appointment of secretary

## 👤 Presenter information

You do not have to give any contact information, but if you do it will help Companies House if there is a query on the form. The contact information you give will be visible to searchers of the public record.

Contact name   John O'Connell

Company name   Jeffrey Green Russell

Address   Waverley House
7-12 Noel Street

Post town   London

County/Region

Postcode   W 1 F   8 G Q

Country

DX   44627 Mayfair

Telephone   020 7339 7014

## ✓ Checklist

We may return forms completed incorrectly or with information missing.

Please make sure you have remembered the following:
☐ The company name and number match the information held on the public Register.
☐ You have correctly entered the name of the secretary being terminated.
☐ You have included the date of termination.
☐ You have signed the form.

## ❗ Important information

Please note that all information on this form will appear on the public record.

## ✉ Where to send

You may return this form to any Companies House address, however for expediency we advise you to return it to the appropriate address below:

For companies registered in England and Wales:
The Registrar of Companies, Companies House, Crown Way, Cardiff, Wales, CF14 3UZ.
DX 33050 Cardiff.

For companies registered in Scotland:
The Registrar of Companies, Companies House, Fourth floor, Edinburgh Quay 2, 139 Fountainbridge, Edinburgh, Scotland, EH3 9FF.
DX ED235 Edinburgh 1
or LP - 4 Edinburgh 2 (Legal Post).

For companies registered in Northern Ireland:
The Registrar of Companies, Companies House, First Floor, Waterfront Plaza, 8 Laganbank Road, Belfast, Northern Ireland, BT1 3BS.
DX 481 N.R. Belfast 1.

## ℹ Further information

For further information, please see the guidance notes on the website at www.companieshouse.gov.uk or email enquiries@companieshouse.gov.uk

This form is available in an alternative format. Please visit the forms page on the website at www.companieshouse.gov.uk

This form has been provided free of charge by Companies House.

CHFP000
10/09 Version 2.0

EXHIBIT "N"   291

# EXHIBIT O

8-K 1 electronicgame_051810-8k.htm ELECTRONIC GAME CARD, INC. 05/18/10 8-K

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, DC 20549

**FORM 8-K**

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(d) OF THE**
**SECURITIES EXCHANGE ACT OF 1934**

Date of Report (Date of earliest event reported): May 18, 2010

# Electronic Game Card, Inc.

(Exact name of registrant as specified in charter)

| Nevada | 000-25843 | 87-0570975 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**5405 Alton Parkway, Suite A-353, Irvine, CA 92604**

(Address of principal executive offices)

Registrant's telephone number, including area code: **866-924-2924**

**Not Applicable**

(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

1

EXHIBIT "O"   292

## SECTION 4 - MATTERS RELATED TO ACCOUNTANTS AND FINANCIAL STATEMENTS

**Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

On May 18, 2010, the Board of Directors Electronic Game Card, Inc. ("EGCI") concluded that its financial statements for the years ended December 31, 2006, 2007 and 2008 should no longer be relied upon because preliminary findings of its previously announced forensic review of the circumstances that gave rise to EGCI's independent auditors' withdrawal of its audit opinions for those years have raised significant concerns as to the integrity of audited financial statements for the fiscal years ended December 31, 2006, 2007 and 2008. EGCI is concerned that reported revenue may be materially overstated and that the reported carrying value of its assets and investments in third-party companies may not be fairly stated.

In addition, EGCI has been unable to confirm the existence or value of a purported investment account in the name of Electronic Game Card (UK) Limited ("EGCL") with R.I.C. Asset Management Limited ("R.I.C."). While the former CFO of EGCI has stated that the R.I.C. investment account exists and had a balance of $12.9 million as of February 26, 2010, he asserts that EGCI does not own the funds in the R.I.C. account because EGCI no longer owns EGCL. This assertion is based on a document described as a 2002 agreement entered into among EGCI, EGCL and the original (unidentified) sellers of EGCL to EGCI. The current EGCI Board of Directors and management were unaware of this document, which was signed by the former CFO on behalf of EGCL, until after questions had arisen concerning the company's audited financial statements.

With respect to EGCI's Series A Convertible Preferred Stock, it appears that a certificate of designation establishing the terms of the Series A Convertible Preferred Stock was not filed with the Secretary of State of Nevada, where EGCI is incorporated. This fact, among others, calls into question, among other things, the validity of the preferred stock and the accuracy of disclosures relating to capitalization and similar matters in EGCI's historical financial statements, periodic reports and proxy statements filed with the Securities and Exchange Commission.

