**ORIGINAL**

1  Laurence M. Rosen, Esq. (SBN 219683)
   THE ROSEN LAW FIRM, P.A.
2  355 South Grand Street, Suite 2450
   Los Angeles, CA 90071
3  Telephone: (213) 785-2610
   Facsimile: (213) 226-4684
4  Email: lrosen@rosenlegal.com

5  -and-

6  Phillip Kim, Esq. (pro hac vice)
   THE ROSEN LAW FIRM, P.A.
7  275 Madison Avenue, 34th Floor
   New York, New York 10016
8  Telephone: (212) 686-1060
   Facsimile: (212) 202-3827
9  Email: pkim@rosenlegal.com

10 Lead Counsel for Plaintiffs and Class

11

FILED

2011 NOV 21  PM 3: 55

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA
BY

BY FAX

12          **UNITED STATES DISTRICT COURT**
           **CENTRAL DISTRICT OF CALIFORNIA**
13              **SOUTHERN DIVISION**

14

| | |
|---|---|
| DALTON PETRIE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | Case No.: SACV-10-00252-DOC(RNBx) |
| Plaintiff, | CLASS ACTION |
| vs. | CONSOLIDATED THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| ELECTRONIC GAME CARD, INC.; LEE J. COLE; LINDEN BOYNE; KEVIN DONOVAN, PAUL FARRELL, EUGENE CHRISTIANSEN, ANNA HOUSSELS, AND THE ESTATE OF LORD LEONARD STEINBERG AND, LYNNE ROCHELLE ATTIAS, AND JONATHAN STEINBERG AS EXECUTORS OF THE ESTATE OF LORD LEONARD STEINBERG, | **JURY TRIAL DEMANDED**  Hon. David O. Carter |
| Defendants. | |

1

Lead Plaintiffs Dr. Thomas Lee, his wife Margaret Yu, and Scott Lovell (collectively the "Plaintiffs" or the "Lee Group"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege in this Consolidated Third Amended Complaint (the "Complaint") the following upon knowledge with respect to their own acts, and upon information and belief based on facts obtained through an investigation conducted by their counsel.

## I.    NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of a class consisting of all persons and entities, other than defendants, who purchased the common stock of Electronic Game Card, Inc. ("EGC") between April 5, 2007 and May 18, 2010 inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of federal securities laws (the "Class").

2.    During the Class Period, EGC had no more than ten employees. EGC purports to design and manufacture electronic "scratch off" devices for various casinos, lotteries and other gaming establishments primarily in the United Kingdom and Europe.  During the Class Period, nearly all of the Company's reported revenues and income were derived from its wholly-owned UK and European operating subsidiary, Electronic Game Card, Ltd. ("EGCL").

3.    During the Class Period, defendants engaged in a fraud to conceal and misstate the Company's true financial condition and performance.

4.    EGC falsely reported incrementally increasing cash balances, starting at approximately $3.0 million at the beginning of the Class Period up to $12.7 million by the third quarter ended September 30, 2009—painitng a picture of a financially successful and fast growing company.  In truth, EGC did not possess any of the millions of dollars it claimed were in its bank accounts.

5.    In connection with EGC's fiscal year ended December 31, 2009 audit, questions concerning the legitimacy of the Company's financial statements and cash balances began to bubble to the surface; and ultimately boiled over causing

EGC to file a Chapter 7 bankruptcy petition, and causing investors to lose their entire investment.

6.      On February 19, 2010, the SEC halted trading in the Company's stock "because of questions that have been raised about the accuracy of assertions by [EGC], and by others, in financial disclosures to investors concerning, among other things, the company's assets."

7.      That same day EGC announced that its auditor Mendoza and Berger and Company, LLP ("M&B") had withdrawn its audit opinions of EGC's financial statements for the fiscal years ended December 31, 2006, 2007, and 2008 because the auditor had "become aware of irregularities in the audit confirmation of a bank account represented to M&B as having been held by [EGCL], a wholly owned subsidiary of [EGC]...".

8.      According to M&B internal documents for its audits of EGC:

a.      In and around January and February 2010, M&B discovered that defendant Boyne had signed falsified audit confirmations for cash balances for years 2006 through 2008, fraudulently representing that EGCL/EGC had a multi-million dollar bank account with Credit Suisse in Gibraltar.[1]

b.      According to Credit Suisse, the account referenced in Boyne's false confirmations, was not an account in the name of EGC or EGCL. Credit Suisse confirmed that EGC had an account with it (a different account and different account number), but EGC's account *never* had any funds.

