("R.I.C."). While the former CFO of [EGC] has stated that the R.I.C. investment account exists and had a balance of $12.9 million as of February 26, 2010, he asserts that [EGC] does not own the funds in the R.I.C. account because [EGC] no longer owns EGCL. This assertion is based on a document described as a 2002 agreement entered into among [EGC], EGCL and the original (unidentified) sellers of EGCL to [EGC]. The current [EGC] Board of Directors and management were unaware of this document, which was signed by the former CFO on behalf of EGCL, until after questions had arisen concerning the company's audited financial statements.

77.     Boyne and Cole have each judicially admitted in their briefs previously filed with the Court that the 2002 agreement and subsequent amendments permitted the ownership of EGCL to revert to a third party, i.e., the original sellers of EGCL.  The agreements provided that the Company "would not make any changes to EGCL's articles of association or its board of directors, unless changes were authorized in writing by a majority of the then-existing board of EGCL." Docket no. 162 [Cole], pp . 3-4; Boyne, Docket no. 165-1 [Boyne], p. 4.

78.     According to Boyne and Cole, because of Donovan and Christiansen's decision to remove EGCL's board (and appoint themselves) without the required approval of EGCL, EGCL ownership reverted back to EGCL's original sellers, and thus, EGC no longer owned EGCL.  Docket no. 162, pp. 5-6; Docket no. 165-1, p. 5.

79.     These purported conditions, demonstrate that EGC's ownership of EGCL never resulted in the requisite level of control required for EGCL's financial results to be consolidated with the EGC's financial results under GAAP.

80.     SFAS 94 states:

A majority-owned subsidiary shall not be consolidated if control is likely to be temporary or if it does not rest with the majority owner (as, for instance, if the subsidiary is in legal reorganization or in bankruptcy or operates under foreign exchange restrictions, controls, or other governmentally imposed

CONSOLIDATED THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
No. SACV-10-00252-DOC(RNBx)

uncertainties so severe that they cast significant doubt on the parent's ability to control the subsidiary).

81.     According to the agreement, if EGC were to attempt to assert control over EGC by changing the composition of its board of directors, EGC would automatically lose its ownership of EGCL. That means EGC did not control EGCL.

82.     Consequently, under GAAP, the financial results and balance sheet of EGCL should not have been consolidated with the financial results of EGC because EGC did not have control of EGCL based solely on the ownership of EGCL equity; EGC could not make any changes to the EGCL's board or articles of association, without EGCL's approval.

83.     Therefore, the Company was required to separately set forth the financial results of EGCL and explain the circumstances and reasons why EGCL was not consolidated, i.e., disclose the purported 2002 agreement and amendments.

84.     Boyne and Cole knowingly concealed the 2002 agreement and its amendment from M&B because they knew that if M&B saw the agreement, M&B would not allow EGC to consolidate EGCL in its financial statements because EGC did not control EGCL.

85.     On August 29, 2011, in connection with his motion to dismiss, Boyne filed with the Court a declaration authenticating EGC board minutes dated February 1, 2006 signed by Boyne and Cole. (Docket #165-2, Ex. A)  The purpose of filing these purported board minutes was to prove to the Court that EGC's board was aware of the 2002 Agreement.

86.     Boyne also attached as Exhibit C to his declaration an Assumption of Acquisition Agreement dated February 1, 2006, purporting to amend and assign the 2002 Agreement.   Boyne cited to the Court the board minutes and the amendment to the 2002 Agreement as evidence that EGC's board was aware of the 2002 Agreement.

27

87.    Pursuant to subpoena, M&B provided to Plaintiffs all of EGC's board minutes for 2006, as well as all material contracts entered into by EGC and EGCL during 2006.

88.    Pursuant to a management representation letter dated, March 29, 2007, Boyne and Cole both represented that they had provided to M&B all minutes of EGC's board of directors for 2006 and also had provided to M&B all of EGC's material contracts for 2006. *See,* Ex. 15, and is incorporated by reference.

89.    Noticeably absent from the board minutes produced by M&B to Plaintiffs were the February 1, 2006 board minutes that defendant Boyne filed with the Court in which the amendment to the 2002 Agreement in the form of the Assumption Agreement is referenced.  In fact, board minutes for seven meetings were produced by M&B, including minutes for a January 27, 2006 meeting and a March 10, 2006 meeting – but no February 1, 2006 minutes exist in M&B's files.

90.    Also missing from M&B's files was the February 1, 2006 Assumption Agreement amending the 2002 Agreement – even though Boyne and Cole represented to M&B that they had provided to M&B all material contracts.

91.    The most likely inferences from these facts is that Boyne and Cole either (i) concealed the February 1, 2006 board minutes and the February 1, 2006 amendment to the 2002 Agreement from M&B during the audit process because Boyne and Cole knew M&B would not permit EGC to consolidate EGCL if M&B discovered the 2002 Agreement existed as it meant that EGC did not control EGCL; or (ii) Boyne and Cole fabricated the February 1, 2006 board minutes and the February 1, 2006 Assumption Agreement amending the 2002 Agreement as a further cover-up for their fraud.

