O

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| DALTON PETRIE,<br><br>    Plaintiff,<br><br>vs.<br><br>ELECTRONIC GAME CARD, INC.; LEE J. COLE; LINDEN BOYNE; KEVIN DONOVAN; PAUL FARRELL; EUGENE CHRISTIANSEN; ANNA HOUSSELS; ESTATE OF LORD LEONARD STEINBERG,<br><br>    Defendants. | Case No.: SACV 10-0252 DOC(RNBx)<br><br>**ORDER GRANTING MOTION FOR CLASS CERTIFICATION [274]** |

Before the Court is Plaintiffs' Motion for Class Certification ("Mot.") (Dkt. 274).

## I.  Background

This lawsuit is a putative securities fraud class action against Defendants Electronic Game Card, Inc. ("EGC"), Linden Boyne ("Boyne"), Lee Cole ("Cole"), Eugene Christiansen ("Christiansen"), Kevin Donovan ("Donovan"), Paul Farrell ("Farrell"), Anna Houssels ("Houssels"), and the Estate of Lord Leonard Steinberg ("Estate of Lord Steinberg"). In the Consolidated Third Amended Complaint ("TAC") (Dkt. 189), the operative complaint, Plaintiffs allege that Defendants EGC, Cole, and Boyne violated Section 10(b) and Rule 10b-5 of the Securities Exchange Act and that Defendants Cole, Boyne, Christiansen, Donovan, Farrell, Houssels, and the Estate of Lord Steinberg should be held liable as control persons under Section 20(a) of the Securities Exchange Act.

The factual allegations in Plaintiffs' TAC were discussed in the Court's February 5, 2015 order. That discussion is repeated here for ease of reference:

During the relevant times, [EGC] was a small company of no more than 10 employees whose business consists of designing and manufacturing "scratch off" devices for various casinos, lotteries and other gaming establishments primarily in the United Kingdom and Europe. TAC ¶ 2. Nearly all of [EGC]'s reported revenues were allegedly derived from its UK and European operating subsidiary, Electronic Game Card, Ltd. ("EGCL"). *Id.*

On February 19, 2010, the SEC halted trading in EGC's stock because of questions regarding the accuracy of EGC's financial disclosures about its assets to investors. That same day, EGC announced that its auditor Mendoza & Berger ("M&B") had withdrawn its audit opinions of EGC's financial statements for FY 2006, 2007, and 2008 because of "irregularities in the audit confirmation of a bank account represented to M&B as having been held by [EGCL], a wholly owned subsidiary of [EGC]…" *Id.* ¶¶ 6-7. [On May 18, 2010, EGC announced that its Board of Directors had concluded that its financial statements for FY 2006, 2007, and 2008 could no longer be relied upon. *Id.* ¶¶ 13-15.] Subsequently, EGC's stock was delisted and EGC ultimately filed for Chapter 7 bankruptcy, causing investors to lose their entire investment in EGC. *Id.* ¶¶ 17-19.

Plaintiffs allege that, during the class period (April 5, 2007 to May 18, 2010), EGC engaged in a fraud to conceal from and misrepresent to EGC's investors the true financial condition and performance of EGC. *Id.* ¶¶ 1, 3. The alleged misrepresentations included statements about EGC's finances made in EGC's 2006, 2007, and 2008 10KSBs; quarterly reports from 2007, 2008, and 2009; earnings conference calls in May, August, and November 2009; and a press release dated August 6, 2009. *Id.* ¶¶ 92-132. Plaintiffs allege that EGC's statements regarding its financial results were false and misleading in two main ways, described below.

. . . .

First, EGC's statements were misleading because EGC falsely reported incrementally increasing cash balances when in fact EGC did not possess any of the millions of dollars it claimed it had. *Id.* ¶ 4. M&B's internal audit documents showed that Boyne forged audit confirmation forms, falsely representing to M&B and to the public that EGCL/EGC had millions of dollars in bank account #207103 with Credit Suisse in Gibraltar when in fact EGC only had an account numbered #208163 and it had never had any assets in it. *Id.* ¶¶ 8, 73-75.

. . . .

Second, EGC's statements were misleading because, according to Boyne and Cole, EGC's ownership of EGCL was subject to a secret 2002 agreement ("2002 Secret Agreement"). Under the agreement, EGC agreed not to make any changes to EGCL's articles of associations or its board of directors unless changes were authorized in writing by a majority of the then-existing board of EGCL (Boyne and his entity Greenfield Capital International Limited ("Greenfield")). If EGC violated this clause, ownership of EGCL would revert to a third party, the unnamed original sellers of EGCL. *Id.* ¶ 77. According to Boyne and Cole, Donovan's and Christiansen's decision to remove EGCL's board (and appoint themselves) without the required approval of EGCL caused EGCL ownership to revert back to EGCL's original sellers, such that EGC no longer owned EGCL. *Id.* ¶ 78.

Assuming that the 2002 Secret Agreement really existed, under GAAP, EGC's financial results should not have been consolidated with EGCL's because EGC did not have the requisite degree of control over EGCL. *Id.* ¶¶ 79-83. Plaintiffs consequently aver that any statements regarding EGC's financial results and assets which included EGCL's were materially false and misleading. *E.g.*, *id.* ¶¶ 95, 98, 101, 116, 121, 125.

Plaintiffs allege that Cole and Boyne knowingly concealed the 2002 Secret Agreement from EGC's auditor M&B because they knew that, if M&B knew of the agreement, M&B would not allow EGC to consolidate EGCL's assets into EGC's financial statements. *Id.* ¶ 84. Part of the alleged concealment involved not turning over to M&B minutes from a February 1, 2006 board meeting where the board allegedly discussed the 2002 Secret Agreement. Alternatively, Plaintiffs allege that Cole and Boyne fabricated the February 1, 2006 minutes to cover up their fraud. *Id.* ¶ 91.

Order Denying Defs.' Mot. to Dismiss Consol. Third Amended Compl. & Mot. for J. on the Pleadings, Feb. 5, 2015 (Dkt. 268), at 2-4.

This lawsuit was filed on March 2, 2010. Compl. (Dkt. 1). Pursuant to the Private Securities Litigation Reform Act ("PSLRA"), the Court appointed Dr. Thomas Lee, Margaret Yu, and Scott Lovell as Lead Plaintiffs on June 4, 2010 (Dkt. 11).

The Lead Plaintiffs filed the instant Motion on March 2, 2015 (Dkt. 274). Defendants Farrell, Houssels, and Estate of Lord Steinberg filed oppositions on June 1 (Dkts. 289, 291, 292, 293). Plaintiffs filed a reply on June 22 (Dkt. 296). Oral argument was heard on July 21 (Dkt. 302).

## II. Legal Standard

Courts may certify a class action only if it satisfies all four requirements identified in Federal Rule of Civil Procedure 23(a). *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Rule 23(a) requires Plaintiffs to show the following: (1) the class is so "numerous" that joinder of all members individually is impracticable; (2) there are questions of law or fact "common" to the class; (3) the claims or defenses of the class representatives are "typical" of the claims or defenses of the class; and (4) the person representing the class is able to fairly and "adequately" protect the interests of all class members. Fed. R. Civ. P. 23(a). These requirements are commonly referred to as "numerosity," "commonality," "typicality," and "adequacy." *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO v. Conoco Phillips Co.*, 593 F.3d 802, 806 (9th Cir. 2010).

In addition, the class must satisfy one of the three subdivisions of Rule 23(b). *Id.* Here, Plaintiffs seeks to certify a class under Rule 23(b)(3), which requires that common questions of law or fact predominate over individual questions, and that class resolution be superior to other available methods of resolution. Fed. R. Civ. P. 23(b)(3).

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). A party seeking class certification must affirmatively demonstrate compliance with Rule 23—that is, the party must be prepared to prove that there are *in fact* sufficiently numerous parties and common questions of law or fact. *Id.*

In resolving a class certification motion, it is inevitable that the Court will touch on the merits of a plaintiff's claims. *See Wal-Mart*, 131 S. Ct. at 2551-52 ("The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's causes of action.") (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982)). But, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013). Accordingly, any merits consideration must be limited to those issues necessary to deciding class certification. *See id.* at 1195 ("Merits questions may be considered to the extent—

but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.").