EGCI's Board of Directors have discussed the matters described in this Item 4.02 with the Company's current independent auditing firm.

## SECTION 8 - OTHER EVENTS

**Item 8.01 Other Events.**

On May 18, 2010, EGCI issued a press release, which is attached hereto as Exhibit 99.

## SECTION 9 - FINANCIAL STATEMENTS AND EXHIBITS.

**Item 9.01 Financial Statements and Exhibits.**

(d)   Exhibits.

The following exhibits are filed with this report.

99.1 - Press Release

## SIGNATURES

In accordance with the requirements of the Exchange Act, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Electronic Game Card, Inc.

By:/s/ Kevin Donovan

Title:  Chief Executive Officer

May 18, 2010

2

**Exhibit Index**

| Exhibit Number | Exhibit Title or Description |
| --- | --- |
| 99.1 | Press Release |

3

# EXHIBIT P

REGISTERED NUMBER    03966151 (England and Wales)

AMENDED REPORT OF THE DIRECTORS AND

FINANCIAL STATEMENTS FOR THE YEAR ENDED 31 DECEMBER 2008

FOR

ELECTRONIC GAME CARD (UK) LIMITED

FRIDAY

*AJM7WQZ7*

A20          21/01/2011          250
COMPANIES HOUSE

**ELECTRONIC GAME CARD (UK) LIMITED**

**CONTENTS OF THE FINANCIAL STATEMENTS
FOR THE YEAR ENDED 31 DECEMBER 2008**

|  | Page |
|---|---|
| Company Information | 1 |
| Report of the Directors | 2 |
| Report of the Independent Auditors | 4 |
| Profit and Loss Account | 6 |
| Balance Sheet | 7 |
| Cash Flow Statement | 8 |
| Notes to the Cash Flow Statement | 9 |
| Notes to the Financial Statements | 11 |

EXHIGIT "P"   297

**ELECTRONIC GAME CARD (UK) LIMITED**

**COMPANY INFORMATION**
**FOR THE YEAR ENDED 31 DECEMBER 2008**

| | |
|---|---|
| **DIRECTORS** | L J H Boyne |
| | G McNally |
| **SECRETARY:** | Greenfield Capital International Limited |
| **REGISTERED OFFICE** | Norfolk House LG Floor |
| | 31 St James Square |
| | LONDON |
| | SW1Y 4JR |
| **REGISTERED NUMBER** | 03966151 (England and Wales) |
| **AUDITORS·** | Hadleys & Co |
| | Chartered Accountants & |
| | Registered Auditors |
| | 5 Malvern House |
| | 199 Marsh Wall |
| | London |
| | E14 9YT |

EXHIGIT "P"   298

### ELECTRONIC GAME CARD (UK) LIMITED

### REPORT OF THE DIRECTORS
### FOR THE YEAR ENDED 31 DECEMBER 2008

The directors present their report with the financial statements of the company for the year ended 31 December 2008

**PRINCIPAL ACTIVITY**
The principal activity of the company in the year under review was that of manufacturing of electronic process equipment and calculators

**REVIEW OF BUSINESS**
Following a period of development and testing the company commenced selling its game card product Initial reaction from customers has been favourable Further product development and range extension will continue in 2009

**DIVIDENDS**
No dividends will be distributed for the year ended 31 December 2008

**DIRECTORS**
L J H Boyne has held office during the whole of the period from 1 January 2008 to the date of this report

**STATEMENT OF DIRECTORS' RESPONSIBILITIES**
The directors are responsible for preparing the financial statements in accordance with applicable law and regulations

Company law requires the directors to prepare financial statements for each financial year   Under that law the directors have elected to prepare the financial statements in accordance with United Kingdom Generally Accepted Accounting Practice (United Kingdom Accounting Standards and applicable law) The financial statements are required by law to give a true and fair view of the state of affairs of the company and of the profit or loss of the company for that period   In preparing these financial statements, the directors are required to

-   select suitable accounting policies and then apply them consistently,
-   make judgements and estimates that are reasonable and prudent,
-   prepare the financial statements on the going concern basis unless it is inappropriate to presume that the company will continue in business
The directors are responsible for keeping proper accounting records which disclose with reasonable accuracy at any time the financial position of the company and to enable them to ensure that the financial statements comply with the Companies Act 1985 They are also responsible for safeguarding the assets of the company and hence for taking reasonable steps for the prevention and detection of fraud and other irregularities