---

[1]  Auditors use audit confirmations to confirm financial statement items such as cash balances as part of the audit process. In normal circumstances, a signatory of a company's bank account would complete the confirmation form, i.e. fill in the bank address and details, account information and balance, and sign the form. Then the company or an auditor would send the audit confirmation to the client's bank to confirm the company's cash balances. The bank officer would then confirm the account balance is correct and send the confirmation of the account directly to the auditor.

c.     When Credit Suisse learned that Boyne had issued false bank audit confirmations and false bank statements on Credit Suisse stationary with forged Credit Suisse employee signatures, Credit Suisse notified the Royal Gibraltar Police, who then commenced a criminal investigation of Boyne and the false bank statements.[2]

d.     M&B asked Boyne for an explanation of the false audit confirmations on or about February of 2010.   Boyne provided the flimsy excuse that the multi-million dollar bank account that he had for three years told the auditors was an account in the name of EGCL/EGC held at Credit Suisse, was actually a multi-million dollar investment account EGCL held with an entity called SBI Bioventures ("SBI") and/or its parent NAB Ventures Ltd. ("NAB"), until late 2009, when RIC Asset Management Limited ("RIC") acquired NAB and SBI.

e.     Boyne' flimsy cover-up excuse demonstrates his guilty state of mind.

f.     Each of the fraudulent EGC/EGCL audit confirmations (2006-2008) signed by Boyne is addressed to the "Audit Confirmation Unit" of Credit Suisse (Gibraltar) in Malaga, Spain.   There is no such Credit Suisse office in Malaga Spain at that address.

g.     The Malaga, Spain address Boyne used for Credit Suisse for the fraudulent audit confirmations is really an address for SBI and NAB.  Boyne knew that there was no Credit Suisse office at the address of SBI and NAB, because Boyne controls and serves as an officer of SBI and controls both NAB.

---

[2]  Because EGCL subsequently closed its account at Credit Suisse the Royal Gibraltar Police ultimately terminated their investigation without filing any charges.

4

h.     The three fraudulent audit confirmations for years 2006-2008 have a forged Credit Suisse fax line and the signature of a Credit Suisse manager confirming funds held by EGCL in account #207103-50 is forged.

i.     M&B's workpapers also show that Boyne gave to M&B a forged Credit Suisse bank statement showing $8,818,606.17 in deposits as of December 31, 2008.

j.     In January 2010, Defendant Donovan asked Diana Ali (Senior Relationship Manager) and Tyrone Vinet (Assistant Vice President) of Credit Suisse whether EGC or EGCL held any account at Credit Suisse. They stated that EGCL held one account #208163 opened on December 5, 2005 and closed on January 13, 2010, "during which time no assets were ever received." They also confirmed that no other account or sub account in the name of EGC or EGCL is or was held with Credit Suisse. They further confirmed that account #207103 (the same account for which Boyne had given M&B a forged Credit Suisse bank statement in the name of ECGL showing $8.8 million on deposit) was never a Credit Suisse account or sub account in the name of EGC or EGCL.

k.     Ms. Ali and Mr. Vinet very soon thereafter sent letter to Mr. Donovan stating that as a result of the forged Credit Suisse Bank documents, Credit Suisse has officially reported the matter to the Royal Gibraltar Police – Financial Crime Unit.

l.     Counsel for plaintiffs contacted Detective Constable Nolan Romero of the Royal Gibraltar Police who verified that Credit Suisse had requested they open a criminal investigation concerning the forged bank documents, though the investigation did not result in criminal charges being filed and was eventually terminated because the subject financial accounts at Credit Suisse were closed.

9.     UK company filings show EGCL had less than £768 of cash on its balance sheet as of December 31, 2008 and reported negative net assets.   The forged 2008 audit confirmation signed by Boyne is for EGCL, and lists over $8.8 million in cash held at Credit Suisse.

10.     Even if one were to believe Boyne's cover-up excuse he manufactured after he was caught and the police were notified of his fraud, the purported bank account transactions that Boyne claims were made with SBI and NAB would still render EGC's financial statements false and misleading and violate Generally Accepted Accounting Principles ("GAAP") and SEC rules.

11.     SBI and NAB are entities that are managed, owned and controlled by Boyne.  EGC never disclosed these material related party transactions in which EGC/EGCL placed its multi-million dollar funds into accounts held by SBI and NAB which are entities owned, controlled, or managed by Boyne.  Under GAAP and SEC rules, these related party transactions were material and EGC was required to disclose them in their periodic reports filed with the SEC.  Because EGC failed to do so, the Company's financial statements filed with the SEC during the Class Period are materially false and misleading for failing to disclose material related party transactions.

12.     When a corporate officer, Boyne, secretly places nearly $9 million of the corporation's funds into the accounts of companies that he controls, manages or owns, such conduct may properly be considered embezzlement, in addition to being an undisclosed related party transaction.  Yet throughout the Class Period, pursuant to the Sarbanes-Oxley Act of 2002, Boyne regularly certified that he had disclosed any fraud at EGC of which he was aware.  Boyne was surely aware that he was embezzling corporate funds.  Of course, the most likely inference from these facts is that Boyne never placed any of EGC/EGCL's money with SBI or NAB.  The money never existed. The purported accounts held with SBI and NAB never existed. Boyne simply cooked the books at EGC and EGCL.

6

13.     On May 18, 2010 the Company announced its Board of Directors had concluded that its financial statements for the years ended December 31, 2006, 2007 and 2008 should no longer be relied upon because of "significant concerns as to the integrity of audited financial statements for the fiscal years ended December 31, 2006, 2007 and 2008."