### E. The False and Misleading Statements

#### 1. Fiscal Year Ended December 31, 2006

92.    The Class Period begins on April 5, 2007 when EGC filed with the SEC the Company's fiscal year ended December 31, 2006 results on Form 10KSB.

**False Bank Balances or Concealed Related Party Transaction**

93.     The 10KSB, signed by defendants Boyne and Cole, and the balance sheet included therein, is materially false and misleading because it falsely states that EGC ha had cash and cash equivalents of $3,052,733 at the end of the year. As set forth above, EGC and EGCL never held any cash in the account that M&B confirmed as holding the cash owned by EGC/EGCL.   Alternatively, even if Boyne's cover-up excuse is credited, the Company failed to disclose the material related party transaction involving the Company's purported $2,706,107 (Ex. 3) held with SBI or NAB, as set forth more fully in ¶¶58-72, above.   Rather the 10KSB falsely states in relevant part:

NOTE 6 - RELATED PARTY TRANSACTIONS

As at December 31, 2006 and 2005 the Company was owed $79,275 and $0 and at December 31, 2006 and 2005, the Company owed $0 and $106,944 and to related parties incurred in the ordinary course of business.

During the years ended December 31, 2006 and 2005 the Company incurred rent expense of $108,000 and $108,000 for rent for the New York office and $66,200 and $46,000 for the London office.

During the year ended December 31, 2006 and 2005, the Company has certain related party payables due on demand and are non-interest bearing. In previous years, the Company and its subsidiaries had borrowed from the same companies in excess of $1 million with little or no interest (see long-term notes payable, Note 5). As of December 31, 2006 and 2005, $79,275 and $0 was owed to the Company.

**False Cash Balance**

94.     The 10KSB falsely states that the Company had cash and cash equivalents of $3,052,733 at the end of the year.   This cash balance is materially false and misleading for the following reasons:

a.     **False Audit Confirms and False Bank Statements**:   As detailed above, Boyne forged audit confirmation and bank statements to

29

misrepresent that EGC/EGCL had a bank account with Credit Suisse with millions of dollars in it. In fact, Credit Suisse confirmed that EGC/EGCL's account never had any money in it.

b. **Audit Opinion Pulled:** On February 19, 2010 the Company filed an 8-K with the SEC entitled "Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Audit Report", announcing that on "February 12, 2009 [sic],"[11] M&B informed EGC's Board of Directors that M&B "had withdrawn its audit opinions for [EGC]'s financial statements for the years ended December 31, 2006, 2007, and 2008." The 8-K sets forth M&B's reasoning for withdrawing its audit opinions and confirms that Company's financial statements would have to be restated as follows:

**M&B advised [EGC] that it had become aware of irregularities in the audit confirmation of a bank account represented to M&B as having been held by Electronic Game Card (UK) Limited ("EGC Ltd")**, a wholly owned subsidiary of [EGC] that conducts its European operations. **Based upon M&B's investigation and inability to confirm the balances in the account, M&B concluded that its prior audits could no longer be relied upon and that it was withdrawing its audit opinions related to [EGC] financial statements for the years ended December 31, 2006, 2007 and 2008 as of February 12, 2010.**

\*      \*      \*

[EGC] intends to determine the adjustments necessary to reissue its prior financial statements, and file amended Annual Reports on Form 10-K for the years ended December 31, 2006, December 31, 2007 and December 31, 2008, and amended Quarterly Report on Form 10-Q for the periods ended March 31, 2009, June 30, 2009 and September 30, 2009 as soon as practicable.

c. **SEC Halts Trading:** On February 19, 2010, the SEC instituted a temporary trading halt of the Company's stock "because of questions that

---

[11] On February 22, 2010, the Company filed an amended 8-K, correcting the date to February 12, 2010.

have been raised about the accuracy of assertions by [EGC], and by others, in financial disclosures to investors concerning, among other things, the company's assets."

   d.   **Forensic review commenced:** On April 8, 2010, the Company issued a press release announcing that PricewaterhouseCoopers LLP, had "begun a forensic review of the circumstances that gave rise to EGC's independent auditors' withdrawal of its audit opinions...."

   e.   **EGC admits 2006-2008 financial statements are false and must be restated:** On May 19, 2010, the Company filed an 8-K with the SEC providing additional information about the Company's intended restatement of its financial statements.  The 8-K stated that EGC's Board "concluded that its financial statements for the years ended December 31, 2006, 2007 and 2008 should no longer be relied upon because preliminary findings of the previously announced forensic review ... have raised significant concerns as to the integrity of audited financial statements for the fiscal years ended December 31, 2006, 2007 and 2008."  The Company explained that it is concerned "that reported revenue may be materially overstated and that the reported carrying value of its assets and investment in third-party companies may not be fairly stated."

   f.   Because the Company's financial statements for the fiscal years ended December 31, 2006, 2007, and 2008 could no longer relied upon and had to be restated, the Company's financial statements and related information in its annual reports filed with the SEC were false when made.

   g.   Restatements are required for material accounting errors that existed at the time financial statements were prepared.  *See* SFAS 154.

   h.   An accounting "error" is a term of art and results from, among other things, an error in recognition, measurement, or mistakes in the application of GAAP.  SFAS 154.