## III.    Discussion

Plaintiffs seek to certify the following class:

> All persons or entities that purchased or otherwise acquired the publicly traded common stock Electronic Game Card, Inc. ("EGC") between April 5, 2007 and May 18, 2010, inclusive, and who held such shares on or after February 10, 2010. Excluded from the Class are Defendants, the present and former officers and directors of EGC and any subsidiary thereof, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

Mot. at 1.

### A.  Requirements of Rule 23(a)

#### 1.   Numerosity

A class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Defendants do not dispute that the proposed class satisfies the numerosity requirement. In addition, the Court finds that the proposed class, numbering in the hundreds, satisfies the numerosity requirement, which is presumptively satisfied when there are at least forty members. *See Avilez v. Pinkerton Gov't Servs.*, 286 F.R.D. 450, 456 (C.D. Cal. 2012). Therefore, the Court finds that Rule 23(a)(1) is satisfied.

#### 2.   Commonality

Rule 23(a)(2) requires courts to perform a "rigorous analysis" to determine whether "there are questions of law or fact common to the class," but "even a single common question will do." *See Wal-Mart*, 131 S. Ct. at 2551, 2556 (citations and quotations omitted); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011). Certification is appropriate where the legality of a particular policy presents a "significant question of law" that is "apt to drive the resolution of the litigation." *Abdullah v. U.S. Sec. Assoc.*, 731 F.3d 952, 963 (9th Cir. 2013) (citing *Wal-Mart*, 131 S. Ct. at 2551).

Defendants do not dispute that common questions of fact and law exist in this case. The Court agrees with Plaintiffs that these common questions include (1) whether Defendants

violated federal securities laws; (2) whether Defendants made statements to investors during the Class Period that misrepresented or omitted material information about the accuracy of EGC's financial situation; (3) whether Defendants made the misrepresentations and omissions with scienter; and (4) the proper measure of damages. Mot. at 7. Therefore, the Court finds that Rule 23(a)(2) is satisfied.

### 3.  Typicality and Adequacy

A class representative's claims or defenses must be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Courts assess typicality by determining whether the class representatives and the rest of the putative class have similar injuries and conduct. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

A class representative must also be able to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In determining adequacy, courts resolve two questions:  "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

"[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Hanon*, 976 F.2d at 508. Unique defenses can go to either the typicality or adequacy of class representatives. *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990).

Here, Defendants argue that each of the Lead Plaintiffs is subject to unique defenses such that they are atypical of other class members and are inadequate representatives. The Court examines each Lead Plaintiff in turn.

### a.  Margaret Yu

Defendants object to Margaret Yu as a class representative because she did not make investment decisions but instead relied on her husband Dr. Thomas Lee to do so. She did not speak with her husband about the EGC stock transactions on her E*Trade account. Yu Dep., May 12, 2015, 16:17-25, 41:18-42:14, 44:17-45:20. She had never heard of EGC before her

husband told her about EGC at the time of or after the stock purchases. *Id.* at 26:9-21. Based on these facts, Defendants argue that Ms. Yu cannot prove that she engaged in a "purchase or sale" within the meaning of the Securities Exchange Act, nor can she prove that she purchased or sold securities in reliance on Defendants' alleged misrepresentations or on the integrity of EGC's market price.

Some courts have held that a plaintiff must at least have some de minimis involvement in the investment decision to bring a securities fraud claim. *Medline Indus., Inc. Emp. Profit Sharing & Ret. Trust v. Blunt, Ellis & Loewi, Inc.*, No. 89 C 4851, 1993 WL 13436, at *2 (N.D. Ill. Jan. 21, 1993); *see also Boyer v. Kruger*, No. 8CV96-00495, 1998 WL 35177818, at *3 (D. Neb. Feb. 4, 1998) (in a suit brought by a married couple and their children, granting summary judgment against the wife and children because they never made nor participated in making any decision to sell their stock, having delegated complete authority to the husband). These cases largely rely on two Seventh Circuit decisions which involved plaintiffs who relied on brokers and dealers to make investments for them and who later sued those brokers and dealers under Section 10(b) and Rule 10b-5 after discovering that the brokers and dealers had lost their money through poor by investment decisions. *Congregation of the Passion, Holy Cross Province v. Kidder Peabody & Co.*, 800 F.2d 177 (7th Cir. 1986); *O'Brien v. Cont'l Ill. Nat. Bank & Trust Co. of Chi.*, 593 F.2d 54 (7th Cir. 1979). The Seventh Circuit held that the plaintiffs' securities fraud claims could not lie because Section 10(b) and Rule 10b-5 prohibited misleading statements and omissions "in connection with" a securities transaction. In those cases, the alleged misrepresentations and omissions affected the plaintiffs' decision whether to maintain fiduciary or agency relationships with the defendants, but they did not affect the plaintiffs' decisions to invest in certain securities because the plaintiffs had delegated full authority for those securities investment decisions to the defendants. *Congregation of the Passion*, 800 F.2d at 181-82; *O'Brien*, 593 F.2d at 60.

The facts of this case are easily distinguishable from the two Seventh Circuit cases, as Ms. Yu is not suing her husband for misrepresenting information about EGC. Defendants have not cited any authority from the Ninth Circuit interpreting *Congregation of the Passion* and

*O'Brien* in the same way as the *Medline* and *Boyer* courts. District courts in the Ninth Circuit have rejected *Medline* and *Boyer*-based arguments. For instance, in *In re Commc'ns Sys., Inc.*, the court held that a named plaintiff was an adequate representative despite the fact that his broker sold his stock for him and the plaintiff did not know about the sales until afterward. "It is inevitable," the court noted,

> that some, if not most, investors rely on the advice of brokers and other specialists wholly or in part. Indeed, a large number of class members in any securities class action are likely to fall in this category. The fact that an investor seeking to be a class representative is in this category does not disqualify him; in fact, he is probably representative of a large number of class members.

No. C 00-1967 MHP, 2003 WL 21383824, at *4 (N.D. Cal. Feb. 24, 2003); *see also In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 603 (C.D. Cal. 2009) ("Reliance on a broker will not generally make a plaintiff atypical."); *In re VeriSign, Inc.*, No. C 02-02270 JW(PVT), 2005 WL 88969, at *7 (N.D. Cal. Jan. 13, 2005) (rejecting defendants' argument that entities that abdicate responsibility for making investment decisions lack standing as purchasers or sellers); *In re Regal Commc'ns Corp. Sec. Litig.*, 1995 U.S. Dist. LEXIS 13492, *14 (E.D. Pa. Sept. 25, 1995) (rejecting argument that named plaintiffs were atypical because they purchased stock through discretionary broker accounts).

Thus, Ms. Yu's delegation of responsibility to her husband does not make her unique, nor does it make the corresponding non-reliance defense against her unique. It thus does not render her atypical or inadequate to serve as a class representative.

### b.  Dr. Thomas Lee

Defendants argue that Dr. Lee lacks standing because, even though he made investment decisions regarding EGC stock, those shares were held in his wife Ms. Yu's name only. *See* Lee Dep., May 12, 2015, 13:7-22, 16:1-6, 25:18-25. Thus, Defendants contend, Dr. Lee lacks Article III standing because he did not suffer an injury in fact. *See W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 109 (2d Cir. 2008) (holding that the plaintiff did not meet Article III's injury-in-fact requirement where the plaintiff, an investment advisor, had authority

to make investment decisions and to litigate on its investor clients' behalf but the clients had never transferred ownership of stock to the plaintiff).

Plaintiffs respond that Dr. Lee has suffered an injury in fact because he has a pecuniary interest in his and his wife's shared property. However, Plaintiffs have cited no legal authority. Nor has the Court found any legal authority to that effect in its own search.