**STATEMENT AS TO DISCLOSURE OF INFORMATION TO AUDITORS**
So far as the directors are aware there is no relevant audit information (as defined by Section 234ZA of the Companies Act 1985) of which the company's auditors are unaware, and each director has taken all the steps that he ought to have taken as a director in order to make himself aware of any relevant audit information and to establish that the company's auditors are aware of that information

EXHIGIT "P"   299

**ELECTRONIC GAME CARD (UK) LIMITED**

**REPORT OF THE DIRECTORS**
**FOR THE YEAR ENDED 31 DECEMBER 2008**

**AUDITORS**
The auditors,   Hadleys & Co , will be proposed for re-appointment at the forthcoming Annual General Meeting

**ON BEHALF OF THE BOARD:**

L J H Boyne   Director

Date   20ᵗʰ December 2010

Page 3

EXHIGIT "P"   300

## REPORT OF THE INDEPENDENT AUDITORS TO THE SHAREHOLDERS OF
## ELECTRONIC GAME CARD (UK) LIMITED

We have audited the financial statements of Electronic Game Card (UK) Limited for the year ended 31 December 2008 on pages six to fourteen  These financial statements have been prepared under the accounting policies set out therein

This report is made solely to the company's members, as a body, in accordance with Section 235 of the Companies Act 1985  Our audit work has been undertaken so that we might state to the company's members those matters we are required to state to them in a Report of the Auditors and for no other purpose  To the fullest extent permitted by law, we do not accept or assume responsibility to anyone other than the company and the company's members as a body, for our audit work, for this report, or for the opinions we have formed

### Respective responsibilities of directors and auditors
The directors' responsibilities for preparing the financial statements in accordance with applicable law and United Kingdom Accounting Standards (United Kingdom Generally Accepted Accounting Practice) are set out on page two

Our responsibility is to audit the financial statements in accordance with relevant legal and regulatory requirements and International Standards on Auditing (UK and Ireland)

We report to you our opinion as to whether the financial statements give a true and fair view and are properly prepared in accordance with the Companies Act 1985  We also report to you whether in our opinion the information given in the Report of the Directors is consistent with the financial statements

In addition we report to you if, in our opinion, the company has not kept proper accounting records, if we have not received all the information and explanations we require for our audit  or if information specified by law regarding directors' remuneration and other transactions is not disclosed

We read the Report of the Directors and consider the implications for our report if we become aware of any apparent misstatements within it

### Basis of audit opinion
We conducted our audit in accordance with International Standards on Auditing (UK and Ireland) issued by the Auditing Practices Board  An audit includes examination, on a test basis, of evidence relevant to the amounts and disclosures in the financial statements  It also includes an assessment of the significant estimates and judgements made by the directors in the preparation of the financial statements  and of whether the accounting policies are appropriate to the company's circumstances, consistently applied and adequately disclosed

We planned and performed our audit so as to obtain all the information and explanations which we considered necessary in order to provide us with sufficient evidence to give reasonable assurance that the financial statements are free from material misstatement, whether caused by fraud or other irregularity or error  In forming our opinion we also evaluated the overall adequacy of the presentation of information in the financial statements

EXHIGIT "P"   301

**REPORT OF THE INDEPENDENT AUDITORS TO THE SHAREHOLDERS OF ELECTRONIC GAME CARD (UK) LIMITED**

**Qualified opinion from limitation in audit scope**

Except for the financial effects of such adjustment, if any, as might have been determined to be necessary had we been able to satisfy ourselves as to the parent company loan, in our opinion the financial statements

- give a true and fair view, in accordance with United Kingdom Generally Accepted Accounting Practice, of the state of the companies affairs as at 31 December 2008 and its profit for the year ended, and

- have been properly prepared in accordance with the Companies Act 1985  In respect solely of the limitation on our work relating to parent company loan

- we have not been able to obtain, for the purpose of our audit, any kind of confirmation from the Parent Company of the amount outstanding as at 31 December 2008

In our opinion the information given in the Report of the Directors is consistent with the financial statements

*Hadleys & Co*

Hadleys & Co
Chartered Accountants &
Registered Auditors
5 Malvern House
199 Marsh Wall
London
E14 9YT