14.     The May 18, 2010 announcement stated that "[EGC] is concerned that reported revenue may be materially overstated and that the reported carrying value of its assets and investments in third-party companies may not be fairly stated."

15.     The May 18, 2010 announcement revealed another assertion (excuse) by Boyne concerning the inability to confirm whether EGC had the cash it represented in its financial statements.  Boyne asserted that EGC's funds, namely $12.9 million, were held in the name of EGCL in an investment account held with RIC.  However, Boyne claimed that EGC no longer owned EGCL.

16.     The following day, in a May 19, 2010 announcement EGC confirmed that the Company's financial statements for the fiscal years ended 2006, 2007 and 2008 should no longer be relied upon and had to be restated.

17.     As a result, EGC's stock was delisted from the NASDAQ Bulletin Board; a SEC investigation was initiated and is ongoing; several former high level executives of the Company have resigned asserting, among other things, that certain members of EGC's management have lied to, and concealed information from, investors, the SEC and the Company's auditor M&B.

18.     Ultimately Boyne's fraud caused EGC, on September 28, 2010, to file a Chapter 7 Voluntary Petition with the U.S. Bankruptcy Court for the District of Nevada, case no. 10-28366-lbr, listing $0.00 in accounts receivable and $0.00 in assets.

19.     The adverse news that EGC's financial statements were false and misleading, along with EGC's subsequent bankruptcy filing, has caused investors to lose their entire investment in EGC.

7

## II.   JURISDICTION AND VENUE

20.   The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

21.   This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

22.   Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District.

23.   In connection with the acts, conduct and other wrongs alleged herein, defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III.   PARTIES

24.   Lead plaintiffs Dr. Thomas Lee, his wife Margaret Yu, and Scott Lovell purchased EGC common stock during the Class period and have suffered damages as a result.   Their PSLRA certifications were previously filed with the Court, and are incorporated herein by reference.

25.   Defendant EGC is a Nevada corporation listing its principal executive offices as 5405 Alton Parkway, Suite A-353 Irvine, CA 92604.  This Irvine address is actually a mail drop located at a UPS Store in the Alton Square Shopping Center.  During the Class Period, the Company's common stock was traded on the NASDAQ Bulletin Board under ticker "EGMI."

26.   Because of EGC's failure to restate its previously reported financial statements and to stay current on its current financial reporting obligations, EGC's stock was delisted and now trades over-the-counter on the "Pink Sheets."

8

27.   Defendant Linden Boyne ("Boyne") served as the Company's Chief Financial Officer, Principal Accounting Officer, and Secretary from at least the beginning of the Class Period, and was a Company Director since 2003, until his resignation from each of those positions on August 31, 2009. He was reappointed CFO and Company's secretary effective October 30, 2009 (but not Director) when his replacement Thomas Schiff resigned effective October 30, 2009. Boyne resigned from these remaining two positions on March 1, 2010. While an EGC Director, Boyne also served on the Company's Audit Committee.

28.   Defendant Lee J. Cole ("Cole") was a Company Director from 2003 until his resignation effective March 8, 2010. Cole served as the Company's CEO from the beginning of the Class Period until he was replaced by Defendant Kevin Donovan on February 1, 2009. During his time with the Company Cole served on the Company's Audit and Compensation committees.

29.   Defendant Kevin Donovan ("Donovan") served as the Company's Chief Executive Officer and Director from February 1, 2009 through the end of the Class Period. Following the death of Company Chairman Lord Leonard Steinberg on November 2, 2009, Donovan was appointed as a member of the Company's two-person Interim Office of the Chairman of the Company, a position he held with defendant Eugene Christiansen.

30.   Sterling FCS Limited ("Sterling"), which later changed its name to Greenfield Capital International Limited ("Greenfield") on about December 9, 2008, is an entity controlled by Boyne. In 2007, Sterling had the same registered address as EGCL. In 2008, Sterling's registered address was the same as SBI Bioventures. Although Boyne changed Sterling's name to Greenfield in 2008, he continued use the Sterling name along with the Greenfield name.

31.   Boyne and Greenfield served as a director of EGCL until his and Greenfield's termination as directors of EGCL on December 28, 2009. On December 28, 2009, Defendants Donovan and Christiansen were installed as

9

directors of EGCL in place of Boyne and Greenfield.  On February 4, 2010, Boyne and Greenfield were reappointed as the directors of EGCL and Donovan and Christiansen were terminated.

32.     Defendant the Estate of Lord Leonard Steinberg ("Steinberg Estate") is a United Kingdom entity.  Lord Steinberg officially served as the Company's Executive Chairman from September 2, 2008 until his passing on November 2, 2009.  On June 6, 2008, the Company initially announced that Steinberg had agreed to join the Company and nominated defendant Anna Houssels and Eugene Christiansen to EGC's Board.

33.     During his tenure at EGC, Lord Steinberg also served as the Chairman of the Company's Audit, Executive Compensation, and Nominations committees.  Lord Steinberg became involved with the Company in November 2007, when he along with others contacted defendant Cole and Boyne with a proposal to join the EGC Board, invest capital, and restructure the Company. Following months of negotiations, in May 2008, the Company accepted Lord Steinberg's proposal to join EGC as Executive Chairman, and to have certain of his business associates installed as directors and officers of the Company.