31

**False Cash Balances Due to Improper Consolidation**

95.     The reported cash balances are independently false for another reason. The financial results and the assets, i.e. cash and investments, of EGCL should not have been consolidated with EGC's financial results and assets, i.e. cash and investments, because EGC did not control EGCL.  EGC did not have to power to change the EGCL's articles of association or Board.  *See* ¶¶ 76-83.

**False Sarbanes-Oxley Act of 2002 Certifications ("SOX")**

96.     Filed with the 10KSB were separately signed SOX certifications of defendants Boyne and Cole.  Boyne and Cole falsely attested that the 10SKB complied with the Exchange Act and that the "information contained in the [10KSB] fairly presents, in all material respects, the financial condition and results of operations of the Company."

97.     Boyne and Cole also certified that the they were each "responsible for establishing and maintaining disclosure controls and procedures (as defined in the Exchange Act...)..."; and the certifications falsely stated, in part, that the 10KSB (a) "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Annual Report," (b) "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash follows of the registrant as of, and for, the periods presented in this report," and  (c) each of them disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information," and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

32

98.     The SOX certifications are materially false and misleading because: (a) EGC failed to disclose the material related party transactions; (b) EGC had false cash balances; (c) the financial statements were improperly consolidated and (d) as a result, the Company's financial statements for the fiscal year 2006-2008 could not be relied upon and had to be restated as set forth more fully in ¶¶51-83.

### 2. False Quarterly Reports of 2007

99.     EGC issued the following interim quarterly reports for 2007:

a.     First quarter ended March 31, 2007 filed with the SEC on May 15, 2007, signed by defendants Cole and Boyne;

b.     Second quarter ended June 30, 2007 filed with the SEC on August 14 2007, signed by Cole and Boyne; and

c.     Third quarter ended September 30, 2007 filed with the SEC on November 14, 2007, signed by Cole and Boyne.

100.    The above quarterly reports are materially false and misleading for failing to disclose the material related party transactions for the same reasons the 2006 10KSB is—the quarterly reports, while disclosing some related party transactions, fail to disclose the purported multi-million dollar investment account with SBI and/or NAB.

101.    Moreover, the cash and cash equivalents balance at the end of each of the three quarters-- Q1: $2,833,280; Q2: $3,632,559; and Q3 $3,473,937 are materially false and misleading because the balances could not be confirmed, the financial results and balances should not have been consolidated, and/or the financial statements had to be restated.

102.    All three of the quarterly reports were accompanied by separately certified SOX certifications of both Boyne and Cole, that were in sum and substance the same as the SOX certifications accompanying the 2006 10KSB; and the quarterly SOX certifications are false for the same reasons the 2006 10KSB SOX certifications are false.

33

### 3. Fiscal Year Ended December 31, 2007

103.   On March 26, 2008, the Company filed with the SEC on Form 10KSB the Company's financial results for the fiscal year ended December 31, 2007.

104.   The 10KSB, signed by defendants Boyne and Cole, and the balance sheet included therein, is materially false and misleading because it falsely states that EGC had cash and cash equivalents of $4,753,040 at year end. As set forth above, EGC and EGCL never held any cash in the account that M&B confirmed as holding the $3,373,773 cash owned by EGC/EGCL. Alternatively, even if Boyne's cover-up excuse is credited, the Company failed to disclose the material related party transaction involving the Company's purported $3,373,773 (Ex. 2) held with SBI or NAB, as set forth more fully in ¶¶58-72, above.

105.   Accompanying the 10KSB were separately certified SOX certifications of both Boyne and Cole that were in sum and substance the same as the SOX certifications accompanying the 2006 10KSB, and are thus false for the same reasons.

### 4. Quarterly Reports for 2008

106.   EGC issued the following interim quarterly reports for 2008:

   a.   First quarter ended March 31, 2008 filed with the SEC on May 14, 2008, signed by defendants Cole and Boyne;

   b.   Second quarter ended June 30, 2008 filed with the SEC on August 8, 2008, signed by Cole and Boyne; and

   c.   Third quarter ended September 30, 2008 filed with the SEC November 17, 2008, signed by Cole and Boyne.

107.   The above quarterly reports are materially false and misleading for failing to disclose material related party transactions for the same reasons the 2007 10KSB is—the quarterly reports, while disclosing some related party transactions, fail to disclose the purported multi-million dollar investment account with SBI and/or NAB.

34

108. Moreover, the cash and cash equivalents balance at the end of each of the three quarters-- Q1: $5,706,906; Q2: $6,885,351; and Q3 $6,734,163 --- are materially false and misleading because the balances could not be confirmed, i.e. the bank confirmations were forged, the financial results and balances of EGCL should not have been consolidated with EGC, and/or the financial statements had to be restated. *See,* ¶¶51-83.

109. All three of the quarterly reports were accompanied by separately certified SOX certifications of both Boyne and Cole, that were in sum and substance the same as the SOX certifications accompanying the 2006 10KSB and are thus false for the same reasons.