Defendants further argue that Dr. Lee cannot cure his lack of Article III standing by having his wife assign her claims to him now, after litigation has begun. Opp'n at 10 (citing *In re IMAX Sec. Litig.*, No. 06CIV6128, 2009 WL 1905033, at *3 (S.D.N.Y. June 29, 2009), and *In re SLM Corp. Sec. Litig.*, 258 F.R.D. 112, 116 (S.D.N.Y. 2009)). At oral argument, the parties disagreed as to whether such a maneuver would be allowed in the Ninth Circuit, under *Northstar Fin. Advisors Inc. v. Schwab Invs.*, 779 F.3d 1036 (9th Cir. 2015).[1] Since the Court is leaving Ms. Yu as a typical and adequate class representative for this class action, it is not necessary for the Court will not decide the *Northstar* issue at this time.

Thus, because Dr. Lee has not shown that he has suffered an injury in fact, the Court finds that Dr. Lee is not a typical or adequate class representative.

### c.  Scott Lovell

Mr. Lovell purchased shares of EGC stock in December 2009. Declaration of Leif Simonson ("Simonson Decl.") Ex. G (Dkt. 290-7). On February 19, 2010, the SEC and EGC made their first announcements that EGC's auditors had withdrawn their audit opinions of three of EGC's previous financial statements. On March 2, 2010, this lawsuit was filed. The original complaint proposed a class period that ended February 19, 2010. Compl. ¶ 1. Four days after the complaint was filed, Mr. Lovell signed a PSLRA certification stating that he had reviewed the

---

[1] In that case, Northstar Financial Advisors, Inc., an investment advising firm that managed investors' discretionary and non-discretionary accounts, brought a securities fraud class action in August 2008, before the Second Circuit decided *Huff*. On December 8, 2008, five days after *Huff* was decided, one of Northstar's client-shareholders assigned his claim to Northstar. The district court then dismissed Northstar's complaint for lack of standing, but granted Northstar leave to amend under Federal Rule of Civil Procedure 15(a). Northstar subsequently filed a new pleading which alleged the assignment. When defendants again moved to dismiss the case for lack of standing on the ground that subject matter jurisdiction must be determined as of the time that the original complaint is filed, the district court denied the motion. The district court construed Northstar's new complaint as a supplemental pleading under Rule 15(d) and held that the supplemental pleading cured the standing deficiency. The Ninth Circuit affirmed. *Northstar*, 779 F.3d at 1043-48.

complaint and that he was willing to serve as a Lead Plaintiff in this lawsuit. *See id.*; Simonson
Decl. Ex. G. In April 2010, Mr. Lovell purchased additional EGC shares. Lovell Dep., May 11,
2015, 39:5-8, 42:19-25, 47:11-14, 49:9-13, 50:20-24. He testified in his deposition that he did so
because the company still had some assets and he still believed in the company. Lovell Dep. at
39:5-40:13. Two months later, on June 4, 2010, Mr. Lovell was appointed Lead Plaintiff along
with Ms. Yu and Dr. Lee (Dkt. 11). On September 13, 2010, he and the other Lead Plaintiffs
filed an amended complaint which extended the class period to May 18, 2010. Consol. Amended
Compl. (Dkt. 22) ¶ 1.

Defendants argue that many courts have found that investors who continue purchasing
stock after corrective disclosures are issued are subject to unique defenses. Opp'n at 11 (citing
cases). Plaintiffs refute this characterization of the case law. Reply at 21-22 (citing cases).

There appears to be a circuit split on this issue. In *Gary Plastic Packaging Corp. v.
Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176 (2d Cir. 1990), the named plaintiff
Gary Plastic Packaging Corporation purchased twelve certificates of deposit ("CDs") through
defendant Merrill Lynch in May and July 1982. After discovering that the Merrill Lynch CDs
paid less interest than CDs purchased directly from the issuing banks, Gary Plastic nonetheless
"rolled over" four of its Merrill Lynch CDs for another term. *Id.* at 178. The following year,
Gary Plastic sued Merrill Lynch for securities fraud in connection with the CDs it had
purchased. *Id.* The Second Circuit affirmed the district court's decision that Gary Plastic was an
inappropriate class representative because it was subject to the unique defense of having
continued to invest with Merrill Lynch even after it had notice and had even investigated alleged
fraud. *Id.* at 179-80; *see also George v. China Auto. Sys., Inc.*, No. 11 CIV. 7533 KBF, 2013
WL 3357170, at *6 (S.D.N.Y. July 3, 2013) ("A named plaintiff who has engaged in a post-
disclosure purchase is subject to the defense that the alleged misstatements or omissions were
really not a factor in the purchasing decision but rather that other investment considerations
drove the decision."); *GAMCO Investors, Inc. v. Vivendi, S.A.*, 917 F. Supp. 2d 246, 261-62
(S.D.N.Y. 2013) (noting that post-disclosure purchases *can* defeat the typicality requirement for
class certification when "plaintiffs made a disproportionately large percentage of their purchases

post-disclosure" or "when a disclosure is so forceful that it becomes unreasonable for an investor, or the market, to continue to be misled by the defendants' alleged misrepresentation") (internal quotation marks omitted).

The Fifth Circuit, however, has "reject[ed] the argument that a proposed class representative in a fraud-on-the-market securities suit is as a matter of law categorically precluded from meeting the requirements of Rule 23(a) simply because of a post-disclosure purchase of the defendant company's stock" on the ground that reliance on the integrity of the market price during the class period is unlikely to be defeated by post-disclosure reliance on the integrity of the market, especially when the market's assimilation of new information "corrected" the stock price. *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 138 (5th Cir. 2005).

The Ninth Circuit does not appear to have spoken directly on the question. However, many district courts in the Ninth Circuit have held that post-disclosure or even post-class period purchases do not necessarily defeat typicality, following the Fifth Circuit's logic. *In re Countrywide*, 273 F.R.D. at 602-03; *In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 576-77 (N.D. Cal. 2009) (collecting cases on both sides, but concluding that the weight of the authority "favor[s] the position that the purchase of stock after a partial disclosure is not a per-se bar to satisfying the typicality requirement"); *In re Emulex Corp. Sec. Litig.*, 210 F.R.D. 717, 719 (C.D. Cal. 2002) (finding that the plaintiffs' post-disclosure purchases, based on their hopes the stock would "rebound" or "come back strong," did not defeat typicality because the plaintiffs' claims arose from the same set of events and course of conduct that gave rise to the claims of other class members).

"Of course, *unusual* post-disclosure trading patterns present typicality problems," *In re Countrywide*, 273 F.R.D. at 603. For example, if "Lead Plaintiffs continued to increase their holdings even after the securities' price remained unaltered following the disclosure of irregularities . . . it could be argued . . . that Lead Plaintiffs would have made their purchase even knowing of accounting irregularities." *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 204 n.12 (E.D. Pa. 2008) ("*DVI I*") *aff'd*, 639 F.3d 623 (3d Cir. 2011) ("*DVI II*").

Here, Defendants argue, Mr. Lovell purchased stock in April 2011 because he believed that the market had overreacted to the February 2011 news—i.e., that the market price did not accurately reflect the true value of the company. This non-reliance defense is not unique to Mr. Lovell, however. Other class members may have reacted the same way. *See In re Countrywide*, 273 F.R.D. at 603 ("[P]urchasing stock subsequent to a materially adverse disclosure, 'averaging down,' is a common technique used to decrease the average cost of an investment and which cannot be used to defeat a proposed class representative's typicality.") (quoting *In re Select Comfort Corp. Sec. Litig.*, 202 F.R.D. 598, 607 n.12 (D. Minn. 2001)). As for Defendants' assertion that Mr. Lovell was different from other class members because he had more detailed knowledge about the alleged fraud after "affirmatively volunteer[ing]" to be Lead Plaintiff than other class members who did not volunteer to be lead plaintiff, Opp'n at 12, the lead plaintiff in every securities fraud class action is different from absent class members in that regard. To characterize a lead plaintiff as atypical for having more information than the rest of the class would potentially make it impossible to find a typical class representative.

Thus, the Court rejects Defendants' argument that Mr. Lovell is subject to a "unique" post-disclosure purchases defense. The Court is satisfied that Mr. Lovell is a typical and adequate class representative.