Date   20 December 2010

Page 5

EXHIGIT "P"   302

**ELECTRONIC GAME CARD (UK) LIMITED**

**PROFIT AND LOSS ACCOUNT
FOR THE YEAR ENDED 31 DECEMBER 2008**

|  | Notes | 2008
£ | 2007
£ |
|---|---|---|---|
| **TURNOVER** | | 5,875,214 | 2,686,770 |
| Cost of sales | | (1,353,269) | (653,887) |
| **GROSS PROFIT** | | 4,521,945 | 2,032,883 |
| Administrative expenses | | (476,080) | (507,906) |
| **OPERATING PROFIT** | 3 | 4,045,865 | 1,524,977 |
| Interest receivable and similar income | | 162,900 | 90,780 |
| | | 4,208,765 | 1,615,757 |
| Interest payable and similar charges | 4 | (144) | (187) |
| **PROFIT ON ORDINARY ACTIVITIES
BEFORE TAXATION** | | 4,208,621 | 1,615,570 |
| Tax on profit on ordinary activities | 5 | (1,195,485) | (17,932) |
| **PROFIT FOR THE FINANCIAL YEAR
AFTER TAXATION** | | 3,013,136 | 1,597,638 |

**CONTINUING OPERATIONS**
None of the company's activities were acquired or discontinued during the current year or previous year

**TOTAL RECOGNISED GAINS AND LOSSES**
The company has no recognised gains or losses other than the profits for the current year or previous year

The notes form part of these financial statements

Page 6

EXHIGIT "P"   303

## ELECTRONIC GAME CARD (UK) LIMITED

### BALANCE SHEET
### 31 DECEMBER 2008

| | Notes | 2008 £ | 2007 £ |
|---|---|---|---|
| **FIXED ASSETS** | | | |
| Tangible assets | 6 | 6,858 | 9,144 |
| | | | |
| **CURRENT ASSETS** | | | |
| Debtors | 7 | 1,776,579 | 915,858 |
| Cash at bank | | 6,119,755 | 1,714,934 |
| | | 7,896,334 | 2,630,792 |
| **CREDITORS** | | | |
| Amounts falling due within one year | 8 | (2,086,135) | (437,116) |
| **NET CURRENT ASSETS** | | 5,810,199 | 2,193,676 |
| **TOTAL ASSETS LESS CURRENT LIABILITIES** | | 5,817,057 | 2,202,820 |
| **CREDITORS** | | | |
| Amounts falling due after more than one year | 9 | (3,372,043) | (2,770,942) |
| **NET ASSETS/(LIABILITIES)** | | 2,445,014 | (568,122) |
| | | | |
| **CAPITAL AND RESERVES** | | | |
| Called up share capital | 11 | 99 | 99 |
| Profit and loss account | 12 | 2,444,915 | (568,221) |
| **SHAREHOLDERS' FUNDS** | 16 | 2,445,014 | (568,122) |

The financial statements were approved by the Board of Directors on *20ᵗʰ December 2010* and were signed on its behalf by

Director

The notes form part of these financial statements

Page 7

EXHIGIT "P"   304

## ELECTRONIC GAME CARD (UK) LIMITED

### CASH FLOW STATEMENT
### FOR THE YEAR ENDED 31 DECEMBER 2008

|  | Notes | 2008 £ | 2007 £ |
|---|---|---|---|
| Net cash inflow from operating activities | 1 | 3,667,342 | 865,377 |
| Returns on investments and servicing of finance | 2 | 162,756 | 90,593 |
| Taxation |  | (17,932) | - |
| Capital expenditure | 2 | - | (1,305) |
|  |  | 3,812,166 | 954,665 |
| Financing | 2 | 601,101 | (837,932) |
| Increase in cash in the period |  | 4,413,267 | 116,733 |
|  |  |  |  |
| Reconciliation of net cash flow to movement in net debt | 3 |  |  |
| Increase in cash in the period |  | 4,413,267 | 116,733 |
| Cash (inflow)/outflow from (increase)/decrease in debt |  | (601,101) | 837,932 |
| Change in net debt resulting from cash flows |  | 3,812,166 | 954,665 |
| Movement in net debt in the period | | 3,812,166 | 954,665 |
| Net debt at 1 January |  | (1,076,089) | (2,030,754) |
| Net funds/(debt) at 31 December |  | 2,736,077 | (1,076,089) |