34.     According to the Company's SEC filings, by May 27, 2008 he had accumulated over 5.04% of the Company's common stock.  Prior to his death, as reported in a Company proxy statement filed with the SEC on August 27, 2009, Steinberg owned over 10.6 million shares or 16.05% of the Company.

35.     Upon information and belief, Lynne Rochelle Attias and Jonathan Steinberg are the Representatives, Trustees, and/or Executors of Steinberg's estate. Therefore, they in that capacity and Steinberg's estate are named herein as defendants. Hereinafter "Steinberg" collectively refers to Lord Leonard Steinberg, the Steinberg Estate, and Lynne Rochelle Attias, and Jonathan Steinberg as Representatives, Trustees, and/or Executors of Steinberg's estate.

36.     Defendant Eugene Christiansen ("Christiansen") served as a Company Director from September 2008 through the end of the Class Period. On November 3, 2009, following the death of the Company's Chairman, Lord Leonard Steinberg, Christiansen was appointed as a member of to the Interim Office of the Chairman. Christiansen also served on the Company's Nominations Committee. Prior to his appointment, the Company announced on June 6, 2008, that Christiansen had been nominated to EGC's Board in June 2008.

37.     Defendant Anna Houssels, ("Houssels") served as a Company Director beginning on September 2008. Houssels officially joined the Company's executive management team as Executive Vice President of Sales on February 1, 2009. Houssels also served on the Company's Executive Compensation and Nominations committees. Houssels resigned on February 21, 2010.

38.     Defendant Paul Farrell ("Farrell") served as a Company Director from October 2, 2008 until his resignation on October 28, 2009. During his tenure, he served on the Company's Audit Committee.

39.     While a Director at EGC, Farrell was a member of the executive committee that oversaw the firm-wide investment strategy and operations of Pequot Capital Management, Inc. ("Pequot"), one of EGC's largest shareholders. Farrell was also the managing director, co-portfolio manager and chief operating officer of the Scout Fund Group of Pequot.   According to EGC's Schedule 13G/A filed with the SEC on February 13, 2009, as of December 31, 2008, three months after Farrell joined EGC, Pequot was EGC's controlling stock holder with a 16.1% ownership interest, owning 9.5 million shares.[3]

---

[3]As of March 5, 2009, in the middle of Farrell's tenure at EGC, Pequot sold off 4.8 million shares of EGC stock. It was thereby left with an 8.24% ownership interest. As of June 30, 2009, due to investigations of Pequot's for insider trading, Pequot sold off its 8.24% interest in EGC stock, and ceased all operations. Pequot and its CEO, Arthur Samberg, ultimately agreed to pay nearly $28 million to settle SEC charges of insider trading in Microsoft securities. As of August 2009, Manatuck Hill Partners ("Manatuck") was the second largest EGC shareholder, owning 12.48% of EGC's stock, in the amount of 8.3 million shares. Manatuck owned its EGC stock

11

## A. The Audit Committee Members and Duties

40.     Farrell, Steinberg, Cole, and Boyne comprised EGC's Audit Committee.

41.     According to EGC's Schedule 14C filed with the SEC on August 27, 2009:

- "The Company's Audit Committee reviews, approves, or ratifies any related party transaction of a character or magnitude that would be required to be reported pursuant to applicable rules and regulations and of which it has been made aware"; and

- "The Audit Committee reviews the Company's financial reporting process on behalf of the Board… The Audit Committee … review[s] and discusse[s] the audited financial statements with management. In addition, the Audit Committee … discusse[s] with the independent auditors the matters required to be discussed…. The Audit Committee meets with the independent auditors, with and without management present, to discuss the results of their examinations, the evaluation of the Company's internal controls and the overall quality of the Company's reporting."

## B. Board of Directors of EGC During the Class Period

42.     From August 2008 through August 2009, there were eight EGC directors: Boyne, Cole, Steinberg, Farrell, Houssels, Christiansen, Donovan, and Schiff.

43.     From September 2009 through October 28, 2009, there were only seven directors because Boyne resigned at the end of August 2009.

through the same Scout Fund that had been previously owned by Pequot – before Pequot ceased business. Manatuck's Scout Fund consisted of the same team that ran Pequot's Scout Fund, except that Farrell was no longer officially the Scout Fund's manager. According to EGC's Schedule 13G/A filed with the SEC on February 11, 2010, as of June 30, 2009, by December 31, 2009, Manatuck's Scout Fund, of which Farrell was without a doubt the manager only a few months prior (until June 30, 2009), sold off almost half of its EGC stock, left with only 5.3 million shares—7.16% ownership of EGC.

12

44.     Between October 28 and November 2, 2009, Farrell and Schiff resigned and Steinberg died. From November 3, 2009 through February 21, 2010, there were only four EGC directors remaining: Houssels, Donovan, Christiansen, and Cole.