110. Additionally, the reported cash balances and the SOX certifications are materially false and misleading because EGCL's financial statements for the year ended December 31, 2008, with the UK Companies House, signed and dated by Boyne, and filed with the Companies House on March 30, 2010, states that EGCL had only £763 in cash and EGCL had a negative asset value, as of December 31, 2008. A copy of the filing is attached hereto as Ex. 16 and is referenced herein.

### 5. Fiscal Year Ended December 31, 2008

111. On March 16, 2009, The Company issued a press release announcing its fourth quarter and fiscal year ended December 31, 2008 results. The press release touted that the "[d]uring the course of the last twelve months the company has delivered four profitable quarters and increased shareholder equity by $12 million, achieved cash balances net of all debt and convertible preferred of $3.5 million,..." In the balance sheet portion of the press release, the Company reported cash of $8,281,899 and cash equivalents at $867,186 and total current assets of $12,151,747. The press release also noted sequential and year-over-year growth of "cash and equivalents" of $1.3 and $4.4 million, respectively. The

35

Company also touted that its revenues for the full year 2008 increased over 76% to $10.6 million from $6 million in 2007.

112. In commenting on the results, defendant Donovan is quoted as stating: "2008 marked the Company's second successful profitable growth year. Our balance sheet is strong and our net cash balance is building consistently. Our company's technology platform is robust and has been prepared to quickly evolve into the next stage of the Company's growth. Electronic Game Card is securely positioned to achieve its earnings guidance of $0.14 per share for 2009,"

113. On March 16, 2009 during the EGC Earnings Conference Call for the quarter and fiscal year ending December 31, 2008, Donovan made materially false and misleading statements. Donovan stated: "Full year 2008 net income totaled $6.3 million.... Our balance sheet has strengthened materially during the year. Cash and equivalents on December 31, 2008 were $9.2 million and an increase of approximately $4.4 million from year end December 31, 2007, and an increase of over $1.3 million from the period ended September 30, 2008."

114. On March 24, 2009 the Company filed with the SEC its financial results for the fiscal year ended December 31, 2008 on Form 10-K, signed by Cole and Boyne, repeating the substantially same cash and equivalents line item and revenue as reported in the press release and repeated by Donovan during the conference call.

115. The 10-K, signed by defendants Boyne and Cole, and the balance sheet included therein, is materially false and misleading because it falsely states that EGC has cash balance of $8,281,889 at the year ended December 31, 2008.

116. As set forth above, EGC and EGCL never held any cash in the account that M&B confirmed because of the forged confirmations and account statements. *See* ¶¶51-57. Alternatively, even if Boyne's cover-up excuse is credited, the Company failed to disclose the material related party transaction involving the over $8 million in its 10-K. *See* ¶¶58-72. The statements relating to

36

the Company's cash and cash equivalents were materially false and misleading because the financial results and balances of EGCL should not have been consolidated with EGC, cash balances could not be confirmed, i.e. the confirmations and account statements were fabricated, and the financial statements had to be restated. *See* ¶¶ 51-83.

117. These statements are also independently false because, as set forth in Ex. 16, EGCL's financial statements filed with UK authorities only showed £763 cash at the year ended December 31, 2008 and negative assets.

118. Accompanying the 10-K were separately certified SOX certifications of both Boyne and Cole that were in sum and substance the same as the SOX certifications accompanying the 2006 10KSB, and are thus false for the same reasons.

119. Kevin Donovan, the Company' CEO at the time, however, did not sign a SOX certification, a violation of the SOX.

### 6. Quarterly Reports for 2009

120. On May 14, 2009 during the EGC Earnings Conference Call for the first quarter ending March 31, 2009, Donovan made materially false and misleading statements. Donovan stated: "For the first quarter of 2009 Electronic Game Card generated revenues of $3 million.... Electronic Game Card reported comprehensive net income of $1.7 million.... Your company and Board of Directors have been very highly disciplined in managing expenses and will continue to do so under my direction. Our balance sheet continues to strengthen. Cash and equivalents on March 31, 2009 were $9.7 million, an increase of approximately $4 million for first quarter 2008, and an increase of $1.4 million from December 31, 2008. At quarter end the Company's current assets totaled $12.8 million..."

121. Donovan's statements made in the May 14, 2009 Earnings Conference Call relating to the Company's cash and cash equivalents and related statements

concerning EGC's financial performance were materially false and because the financial results and balances of EGCL should not have been consolidated with EGC, cash balances could not be confirmed, i.e. the confirmations and account statements were fabricated, and the financial statements had to be restated. *See* ¶¶ 51-83.

122. The Company's quarterly reports for fiscal 2009 were materially false and misleading for similar reasons.

123. The quarterly reports are as follows:

a. First quarter ended March 31, 2009 filed with the SEC on May 15, 2009, signed by defendants Cole and Boyne;

b. Second quarter ended June 30, 2009 filed with the SEC on August 14, 2009, signed by Cole and Boyne; and

c. Third quarter ended September 30, 2009 filed with the SEC November 20, 2009, signed by Cole and Boyne.

124. The above quarterly reports are materially false and misleading for failing to disclose the material related party transactions for the same reasons the 2008 10K is—the quarterly reports, while disclosing some related party transactions, fail to disclose the purported multi-million dollar investment account with SBI and/or NAB.