## B.  Requirements of Rule 23(b)(3)

### 1.  Predominance

"Rule 23(b)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). Rule 23(b) requires that courts "take a 'close look' at whether common questions predominate over individual ones." *Id.*

Defendants argue that individual questions of whether each individual investor relied on the alleged misstatements and omissions predominate over any common questions in this action because Plaintiffs cannot presume, based on the fraud-on-the-market theory, that all class members relied on the alleged misrepresentations. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005) (listing reliance as an element of Section 10(b) and Rule 10b-5 claims).

Specifically, Defendants argue that the fraud-on-the-market presumption does not apply in this case because EGC stock was not traded in an efficient market.

Under the fraud-on-the-market theory, an investor plaintiff's reliance on misleading statements about a company and its business can be presumed if "(1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2413 (2014). The fraud-on-the-market theory is an indirect way to show that the specific misrepresentation alleged by the plaintiff impacted the price of the stock. *Id.* at 2415. Thus, even if plaintiffs do not have direct evidence of price impact, plaintiffs can potentially satisfy their burden of proving class-wide reliance merely by proving the four elements of the fraud-on-the-market theory. *See id.* at 2414. Plaintiffs have the burden to prove, not just plead, market efficiency by a preponderance of the evidence before class certification. *Id.* at 2412; *Rodman v. Safeway, Inc.*, No. 11-CV-03003-JST, 2014 WL 988992, at *4 (N.D. Cal. Mar. 10, 2014). Defendants, however, may defeat the presumption at the class certification stage through "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price," for instance through evidence that the specific misrepresentation at issue did not actually impact the price. *Id.* at 2408, 2414-16.

An efficient market is one that "react[s] quickly in processing information[,] enabling it [] to be reflected in the market price." 4 Thomas Lee Hazen, Law Sec. Reg. § 12.10 (2015); *Binder v. Gillespie*, 184 F.3d 1059, 1065 (9th Cir. 1999) ("The question is whether such a market is efficient—meaning simply whether the stock prices reflect public information."). Most courts have held that where a stock is traded—in an over-the-counter market, like EGC stock was, versus on a national exchange—is not dispositive as to whether the market for that stock is efficient. *See Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001); *Cammer v. Bloom*, 711 F. Supp. 1264, 1280-84 (D.N.J. 1989). Rather, to determine whether the market for a particular stock was efficient, many courts, including the Ninth Circuit, use the five factors from

*Cammer. See Binder*, 184 F.3d at 1065. The *Cammer* factors are: (1) whether the stock trades at a high weekly volume; (2) whether securities analysts follow and report on the stock; (3) whether the stock has numerous market makers and arbitrageurs; (4) whether the company is eligible to file SEC registration form S-3, as opposed to form S-1 or S-2; and (5) whether there are "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Id.* (quoting *Cammer*, 711 F. Supp. at 1286-87). The *Cammer* factors are "an analytical tool, not a checklist" of requirements, *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05 Civ. 1898(SAS), 2006 WL 2161887, at *5 (S.D.N.Y. Aug. 1, 2006), and can be supplemented by other measures, such as "(6) the company's market capitalization; (7) the bid-ask spread; (8) the float, or issue amount outstanding excluding insider-owned securities; and (9) the percentage of institutional ownership." *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 632 (N.D. Ala. 2009) (citing *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005)).

In this case, to support the contention that EGC's stock price was impacted by Defendants' alleged misrepresentations and omissions, Plaintiffs present evidence to show that the market for EGC stock was *Cammer* efficient during the Class Period. The Court will consider the evidence supporting each of the *Cammer* and non-*Cammer* factors in turn.

### a.  *Cammer* Factors

### i.  Average Weekly Trading Volume

A high average trading volume supports a finding of market efficiency, because it "implies significant investor interest in the company," and that interest "implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Cammer*, 711 F. Supp. at 1286. Turnover, "measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption." *Id.* (citation omitted).

Here, the average weekly trading volume of EGC's stock during the Class Period was 3.3%, which, under *Cammer*, justifies a strong presumption of an efficient market. Declaration of Howard J. Mulcahey ("Mulcahey Decl. I") (Dkt. 274-4) ¶ 28.

Defendants do not dispute this figure. Rather, Defendants contend that, for *Cammer* purposes, the 3.3% figure should be discounted by 60% or 70% because recent industry studies show that high frequency trading generally accounts for 60-70% of market activity. Applying a 60% adjustment factor to account for high frequency traders would reduce the trading volume to 1.32% and applying a 70% adjustment factor would reduce the volume to 0.99%. Declaration of Mukarram Attari ("Attari Decl.") (Dkt. 291-2) ¶ 41.

Defendants urge that the average weekly trading volume figure should be further discounted by unknown percentages because roughly 85% of EGC's trading volume during the Class Period was attributable to retail investors (who are usually less informed than institutional investors) and because of "potential double counting of volume that is a feature of dealer markets." *Id.* ¶¶ 41-44. Once these discounts are applied, Defendants contend, EGC's average weekly trading volume drops below the range of volumes for stock that courts have found to have been traded in an efficient market. *See* Mulcahey Decl. I Ex. 15 (listing cases where courts found efficient markets and the average weekly trading volumes of the stock).

Defendants have not shown how much "potential double counting" of market maker trading occurred nor have Defendants proposed how much EGC's average weekly trading volume should be discounted to adjust for the market maker trading and retail investor trading. Thus, the Court finds those arguments unavailing. The high frequency trading argument is more persuasive. However, even if EGC's average weekly trading volume is reduced to 0.99% or 1.32%, that is still within the "substantial presumption" range in *Cammer*. Thus, the Court find that this factor weighs in Plaintiffs' favor.

### ii.  Analyst Coverage

Coverage of a company's stock by "significant number of securities analysts" during a class period indicates market efficiency because it implies that available information on the company was "closely reviewed by investment professionals, who would in turn make buy/sell

recommendations to client investors," which would in turn affect the price of the stock. *Cammer*, 711 F. Supp. at 1286. There is no bright-line rule regarding how many analysts it takes to constitute a "significant" number. In *Cammer*, the court found market efficiency in part based on the fact that 15 research reports on the company at issue were issued between July 1987 and June 1988. *Id.* at 1283 n.30. In *In re Amerifirst Sec. Litig.*, market efficiency was found where at least six securities analysts issued reports during the class period. 139 F.R.D. 423, 432 (S.D. Fla. 1991). In *In re Xcelera.com Sec. Litig.*, market efficiency was found where only one securities analyst followed the company's stock and issued only one report during the 16-month class period, but information about the company was widely distributed through news articles, press releases, television interviews, the company's SEC filings, and influential brokerage firms' reporting on Internet and technology stocks. 430 F.3d 503, 515 (1st Cir. 2005). On the other hand, the court in *Krogman* held that "[t]he existence of one . . . independent analyst, Attkisson, and coverage by Moody's and similar publications, is insufficient to cause this factor to weigh in favor of market efficiency." 202 F.R.D. at 475. Taking more of a middle ground, the court in *Cheney v. Cyberguard Corp.*, found that the analyst factor did not "strongly" weigh in favor of a market efficiency finding where two analysts issued five reports during the 22-month class period, but there were significant news reports about the company. 213 F.R.D. 484, 499 (S.D. Fla. 2003). The court noted, however, that this factor was not dispositive. *Id.*

Here, the parties try to slice and dice the same data in different ways. Plaintiffs claim that 148 analyst reports about EGC stock were issued during the 37-month Class Period. The 148 reports consisted of 37 comprehensive research reports and 111 secondary research reports. Of the 37 comprehensive research reports, 35 were published by securities analysts Roth Capital Partners ("Roth") and 2 were published by Merriman Curhan Ford ("Merriman"). Mulcahey Decl. I ¶¶ 33-34. Dividing the 37 comprehensive reports over the three-year Class Period yields an average of 12 reports per year, which Plaintiffs argue is close enough to the 15 reports in one year in *Cammer* to warrant finding this factor in their favor even without adding the 111 secondary reports.

The 111 secondary research reports were produced by PriceTarget (1 report), ValueEngine (18 reports), and TheStreet.com (92 reports). *Id.* ¶ 38. These reports included the following information:

- An investment rating (buy/hold/sell recommendations);
- An analysis of recent earnings reports or value-changing events;
- Projections, price target, and historical earnings trends and analyses;
- A comparison to peer companies; and
- The names of the analysts.