The notes form part of these financial statements

Page 8

EXHIGIT "P"   305

ELECTRONIC GAME CARD (UK) LIMITED

NOTES TO THE CASH FLOW STATEMENT
FOR THE YEAR ENDED 31 DECEMBER 2008

1  RECONCILIATION OF OPERATING PROFIT TO NET CASH INFLOW FROM OPERATING ACTIVITIES

|  | 2008 £ | 2007 £ |
|---|---|---|
| Operating profit | 4,045,865 | 1,524,977 |
| Depreciation charges | 2,286 | 2,830 |
| Increase in debtors | (860,721) | (899,851) |
| Increase in creditors | 479,912 | 237,421 |
| Net cash inflow from operating activities | 3,667,342 | 865,377 |

2  ANALYSIS OF CASH FLOWS FOR HEADINGS NETTED IN THE CASH FLOW STATEMENT

|  | 2008 £ | 2007 £ |
|---|---|---|
| **Returns on investments and servicing of finance** | | |
| Interest received | 162,900 | 90,780 |
| Interest paid | (144) | (187) |
| Net cash inflow for returns on investments and servicing of finance | 162,756 | 90,593 |
| **Capital expenditure** | | |
| Purchase of tangible fixed assets | - | (1,305) |
| Net cash outflow for capital expenditure | - | (1,305) |
| **Financing** | | |
| New loans in year | 601,101 | - |
| Loan repayments in year | - | (837,932) |
| Net cash inflow/(outflow) from financing | 601,101 | (837,932) |

The notes form part of these financial statements

Page 9

EXHIGIT "P"   306

**ELECTRONIC GAME CARD (UK) LIMITED**

**NOTES TO THE CASH FLOW STATEMENT**
**FOR THE YEAR ENDED 31 DECEMBER 2008**

3    ANALYSIS OF CHANGES IN NET DEBT

|  | At 1 1 08 £ | Cash flow £ | At 31 12 08 £ |
|---|---|---|---|
| Net cash |  |  |  |
| Cash at bank | 1,714,934 | 4,404,821 | 6,119,755 |
| Bank overdraft | (20,081) | 8,446 | (11,635) |
|  | 1,694,853 | 4,413,267 | 6 108,120 |
| Debt |  |  |  |
| Debts falling due after one year | (2,770,942) | (601,101) | (3,372,043) |
|  | (2,770,942) | (601,101) | (3,372,043) |
| Total | (1,076,089) | 3,812,166 | 2,736,077 |

The notes form part of these financial statements

Page 10

EXHIGIT "P"   307

**ELECTRONIC GAME CARD (UK) LIMITED**

**NOTES TO THE FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 31 DECEMBER 2008**

1   **ACCOUNTING POLICIES**

**Accounting convention**
The financial statements have been prepared under the historical cost convention

**Turnover**
Turnover represents net invoiced sales of goods, excluding value added tax

**Tangible fixed assets**
Depreciation is provided at the following annual rates in order to write off each asset over its estimated useful life

Computer equipment          - 25% on reducing balance

2   **STAFF COSTS**

|  | 2008 £ | 2007 £ |
|---|---|---|
| Wages and salaries | 160 500 | 161,758 |
| Social security costs | 18,475 | 18,110 |
|  | 178,975 | 179,868 |

The average monthly number of employees during the year was as follows

|  | 2008 | 2007 |
|---|---|---|
| Administration | 1 | 1 |
| Marketing | 2 | 2 |
|  | 3 | 3 |

3   **OPERATING PROFIT**

The operating profit is stated after charging

|  | 2008 £ | 2007 £ |
|---|---|---|
| Depreciation - owned assets | 2,286 | 2,830 |
| Auditors' remuneration | 4,000 | 4,000 |
| Auditors' remuneration for non audit work | 2,350 | 2,350 |
| Foreign exchange differences | 2,724 | - |
| Directors' emoluments | - | - |

EXHIGIT "P"   308

ELECTRONIC GAME CARD (UK) LIMITED

NOTES TO THE FINANCIAL STATEMENTS – continued
FOR THE YEAR ENDED 31 DECEMBER 2008

4    INTEREST PAYABLE AND SIMILAR CHARGES

|  | 2008 £ | 2007 £ |
|---|---|---|
| Bank interest | 144 | 187 |

5    TAXATION

**Analysis of the tax charge**
The tax charge on the profit on ordinary activities for the year was as follows

|  | 2008 £ | 2007 £ |
|---|---|---|
| Current tax | | |
| UK corporation tax | 1,195,485 | 17,932 |
| Tax on profit on ordinary activities | 1,195,485 | 17,932 |