45.     A letter from Greenfield, signed by Defendant Boyne, to Lead Counsel for Plaintiffs, dated January 6, 2011, states: "board control passed to Donovan and Christiansen in November 2009."

46.     Boyne, Cole, Donovan, Steinberg, Houssels, Christiansen, and Farrell, are collectively referred to hereinafter as the "Individual Defendants."

47.     Each of the Individual Defendants:

  a.     directly participated in the management of the Company;

  b.     was directly involved in the day-to-day operations of the Company at the highest levels;

  c.     was privy to confidential proprietary information concerning the Company and its business and operations;

  d.     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

  e.     was directly or indirectly involved in the oversight or implementation of the Company and Bank's internal controls;

  f.     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and

  g.     approved or ratified these statements in violation of the federal securities laws.

48.     EGC is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

13

49.   The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to EGC under *respondeat superior* and agency principles.

## C. Confidential Witness

50.   Confidential Witness No. 1 ("CW1") is a former paid advisor and consultant to EGC and its Board. CW1 was engaged by EGC in June 2006 as an advisor to the Company's Board as an expert in the U.S. gaming industry and a technology specialist. CW1's role as a consultant and advisor ceased in July 2009 when EGC stopped paying CW1 as required under a 3 year contract CW1 had entered into with EGC. According to CW1:

a.   CW1 was hired by the Company in connection with the Company's efforts to expand and explore business opportunities in the United States, as nearly all of its revenues were derived from the Company's European and U.K. operations conducted by EGCL and EGC wished to expand its business in the US. During his tenure at EGC, EGC's U.S. operations were generating little to no sales. CW1 was informed by Board members that most if not all of EGC's sales were made through EGCL.

b.   In his role as advisor to the Company, CW1 met Steinberg at the Four Seasons Hotel in New York City in the summer of 2007. During this meeting, Steinberg indicated his interest in managing and investing in a Company such as EGC. CW1 was privy to and involved in negotiations from late 2007 through 2008 between EGC and Steinberg concerning Steinberg investing in, and taking over control of the Company. During these negotiations, Steinberg agreed that CW1 would either be appointed CEO and/or COO of the Company, after Steinberg joined the Company. Ultimately, CW1 was not appointed CEO and/or COO, after he had disagreed with Steinberg's choice of certain individuals to join the management team in late 2008 and early 2009. After Steinberg officially

joined the Company, in January 2009, CW1's engagement with EGC was renewed.

    c.     During CW1's tenure at EGC he met with defendants Steinberg, Houssels, Christiansen and Cole on many occasions. These meetings concerned several facets of EGC's business and operations, including but not limited to, (a) the formation and development of the Company's U.S. operations; (b) the hiring of personnel; (c) business and opportunities for the Company; and (d) potential strategic partnerships for the Company.

    d.     Some of these meetings were held in New York in the June 2007 through November 2007 period and in London in the November 2007 through April 2008 time period. CW1 also attended meetings with the Individual Defendants in Las Vegas in December 2007 and February of 2008. Thereafter, beginning in February of 2009, CW1 continued to have discussions with the Individual Defendants through various modes of communications, including telephone and email.

    e.     Defendant Steinberg wielded "great power" and control over the Company due to Steinberg's wealth and status. Steinberg was a Member of the British House of Lords and former head of one of the leading betting companies in the U.K. which was the largest bookmaker and casino owner in the UK at one time. He also held a large percentage of EGC's stock and thereby handpicked its Board of directors and management team.

    f.     During mid 2008, when Steinberg agreed to join the Company as Executive Chairman, he hand-picked his friends and associates as officers and directors of the Company.

    g.     Steinberg selected defendants Farrell, Christiansen, Donovan and Houssels to serve as directors and officers of EGC and agreed to have Cole continue as a Director of the Company.

15

h. Defendant Steinberg interviewed and selected defendant Donovan to serve as EGC's CEO in December 2008. Houssels and Christiansen were prior business and social friends of Steinberg.

i. Houssels, a former actress (under the names Anna de Cardi, and Jane Leno) and ballerina, was Steinberg's real estate agent and sold him two condos at the MGM City Center Development in Las Vegas. Houssels had no gaming or technology experience. After her tenure in the movie industry, she became a real estate agent and worked for a series of organizations including MGM where she met Steinberg who was a high roller and a VIP client for the Bellagio Hotel and Casino. Steinberg was a frequent visitor to Las Vegas and met with Houssels on a routine basis during his trips. Initially the headquarters of the Company was slated to be in Las Vegas as it is the capital of the global gaming industry and Nevada is where EGC is registered. Houssels had decided to live in Orange County, CA, and through her encouragement, in 2009 EGC's U.S. "offices" were moved to an Irvine, CA mail drop, while Houssels and Donovan operated from their Orange County residences.

j. Houssels, as the Company's Executive Vice President and head of operations/sales was compensated with an annual salary of $375,000 and provided 1.5 million shares of Company stock. Yet defendant Donovan's compensation was $250,000 per year and he was the CEO of the Company. Christiansen was paid $150,000 per year. Steinberg authorized these payments and arrangements for Houssels, Christiansen and Donovan.