125. Moreover, the cash and cash equivalents balance at the end of each of the three quarters-- Q1: $9,687,299 ; Q2: $ 11,352,973 ; and Q3 $ 12,696,691 are materially false and misleading because the balances could not be confirmed, i.e. the bank confirmations were forged, the financial results and balances of EGCL should not have been consolidated with EGC, and/or the financial statements had to be restated. *See,* ¶¶51-83.

126. All three of the quarterly reports were accompanied by separately certified SOX certifications of both Boyne and Cole, that were in sum and

38

substance the same as the SOX certifications accompanying the 2006 10KSB; and are thus false for the same reasons.

127.   Donovan as CEO violated SOX by not certifying any of the 2009 10-Qs.

128.   On August 6, 2009 during the EGC Earnings Conference Call for the second quarter ending June 30, 2009, Donovan made materially false and misleading statements. Donovan stated: "For the second quarter 2009 Electronic Game Card generated record revenues of $3.1 million.... Electronic Game Card reported record comprehensive net income of $2 million.... Our balance sheet continues to strengthen. Cash equivalents and marketable securities on June 30, 2009 totaled $11 million, an increase of approximately $1 million from first quarter 2009 and an increase of $2 million from December 31, 2008."

129.   In an August 6, 2009 press release announcing the Company's second quarter ended June 30, 2009 results, Defendant Donovan is quoted as saying:

> "During this second quarter Electronic Game Card achieved **record revenue** and net income as well as **continued improvement in the company's net cash balance.** We have made great strides this quarter to materially add to this solid financial base as we progress through the second half of this year and beyond,"

130.   The Press Release also stated: "The Company reported a comprehensive net income ... of $2.0 million... for the second quarter of 2009.... and a net income of $1.7 million.... Cash and equivalents on June 30, 2009 were $10.8 million...."

131.   On November 12, 2009 during the EGC Earnings Conference Call for the third quarter ending September 30, 2009, Donovan made materially false and misleading statements. Donovan stated: "During third quarter 2009, Electronic Game Card generated record revenues of $4.2 million.... We generated $2.9 million or $.04 per diluted share in comprehensive net income applicable to

CONSOLIDATED THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
No. SACV-10-00252-DOC(RNBx)

common stockholders, marking our 11th consecutive profitable quarter.... Cash and equivalents on September 30, 2009 totaled $12.7 million."

132.   Donovan's statements about cash and cash equivalents in the August 6 announcement and November 12th conference, were materially false and misleading because the balances could not be confirmed, i.e. the bank confirmations were forged, the financial results and balances of EGCL should not have been consolidated with EGC, and/or the financial statements had to be restated. *See,* ¶¶51-83.

## V.   LOSS CAUSATION / FALSE ASSURANCES

133.   On November 16, 2009, the Company filed with the SEC on Form 12b-25 a notification of late filing for the Company's third quarter ended September 30, 2009 10-Q.  The notification states in relevant part:

> The Registrant's annual report on Form 10-Q could not be filed within the prescribed time period due to the Registrant and its accountants requiring additional time to prepare and review the financial statements of the Registrant for the period ended September 30, 2009. Such delay could not be eliminated by the Company without unreasonable effort and expense. In accordance with Rule 12b-25 of the Securities Exchange Act of 1934, the Company will file its Form 10-Q no later than the fifth calendar day following the prescribed due date.

134.   This announcement caused the Company stock to fall $.15 per share, or 8%, to $1.70 per share through November 17, 2009.

135.   On February 10, 2010 the Company issued a press release announcing it was rescheduling a conference call with investors scheduled for that day to February 25, 2010.   The conference call was originally announced in the Company's February 1, 2010 press release to "Update Investors on Company Progress."

136.   The February 10, 2010 announcement caused the Company's stock to fall $.17 per share, or 15.8%, to $.901 per share on February 10, 2010.

137.   On February 12, 2010 it was announced after market close that Merriman Curhan Ford & Co. downgraded the Company's stock from a "Buy" recommendation to "Neutral."  The announcement caused the Company's stock to fall from $.91 to $.83 per share, or 8.8%.

138.   On February 19, 2010 trading in the Company's stock was temporarily suspended by the SEC "because of questions that have been raised about the accuracy of assertions by [EGC], and by others, in financial disclosures to investors concerning, among other things, the company's assets."  The SEC's release states in relevant part:

> SECURITIES EXCHANGE ACT OF 1934
> Release No. 61544 / February 19, 2010
> The Securities and Exchange Commission ("Commission") announced the temporary suspension, pursuant to Section 12(k) of the Securities Exchange Act of 1934 (the "Exchange Act"), of trading in the securities of [EGC], of Irvine, California, at 9:30 a.m. on February 19, 2010, and terminating at 11:59 p.m. on March 4, 2010.
>
> The Commission temporarily suspended trading in the securities of [EGC] because of questions that have been raised about the accuracy of assertions by [EGC], and by others, in financial disclosures to investors concerning, among other things, the company's assets.