*Id.* ¶ 34. In addition, EGC appeared in 1,650 news stories and press releases and made 110 filings with the SEC during the class period. *Id.* ¶ 44.

Defendants point out that, between Merriman and Roth, a maximum of two analysts covered EGC's stock at any point during the Class Period and, for 32 out of the 37 months of the Class Period, EGC's stock was covered only by one analyst or none at all. Opp'n at 10-11. Thus, Defendants argue, this factor should weigh against Plaintiffs under *Krogman* and *Cheney*. Defendants also argue that the 111 secondary research reports do not count because they were not produced by securities analysts, as they are not of the same quality as the Merriman and Roth reports. Also, Defendants contend that any press releases and SEC filings should be discounted under *Serfaty v. Int'l Automated Sys., Inc.*, 180 F.R.D. 418, 422 (D. Utah 1998) (finding that the analyst factor weighed against finding market efficiency where the plaintiffs had no evidence of analyst reports, only advertisements and press releases disseminated by the company itself because the latter information was "not a substitute" for analyst reports).

Given that there was only one analyst reporting on EGC stock at most points during the Class Period and given the dubious treatment some courts have given to non-analyst reports and news reports, the Court finds that this factor weighs against Plaintiffs.

### iii. Number of Market Makers

"A market-maker is one who helps establish a market for securities by reporting bid-and-asked quotations (the price a buyer will pay for a security and the price a seller will sell a security) and who stands ready to buy or sell at these publicly quoted prices." *In re Countrywide*, 273 F.R.D. at 613-14. "The more market-makers for a particular security (and,

relatedly, the greater the volume of the security the market-makers are prepared to handle), the more reasonable it is to infer that the security is liquid, and, therefore, more likely the market for that security is efficient." *Id.* at 614. In *Cammer*, a market was found efficient in part based on the existence of 11 market makers in the relevant market. *Cammer*, 711 F. Supp. at 1283; *see also Hodges v. Akeena Solar, Inc.*, 274 F.R.D. 259, 269 (N.D. Cal. 2011) (finding market efficiency based in part on the existence of "over twenty" market makers); *Levine v. SkyMall, Inc.*, No. CIV. 99-166-PHX-ROS, 2002 WL 31056919, at *6 (D. Ariz. May 24, 2002) (finding a market efficient where there were between 11 and 22 market makers).

Here, Plaintiffs' evidence shows that there were between 24 and 32 market makers in EGC common stock during the Class Period, with an average of 27 market makers. Mulcahey Decl. I ¶ 50. Defendants argue that this evidence should be discounted because Plaintiffs did not show that all of these market makers actually and regularly bought and sold stock throughout the Class Period, as opposed to merely quoting EGC stock prices during the Class Period. Opp'n at 15. Defendants cite *O'Neil v. Appel*, which states that the mere number of market makers, "is virtually meaningless" without more information about "the volume of shares that they committed to trade, the volume of shares they actually traded, and the prices at which they did so" because "market makers generally do not analyze and disseminate information about the stock that they make a market for" unless, potentially, when they are buying and selling that stock. 165 F.R.D. 479, 501-02 (W.D. Mich. 1996); *see also Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 315 (5th Cir. 2005) (citing *O'Neil*); *In re Netbank, Inc. Sec. Litig.*, 259 F.R.D. 656, 671 (N.D. Ga. 2009) (same).

No court in the Ninth Circuit has adopted this viewpoint, as most courts consider only the number of market makers. However, even under the *O'Neil* standard, Plaintiffs have provided evidence that (1) market makers accounted for 94.5% of EGC's trading volume (282.7 million trading volume out of total trading volume of 299 million), Declaration of Howard J. Mulcahey ("Mulcahey Decl. II") (Dkt. 296-3) ¶ 120; (2) the average market maker trading volume during the Class Period was 5,139,144 shares, *id.* ¶ 121; (3) 13 market makers traded at least 5,139,144 shares during the Class Period, *id.*; (4) 23 market makers traded at least 1 million shares over the

Class Period, *id.*; and (5) there were no trading days during the Class Period during which EGC stock did not trade except during the last three months when trading was halted by the SEC, *id.* ¶ 117.

Based on this record, the Court finds that this factor weighs in favor of Plaintiffs.

### iv. Eligibility to File a Form S-3 with the SEC

A fourth factor under *Cammer* is whether the defendant is eligible to file an SEC registration Form S-3. That form is a short form registration statement reserved for companies (1) with $75 million in common equity held by non-affiliates of the registrant and (2) that have filed reports with the Securities and Exchange Commission ("SEC") for 12 consecutive months. *See* 17 C.F.R. § 239.13. "Courts have found that the SEC permits an S-3 Registration statement 'only on the premise that the stock is already traded on an open and efficient market, such that further disclosure is unnecessary.'" *Teamsters*, 2006 WL 2161887 at *7 (citations omitted). The SEC has relaxed the requirements for S-3 eligibility since *Cammer*, but the factor remains an important one for courts. *Krogman*, 202 F.R.D. at 476-77 (citing cases).

Here, Plaintiffs concede that EGC was ineligible to file Form S-3 for most of the Class Period and, thus, this factor does not support a finding of market efficiency. Mot. at 16. However, Plaintiffs argue, this factor is not fatal to a finding of market efficiency. The Court agrees. *Nguyen v. Radient Pharm. Corp.*, 287 F.R.D. 563, 574 (C.D. Cal. 2012); *Cammer*, 711 F. Supp. at 1287 (rejecting Form S-3 eligibility as a bright-line test for market efficiency); *cf. O'Neil*, 165 F.R.D. at 502 (holding that a stock was not traded in an efficient market, in part because the stock was *never* eligible to file an S-3 form).

### v. Cause-and-Effect Relationship Between Corporate News and the Company's Stock Price

The fifth *Cammer* factor is whether there are facts to support a cause-and-effect relationship between unexpected corporate events or financial releases and an immediate response in stock price. This factor is "the essence of an efficient market and the foundation for the fraud on the market theory." *Cammer*, 711 F. Supp. at 1287. "Event studies are by far the

most common test for a causal connection." *In re Countrywide*, 273 F.R.D. at 614. An event study typically

> partition[s] a company's security price movement on each trading day in the class period into three parts: the movement caused by market-wide factors, or the "market effect"; the movement caused by industry-wide factors, or the "industry effect"; and the movement caused by "firm-specific effect." Once the factors are partitioned and firm-specific effects are isolated to determine if the market reacts efficiently to disclosures, the court is generally presented empirical evidence showing whether the firm-specific abnormal returns or returns in excess of what is predicted by the statistical model are statistically significant. The court examines those days throughout the class period when either, (a) there appear to be material or statistically significant firm-specific abnormal returns, and to determine whether there are associated disclosures, or conversely (b) there are material or corrective disclosures, and to determine whether there are associated material or statistically significant firm-specific abnormal returns.

Michael L. Hartzmark & H. Nejat Seyhun, *The Curious Incident of the Dog That Didn't Bark and Establishing Cause-and-Effect in Class Action Securities Litigation*, 6 Va. L. & Bus. Rev. 415, 425-26 (2012).

Plaintiff's expert Howard Mulcahey, conducted five different tests to determine the impact of new information on the market price for EGC common stock. Defendants have numerous objections to Mr. Mulcahey's tests. The Court will address each in turn.

### (1) Reaction to new information ("Test 1")

Mr. Mulcahey identified the 20 days in which EGC's common stock had the largest price movements compared to the market. He then studied the actual news disclosed on those days to determine if any of that new information was responsible for EGC stock price movements. He found that on 10 of those 20 days and on 6 of the top 10 days, the direction and magnitude of EGC stock's price movements correlated with the news disclosed that day. Mulcahey Decl. I ¶¶ 68-74.

With regard to Test 1, Defendants point out that, on 10 (50%) of those 20 days, the large price movement was not associated with any news whatsoever and can be discounted as "noise." Opp'n at 17. This argument is not persuasive, as Plaintiffs have provided evidence that

only a third of abnormally large stock price movements are typically associated with news events. *See* Mulcahey Decl. I at 29 n.68; *see also DVI II*, 639 F.3d at 635 (affirming district court's factual finding that 60-65% correlation between news events and price changes in light of two studies offered by plaintiffs which found that approximately one-third of statistically significant stock price changes were associated with identifiable news events), *abrogated on other grounds by Amgen*, 133 S. Ct. 1184.