6    TANGIBLE FIXED ASSETS

| | Computer equipment £ |
|---|---|
| **COST** | |
| At 1 January 2008 | |
| and 31 December 2008 | 25,753 |
| **DEPRECIATION** | |
| At 1 January 2008 | 16,609 |
| Charge for year | 2,286 |
| At 31 December 2008 | 18,895 |
| **NET BOOK VALUE** | |
| At 31 December 2008 | 6,858 |
| At 31 December 2007 | 9,144 |

7    DEBTORS· AMOUNTS FALLING DUE WITHIN ONE YEAR

|  | 2008 £ | 2007 £ |
|---|---|---|
| Trade debtors | 1,759.648 | 893,593 |
| Other debtors | 13,685 | 12,300 |
| VAT | 3.246 | 1,132 |
| Prepayments | - | 8,833 |
|  | 1,776.579 | 915,858 |

Page 12                                                    continued

EXHIGIT "P"   309

ELECTRONIC GAME CARD (UK) LIMITED

NOTES TO THE FINANCIAL STATEMENTS - continued
FOR THE YEAR ENDED 31 DECEMBER 2008

**8    CREDITORS. AMOUNTS FALLING DUE WITHIN ONE YEAR**

|  | 2008 £ | 2007 £ |
|---|---|---|
| Bank loans and overdrafts (see note 10) | 11,635 | 20,081 |
| Trade creditors | 683,621 | 260,880 |
| Tax | 1,195,485 | 17,932 |
| Social security and other taxes | 89,262 | 119,373 |
| Accrued expenses | 106,132 | 18,850 |
|  | 2,086,135 | 437,116 |

**9    CREDITORS  AMOUNTS FALLING DUE AFTER MORE THAN ONE YEAR**

|  | 2008 £ | 2007 £ |
|---|---|---|
| Loans (see note 10) | 3,372,043 | 2,770,942 |

**10   LOANS**

An analysis of the maturity of loans is given below

|  | 2008 £ | 2007 £ |
|---|---|---|
| Amounts falling due within one year or on demand | | |
| Bank overdrafts | 11,635 | 20,081 |
| Amounts falling due between one and two years | | |
| Parent Company loan | 3,372,043 | 2,770,942 |

**11   CALLED UP SHARE CAPITAL**

Authorised

| Number | Class | Nominal value | 2008 £ | 2007 £ |
|---|---|---|---|---|
| 1,000 | Ordinary | £1 | 1,000 | 1,000 |

Allotted  issued and fully paid

| Number | Class | Nominal value | 2008 £ | 2007 £ |
|---|---|---|---|---|
| 99 | Ordinary | £1 | 99 | 99 |

continued

EXHIGIT "P"   310

## ELECTRONIC GAME CARD (UK) LIMITED

### NOTES TO THE FINANCIAL STATEMENTS - continued
### FOR THE YEAR ENDED 31 DECEMBER 2008

12 **RESERVES**

| | Profit and loss account £ |
|---|---|
| At 1 January 2008 | (568,221) |
| Profit for the year | 3,013,136 |
| At 31 December 2008 | 2,444,915 |

13 **ULTIMATE PARENT COMPANY**

As at 31 December 2008 the directors consider the parent company to be Electronic Game Card Inc, registered in the State of Nevada in the United States of America. Electronic Game Card Inc own 100% of share capital in Electronic Game Card Limited

14 **RELATED PARTY DISCLOSURES**

The company has taken exemptions under FRS8 from disclosing transactions with entities that are part of the Electronic Game Card Inc group, as the directors believe that the consolidated financial statements of that group are publicly available

During the year, a director of the company, Mr G McNally has received £45,833 as consultancy fees

15 **ULTIMATE CONTROLLING PARTY**

As at 31 December 2008, the directors consider the ultimate controlling party to be Electronic Game Card Inc

16 **RECONCILIATION OF MOVEMENTS IN SHAREHOLDERS' FUNDS**

| | 2008 £ | 2007 £ |
|---|---|---|
| Profit for the financial year | 3,013,136 | 1,597,638 |
| **Net addition to shareholders' funds** | 3,013,136 | 1,597,638 |
| Opening shareholders' funds | (568,122) | (2,165,760) |
| **Closing shareholders' funds** | 2,445,014 | (568,122) |

Page 14

EXHIGIT "P"   311