## IV. DEFENDANTS' MISCONDUCT

### A. Boyne Submitted Knowingly False Audit Confirmations to EGC's Auditor-- Mendoza Berger & Company LLP ("M&B")

51. During each fiscal year audit, auditors are required to confirm cash balances of a Company. As part of the audit confirmation process, the auditor will

16

require the company to execute a form authorizing the financial institution where the Company has accounts to confirm the existence of funds in the particular account. The confirmation form authorizes the financial institution to release such information to the auditor. Typically the company or the auditor will send the requested audit confirmation to the financial institution. The financial institution will then confirm the existence of the account and amount on deposit and then send the signed audit confirmation directly back to the auditor.

52.     During the Class Period defendant Boyne submitted and signed knowingly false confirmations for an alleged U.S. dollar based deposit account that he fraudulently represented to M&B that EGCL/EGC maintained with Credit Suisse of Gibraltar. Boyne signed the following confirmations for a purported Credit Suisse account in the name of EGCL/EGC account number 207103-50. Boyne then forged the signature of a Credit Suisse employee confirming the existence of the account and the amount of funds on deposit and faxed the fraudulent audit confirmation to M&B:

> a.     At the fiscal year ended December 31, 2008, claiming a balance of $8,847,407.17;

> b.     At the fiscal year ended December 31, 2007, claiming a balance of $3,373,773; and

> c.     At the fiscal year ended December 31, 2006, claiming a balance of $2,706,107.

53.     Copies of all three fraudulent audit confirmations that Boyne sent to M&B under the pretense that they were actually being faxed directly from Credit Suisse are attached hereto as Exs. 1-3, and are incorporated herein.[4]

---

[4] Unless otherwise indicated herein, the documents attached to the Complaint as exhibits, were obtained from M&B pursuant to a subpoena issued by Plaintiffs' counsel dated June 23, 2011. Notice of the subpoena was provided to the parties on that date. The subpoena was served o June 24, 2011. Unless otherwise indicated, the notes and other markings of the documents are not of Plaintiffs or Plaintiffs' counsel; such notes and markings are present in the documents produced by M&B pursuant to the subpoena.

54.     The confirmations signed by Boyne were knowingly false for the following reasons.

a.     **Credit Suisse stated that EGCL had a different a account with them, and the account *never* had any funds in it:** In a letter dated January 29, 2010 addressed to Kevin Donovan, Credit Suisse employees Diana Ali and Tyrone Vinet[5] state that while EGC had an account # 208163 with Credit Suisse that "account was subsequently closed on the 13th January 2010. During the time that the account was opened we can confirm that *no assets were ever received.*" The letter also stated that "Please note that the account number 27103 [the account reflected in Boyne's fraudulent audit certifications and his false bank statement] "is not an account for Electronic Game Card Inc. or Electronic Game Card (UK) Limited." A copy of this January 29, 2010 letter is attached hereto as Ex. 4, and is incorporated by reference.   Another letter dated February 5, 2010, from the same Credit Suisse employees confirms the January 29, 2009 letter (Ex. 4) and indicates that other than the closed Credit Suisse account with zero balance, there is "no account or sub account" in the name of EGC or EGCL. The February 5, 2010 letter is attached hereto as Ex. 5, and is incorporated by reference.

b.     Stated simply, the Credit Suisse account #207103 that Boyne told M&B was in EGCL's name and held $8.8 million at December 31, 2008 was not an account or sub account of EGC or EGCL. EGC did have an account with Credit Suisse (#208163) but that account never had any funds in it.   One letter (Ex. 4) states that defendants Cole and Boyne were "mandated to operate the bank account" #208163 in EGC's name at Credit Suisse.

---

[5]  Ms. Ali is listed as Senior Relationship Manager and Mr. Vinet an Assistant Vice President at Credit Suisse in Gibraltar.

c.     **Credit Suisse Calls Gibraltar Police:** Following a series of phone calls and letters with Credit Suisse (Gibraltar) in January and early February, on February 5, 2010, Kevin Donovan emailed to Diana Ali and Tyrone Vinet at Credit Suisse a copy of the forged Credit Suisse bank statements for account #207103 that falsely represented that EGCL had an account with more than $8.8 million on deposit. Donovan inquired whether the forged Credit Suisse account statement for EGCL was accurate. Credit Suisse confirmed that such documents "have not been produced by Credit Suisse (Gibraltar) Ltd." Thus, in furtherance of this scheme, Boyne forged Credit Suisse bank account documents, such as the one he gave to M&B as part of the fiscal 2008 audit. (Attached as Ex. 6, and incorporated by reference.)[6] The letter also states that Credit Suisse had officially reported the forgeries to the Royal Gibraltar Police – Financial Crimes Unit for investigation. The letter is attached hereto as Ex. 7, and is incorporated herein.[7]

d.     In addition to the forged Credit Suisse bank account statement as Boyne created that falsely represented EGCL held an account #207103 with Credit Suisse (Gibraltar) for the 2008 audit (Ex. 6), Boyne provided to M&B a forged statement for the 2009 review and audit (Attached as Ex. 8 and incorporated by reference). Both fraudulent bank statements were relied on by M&B in the conduct of their 2008 and 2009 review and audits of EGC.[8]

e.     The forged December 31, 2008 statement represents that EGCL holds $8.8 million in the name of EGCL in account #207103. (Ex. 6).