139.   The last trade price of the Company's stock immediately prior to the trading halt was $.88 per share.

140.   On February 19, 2010 the Company filed an 8-K with the SEC announcing that its auditor, M&B, on February 12, 2010 withdrew its clean audit opinions for the Company's financial statements for the years ended December 31, 2006, 2007 and 2008.  The stated reason for this action was M&B becoming aware of irregularities in the audit confirmation of a bank account represented to M&B as having been held by EGCL and M&B's investigation and inability to confirm the balances in the account.  The announcement states in relevant part:

Item 4.02    Non-Reliance on Previously Issued Financial Statements or a
Related Audit Report or Completed Interim Audit Report.

(b) On February 12, [2010], Mendoza Berger and Company, LLP ("M&B"),
the independent auditors for [EGC], informed the [EGC] Board of Directors
that it had withdrawn its audit opinions for [EGC's] financial statements for
the years ended December 31, 2006, 2007 and 2008.

M&B advised [EGC] that it had become aware of irregularities in the audit
confirmation of a bank account represented to M&B as having been held by
Electronic Game Card (UK) Limited ("EGC Ltd"), a wholly owned
subsidiary of [EGC] that conducts its European operations.  Based upon
M&B's investigation and inability to confirm the balances in the account,
M&B concluded that its prior audits could no longer be relied upon and that
it was withdrawing its audit opinions related to [EGC's] financial statements
for the years ended December 31, 2006, 2007 and 2008 as of February 12,
2010.

Kevin Donovan, the Chief Executive Officer of [EGC],  has discussed all
matters described above with M&B, and has provided a copy of this Form 8-
K to M&B.

141.  In the February 19, 2010 8-K, the Company also explained that it
would determine the necessary adjustment and reissue corrected financial
statements for the fiscal years ended 2006, 2007, 2008, and the first three quarters
of 2009.  The 8-K states in relevant part:

[EGC] intends to determine the adjustments necessary to reissue its prior
financial statements, and file amended Annual Reports on Form 10-K for the
years ended December 31, 2006, December 31, 2007 and December 31,
2008, and amended Quarterly Report on Form 10-Q for the periods ended
March 31, 2009, June 30, 2009 and September 30, 2009 as soon as
practicable.

142.  On February 24, 2010, the Company issued a press release
announcing it had postponed the shareholder conference call with investors
scheduled for February 25, 2010 (per the Company's February 10, 2010 press

42

release above) "due to the suspension of trading of its common shares. The Company noted that it "is working diligently with its independent auditor to address the situation and will update investors as soon as possible."

143.   On March 5, 2010 the Company's shares began trading again with an opening price of $.25 per share. The last trade immediately prior to the halt was $.88 per share. The drop in EGMI's share price was directly related to the adverse news disclosed on February 19, 2010 that EGMI's auditors could not confirm its bank balances and that its financial statements should no longer be relied upon.

144.   During the afternoon of March 5, 2010, the Company issued a press release announcing that it "believes that there will be no material change to the Company's net asset value upon the completion of the review of its financial statement by its independent accountant."

145.   The March 5, 2010 assurance was materially false and misleading because on March 1, 2010 EGC no longer owned the share capital of EGCL, and an entity named EPN Advisors Limited owned all the share capital of EGCL (*See* Exhibit 17). Defendants never disclosed this to investors.

146.   The March 5, 2010 announcement was materially false because by March 5, 2010, by way of the February 22, 2010 M&B memorandum (Ex. 9) EGC, the Board, and Boyne knew the Company's financial statements, particularly its cash balances were "materially misstated." EGC, the Board, and Boyne also knew by March 5, 2010, that M&B had discovered that Boyne forged audit confirmations and bank statements for the fictitious Credit Suisse account.

147.   Notwithstanding the false reassurances from the Company, the EGC's stock lost half of its value on March 5, 2010 closing the day at $.44/share. EGC's stock fell an additional $.10 per share, or 22.7%, the following trading day.

148.   On March 19, 2010, the Company issued a press release which revealed the dire financial situation of the Company. The announcement stated that the Company had engaged G.C. Andersen Partners, LLC, to serve as the

Company's strategic and financial advisor. According the announcement, "[d]ue to EGC's state of affairs, one of Andersen Partners' first initiatives will be to raise working capital funds to enable the Company to engage legal, accounting and other service providers to review the historical operating and financial performance of EGC and its subsidiaries."

149.  Commenting on the engagement of G.C. Andersen Partners in the press release defendant Donovan stated:

> "Having the support of an experienced advisor such as G.C. Andersen Partners will allow us to review our operations and identify the most advantageous options for the Company and its shareholders going forward."

150.  This announcement caused the Company's stock to fall $.17 per share, or 13.6%, to $.18 per share on March 19, 2010.