Defendants argue that the top 20 days in which EGC's common stock had the largest price movements compared to the market is too small of a sample size and may not be representative of most trading days. Opp'n at 16-17. This argument gives pause. Defendants cite two cases in which such methodology was criticized. In *In re Countrywide*, the court found an expert report unhelpful where the expert used a small, potentially non-representative sample of ten days within the class period with some of the biggest return days. 273 F.R.D. at 619. In *In re PolyMedica Corp. Sec. Litig.*, the court critiqued an expert's event study for picking the top ten days with stock price drops and describing the news events that correlated with those stock price drops instead of systematically comparing all news days with all non-news days. 453 F. Supp. 2d 260, 270 (D. Mass. 2006) ("*PolyMedica II*").

To defend Mr. Mulcahey's decision to analyze only the top 20 days, Plaintiffs rely on *Radient*, a previous case before this Court where the Court found that Mr. Mulcahey's event studies in that case supported a finding of market efficiency. There, however, Mr. Mulcahey's event studies were unopposed, 287 F.R.D. at 574, meaning that this Court did not consider the question of whether evaluating only the days with the largest price movements renders an expert's opinion unhelpful. Plaintiffs also cite *DVI I*. In that case, however, the plaintiffs' expert examined *all* days with statistically significant returns (totaling 34 days), not just the top few days. 249 F.R.D. at 211.

Here, Mr. Mulcahey appears to have chosen, for some reason, to examine the top 20 days with the largest price movements in Test 1 out of a total set of 23 days with statistically significant large price movements. Even after hearing oral arguments, the Court is still puzzled by this seemingly arbitrary choice, as changing the denominator from 20 to 23 would not have

dramatically changed the percentage of days in which the news seems to have caused a price movement. (This is especially so given Plaintiff's counsel's representation at oral argument that, had Mr. Mulcahey used the 23-day set, he would have found that 12 of them were preceded by news days.) Given the fairly small difference between a subset of 20 and the total set of 23, the Court is not overly concerned about Test 1 from a *PolyMedica II* cherry-picking standpoint. The Court ultimately is also not concerned about the charge that the sample size of 20 or 23 out of 777 is too small or is unrepresentative. The *Countrywide* court was concerned about not just a sample size of 10 out of 997 trading days, but also about the fact that the expert was analyzing a bond that was supposed to be representative of other bonds at issue in the case, but actually may not have been for many reasons, including differences in trading volume, percentage of institutional holders, and number of trading days. *In re Countrywide*, 273 F.R.D. at 620. Here, Defendants have attacked Mr. Mulcahey's credibility, but have not provided the same type of data as in *Countrywide* that would make this Court's concerned about the sample size and representativeness. Thus, the Court finds that Test 1 weighs somewhat in Plaintiffs' favor.

### (2) Stock price reaction to EGC's press releases and earnings announcements ("Tests 2 and 3")

In Test 2, Mr. Mulcahey compared the average absolute value of excess returns on EGC stock on the 50 days during the Class Period when EGC issued press releases with the days on which EGC did not issue press releases. Mr. Mulcahey found that the average absolute value of excess returns on EGC stock was 8.8% on press release days versus 3.9% on non-press release days. In addition, excess returns on 8 (16%) of the 50 press release days were statistically significant while excess returns on only 29 (4%) out of the 727 non-press release days were statistically significant. Based on these results, Mr. Mulcahey opined that EGC stock prices reacted in a statistically significant way to EGC press releases. Mulcahey Decl. I ¶¶ 75-83.

In Test 3, Mr. Mulcahey compared the variance of excess returns on the 11 days during the Class Period when EGC issued earning announcements and on the days on which EGC did not issue earnings announcements. Mr. Mulcahey found that, on earnings announcement days, the variance of excess returns was 1.34% compared to a variance of 0.47% on non-earnings

announcement days. Based on these results, Mr. Mulcahey opined that EGC stock prices reacted in a statistically significant way to EGC earnings announcements. Mulcahey Decl. I ¶¶ 84-88.

With regard to Tests 2 and 3, Defendants claim that the results were skewed by large price movements on two days in May and August 2007. Opp'n at 19. Without those two outliers, the average absolute value of excess returns on EGC stock was only 4.5% on press release days (not 8.8%), compared to 3.9% on non-press release days. Attari Decl. Ex. 7. Similarly, without those two outliers, the volatility of the stock price on earnings announcement days was actually less than the volatility on non-earnings announcement days, as the variance on earnings announcement days was 0.40% (not 1.34%) compared to a variance of 0.47% on non-earnings announcement days. Attari Decl. ¶ 52, Ex. 6. Although it would be improper to completely disregard the two outlying data points in a study about the whole Class Period, the weight of Mr. Mulcahey's conclusions in Tests 2 and 3 is lessened by disproportionately large price movements in the early part of the Class Period.

Defendants also contend that Mr. Mulcahey's methodology was unreliable because he did not show whether the price movement's direction correlated with the news, i.e., that good news was correlated with an increase in price and bad news was correlated with a decrease in price. Opp'n at 18-19. When deposed, Mr. Mulcahey testified regarding Test 2 that he did not consider whether the price movement on any particular press release day was in a direction consistent with what might be expected given the type of information in the press release. Mulcahey Dep., May 27, 2015, 157:13-23. For Test 3, he did consider that factor for some but not all of the earnings announcement days and found that the direction of the price movement was consistent with the content of the earnings announcements on those days. *Id.* at 168:18-169:5.

For the proposition that evidence of the price movement's direction is necessary, Defendants cite *In re Countrywide*, which described an event study as an attempt "to determine whether new information correlates with a price movement—*including the price movement's direction* and, perhaps, magnitude." 273 F.R.D. at 614 (emphasis added).

In response, Plaintiffs contend that they do not need to prove the direction of the price movement because, to prove *Cammer* market efficiency, a plaintiff need not show "fundamental

efficiency," only "informational efficiency." That is, plaintiffs need not show that, as a result of incorporating information, the market price reflected the intrinsic value of the stock. Rather, plaintiffs need only show that the price absorbs and reflects "all available information (and misinformation)" in a way that justifies an inference of investor reliance. *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 16 (1st Cir. 2005) ("*PolyMedica I*").

The Court agrees with Plaintiffs that there is no absolute requirement to show that certain information caused prices to move in a specific direction. In some circumstances, it may be virtually impossible to determine the "correct" direction in which the price should move in response to a certain piece of information. For instance, a press release might contain both "good" and "bad" news. Or, the same new information might be "good" news to one investor but "bad" to another. On the other hand, certain news can be reasonably expected to drive the price only in one direction. For instance, if a stock price went up every time a federal agency announced an investigation into the company, a fact finder would be hard pressed to say that the stock price reflected investor reliance on all available information. Thus, while lack of evidence about the direction of the price impact is not necessarily fatal to an event study, it can be relevant to how much weight the study is given.

Here, in summary, Plaintiffs have some evidence that, during the Class Period, the absolute value of excess returns was marginally greater on days when press releases were issued compared to days with no press releases, but no evidence of the direction in which the stock price moved. Plaintiffs also have some evidence that there were greater excess returns (in the expected direction) on days with earnings announcements as opposed to non-earnings announcement days. Also, EGC's stock price was slightly more volatile on some days when earnings announcements were made compared to days with no earnings announcements, but on many days it was less volatile or no more volatile.

On the whole, Tests 2 and 3 are not very helpful to Plaintiffs.

**(3) Speed of price reaction to new information**

**("Test 4")**

For Test 4, Mr. Mulcahey identified 23 days in which there was unusually large one-day change in EGC's net-of-market stock price. He assumed that the excess returns in those days were all caused by news events. He then looked for excess returns on the days immediately following the "big-return days" and found that, on 17 (74%) of those 23 days, EGC common stock did not experience a statistically significant stock price movement. Thus, Mr. Mulcahey concluded, EGC's stock price incorporated this information within a one-day event window. Mulcahey Decl. I ¶¶ 89-95.