---

[6] Exhibit 6, is M&B audit workpapers for the "Electronic Game Card 2008 Cash Audit Work."
[7] It appears the letter contains a typographical error. The letter is dated February 5, 2008. It is likely the correct date is February 5, 2010.
[8] M&B never completed the 2009 fiscal year audit because it discovered Boyne's fraud.

19

f.     The September 30, 2009 bank statement represents that EGCL holds $12.4 million in the name of EGCL in account #207103. (Ex. 8).

g.     As the three letters from Credit Suisse indisputably show (Exs. 4,5,7), EGCL never held an account #207103 at Credit Suisse, and the account that EGC held, #208163, NEVER held any funds at all. Therefore, Boyne knowingly forged Credit Suisse bank statements for false bank accounts in the name of EGCL to fraudulently represent to EGC's auditors that EGCL held millions of dollars in a bank account at Credit Suisse, when the account never held any funds at Credit Suisse.

h.     Additionally, the Malaga, Spain address listed on the each of the audit confirmations signed by Boyne, is not that of any Credit Suisse office, but rather that of NAB and/or SBI.

55.     A memorandum dated February 22, 2010 written by M&B audit partner James Berger to EGC's board of directors states that M&B has "confirmed that neither Electronic Game Card Incorporated nor Electronic Game Card Limited had the cash account at Credit Suisse that was confirmed by us during our audits of the 2006, 2007 and 2008 financial statements. An account had been opened by Electronic Game Card Limited and was subsequently closed in January, 2010, however it never contained any deposits during the entire time it had been open." A copy of the memorandum is attached hereto as Exhibit 9 and is incorporated by reference.

56.     When M&B discovered that EGC and EGCL did not hold any funds at Credit Suisse, M&B asked Boyne to explain why Boyne had provided bank statements. Boyne told M&B (falsely) that the millions of dollars were actually held in an account belonging to SBI or its parent, NAB. M&B partner Mr. Berger requested that Boyne and EGC provide necessary back-up documentation to prove the truth of these new facts concerning the location of the millions of dollars purportedly owned by EGC. M&B wanted the transaction history for the purported

20

accounts EGCL held with SBI and NAB, as well as organizational documents to determine whether SSBI and NAB were related parties (i.e. owned or controlled by Boyne).

57.     EGC and Boyne never provided M&B with all the necessary documentation to satisfy M&B that Boyne cover-up excuse was true, and as a result, M&B resigned as EGC's auditors.

### B. Even if Boyne's Cover-up Excuse is Credited, EGC Failed to Disclose Material Related Party Transactions, Rendering EGC's Financial Statements Filed With SEC Materially False and Misleading

58.     After he was caught by M&B; and the Gibraltar Police notified; Boyne stated that the funds were actually held in an investment account with SBI and/or its parent NAB.

59.     EGC was required in each financial statement it filed with the SEC to disclose that the purported millions of dollars it had (as set forth in Boyne's audit confirmations and later in EGC's SEC filings), were allegedly in an investment account with SBI and/or its parent NAB.

60.     SBI is a related party because it is an entity managed, owned and controlled by defendant Boyne. According to official filings made by SBI with the U.K. Companies House:[9]

    a.     SBI's annual return for May 18, 2007 lists Linden Boyne as SBI's secretary and Sterling, as SBI's lone director. Sterling is also listed as SBI's shareholder. Sterling is an entity controlled by Boyne.

    b.     Nearly identical disclosures were made in SBI's annual return dated May 7, 2008.

---

[9] The UK Companies House is an Executive Agency of the UK Government. All limited companies in England, Wales, Northern Ireland and Scotland are registered at the Companies. Registered companies are required to make periodic filings with the Companies House. Filings with the Companies House are publicly available.

21

c.      SBI's annual return dated May 7, 2009, lists Boyne as secretary and Greenfield as Director.  According to SBI's filing dated December 9, 2008, Sterling had changed its named to Greenfield.

61.    In addition, NAB is also a related party.  NAB is related to Boyne through his relationship with SBI.

a.      Additionally, NAB, which in December of 2009 changed its named to Innovation and Growth Limited, lists in a filing, dated November 14, 2011, made with the Gibraltar Companies House[10] a registered office of Suites 21&22 Victoria House, 26 Main Street, Gibraltar.  *See,* Ex. 10, and incorporated by reference.. This address is also listed as the address of NAB's two directors, Capital Services Limited and Capital Secretaries Limited.  Both entities were appointed NAB directors in August of 2004.  The third director is Vulkon Financial Corp. Limited ("Vulkon") listing a different address. *The Suites 21& 22 Victoria House address is the same the same address listed for Boyne's Greenfield entity as of July 31, 2009. See,* Ex. 11, and is incorporated by reference.