151.  On May 18, 2010, after market close, the Company issued a press release entitled "Electronic Game Card, Inc. Provides Stockholder Update" which provided additional and new information about the Company's financial statements. The press release states in relevant part:

> IRVINE, CA, – May 18, 2010 - Electronic Game Card, Inc. provided the following update to its stockholders.
>
> The investigation into [EGC's] financial position is continuing. However, preliminary findings have raised significant concerns as to the integrity of audited financial statements for the fiscal years ended December 31, 2006, 2007 and 2008. [EGC] is concerned that reported revenue may be materially overstated and that the reported carrying value of its assets and investments in third-party companies may not be fairly stated.
>
> In addition, [EGC] has been unable to confirm the existence or value of a purported investment account in the name of Electronic Game Card (UK) Limited ("EGCL") with R.I.C. Asset Management Limited ("R.I.C."). While a former CFO (and director) of [EGC] has stated that the R.I.C. investment account exists and had a balance of $12.9 million as of February 26, 2010, he asserts that [EGC] does not own the funds in the R.I.C. account because [EGC] no longer owns EGCL. This assertion is based on a document

44

described as a 2002 agreement entered into among [EGC], EGCL and the original (unidentified) sellers of EGCL to [EGC]. The current [EGC] Board of Directors and management were unaware of this document, which was signed by the former CFO on behalf of EGCL, until after questions had arisen concerning the company's audited financial statements.

With respect to [EGC's] Series A Convertible Preferred Stock, it appears that a certificate of designation establishing the terms of the Series A Convertible Preferred Stock was not filed with the Secretary of State of Nevada, where [EGC] is incorporated. This fact, among others, calls into question, among other things, the validity of the preferred stock and the accuracy of disclosures relating to capitalization and similar matters in [EGC] historical financial statements, periodic reports and proxy statements filed with the Securities and Exchange Commission (the "SEC").

[EGC] continues to investigate these matters. The SEC, which suspended trading in [EGC] stock for two weeks starting on February 19, 2010, also continues to investigate. [EGC] continues to explore its strategic options, which may include filing for bankruptcy protection.

152.   On May 19, 2010 the Company filed with the SEC an 8-K which attached the May 18, 2010 press release and stated that on May 18, 2010 that "the Board of Directors of Electronic Game Card, Inc. [EGC] concluded that its financial statements for the years ended December 31, 006, 2007 and 2008 should no longer be relied upon because preliminarily findings of its previously announced forensic review of the circumstances that gave rise to [EGC's] independent auditors withdrawal of its audit opinions... ."

153.   The adverse information in these disclosures caused the Company's stock to fall $.09 per share, or 75%, to $.03 per share on May 19, 2010.

154.   Between May 19, 2010 and September 28, 2010 the Company went "dark." The Company did not issue a single press release or make any SEC filings. The price of the Company's stock has drifted downward.

155.   On September 28, 2010 EGC filed a Chapter 7 Voluntary Petition with the U.S. Bankruptcy Court for the District of Nevada, case no. 10-28366-lbr.

45

156.   According to schedules filed with the Bankruptcy Court on November 12, 2010, signed by defendant Donovan, despite the millions in sales and cash reported by the Company during the Class Period, the schedules for EGC reveal $0.00 in accounts receivable and $0.00 assets. *See* Docket no. 9, in case 10-28366-lbr (D. Nev. Bkr.).  Yet, in the Company's 2008 10-K and third quarter ended September 30, 2009 10-Q, the Company reported accounts receivable of $2.8 million and $3.7 million, respectively.

157.   EGMI's bankruptcy was the materialization of the risk concealed by Boyne fraudulently overstating EGC's bank balances and financial condition.

158.   As a result of the alleged fraud, investors have lost the entire value of their investment.

## VI.   ADDITIONAL ALLEGATIONS DEMONSTRATING FALSITY AND SCIENTER

159.   The following additional facts, when considered holistically with the other allegations in the Complaint, demonstrate a cogent and compelling strong inference of scienter and further demonstrate the falsity of Defendants' statements.

160.   Cole was co-signer and authorized account operator for the EGC account at Credit Suisse that contained no funds.  Cole was aware that Boyne had falsely represented to M&B that this EGCL account held millions of dollars during the fiscal years 2006-2009.

161.   In addition to the false assurances set forth above, Defendants continue to misrepresent the truth.  On August 29, 2011 both Boyne and Cole filed a purported restated financial statement for EGCL for the fiscal year ended December 31, 2008. (Cole: Docket no. 162-6; Boyne Docket no. 165-3)  This financial statement was filed with the UK Companies House on January 21, 2011 and is signed by Boyne, dated December 20, 2010.  The amended complaint that had first raised the fact off EGCL's materially smaller financial results was filed with the Court on September 13, 2010, docket no. 22.  Both Boyne and Cole were

46

on notice of the allegation relating to EGCL's UK filings as early as October 13, 2010, when they were served by international registered mail.  Docket no. 107.

162.   The restated financial statement is merely filed by Boyne and Cole to cover-up the fraud, which was clearly created after Boyne and Cole were on notice of the amended complaint.  Moreover, the restated financial statement itself is materially false and misleading because no related party transactions are disclosed. The excuse provided in the financial statement that EGC's consolidated financial statements are publicly available and thus no related party disclosure is necessary, is itself misleading, because EGC's financial statements do not disclose the material related transaction involving the purported investment account with SBI and/or NAB.

163.   The Company is subject to an ongoing formal SEC investigation concerning, among other things, for potential fraud in its financial statements and assets, Boyne, Greenfield, Cole, and Steinberg.