With regard to Test 4, Defendants object that Mr. Mulcahey cannot credibly assume that the 23 days with statistically significant excess returns were all due to news events when Mr. Mulcahey found in Test 1 that half of the top 20 largest price movements were not associated with any news event at all. Opp'n at 18. Plaintiffs attempt to defend Mr. Mulcahey's Test 4 by emphasizing that Test 1 evaluated the impact of published news articles on stock price while Test 4 evaluated the impact of any kind of new information, published or not. This argument is unavailing, as Plaintiffs' expert does not himself distinguish between published news articles and other types of disclosed news. The argument also misses the point, as it does not squarely address whether the assumption underlying Test 4—that disclosure of new information correlated with the big returns on those 23 days—was a valid assumption. Plaintiffs' own data shows that the top 20 days are a subset of the 23 "big-return days" set in Test 4, meaning that only 10 (or at most 13) out of the 23 "big returns" days were "news" days. *See* Mulcahey Decl. Ex. 7, App'x A. Accordingly, it is not credible to assume that the "big returns" on all 23 days were correlated with disclosure of new information.

That said, the underlying data shows that, out of the 10 days where "big returns" were correlated with news, 8 (80%) of those days were followed by days where there were no statistically significant price movements, suggesting that the news was incorporated into the stock price within one day. *See* Mulcahey Decl. I at 38 n.84, Ex. 7, App'x A. Thus, it appears

that, in general, the rapid speed at which news was incorporated into EGC's common stock price during the Class Period supports a finding of market efficiency.

### (4) Correlation between absolute stock returns and trading volume ("Test 5")

Mr. Mulcahey found a strong, positive correlation between daily trading volume and the absolute value of EGC common stock price returns, which, he opines, supports a finding of market efficiency because it reflects active trading and because it is consistent with a general economic finding that a high correlation between trading volume and returns implies that the stock price is reacting to new information. Mulcahey Decl. I ¶¶ 96-100. Defendants do not challenge this finding.

### (5) Conclusion

Based on this record, the Court concludes that the cause-and-effect factor weighs weakly in Plaintiffs' favor.

### b.  Other Factors

Plaintiffs further contend that other indicators of market efficiency, outside of the five *Cammer* factors, also support a fraud on the market presumption, and thus certification under Rule 23(b)(3).

### i.  Bid-Ask Spread

The bid-ask spread, for instance, is a measure of "the difference between the price at which current stockholders are willing to buy the stock and the price at which current stockholders are willing to sell their shares." *Cheney*, 213 F.R.D. at 501 (citing *Krogman*, 202 F.R.D. at 478). A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade. *Krogman*, 202 F.R.D. at 478. In *Cheney*, a spread of 2.44% was found to weigh in favor of market efficiency, 213 F.R.D. at 501, while in *Krogman*, a spread of 5.6% was found to suggest market inefficiency, 202 F.R.D. at 478. Here, the average and median bid-ask spread of EGC stock during the Class Period was 2.91% and 2.20% respectively. No court has held that EGC's bid-ask spread is too high. However, as Defendants point out, EGC's bid-ask spread is higher than the bid-ask spread of other companies in cases

where courts have found market efficiency. As shown in Mr. Mulcahey's list of such cases, the vast majority of these cases involved companies with a bid-ask spread of lower than 1%. Mulcahey Decl. I, Ex. 15. In conclusion, this factor supports Plaintiffs' case more than it does Defendants', but not strongly.

### ii. Autocorrelation

"A security exhibits autocorrelation if the change in price of the security on a given day provides an indication of what the change in price for the security will be on the following day." *DVI I*, 249 F.R.D. at 213. The more likely past price movement is to predict future price movement, the less efficient a market is likely to be because an efficient market incorporates information quickly into the first day's price, whereas an inefficient market would not fully digest the information until later. *Id.*; *PolyMedica I*, 453 F. Supp. 2d at 278. The court in *DVI I* found that the autocorrelation factor weighed against plaintiffs when the autocorrelation coefficient was 0.23, which implied that, if the company's stock showed an above average return of 10% on one day, the return the next day would be expected to be 2.3% above average. 249 F.R.D. at 213, 213 n.30.

Plaintiffs' expert's autocorrelation study found no significant autocorrelation for EGC's raw or excess returns over the Class Period, as the coefficient for EGC's stock return from the previous day over the Class Period was -0.004 and the coefficient for EGC's excess return was -0.008. Mulcahey Decl. I ¶ 115. Defendants' expert found significant autocorrelation when the Class Period was divided into subparts—first, divided into four one-year periods starting with the year preceding the Class Period and ending three months before the end of the Class Period (April 5, 2006 to April 4, 2007; April 5, 2007 to April 4, 2008; April 5, 2008 to April 4, 2009; and April 5, 2009 to February 18, 2010); and second, divided into three sub-periods marked by the peaks and valleys of the stock market during the Great Recession (April 5, 2006 to October 31, 2007; October 31, 2007 to March 9, 2009; and March 9, 2009 to February 18, 2010). Attari Decl. ¶¶ 30-35.

Defendants have not provided legal authority to support the proposition that courts should evaluate autocorrelation based on data for sub-periods within the Class Period, particularly the

seemingly arbitrary one-year sub-periods in Mr. Attari's first autocorrelation study, as opposed to the Class Period overall. In conclusion, this factor weighs in Plaintiffs' favor.

### iii. Institutional Investors

Some courts have found that a large number of institutional investors holding a company's stock suggests that a market is efficient. *Bennett v. Sprint Nextel Corp.*, 298 F.R.D. 498, 511 (D. Kan. 2014); *In re HealthSouth*, 261 F.R.D. at 637; *O'Neil*, 165 F.R.D. at 503. However, few courts have explained how to evaluate how many institutional investors constitutes a "large" number. In *Lumen v. Anderson*, the court found the institutional investors factor to weigh in plaintiffs' favor where between 70 and 140 institutional investors held between 8 and 20 million shares (29%-71%) out of 28 million outstanding shares. 280 F.R.D. 451, 460 (W.D. Mo. 2012). In *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, market efficiency was found based in part on 329 and 425 institutional investors holding the company's stock. 762 F.3d 1248, 1258 (11th Cir. 2014). In *Tatz v. Nanophase Techs. Corp.*, market efficiency was found based in part on the fact that "numerous" institutional investors held 11% to 13% of the total outstanding common stock. No. 01 C 8440, 2003 WL 21372471, at *7 (N.D. Ill. June 13, 2003).

Here, institutional investors held between 10.9% and 33.4% (average of 24.2%) of EGC's outstanding common stock during the Class Period. Mulcahey Decl. I ¶ 123. Between 4 and 7 institutional investors held shares in any given quarter during the Class Period, with 17 unique institutional investors holding shares at some point during the Class Period. Attari Decl. Ex. 5. As discussed above, only 14.9% of EGC's trading volume during the Class Period was attributable to institutional investors. *See* Attari Decl. ¶ 44; *supra* Part III.B.1.a.i.

Here, as was the case with the bid-ask spread factor, no court has held that the number of institutional investors holding EGC stock was too low. However, based on Plaintiffs' own list of cases where courts have found market efficiency, the vast majority of these cases involved companies with average institutional holdings of over 70%. Mulcahey Decl. I, Ex. 15. Thus, this factor does not weigh in Plaintiffs' favor.

### iv.  Percentage of Shares Held by Insiders

The percentage of stock held by corporate insiders, known as the "float," is helpful in determining market efficiency. Since "insiders may have information that is not yet reflected in stock prices, the prices of stocks that have greater holdings by insiders are less likely to accurately reflect all available information." *Krogman*, 202 F.R.D. at 478 (internal quotation marks omitted). Thus, a high percentage of insiders holding stock (low float) weighs against a finding of market efficiency, *id.* (finding that float factor weighed against market efficiency where insiders held 54% of stock), while a low percentage of insiders holding stock (high float) supports a finding of market efficiency, *Cheney*, 213 F.R.D. at 502 (finding that float factor weighed in favor of market efficiency where insiders held 5% of stock).