62.    Greenfield (then known as Sterling) was listed as Vulkon's secretary in Vulkon's filings with the UK Companies House between 2007 and 2008 (Vulkon was previously known as Bristol Int. Trading Ltd., until Boyne changed its name to Vulkon in December 2009).  After Boyne changed Sterling's name to Greenfield in 2009 (Ex. 12), Greenfield is variously listed as a Vulkon officer or director from 2009 to 2011.

63.    None of these material related party transactions were disclosed in the Company's financial statements filed with the SEC during the Class Period, rendering them materially false and misleading as the financial statements failed to comply with GAAP and SEC rules.

64.    The SEC requires that publicly traded companies such as EGC include financial statements that comply with GAAP in their annual reports filed with the

---

[10] The Gibraltar Companies House is analogous to UK Companies House for Gibraltar entities.

SEC. SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1)

65. GAAP, Statement of Financial Accounting Standards ("SFAS") and SEC regulations required the Company to disclose all material related party transactions.

66. SFAS No. 57 provides that a public company's "[f]inancial statements shall include disclosures of material related party transactions." SFAS No. 57 ¶ 2.

67. "Related party transactions" include those between "an enterprise and its principal owners, management, or members of their immediate families" and those between a company and its "affiliates." SFAS No. 57 ¶ 1. "Affiliate" includes any company that is under common control or management with the public company. SFAS No. 57 ¶ 24(a, b).

68. Disclosures of related party transactions shall include (a) the nature of the relationship involved, (b) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements, (c) the dollar amount of transactions for each of the periods for which income statements are presented, and (d) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. SFAS No. 57 ¶ 2.

69. SEC Regulation S-K ("Reg. S-K"),together with the General Rules and Regulations under the Securities Act of 1933 ("Securities Act") and the Exchange Act and the forms under these Acts, states the requirements applicable to the content of the non-financial statement portions of the annual reports on form 10-K, quarterly reports on form 10-Q and proxy statements on form 14A. (See Reg. S-K, §229.10).

70.    Reg. S-K at §229.404, Item 404, required, at all times during the Class Period, that the Company "[d]escribe any transaction, since the beginning of the registrant's last fiscal year, or any currently proposed transaction, in which the registrant was or is to be a participant and the amount involved exceeds $60,000 [for filings made before December 2006, and $120,000 for filings made thereafter], and in which any related person had or will have a direct or indirect material interest."

71.    Reg. S-K §229.303, Item 404 (b)(1)(6) also mandates disclosure of any other relationships that the registrant is aware of between the nominee or director and the registrant that are substantially similar in nature and scope to those relationships listed in paragraphs (b)(1) through (5).

72.    A "related person" is defined by Reg. S-K as including any director or executive officer of the Company, any nominee for director, or any immediate family member of a director or executive officer of the registrant, or of any nominee for director or any 5% or greater shareholder.

**C.    Boyne and Cole Submit False Management Representation Letters to M&B**

73.    Under PCAOB Rule AU 333, the Company's top officers are required to submit a Management Representation letter to the Company's auditor before the auditor will certify the Company's annual audit.   Management Representation letters are used to provide information to the auditors about matters that cannot be objectively tested because they depend on management's knowledge, such as management intentions and the completeness of information provided to the auditor.

a.    Defendants Cole and Boyne signed a Management Representation Letter to M&B dated March 20, 2009 for the fiscal years ended December 31, 2008 and 2007, that falsely stated:

10) The following, if material, have been properly recorded or disclosed in the financial statements:

    a) Related party transactions and related accounts receivable or payable, including sales, purchases, loans, transfers, leasing arrangements, and guarantees.

16) Investments classified under SFAS 115 have been properly reviewed for impairment and have been classified based upon management's intent and ability to hold the investments as available for sale securities and marketable securities.

74.    Similar representations were made by both Boyne and Cole in a Management Representation letter dated May 15, 2007 provided to M&B. The March 20, 2009 and May 15, 2007 Management Representation letters are attached hereto as Exs. 13-14, and are incorporated by reference.

75.    These Management Representation letters were knowingly false. Boyne and Cole initially told M&B that EGC/EGCL's funds were held at Credit Suisse. When caught, Boyne claimed the funds were really held with SBI or NAB. However because SBI and NAB are related parties as they are controlled by Boyne, Boyne was required to disclose to the auditor his control of SBI and NAB and that the investments made with SBI and NAB were related party transactions because Boyne and his entities (Sterling and Greenfield) served as Director, Officer, and owner of these SBI and NAB.

**D.    EGC's Periodic Reports Filed with the SEC Are Materially False and Misleading As They Improperly Consolidated the Financials of EGCL**

76.    On May 19, 2010 the Company filed with the SEC a Form 8-K stating that the Company's former CFO (*i.e.*, Boyne) was claiming that EGC no longer owned EGCL. Thus, any monies held in the name of EGCL no longer belonged to EGC. The announcement states in relevant part:

In addition, [EGC] has been unable to confirm the existence or value of a purported investment account in the name of Electronic Game Card (UK) Limited ("EGCL") with R.I.C. Asset Management Limited

25