164.   According to 2010 UK news reports, both Cole and Boyne are being probed in connection with the failure of a UK investment bank First London PLC, concerning allegations of disappearing assets and material related party transactions.  Cole and Boyne served as advisors to First London.  According to a September 12, 2010 article published by *The Independent,* entitled The City Diary: First London attracts attention:

> More, much more, on First London, the former investment bank which, as I wrote last week, has gone into administration.
>
> The administrator, you'll recall, is probing a deal whereby First London's asset management business was "sold" to the mysterious Swiss Commodity Holding for £173m last October – the only problem being that while the assets were transferred, no cash has yet arrived.
>
> This deal is complicated by the fact that many of the people controlling First London – including former Jersey bankrupt Kevin

47

> Leech, **his side-kick [Defendant] Cole** and convicted fraudster Russell King – also had major roles in SCH, which has now changed its name to Coremin.
>
> Administrator Hasan Mirza from accountants Alexander Green tells me that he is not yet satisfied that the transaction was valid and adds enticingly: "I'm aware of certain authorities that have an interest [in First London] but I can't say if that is the Financial Services Authority or more serious".
>
> Andrew Turner, First London's last remaining director, says he does not know why any authority might be slightly curious. Maybe the missing £173m, I suggest? "I've no idea," he says. "I can't comment on that."

A prior September 5, 2010 article identified defendants Boyne and Cole as advisors of First London.

165.   The magnitude of the transactions at issue, support a strong inference of scienter.  EGC was at all relevant times a small company with no more than 10 employees per the Company's most recent 10-K.   The material related party transactions involved several million dollars and represented nearly all of EGC's reported cash balances during the Class Period.   The false financial statements implicates three years worth of financial statements and involve straight forward and fundamental financial metrics and accounting rules, i.e. where are the Company's monies held, is that entity related, etc.

166.   Additionally, the monies involved were more than a majority of EGC's assets.  As reported the Company's April 5, 2007 10KSB for FY 2006, cash and cash equivalents constituted 76% of the Company's total current assets on the balance sheet.   In the Company's March 26, 2008 10KSB for the FY 2007, cash and cash equivalents constituted 63.7% of the Company's total current assets on the balance sheet.

167.   Defendants were also on notice of potential issues relating to financial reporting. On April 15, 2008, the Company issued an 8-K stating that its FY 2007

48

10KSB was mistakenly filed "[a]s a result of a miss-communication [sic] between Registrant and its auditors, Mendoza Berger & Company, L.L.P., Registrant mistakenly understood that its auditors had completed their audit of the financial statements contained in that Form 10-KSB and had consented to the use of the financial statements." Ultimately the Company filed the restated 10KSB with the SEC on April 15, 2008 with no materially apparent changes. Thereafter on May 14, 2008 the Company filed its first quarter ended March 30, 2008 results, in the section of the 10-Q discussing the Company's "controls and procedures" EGC stated that the Company "found it necessary to upgrade its procedure for contact with our auditors," yet the Company found that its controls and procedures were effective.

168.   Throughout the Class Period the Company's senior management had access to and monitored the Company's cash and revenue because they touted the Company's growing cash, revenue and financial health. For example:

a.   In a March 16, 2009 press release announcing the Company's results for the fiscal year and fourth quarter ended, December 31, 2008, Defendant Donovan is quoted as saying:

"2008 marked the Company's second successful profitable growth year. Our **balance sheet is strong and our net cash balance is building consistently**. Our company's technology platform is robust and has been prepared to quickly evolve into the next stage of the Company's growth. Electronic Game Card is securely positioned to achieve its earnings guidance of $0.14 per share for 2009,"

b.   In an August 6, 2009 press release announcing the Company's second quarter ended June 30, 2009 results, defendant Donovan is quoted as stating:

"During this second quarter Electronic Game Card achieved **record revenue** and net income as well as **continued improvement in the company's net cash balance.** We have made great strides this quarter to materially add to

49

this solid financial base as we progress through the second half of this year and beyond,"

c.     In a November 12, 2008 press release, defendant Steinberg touted the Company's "growing balance sheet."

d.     According to CW1, in a March 2008 email from Steinberg's secretary relaying a message to CW1 and others, Steinberg noted that EGC's larger shareholders at the time, Pequot, Trafelet, and Ingalls & Snyder, had suspicions that EGC's financial figures may not be what they seem. Meetings were taking place between Steinberg and EGC's larger shareholders to ensure Steinberg's appointment as Chairman.  In early to mid-2008, CW1 advised Steinberg to hire a forensic accountant to review the Company's financials and particularly EGC's sales agreements and other agreements in order to conduct proper due diligence of the Company and its operations prior to joining EGC.  In December 2008, CW1 also requested that defendant Farrell, who at the time was an EGC director and Audit Committee member to conduct a forensic examination of the Company's financial statements.  CW1 was not aware if any such forensic examination took place at any time during his tenure at EGC.

## VII.  CLASS ACTION ALLEGATIONS

169.  Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who purchased the common stock of EGC during the Class Period and who were damaged thereby.  Excluded from the Class are Defendants, the present and former officers and directors of the EGC and any subsidiary thereof, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

170.  The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, EGC's stock was actively

50