Here, insiders held an average of 12.6% of EGC stock during the Class Period. Mulcahey Decl. I ¶ 118. As Defendants appear to concede through their non-opposition, this factor weighs in favor of market efficiency.

### v.  Short Interest

The "short interest" of a security is the percentage of shares outstanding that has been sold short. It is an indicator of arbitrageurs' presence in a stock market. The higher the short interest ratio, the more likely a market is efficient because arbitrageurs are one important way through which information gets absorbed into the stock price.[2] That said, "while the average short interest of a security is a useful proxy for determining whether there existed barriers to short-selling a particular security, it is not dispositive because other factors (including the market's expectations about the future direction a of security's price) may have caused reduced short selling." *DVI I*, 249 F.R.D. at 213. Ultimately, the key inquiry is whether there were barriers to short-selling during the Class Period. *Id.* (finding short interest factor weighed in

---

[2] Arbitrageurs "obtain and analyze information about stocks from a variety of sources, including from the issuer, market analysts, and the financial and trade press." *PolyMedica I*, 432 F.3d at 9. They then "immediately attempt to profit from such information (for instance, through short sales), thereby causing the stock to move to a price which reflects the latest public information concerning the stock, where it is no longer possible to generate profits." *Id.* (footnote omitted).

favor of market efficiency where average short interest of the company stock was low, but there were no significant barriers to short-selling).

Plaintiffs contend that short interest in EGC stock, an average of 1.03% over the Class Period, is consistent with an efficient market. Mulcahey Decl. I ¶¶ 126-132. Defendants do not dispute this figure, nor do they argue that there were uncommonly high barriers to arbitrageurs short-selling EGC stock. Thus, this favor weighs in Plaintiffs' favor.

### c.  Conclusion

Overall, Plaintiffs have relatively weak evidence of market efficiency, compared to other cases which have found market efficiency. The most important cause-and-effect factor weighs only weakly in favor of Plaintiffs. Of the other four *Cammer* factors, the analyst coverage and Form S-3 eligibility factors weigh against Plaintiffs. The average weekly trading volume and number of market makers factor weigh somewhat in favor of Plaintiffs. The non-*Cammer* factors are also generally a wash, with the autocorrelation, percentage of insider holdings, and short interest factors supporting Plaintiffs while the bid-ask spread and institutional holdings factors are not particularly helpful to them.

Based on the totality of the record, the Court finds that Plaintiffs have nevertheless met their burden of proving that they are entitled to the fraud-on-the-market presumption. Thus, the Rule 23(b) predominance requirement is met.

### 2.  Superiority

Class certification is appropriate only if class resolution is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) lays out four non-exhaustive factors for courts to take into consideration:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Defendants have not raised any issues related to these four factors. Generally, "[i]f united by a common core of facts, and a presumption of reliance on an efficient market, class actions are the superior way to litigate a case alleging violations of securities fraud." *Radient*, 287 F.R.D. at 575. Here, there is a common core of facts. Since Plaintiffs have prevailed on the fraud-on-the-market theory, the Court finds the superiority requirement met.

### C. Shortening of Class Period

Defendants present two arguments why the Class Period should be shortened. The Court addresses each in turn.

#### 1. Whether Fraud-on-the-Market Presumption Applies Between February 19 and May 18, 2010

Defendants argue that the Class Period should be shortened by moving up the end date from May 18, 2010 to February 19, 2010 because the EGC failed to meet the *Cammer* factors after February 18, 2010. Opp'n at 23 n.9. Specifically, Defendants point out, EGC's adjusted trading volume dropped to 2.56% (or 0.77-1.02% after applying the 60-70% downward adjustments discussed in Part III.B.1.b.1). Attari Decl. ¶ 61. Defendants also pointed out that Plaintiffs' expert did not have any evidence of analysts reporting on EGC nor did he have data on market makers during this time. *Id.* ¶ 62. Defendants also assert that the market price of EGC stock moved volatilely during this time period with no news associated with the movements, such as when the stock returns on May 4, 10, and 11 were -15.78%, 45.07%, and 19.02% respectively. *Id.* ¶ 63.

Plaintiffs' expert responded with evidence that Merriman, an analyst, released a statement in March 2010 that it was no longer providing coverage of EGC stock, which demonstrated that an analyst was still watching the stock during this time. Mulcahey Decl. II ¶¶ 155-156. Moreover, there were numerous news stories about EGC during this time, more on average than in the first three years of the Class Period. *Id.* ¶ 159. Plaintiffs' expert also shows that 14 market makers traded between March and May 2010. *Id.* ¶¶ 164-168.  Plaintiffs' expert

explains the volatility of the stock identified by Defendants' expert is attributable to the public revelations of the alleged fraud during that time period. *Id.* ¶ 170.

Plaintiffs have also provided unrefuted evidence that EGC's stock price dropped after key revelations during February-May 2010. Specifically, between February 18, 2010, when the SEC suspended trading in EGC stock, and March 5, 2010, when trading resumed, the price of EGC stock dropped from $0.88 per share to $0.44 per share (50% decrease). Mulcahey Decl. I ¶ 161. On March 19, 2010, after EGC announced that it had hired a financial advisor to raise capital funds "to engage legal, accounting and other service providers to review the historical operating and financial performance of EGC and its subsidiaries," the stock price dropped from $0.35 at close of the previous trading day to $0.17 per share at the close of market on March 19 (48.6% decrease). *Id.* ¶¶ 163-164.  On May 18, 2010, EGC filed a Form 8-K after the close of market which stated that its financial statements from FY 2006, 2007, and 2008 could no longer be relied upon. The next day, its stock price dropped from $0.12 per share to $0.09 per share (75% decrease). *Id.* ¶¶ 166-168.

Given Plaintiffs' direct evidence of reliance during February and May 2010 and the dearth of precedent for modifying the length of a class period based on failure to meet the *Cammer* factors in certain sub-periods, the Court does not find it appropriate to shorten the class period at this time on the ground that Plaintiffs cannot use the fraud-on-the-market presumption during that three-month period.

### 2.  Defendants Estate of Lord Steinberg and Farrell

Defendants argue that the Class Period should not begin until September 2, 2008 for Defendant Estate of Lord Steinberg and should not begin until October 2, 2008 for Defendant Farrell because, taking the allegations in the TAC as true, Steinberg and Farrell could not have been "control persons" until they joined EGC's board of directors on those dates. TAC ¶¶ 32, 38. Plaintiffs oppose this proposal on the ground that it is legally unprecedented and procedurally impracticable. Reply at 23.

The district court has broad discretion to create subclasses as needed to manage a complex class action, *Am. Timber & Trading Co. v. First Nat. Bank of Oregon*, 690 F.2d 781,

786-87 (9th Cir. 1982), as long as each class and subclass meets the requirements of Rule 23, *Parsons v. Ryan*, 754 F.3d 657, 674 (9th Cir. 2014).

Defendants have cited one case in which a court has created subclasses to account for the fact that one defendant did not become involved in a fraudulent scheme until part way through the class period. *In re Blech Sec. Litig.*, 187 F.R.D. 97, 104 (S.D.N.Y. 1999). This Court is not persuaded by this case that creating subclasses to accommodate Defendants Steinberg and Farrell's later involvement with EGC would be the best way to manage this action. Creating subclasses would create needless confusion when class notice is disseminated. Any concern about determining Defendants Steinberg's and Farrell's proportionate liability as distinguished from other Defendants' liability can be addressed through a well-crafted jury verdict form or through seeking contribution from the other Defendants. *Cf. Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 428, 428 n.13 (7th Cir. 2015) (discussing proportionate liability and allocation of damages for a control person defendant); *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 723 (S.D. Tex. 2006) ("Should the trier of fact in this action determine that a defendant is liable but did not act knowingly, and should the determination of proportionate liability among all wrongdoers so necessitate, the calculation, though it would necessitate extending the trial, should not defeat the class certification.").

**IV. Disposition**

For the reasons discussed above, the Court GRANTS Plaintiffs' Motion for Class Certification.


DATED:  July 31, 2015

*David O. Carter*
_____
DAVID O. CARTER
UNITED STATES DISTRICT JUDGE